No. 26-508

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

STATE OF CALIFORNIA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, ET AL.,

*Respondents.*

_____

## PETITIONER'S OPENING BRIEF

_____

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA C. MORRISON
  *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
REBECCA HUNTER
RAFAEL J. HURTADO
MITCHELL RISHE
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
  *Attorneys for Petitioner*

March 23, 2026

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................ 1

Jurisdictional Statement ............................................................ 3

Statement Of The Case .............................................................. 4

I.     The Santa Ynez Offshore Oil Unit Transports Oil to Market Via Three Separate Facilities ...................................... 4

    A.     The Santa Ynez Unit's Operations in the 1980s Followed by the Construction of the Pipelines to Shore ............................................................................ 5

    B.     Lines CA-324/325 Were Brought Online in the 1990s ............................................................................. 6

    C.     The Las Flores Canyon Oil Processing and Treatment Facilities Sit Between the Offshore Emulsion Pipeline and Lines CA-324/325 ..................... 8

II.     The 2015 Refugio Oil Spill Caused Substantial Damage, a Large, Coordinated Response, and a Change in Jurisdiction .... 9

    A.     The 2015 Refugio Oil Spill Resulted from Serious Design Defects in Lines CA-324/325 ............................ 9

    B.     PHMSA Approved the Transition to State Jurisdiction and Entry Into the Consent Decree ........... 11

III.     Sable Acquired the Santa Ynez Unit, LFC Facilities, and Pipelines and Obtained State Waivers from OSFM ................ 13

IV.     Environmental Non-Governmental Organizations Challenged the State Waivers ................................................ 14

V.     Sable Unsuccessfully Attempted to Restart Lines CA-324/325 Without Complying With State Law ........................ 15

Issues Presented ....................................................................... 19

Summary Of Argument ............................................................. 20

Standard of Review .................................................................. 22

Argument .................................................................................. 23

i

# TABLE OF CONTENTS
## (continued)

Page

I.     California Has Standing to Challenge PHMSA's Federalization and Subsequent Orders .................................... 23

II.    The Federalization Order Exceeds PHMSA's Statutory Authority and Is Contrary to Law ........................................... 23

       A.    The Federalization Order Is a Final Agency Action..... 23

       B.    The Federalization Order Conflicts with the Text of the Pipeline Safety Act.................................................. 24

       C.    PHMSA's Redesignation Is Inconsistent with the Statutory Term "Facility" .............................................. 26

       D.    PHMSA's Redefinition Improperly Includes Facilities That Cannot Be Part of a Hazardous Liquid Pipeline Facility.................................................. 30

       E.    PHMSA's Redefinition Is Inconsistent with the Purpose of the Pipeline Safety Act .............................. 34

       F.    PHMSA's Federalization Order Is Inconsistent With its Own Regulations...................................................... 36

       G.    The Federalization Order Sidestepped Section 60105's Requirements for Asserting Federal Jurisdiction Over Intrastate Pipelines .......................... 38

       H.    PHMSA (and Sable) Are Bound by the Consent Decree Which Delegates Regulatory Authority over Lines CA-324/325 to the State.................................... 39

III.   The Federalization Order is Arbitrary and Capricious, Not Supported by the Record, and Contradicted by PHMSA's Prior Determination.................................................................. 43

IV.    The Restart Approval is Contrary to Law, Arbitrary and Capricious, and in Excess of Authority.................................... 53

V.     The Emergency Special Permit is Contrary to Law, Arbitrary and Capricious, and Fails to Justify Issuing the Permit on an "Emergency" Basis........................................... 57

ii

**TABLE OF CONTENTS**
**(continued)**

**Page**

A.    The Emergency Special Permit is Contrary to Law, Arbitrary and Capricious, and Without Authority ........ 58

B.    The Emergency Special Permit Fails to Meet the Conditions Set by Statute and Regulation for Emergency Special Permits ........................................... 59

Conclusion ...................................................................... 61

# TABLE OF AUTHORITIES

**Page**

CASES

*Anaheim Mem'l Hosp. v. Shalala*
130 F.3d 845 (9th Cir. 1997) ...................................................... 53

*Bear Lake Watch, Inc. v. FERC*
324 F.3d 1071 (9th Cir. 2003) .................................................... 22

*Biden v. Texas*
597 U.S. 785 (2022) .................................................................... 24

*Biestek v. Berryhill*
587 U.S. 97 (2019) ...................................................................... 22

*Burlington Truck Lines, Inc. v. United States*
371 U.S. 156 (1962) .............................................................. 43, 49

*California Pac. Bank v. Fed. Deposit Ins. Corp.*
885 F.3d 560 (9th Cir. 2018) ...................................................... 22

*Connecticut Light & Power Co. v. Fed. Power Comm'n*
324 U.S. 515 (1945) .................................................................... 32

*Dep't of Commerce v. New York*
588 U.S. 752 (2019) .................................................................... 44

*Dept of Homeland Security v. Regents of the University of California*
591 U.S. 1 (2020) ........................................................................ 53

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) .................................................................... 44

*F.C.C. v. Fox Television Stations, Inc.*
556 U.S. 502 (2009) .................................................................... 44

*FCC v. Prometheus Radio Project*
592 U.S. 414 ............................................................................... 56

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Friends of the Eel River v. North Coast Railroad Authority*
3 Cal.5th 677 (2017) ..................................................................32

*Hook. v. State of Ariz., Dep't of Corr.*
972 F.2d 1012 (9th Cir. 1992) ...........................................54, 55

*Hooks v. Clark Cnty. Sch. Dist.*
228 F.3d 1036 (9th Cir. 2000) ...................................................28

*Interstate Fire & Cas. Co., an Illinois Corp. v. Underwriters at Lloyd's, London*
139 F.3d 1234 (9th Cir. 1998) ...............................................1, 40

*Jeff D. v. Kempthorne*
365 F.3d 844 (9th Cir. 2004) .....................................................40

*Level the Playing Field v. Fed. Election Comm'n*
961 F.3d 462 (D.C. Cir. 2020)....................................................51

*Littlejohn v. United States*
321 F.3d 915 (9th Cir. 2003) .....................................................42

*Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*
478 U.S. 501 (1986).....................................................................43

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024).....................................................................24

*Maine v. Taylor*
477 U.S. 131 (1986).....................................................................23

*Mi Familia Vota v. Fontes*
111 F.4th 976 (9th Cir. 2024) .............................................42, 54

*Moore v. Deal*
240 F. Supp. 1004 (E.D. Pa. 1965).............................................54

v

# TABLE OF AUTHORITIES
## (continued)

Page

*Morton v. Ruiz*
415 U.S. 199 (1974)..................................................................36

*Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)................................................................43, 45

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) ...................................................36

*Olympic Pipe Line Co. v. City of Seattle*
437 F.3d 872 (9th Cir. 2006) ...................................................35

*Organized Vill. of Kake v. U.S. Dep't of Agric.*
795 F.3d 956 (9th Cir. 2015) .............................................51, 52

*Pugin v. Garland*
599 U.S. 600 (2023)..................................................................28

*Pulsifer v. United States*
601 U.S. 124 (2024)..................................................................31

*Russello v. United States*
464 U.S. 16 (1983)....................................................................31

*Snoqualmie Indian Tribe v. FERC*
545 F.3d 1207 (9th Cir. 2008) .................................................22

*Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*
796 F.2d 539 (D.C. Cir. 1986)..................................................35

*Taylor v. Sturgell*
553 U.S. 880 (2008)..................................................................42

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Taylor v. United States*
181 F.3d 1017 (9th Cir. 1999) ...............................................55, 58

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*
578 U.S. 590 (2016)..................................................................24

*United States, et al. v. Plains Pipeline, et al.*
C.D. Cal. Case No. 2:20-cv-02415 ...........................................13

*United States v. Approximately 64,695 Pounds of Shark Fins*
520 F.3d 976 (9th Cir. 2008) ...................................................26

*United States v. Youssef*
547 F.3d 1090 (9th Cir. 2008) .................................................31

*W. Radio Servs. Co. v. Glickman*
123 F.3d 1189 (9th Cir. 1997) .................................................41

*W. Ref. Sw., Inc. v. FERC*
636 F.3d 719 (5th Cir. 2011) ...................................................44

*Washington v. Trump*
No. 2:25-cv-00869 (W.D. Wash. May 9, 2025).........................60

*Williams Gas Processing-Gulf Coast Co. L.P. v. FERC*
475 F.3d 319 (D.C. Cir. 2006)..............................46, 47, 48, 49

STATUTES

5 U.S.C.
§ 702.....................................................................................24
§ 706.....................................................................................53
§ 706(2)...........................................................................19, 43
§ 706(2)(A) ...........................................................................22
§ 706(2)(A)–(D)......................................................................23
§ 706(2)(C)........................................................................22, 57

## TABLE OF AUTHORITIES
### (continued)

**Page**

15 U.S.C. § 717 .................................................................................32, 48

49 U.S.C.
  § 60101 ................................................................................................. 1
  §§ 60101-60143 ................................................................................31
  § 60101(a)(3) .....................................................................................32
  § 60101(a)(5) ....................................................................26, 29, 32
  § 60101(a)(6) .....................................................................................32
  § 60101(a)(7) .....................................................................................48
  § 60101(a)(7), (8)(B) .......................................................................25
  § 60101(a)(8)(A) ...............................................................................32
  § 60101(a)(8)(B), (a)(10) .................................................................45
  § 60101(a)(10) ...................................................................................25
  § 60101(a)(17) ....................................................................3, 5, 6, 23
  § 60101(a)(20) ...................................................................................23
  § 60101(a)(22) ...................................................................................27
  § 60104(c) ...........................................................................3, 12, 25
  § 60105(a) ..........................................................................................57
  § 60105(f) ...........................................................................................38
  § 60118(c) ............................................................................................3
  § 60118(c)(1)(A) ...............................................................................14
  § 60118(c)(2) .....................................................................................57
  § 60118(c)(2)(A) ...............................................................................60
  § 60118(d) ..................................................................................12, 14
  § 60119(a) ..........................................................................................23
  § 60119(a)(1) .......................................................................................3
  § 60119(a)(3) .....................................................................................22

Cal. Gov't. Code § 51010 .....................................................................23

Cal. Health and Safety Code
  § 25270 ...............................................................................................27
  § 25270.2(a)(6) ..................................................................................27
  § 25270.13 ..........................................................................................27

24 Stat. 379 (1887) ...............................................................................32

## TABLE OF AUTHORITIES
### (continued)

**Page**

49 Stat. 838 (1935)................................................................32

82 Stat. 720 (1968)................................................................34

93 Stat. 989 (1979)................................................................34

106 Stat. 3289 (1992)..............................................................35

108 Stat. 745 (1994)...........................................................31, 35

**COURT RULES**

Rule 60(b)........................................................................40

**OTHER AUTHORITIES**

40 C.F.R. § 112, Appendix A, § II(1)(F) (1994) ...................................27

49 C.F.R ..........................................................................17

49 C.F.R. pt. 195, Appendix A, Example 7..........................................52

49 C.F.R.
    § 190.341......................................................................3
    § 190.341(g)..............................................................17, 57
    § 192.625(a), (b) (2019)......................................................33
    § 195, Appendix A, Example 7 .................................................37
    § 195, Appx. A, Example 7. 1-CalER-25-26......................................17
    § 195.2.......................................................................37
    § 195.452(h)(4)(iii)(H)...................................................17, 58
    § 195.563.....................................................................11
    § 190341(g)...................................................................60

33 Fed. Reg. 10,213, 10,214.......................................................34

50 Fed. Reg. 39008 (Sept. 26, 1985) ..............................................34

90 Fed. Reg. 8353 (Jan. 29, 2025).................................................18

x

## TABLE OF AUTHORITIES
### (continued)

Page

91 Fed. Reg. 8949 ...................................................................58

Black's Law Dictionary ...........................................................28

S. Rep. No. 96-182 (1979) ......................................................33

Sara Gosman, *Justifying Safety: The Paradox of Rationality*, 90
    Temp. L. Rev. 155 (2018)..................................................34

## INTRODUCTION

Like many Acts of Congress, the federal Pipeline Safety Act distinguishes between interstate and intrastate activities. *See* 49 U.S.C. § 60101 et seq. The federal Pipeline and Hazardous Materials Safety Administration (PHMSA) is the exclusive regulator of *interstate* pipelines—those that cross state lines, or travel from federal waters to a state. *Intrastate* pipelines, in contrast, may be regulated by state pipeline safety agencies, like California's Office of the State Fire Marshal.

For years, the State Fire Marshal has been the regulator of two intrastate pipelines known as Lines CA-324 and CA-325, which transport treated and stabilized crude oil from a processing facility on the coast of Santa Barbara County, California, to a distribution terminal in Kern County, California. Those pipelines were shut down in 2015 following a catastrophic rupture of CA-324, which spilled over 120,000 gallons of oil onto Refugio State Beach.

PHMSA, meanwhile, has been the regulator of a separate pipeline that runs from offshore oil platforms in federal waters to the processing facility, where the oil emulsion extracted at the platform exits the pipeline to be treated, separated into different products, and stored before treated and stabilized crude oil is sent inland via CA-324 and CA-325.

In December 2025, however, at the request of intervenor Sable Offshore Corporation and without any public process, PHMSA declared itself the exclusive

regulator of not only the offshore pipelines but also the onshore pipelines that run entirely within California. In a novel approach, PHMSA characterized the offshore pipeline, the processing facility, and the onshore pipelines all as a single "pipeline system" that runs all the way from the oil platforms in federal waters to inland California, and thus deemed the entire system "interstate" and subject to its exclusive jurisdiction. It did so notwithstanding that the processing facility in the middle is not a "pipeline" at all, but rather a massive industrial operation where the product that comes out of the offshore pipeline (crude oil emulsion containing other hydrocarbons and sulfur) is transformed into new products (treated and separated petroleum products like oil, propane, butane, and fuel quality gas) and stored before treated and stabilized crude oil is loaded into the onshore pipeline for transportation onward. And as a result of this sudden redefinition, PHMSA cast aside the State Fire Marshal's regulation of Lines CA-324 and CA-325 and promptly issued orders designed to allow the lines to restart for the first time since the rupture and oil spill.

This Court should reject PHMSA's jurisdictional coup. PHMSA's new link-it-all-together definition of an "interstate" pipeline is owed no deference. That definition cannot be squared with the text of the federal Pipeline Safety Act, which defines intrastate pipelines based on the location of the pipeline, not the source or designation of the oil transported within the pipeline. Nor can it be squared with

2

the earlier treatment of Lines CA-324 and CA-325 as intrastate pipelines or the evidence (most of which PHMSA failed to even consider) that the offshore and onshore pipelines are two distinct pipelines, separated by a processing facility that is not a pipeline at all. As a result, PHMSA's orders violate the Administrative Procedure Act because they are contrary to law, are arbitrary and capricious, and exceed PHMSA's authority. What's more, PHMSA's approach contradicts a consent decree that the United States entered into after the 2015 oil spill that confirms the intrastate nature of Lines CA-324 and CA-325 and expressly provides that the State Fire Marshal is thus the relevant regulator who must approve any restart of the previously ruptured onshore pipelines.

This Court should grant the petition, vacate PHMSA's orders, and confirm that California's State Fire Marshal has jurisdiction over intrastate pipelines Lines CA-324 and CA-325.

## JURISDICTIONAL STATEMENT

The agency's jurisdiction is in dispute. PHMSA asserted jurisdiction under 49 U.S.C. § 60118(c) and under 49 C.F.R. § 190.341, which authorizes the agency to issue special permits to interstate pipelines. 1-CalER-1, 25; *see also* 49 U.S.C. § 60104(c). Petitioner disputes that the relevant pipelines are interstate pipelines.

This Court has jurisdiction over the State's petition under 49 U.S.C. § 60119(a)(1); *see also* 49 U.S.C. § 60101(a)(17). This petition was timely filed on

3

January 23, 2026, within 89 days of the December 17, 2025, date of the first of the three challenged orders. All three PHMSA Orders constitute final agency actions because they mark the conclusion of the agency's decision-making process and affect the Petitioner's legal rights and obligations.

## STATEMENT OF THE CASE

**I.    THE SANTA YNEZ OFFSHORE OIL UNIT TRANSPORTS OIL TO MARKET VIA THREE SEPARATE FACILITIES**

This case concerns a series of distinct facilities used to process, transport and store hydrocarbons from platforms off the California coast to a transit point in California's Central Valley. The first is an offshore pipeline that transports an oil emulsion of oil, water, and other hydrocarbons from the Santa Ynez Unit drilling platforms (the "Offshore Emulsion Pipeline"), located in federal waters on the Outer Continental Shelf, to the Las Flores Canyon oil processing and treatment facilities (the "LFC Facilities") immediately onshore in Santa Barbara County, California. 1-CalER-24, 2-CalER-27. Second are the LFC Facilities—located on a 113-acre parcel approximately a mile inland from the coastline—which process, treat, and store gas and crude oil and remove water for return and reinjection on the Outer Continental Shelf. 2-CalER-206; *see* 1-CalPSE-89 (Spill Prevention, Control, and Countermeasure ("SPCC") Plan at 8). Third are the pipelines at issue in this case—Lines CA-324/325—which are onshore pipelines that are used to transport oil from the LFC Facilities facility to Kern County, in California's

4

Central Valley, where Lines CA-324/325 then connect with other pipelines for further transport. 1-CalER-2.

Before December 2025, no agency or court had ever concluded that these three facilities—Lines CA-324/325, the Offshore Emulsion Pipeline, and the LFC Facilities—were part of the same "pipeline facility."

**A.    The Santa Ynez Unit's Operations in the 1980s Followed by the Construction of the Pipelines to Shore**

The Santa Ynez Unit is the term traditionally used for the three westernmost offshore oil platforms in the Santa Barbara Channel, in federal waters. Drilling in this area began with Platform Hondo in the mid-1970s and produced oil starting in the early 1980s. 3-CalER-375-76. Platforms Harmony and Heritage were constructed in the late 1980s and produced crude oil starting in the early 1990s. *Id*. All three platforms are in federal waters and all three separate oil from gas at the platform. At first, the platforms had no oil pipeline connected to onshore infrastructure. Instead, they used storage and treating vessels to process oil offshore and transport it via ship to oil terminals.

Later, offshore pipelines were added to connect the platforms to the Las Flores Canyon processing facilities on the mainland in Santa Barbara County. The offshore pipelines consist of three separate pipelines: (1) a gas pipeline, (2) the Offshore Emulsion Pipeline, and (3) a water pipeline. 2-CalER-206; *see also* 1-CalPSE-161 (California State Lands Commission summary providing descriptions

of the different pipelines). The gas pipeline transports gas separated at the offshore platforms. *Id*. The Offshore Emulsion Pipeline transports extracted oil, water, and other hydrocarbons from the offshore platforms to the onshore facilities at Las Flores Canyon. *Id*. Once these substances are separated at the onshore LFC Facilities, the additional gas is further processed at the LFC Facilities. 1-CalPSE-61. The water is transported through the water pipeline back to the offshore platforms for reinjection. 1-CalPSE-161. Only the oil portion of the emulsion continues into Lines CA-324/325.

### B. Lines CA-324/325 Were Brought Online in the 1990s

Lines CA-324 and CA-325, then designated as lines 901 and 903, respectively, came online in the early 1990s. 3-CalER-376. They are located entirely on land and within the State of California. 1-CalER-4. The first segment, line CA-324, runs westward from Las Flores Canyon to a pump station in Gaviota. *Id.* The next segment, CA-325A/B, continues west through Gaviota State Park and then north across the length of Santa Barbara County, then east to where the line terminates at Pentland Station in Kern County, California. *Id*, *see* Figure 1. From Pentland, oil can be delivered north, east, or south in separate pipelines.[1]

---

[1] PHMSA maintains a publicly-accessible map of crude oil pipelines at https://pvnpms.phmsa.dot.gov/PublicViewer/

6



Figure 1. 3-CalER-539.

At the time of their construction in the early 1990s, the plans for Lines CA-324/325 indicated an intention to cross Arizona and New Mexico and to connect to refineries in Texas. See 3-CalER-376 (citing Celeron-All American EIR/EIS). However, the out-of-state portions were never built; instead, Lines CA-324/325 terminate at Pentland, and transporters must use other pipelines from Pentland. 2-CalER-209.

Prior to 2016, Lines CA-324-325 were subject to tariffs with FERC. 5-CalER-894. Because PHMSA has traditionally viewed FERC tariffs as an indicator that a pipeline is interstate, and as a holdover from when they were planned to

7

extend to other states, PHMSA treated Lines CA-324/325 as subject to exclusive federal regulation, until the tariffs were cancelled in 2016 following the Refugio Oil Spill. *Id*.

**C.   The Las Flores Canyon Oil Processing and Treatment Facilities Sit Between the Offshore Emulsion Pipeline and Lines CA-324/325**

Separating the Emulsion Pipeline discussed above from Lines CA-324/325 are the LFC Facilities, a sprawling complex of oil and gas infrastructure covering 34 developed acres of land in Santa Barbara County. *See* 1-CalPSE-89 (Sable Offshore Corp. Spill Prevention, Control, and Countermeasure ("SPCC") Plan at 8). Before shutting down in 2015, the LFC Facilities were "Santa Barbara County's largest source of greenhouse gas, volatile organic compounds, fine particulate matter, and formaldehyde pollution . . . ." 3-CalER-383 (citing California Air Resources Board and US EPA data). As described by Sable's subsidiary, Pacific Pipeline Company, in its Complaint filed last fall in Kern County Superior Court:

> The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

1-CalPSE-61 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508 (Kern County Sup. Court), ¶ 19).

In addition to gas and oil processing plants, the LFC Facilities also include, among other infrastructure, a cogeneration power plant, a biologic water treatment plant, two 270,000-gallon capacity crude oil storage tanks, a warehouse, a laboratory, and office buildings. 1-CalPSE-126-29, 136 (SPCC Plan).

Historically, the LFC Facilities have consistently been treated as separate from Lines CA-324/325. For instance, they were reviewed in an Environmental Impact Report and Environmental Impact Statement separate from Lines CA-324/325. *See* 3-CalER-376 (citing to Celeron Celeron/All American Pipeline Project EIR/EIS). The LFC Facilities also have been historically regulated separately from Lines CA-324/325 by the County of Santa Barbara—not by the State pipeline regulator (OSFM) or the federal one (PHMSA). *See, e.g.*, 1-CalPSE-9 (Complaint, *Sable v. California*, Case No. 26WM000036 (Sacramento Sup. Court), at ¶ 39.

## II. THE 2015 REFUGIO OIL SPILL CAUSED SUBSTANTIAL DAMAGE, A LARGE, COORDINATED RESPONSE, AND A CHANGE IN JURISDICTION

### A. The 2015 Refugio Oil Spill Resulted from Serious Design Defects in Lines CA-324/325

On May 19, 2015, Line CA-324 (then designated Line 901) ruptured, releasing over 120,000 gallons of crude oil into the environment. 5-CalER-785; 4-CalER-658. The Refugio Oil Spill caused widespread oiling of the Pacific Ocean, shorelines, beaches, and other areas ranging from Refugio Beach in Santa Barbara

9

County to as far south as Los Angeles County. The spill adversely impacted natural resources, including hundreds of marine mammals and fish, along with their prey base, including kelp and eelgrass, and their habitats. 4-CalER-658, 733-35, 6-CalER-899. The spill required the California Department of Fish and Wildlife to close commercial and recreational fishing. 4-CalER-735. It adversely impacted migratory species, such as marine mammals and birds. *See* 4-CalER-734. It also impeded shoreline and offshore recreation and boating. 4-CalER-740.

Lines CA-324/325 were taken out of service pending investigation and remediation. 4-CalER-627. Investigations determined that CA-324/325's cathodic protection system—that is, the system designed to prevent corrosion—used a defective design that could not be remediated. Specifically, PHMSA's Failure Investigation Report determined that the proximate cause of the spill was external corrosion that thinned the pipeline's wall to an extent where it ruptured—only 11 percent of its wall thickness remained at the point of failure at the time of the rupture. 6-CalER-909 (reporting corrosion that resulted in loss of 89% of pipeline wall). Contributory causes attributed to Plains (owner of Lines CA-324/325 at the time and predecessor-in-interest to Sable) and described in the Failure Investigation Report include, in part: (1) ineffective protection against external corrosion; (2) failure to detect and mitigate corrosion; (3) lack of timely detection and response to the spill; (4) lack of an adequate oil response plan, including a

10

failure to identify the culvert near the rupture that served as a pathway directly to the Pacific Ocean; and (5) failure to develop and implement an adequate Integrity Management Program required by the Pipeline Safety Act and associated regulations, particularly the failure to identify corrosion under insulation as a risk-driving threat. 6-CalER-899-90. For 20 years or more, buried insulated pipes had been recognized as being particularly susceptible to external corrosion due to trapped moisture and failure of cathodic protection—i.e., anti-corrosion—systems. 7-CalER-1399, 1404-06. The term generally used to describe this unique increased risk is "corrosion under insulation" or "CUI." 7-CalER-1211, 1217-18.

Federal regulations require buried or submerged pipelines to be protected by a cathodic protection system, to counteract the effects of corrosion. 49 C.F.R. § 195.563. However, the cathodic protection typically used by industry to protect underground pipelines from corrosion is not effective when these underground pipelines are wrapped with insulation, as was the case with Lines CA-324/325. 7-CalER-1404.

## B. PHMSA Approved the Transition to State Jurisdiction and Entry Into the Consent Decree

In early 2016, Plains cancelled its tariffs with FERC—tariffs that had been PHMSA's only basis for designating Lines CA-324/325 as interstate pipelines. 5-CalER-894. In a May 18, 2016, letter agreement (the "2016 Letter Agreement"),

11

PHMSA re-designated Lines CA-324/325 as intrastate, and identified OSFM as the safety regulator. 5-CalER-894-96.

After the Refugio Oil Spill, state and federal agencies, including PHMSA, engaged with Plains regarding harm from the spill, projects to remedy that harm, and civil penalties. Those efforts culminated in 2020 with the agreed Consent Decree, filed in and approved by the Central District of California (Hon. Philip S. Gutierrez). 5-CalER-781-882. The Consent Decree resolved claims by agencies including PHMSA and OSFM. *Id.* The Consent Decree offered a possibility of restarting Lines CA-324/325 without replacing the pipelines, while acknowledging the defect in their design. 5-CalER- 876-82. To do so lawfully and safely, the pipeline owner would be required to obtain permits from OSFM, known as State Waivers, that provided alternative conditions in lieu of cathodic protection, in light of the modern understanding that the technology is not effective for insulated lines like Lines CA-324/325. This was consistent with the federal Pipeline Safety Act, which allows state regulators to adopt and enforce safety standards, including their own standards, in addition to or more stringent than PHMSA's standards. 49 U.S.C. §§ 60104(c), 60118(d). The Consent Decree also assigns OSFM the power to approve a restart plan after the pipeline owner complies with the State Waivers. 5-CalER-876-82. Removing any ambiguity about whose job it was to regulate the pipelines, in October 2020, PHMSA sent a closure letter to Plains:

12

> Upon entry, the Consent Decree . . . transferred all outstanding corrective actions in PHMSA's closed CAO, and amendments, to the **sole regulatory oversight of the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal.**

4-CalER-603 (emphasis added).

## III. SABLE ACQUIRED THE SANTA YNEZ UNIT, LFC FACILITIES, AND PIPELINES AND OBTAINED STATE WAIVERS FROM OSFM

In February 2024, Sable acquired the Santa Ynez Unit, LFC Facilities, and Lines CA-324/325 from ExxonMobil, including a 100% interest in Pacific Pipeline Company. As a condition of this acquisition, Sable agreed to be bound by the Consent Decree. 3-CalER-558-65 (Assumption Agreement).

Shortly after Sable formally acquired Lines CA-324/325 (along with the Santa Ynez Unit and the LFC Facilities), Sable began the process of restarting oil production at the Santa Ynez Unit and transporting crude oil through Lines CA-324/325. Sable would not announce actual restart and flowing of oil through Lines CA-324/325 until later, on March 14, 2026. *See United States, et al. v. Plains Pipeline, et al.*, C.D. Cal. Case No. 2:20-cv-02415, ECF 44 at 10.

Sable applied for State Waivers in April 2024, which OSFM issued on December 17, 2024. The State Waivers require that "[a]ll immediate and 180-day repair conditions that are listed in this state waiver . . . be evaluated and remediated *prior to* restarting CA-324." 3-CalER-459 (CA-324 State Waiver, ¶ 9 (emphasis

13

added)); *see also* 3-CalER-456-70 (CA-324 Waiver) and 3-CalER-471-85 (CA-325 Waiver).

Neither Sable nor PHMSA objected to the terms of the State Waivers, and PHMSA provided its notices of non-objection to the State Waivers in February 2025. 3-CalER-348-49 (PHMSA non-objection re: CA-324), 350-51 (PHMSA non-objection re: CA-325); *cf.* 49 U.S.C. § 60118(c)(1)(A), (d) (authorizing PHMSA to object to state waivers "inconsistent with pipeline safety").

## IV. ENVIRONMENTAL NON-GOVERNMENTAL ORGANIZATIONS CHALLENGED THE STATE WAIVERS

In April 2025, the Center for Biological Diversity and Environmental Defense Center, with their co-petitioners (collectively "EDC"), filed two petitions for writs of mandate in Santa Barbara County Superior Court, challenging the validity of the State Waivers. EDC alleged, *inter alia*, that OSFM was required under California law to conduct additional environmental review prior to issuing the State Waivers. EDC applied for a temporary restraining order against restarting the pipelines, which the court granted on June 3, 2025. On July 18, 2025, the Superior Court issued a ruling granting in part and denying in part EDC's request for a preliminary injunction. The Superior Court explained that Sable could not lawfully restart Lines CA-324/325 prior to obtaining additional approvals—most notably OSFM's approval of a restart plan—and imposed a requirement that once Sable obtained all required approvals, it must provide notice of those approvals ten

14

days before restarting to provide time to resolve any dispute as to completeness of those approvals.

## V.   SABLE UNSUCCESSFULLY ATTEMPTED TO RESTART LINES CA-324/325 WITHOUT COMPLYING WITH STATE LAW

In September 2025, Sable submitted a restart plan to OSFM for review and approval. 2-CalER-214. OSFM declined approval, advising Sable that "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart." 1-CalPSE-56-57 (OSFM Letter to Sable dated Oct. 22, 2025). Specifically, Sable had not remediated anomalies where the measured loss of the thickness of the pipe, factoring in the tool tolerance (i.e. margin of error), was 40% or more. 3-CalER-459, 474-475 (paragraphs 9 and 12, requiring remediation prior to restart), 3-CalER-446, 479 (paragraphs 35 (for CA-324) and 36 (for CA-325), and footnote 10 (describing tool tolerance calculation)). Sable reported that it had remedied anomalies where it measured 40% loss of thickness, but had not remedied anomalies where the measured loss *plus the tool tolerance* exceeded 40%—despite the State Waivers requiring Sable to do so before restarting Lines CA-324/325.[2] 1-CalPSE-54-55 (discussing 3-CalER-459, 474). Sable responded the next day, disagreeing with OSFM's

---

[2] *Tool tolerance* is how the State Waivers account for the margin of error in measurements by the tools used to measure loss of pipeline thickness. The calculation method is explained in the State Waivers at footnote 10. 3-CalER-464.

interpretation, but not disputing the underlying facts. Sable contended that the State Waivers did not require remediation of these previously-discovered anomalies prior to restart. 1-CalPSE-55 (Sable Letter to OSFM dated Oct. 23, 2025).

Rather than come into compliance with the State Waiver requirements, on November 26, 2025, Sable petitioned PHMSA to step in and unilaterally assume jurisdiction over Lines CA-324/325. *See* 2-CalER-206-09. Sable's letter asked that PHMSA treat the Offshore Emulsion Pipeline, the LFC Facilities, and Lines CA-324/325—and possibly also the offshore platforms—as a *single* "interstate" facility for the first time ever. 2-CalER-206; *see also* map at 2-CalER-209. Sable claimed that "intervening events . . . merit reassessment." But the only identified event was Sable's unification of ownership of these assets. Sable's application offered no authority for the proposition that change in ownership is relevant to defining a "facility." 2-CalER-207-08.

PHMSA swiftly approved Sable's requests. First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over Lines CA-324/325. 1-CalER-24-26. PHMSA did so on the grounds that it conducted an evaluation and determined that the "Las Flores Pipeline [CA-324/325] . . . transports crude oil from the O[uter] C[ontinental] S[helf] to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland,

16

California," and is therefore an interstate pipeline consistent with 49 C.F.R. Part 195, Appx. A, Example 7. 1-CalER-25-26.

Next, on December 22, 2025, PHMSA issued the Restart Approval, a one-page letter approving Sable's Restart Plan for Lines CA-324/325. 1-CalER-22. The Restart Approval makes no mention of the Consent Decree and ignores that the authority to approve any restart of Lines CA-324/325 was explicitly conveyed by that court-approved agreement to OSFM, not PHMSA. Nor does the Restart Approval make any attempt to explain PHMSA's abrupt change in its position that OSFM has "sole regulatory oversight" over the restart of Lines CA-324/325.

And finally, the following day, December 23, 2025, PMHSA issued an Emergency Special Permit,[3] waiving compliance with 49 C.F.R § 195.452(h)(4)(iii)(H).[4] 1-CalER-2-21. Although the Emergency Special Permit mirrored much of OSFM's State Waivers, it removed the critical tool tolerance provision, permitting Sable to restart without remediating the areas where the measured wall loss exceeded 40% after accounting for the tools' margin of error, as OSFM's State Waivers required to ensure safety. PHMSA also stated that

---

[3] "Special Permit" is PHMSA's name for the federal analogue to OSFM's State Waivers. A special permit may be issued on an emergency basis for a term of up to 60 days. 49 C.F.R. § 190.341(g).

[4] 49 C.F.R § 195.452(h)(4)(iii)(H) "requires corrosion of or along a longitudinal seam weld" be scheduled "for evaluation and remediation within 180 days of discovery of the condition."

granting the Emergency Special Permit was necessary to address the "energy emergency" that the President declared in Executive Order 14156, 90 FR 8353 (Jan. 29, 2025) ("E.O. 14156"). 1-CalER-20; *see also* 3-CalER-352-56 (E.O. 14156). However, PHMSA did not further explain how the granting of the Emergency Special Permit would address the purported energy emergency.

In the consolidated case, *Environmental Defense Center, et al. v. PHMSA, et al.*, no. 25-8059, Petitioners filed their petition for review on December 24, 2025, challenging the second and third PHMSA orders (orders dated December 22 and 23, respectively).

On January 12, 2026, PHMSA issued a Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency ("Limited Enforcement Discretion Policy"). In response to E.O. 14156, PHMSA directed its Office of Pipeline Safety and Office of Hazardous Materials Safety to "refrain from taking any enforcement action against a regulated party who defers the performance of an activity that would otherwise be required under the Federal pipeline or hazardous materials safety regulations" if: (1) performing the required activity would contribute to the purported national energy emergency by adversely impacting the transportation of energy, (2) the "regulated party demonstrates that deferring the performance of the required activity will not create an unreasonable risk to public safety, property, or

18

the environment," and (3) the regulated party "files an application for a special permit promptly, but no later than 45 days after determining that the required activity should not be performed in response to the national energy emergency." 1-CalPSE-50 (Limited Enf. Disc. Policy (Jan. 12, 2026) at 2). Further, the policy dictates that PHMSA will refrain from taking any enforcement action until a final decision on an application for a special permit is made *and* for a period thereafter "so that the party who sought the waiver or exemption can take appropriate action to perform the required activity without incurring any additional enforcement risk," providing the regulated community a temporary safe harbor if they fail to adhere to PHMSA's special permit conditions. *Id.* at 1-CalPSE-51-52.

On January 23, 2026, California, by and through Attorney General Rob Bonta and OSFM, timely filed this Petition for Review. The Court consolidated this case with case no. 25-8059 on February 5, 2026 (Docket Entry No. 11).

## ISSUES PRESENTED

1. Is the Federalization Order contrary to law because Lines CA-324/325 are intrastate pipelines subject to state, not federal, jurisdiction under both the Pipeline Safety Act and the Consent Decree?

2. Are the Federalization Order, Restart Approval, and Emergency Special Permit unsupported by substantial evidence, or arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)?

19

## SUMMARY OF ARGUMENT

PHMSA acted contrary the Pipeline Safety Act and the Consent Decree when it issued the Federalization Order. The Federalization Order is the consummation of PHMSA's decision to change the designation of Lines CA-324/325 from intrastate pipelines to "portions" or "segments" of a greater interstate facility. By designating the pipelines part of an interstate facility, PHMSA determined that Lines CA-324/325 were no longer under state regulatory oversight by OSFM but rather under federal regulatory oversight by PHMSA.

PHMSA made this determination even though the purpose of Lines CA-324/325 is to transport oil wholly within California, from Las Flores Canyon, California, to Pentland, California. PHMSA created a pretext by combining Lines CA-324/325 with the Las Flores Canyon oil process and treatment plant and the Offshore Emulsion Pipeline, and—for the first time—designating all three as part of a single "interstate hazardous liquid pipeline facility." PHMSA's determination not only conflicts with the language of the Pipeline Safety Act and the agency's own regulations, but also the Act's purpose, which was enacted by Congress, in part, to encourage "extensive state involvement . . . allowing full state enforcement authority for intrastate pipeline transportation[.]" *See* 50 Fed. Reg. 39008, 39011.

The Federalization Order also contravenes the Consent Decree. The Consent Decree explains that Lines CA-324/325 are intrastate pipelines. As the District

20

Court's final judgment, it lays out the roles and responsibilities of each party bound by the Consent Decree. The judgment expressly conveys sole regulatory oversight of Lines CA-324/325 on OSFM and authorizes only it to review and approve a restart plan and issue state waivers. The agency's violation of the Consent Decree was arbitrary and capricious and contrary to law. And as a party that proposed and is a signatory to the Consent Decree, PHMSA is bound by it and barred from suddenly taking the inconsistent position that Lines CA 324/325 are interstate.

Finally, the Federalization Order was arbitrary and capricious because it failed to provide a reasoned explanation for asserting an inconsistent position. The record does not support PHMSA's interstate determination, and PHMSA does not connect the facts to its decision. Yet, despite the lack of support, PHMSA used the Federalization Order as a basis to issue two additional orders, the Restart Approval and the Emergency Special Permit.

PHMSA issued the Restart Approval allowing Sable to return Lines-CA 324/325 to service. PHMSA did so even though the Consent Decree conveys the authority to review and approve a restart plan to OSFM. PHMSA also issued an Emergency Special Permit, which waived an important safety requirement from the Pipeline Safety Act's regulations and OSFM's State Waivers. PHMSA issued

21

these two orders without providing any justification for acting contrary to law and in excess of its authority.

## STANDARD OF REVIEW

The Pipeline Safety Act, in 49 U.S.C. § 60119(a)(3), explicitly incorporates the standards of review set forth in the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) ("hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *id*. § 706(2)(C) (action taken in excess of the agency's jurisdiction).

On judicial review, an agency's factual findings are reviewed under the substantial evidence standard. *See, e.g.*, *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019). The substantial evidence standard requires the appellate court to review the administrative record as a whole, weighing both the evidence that supports the agency's determination as well as the evidence that detracts from it. *See California Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018).

An agency's interpretation or application of a statute is a question of law reviewed de novo. *See Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1212 (9th Cir. 2008). An agency's interpretation of its statutory mandate is also reviewed de novo. *See Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1073 (9th Cir. 2003).

22

# ARGUMENT

## I. CALIFORNIA HAS STANDING TO CHALLENGE PHMSA'S FEDERALIZATION AND SUBSEQUENT ORDERS

"[A] State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986). Under California law, OSFM is granted "exclusive safety regulatory and enforcement authority over intrastate . . . hazardous liquid pipelines" and tasked with implementing the Pipeline Safety Act and federal pipeline safety regulations and obtaining annual federal certification. Cal. Gov't. Code § 51010.

The federal Pipeline Safety Act provides that a "person" who is adversely affected by PHMSA's Orders may file a petition for review in the Court of Appeals. 49 U.S.C. § 60119(a). A "person" includes a state of the United States. 49 U.S.C. § 60101(a)(17) and (20).

## II. THE FEDERALIZATION ORDER EXCEEDS PHMSA'S STATUTORY AUTHORITY AND IS CONTRARY TO LAW

Under the APA standards incorporated into the Pipeline Safety Act, the Federalization Order should be set aside as "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," and "not in accordance with law." 5 U.S.C. § 706(2)(A)–(D).

### A. The Federalization Order Is a Final Agency Action

The APA and Pipeline Safety Act grant a right of judicial review of final agency action to any person "suffering legal wrong because of agency action, or

23

adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Actions are "final agency action[s]" subject to judicial review when they "'mark[]' the 'consummation' of the agency's decisionmaking process' and result[] in 'rights and obligations being determined.'" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).

The December 17, 2025, Federalization Order, 1-CalER-24-26, redesignating Lines CA-324/325 as interstate, is a final agency action. It marks the conclusion of the agency's decision-making process. *See U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 597-98 (2016). And it purports to determine the rights of OSFM vis a vis PHMSA and Sable, by "notif[ying] OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA," and that OSFM's power to regulate pipeline safety has been terminated.

**B.    The Federalization Order Conflicts with the Text of the Pipeline Safety Act**

This Court interprets the statutes de novo. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 400–01 (2024). In designating the Las Flores Pipeline as an interstate facility under the Pipeline Safety Act, PHMSA violated the statute and exceeded its jurisdiction.

The Pipeline Safety Act distinguishes between interstate pipelines and intrastate pipelines. For interstate pipelines, the Pipeline Safety Act imposes exclusive federal jurisdiction, making PHMSA the regulator. But the Pipeline

24

Safety Act preserves a role for states to regulate intrastate pipelines, including allowing state regulators to enforce standards more stringent than PHMSA's. 49 U.S.C. § 60104(c).

An "interstate hazardous liquid pipeline facility" is a pipeline facility that transports hazardous liquid "between (i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State."[5] 49 U.S.C. § 60101(a)(7), (8)(B). Conversely, "'intrastate hazardous liquid pipeline facility' means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility." 49 U.S.C. § 60101(a)(10). In other words, a pipeline that transports hazardous liquid from a place within a state to another place within the same state without passing through another state is *intra*state. Because Lines CA-324/325 originate onshore in Santa Barbara County, California, and terminate in the Central Valley in Kern County, California, without passing through any other state, 1-CalER-2, they are an intrastate pipeline facility.

PHMSA's December 2025 orders confirm this understanding of the statute. What changed is PHMSA's definition of the relevant "facility." PHMSA historically identified Lines CA-324/325 themselves as the relevant "facility." 5-

---

[5] The Pipeline Safety Act contains two sets of definitions—one for gas pipelines and one for hazardous liquid pipelines. Crude oil is a hazardous liquid, so crude oil pipelines are governed by the provisions addressing hazardous liquid pipelines.

CalER-894-96 (2016 Letter Agreement), 4-CalER-621-22 (identifying CA-325/325 as intrastate when seeking approval of Consent Decree), 4-CalER-655 (Declaration provided by OSFM in support of United States' motion for approval of Consent Decree). Under that identification of the relevant "facility," Lines CA-324/325 did not extend to another state, and, as a result, they were intrastate. Now, PHMSA purports to redefine Lines CA-324/325 as part of a larger system that includes areas previously never considered as part of the "pipeline facility," including the Offshore Emulsion Pipeline and the LFC Facilities. The task presented here is to determine which interpretation comports with the statute; *i.e.*, whether Lines CA-324/325 are intrastate or interstate pipelines.

### C. PHMSA's Redesignation Is Inconsistent with the Statutory Term "Facility"

"In determining the meaning of a statute, we first look to the language of the statute itself." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008). The Pipeline Safety Act defines a "hazardous liquid pipeline facility" to "include[] a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5). "Transporting hazardous liquid," in turn:

> (A) means--
> (i) the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce; and

26

(ii) the movement of hazardous liquid through regulated gathering lines; but

(B) does not include moving hazardous liquid through--

(i) gathering lines (except regulated gathering lines) in a rural area;

(ii) onshore production, refining, or manufacturing facilities; or

(iii) storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities;

49 U.S.C. § 60101(a)(22).

These definitions, read together, illuminate what constitutes a hazardous liquid pipeline facility under the statute. Equipment used to transport oil, including the pipeline and valves, are part of the transportation "facility." Storage incidental to transportation is also part of the "facility." But no part of the definitions of "hazardous liquid pipeline facility" or "transporting hazardous liquid" covers activities like separation of different hydrocarbons and sulfur products or treatment of crude oil—activities that happen at the LFC Facilities. Such activities are not part of "mov[ing]" the oil, or "stor[ing]" it "incidental to [such] movement." [6]

---

[6] The LFC Facilities' storage tanks are non-transportation-related facilities because they are regulated by the County of Santa Barbara pursuant to the California Aboveground Petroleum Storage Act ("APSA"), sections 25270 to 25270.13 of the California Health and Safety Code. *See* 1-CalPSE-6 (Complaint, *Sable v. California*, Case No. 26WM000036 (Sacramento Sup. Court), at ¶ 24). The APSA specifically excludes from its provisions, "transportation-related tank facilit[ies], subject to the authority and control of the United States Department of Transportation, as defined in the Memorandum of Understanding between the Secretary of Transportation and the Administrator of the United States Environmental Protection Agency." Cal. Health & Safety Code, § 25270.2(a)(6). That Memorandum of Understanding defines *non-transportation-related* facilities as including oil storage facilities not "needed for the continuous operation of a pipeline system." 40 C.F.R. Part 112, Appendix A, § II(1)(F) (1994).

Those are the kind of activities completed as part of production, refining, or manufacturing.

This understanding is consistent with ordinary definitions of the word "facility." Because the Pipeline Safety Act does not define "facility," we look to dictionary definitions of "facility" from the time of the relevant statute's enactment. *See Pugin v. Garland*, 599 U.S. 600, 604 (2023). Here, Congress enacted the relevant provisions governing hazardous liquid (here, oil) pipelines first as part of the Hazardous Liquid Pipeline Safety Act in 1979 and re-enacted those provisions in the Pipeline Safety Act—governing hazardous liquid and gas pipelines—in 1991, which Congress re-codified in its current form in 1994. The first definition of "facility" in Black's Law Dictionary is unchanged between the Fourth (1968), Fifth (1979), and Sixth (1990) editions: a "facility" is "Something that is built or installed to perform some particular function . . . ."[7] This definition is in line with definitions in other dictionaries and adopted by courts in other contexts. *See, e.g.*, *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1040 (9th Cir. 2000) (quoting Webster's II, New Riverside University Dictionary 460 (1994)) ("a 'facility' can be commonly defined as '[s]omething created to serve a particular function[]'").

---

[7] All three relevant editions of Black's Law Dictionary also note that facility "also means something that promotes the ease of any action or course of conduct." This second definition is not applicable.

Lines CA-324/325 constitute an onshore pipeline "facility" built and installed to serve a particular purpose: to transport the oil that is processed and treated in Las Flores Canyon, California, to Pentland, California. 1-CalER-2 ("124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 . . . transport[] crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties.").

PHMSA's new redefinition improperly attempts to expand Lines CA-324/325 via consolidation with the LFC Facilities. But the LFC Facilities perform vastly different functions than CA-324/325. They do not "transport[] hazardous liquid." 49 U.S.C. § 60101(a)(5). Instead, the plants treat and process the product arriving from the Offshore Emulsion Pipeline by separating and treating hydrocarbons and sulfur products, as well as storing the processed oil in two 270,000-gallon tanks. *See* 2-CalER-92 (discussion of "LFC treatment facility"); 1-CalPSE-136) (SPCC Plan at F-4 (describing storage tanks)); *see also* 1-CalPSE-61 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508, ¶ 19 (Kern County Sup. Court) ("The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas.")).[8] This is a different

---

[8] Although PHMSA did not include the *Pacific Pipeline v. California* Complaint in the Administrative Record, PHMSA attests to having completed a site inspection at the LFC facilities, 1-CalER-24, and assuredly would have been aware that the facility separates hydrocarbons and sulfur products, and treats and stabilizes crude oil.

29

purpose, and that purpose is not consistent with the statutory definitions of a "hazardous liquid pipeline facility" or "transporting hazardous liquid." PHMSA's cursory Federalization Order made no attempt to even describe the LFC Facilities, let alone reconcile these definitions.

Further upstream, the Offshore Oil Pipeline performs yet another, different function than either Lines CA-324/325 or the LFC Facilities. Unlike Lines CA-324/325, the Offshore Oil Pipeline does not transport a hazardous liquid (oil) between two land-based locations. Instead, it delivers a "crude oil emulsion," *i.e.*, a mix of oil, gas, water, and other substances, from offshore platforms to the LFC Facilities for processing and treatment. 2-CalER-27. Thus, the Offshore Oil Pipeline serves a different function than either the LFC Facilities or Lines CA-234/235. As with the LFC Facilities, PHMSA makes no effort to reconcile these realities with statutory text.

### D. PHMSA's Redefinition Improperly Includes Facilities That Cannot Be Part of a Hazardous Liquid Pipeline Facility

PHMSA purports to define Lines CA-324/325, the LFC Facilities, including the oil treatment plant, and the undersea Offshore Emulsion Pipeline, as part of a single pipeline facility. For this definition to be consistent with the law, each of these components of the facility must perform functions that a hazardous liquid pipeline facility may perform, and not perform functions that a hazardous liquid pipeline facility, as defined by the Pipeline Safety Act, cannot perform. By

sweeping the LFC Facilities into the same facility as Lines CA-324/325, PHMSA includes, in part, a treatment plant as a part of the pipeline. That is not just counterintuitive; it is contrary to the Pipeline Safety Act.

Statutory text must be interpreted in context. *Pulsifer v. United States*, 601 U.S. 124, 133–34 (2024). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). This principle applies to provisions enacted together or provisions enacted separately but addressing related statutory schemes. *See United States v. Youssef*, 547 F.3d 1090, 1095 (9th Cir. 2008). Here, the pipeline safety statutes for gas and oil originated in separate but related statutes, with the natural gas statute enacted first, and the relevant provisions later re-enacted together as part of the Pipeline Safety Act. *See* 108 Stat. 745 (1994), codified at 49 U.S.C. §§ 60101-60143. Congress's choice of language with respect to gas pipeline regulation illuminates their intent as to oil pipelines.

The Pipeline Safety Act imposes broader exclusive federal jurisdiction for gas pipelines than for hazardous liquid (*e.g.*, oil) pipelines.[9] There are two key

---

[9] Federal jurisdiction over hazardous liquid pipelines is also narrower than federal jurisdiction over other comparable industries—all of which arise under

(continued…)

31

distinctions. First, the provision defining interstate gas pipelines includes pipelines that reach a place outside of the state—like for hazardous liquid pipelines—plus additional exclusive federal jurisdiction over gas pipelines that "affect[] any commerce" . . . "between a place in a State and a place outside that State."[10] 49 U.S.C. § 60101(a)(8)(A). No similar "affecting commerce" provision exists in the statute that applies to oil pipelines.

Second, the definition of a "gas pipeline facility" includes "equipment used in . . . treating gas." 49 U.S.C. § 60101(a)(3). In contrast, oil pipelines are governed by the definition of "hazardous liquid pipeline facility," which contains no similar reference to "treat[ment]." *Id.,* § 60101(a)(5).

---

older statutes. For electricity, the Federal Power Act, enacted in 1935, provides that wholesale electricity transactions, even if transmitting electricity entirely within a state, fall under exclusive federal jurisdiction. (*See Connecticut Light & Power Co. v. Fed. Power Comm'n*, 324 U.S. 515, 518 (1945) (discussing Federal Power Act, 49 Stat. 838 (1935)). For railroads, preemption now codified under the Interstate Commerce Commission Termination Act preempts state regulation "even [of] intrastate transportation so long as it is 'part of the interstate rail network.'" *Friends of the Eel River v. North Coast Railroad Authority*, 3 Cal.5th 677, 707 (2017) (citing 49 U.S.C. § 10501(a)(2)(A)). This provision has its origin in the Interstate Commerce Act of 1887, 24 Stat. 379 (1887). In the case of oil pipelines, Congress unambiguously selected a narrower scope of exclusive federal jurisdiction.

[10] The Pipeline Safety Act also limits the definition of an "interstate gas pipeline facility" to include only facilities "subject to the jurisdiction of the [Federal Energy Regulatory] Commission under the Natural Gas Act." 49 U.S.C. § 60101(a)(6) (referring to 15 U.S.C. § 717, et seq.). This provision is similar to the reservation for states to regulate retail electricity transactions.

32

The distinct language makes a difference. An interstate oil pipeline *must reach a place outside of a state*—an effect on interstate commerce—even a significant effect—is not enough. And while a gas pipeline facility may include equipment used in treating the transported substance,[11] an oil pipeline cannot.[12]

The Federalization Order's reason for treating Lines CA-324/325 as interstate was that it viewed them as part of a single, larger facility that stretched from the drilling platforms in the outer continental shelf, through the processing, treatment and storage facilities at Las Flores Canyon, and on to Kern County.But as Sable's own expert stated, in a sworn declaration that Sable submitted first to a California trial court and then to PHMSA in support of its request for an Emergency Special Permit, the LFC Facilities constitute a "treatment facility." If PHMSA had properly investigated the matter, kept a proper administrative record, or allowed interested entities such as the State to submit evidence, PHMSA would have had even more evidence of this nature. *See, e.g.,* 1-CalPSE-61 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-103508 (Kern County Sup.

---

[11] In fact, some gas transmission pipelines must be treated with a "natural odorant" or odorized to certain standards. 49 C.F.R. § 192.625(a), (b) (2019).

[12] The difference between the gas and hazardous liquid provisions is not a drafting accident. As originally introduced in the Senate, the definition of a "hazardous liquid pipeline facility" included "or the treatment of hazardous liquids during the course of transportation." The Senate Committee on Commerce, Science, and Transportation "deleted this portion" after "industry representatives pointed out that the processes used for liquid transported by pipeline make this portion of the definition inappropriate . . . ." S. Rep. No. 96-182 at 18 (1979).

Court), ¶ 19 (state-court complaint by Sable's wholly-owned subsidiary describing separation of hydrocarbons and sulfur products at the LFC Facilities)). Given the existence of a treatment facility interrupting the flow of oil between CA 324/325 and the Offshore Emulsion Pipeline, the statute precludes treating everything as one single interstate facility. PHMSA's contrary determination was contrary to law and must be vacated.

### E. PHMSA's Redefinition Is Inconsistent with the Purpose of the Pipeline Safety Act

State regulation of intrastate pipelines predates the federal regulatory scheme in place today. "By 1965, twenty-six states regulated the safety of at least part of the natural gas pipeline network within their borders." Sara Gosman, *Justifying Safety: The Paradox of Rationality*, 90 Temp. L. Rev. 155, 169 (2018). Facing increased pressure from the public and state governments, industry sought federal regulation. *See id.* at 170 & n.144 (discussing 33 Fed. Reg. 10,213, 10,214). These efforts culminated first in the Natural Gas Pipeline Safety Act of 1968, 82 Stat. 720 , and later in the Hazardous Liquid Pipeline Safety Act of 1979, 93 Stat. 989 . The Materials Transportation Bureau, Research and Special Programs Administration, a component of the United States Department of Transportation, promulgated regulations in 1985. *See* Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 39008-02 (Sept. 26, 1985). Congress consolidated gas and hazardous liquid pipeline safety into one statute, the

34

Pipeline Safety Act, in 1992, but preserved the role for states to regulate intrastate pipelines. 106 Stat. 3289 (1992); *see also Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 n.14 (9th Cir. 2006) (describing consolidation of two statutes). Congress reorganized the statute to its present configuration in 1994, again retaining the states' role regulating intrastate pipelines. 108 Stat. 745 (1994).

Nevertheless, Congress has always "recognized a major role for the states in pipeline safety." *Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986) (quoting 50 Fed. Reg. 39,011 (1985)). As Department of Transportation statements implementing the Hazardous Liquid Pipeline Safety Act recognize, "[s]tates are in the best position to assess the needs of their communities with respect to pipeline safety," and the federal policy is "to allow states to assume as much responsibility for pipeline safety within their states as possible, subject only to the limitations of the [Hazardous Liquid Pipeline Safety Act]." Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 39008-02, 39011 (Sept. 26, 1985).

PHMSA's and Sable's position would grossly undermine Congress's policy, because it would effectively remove state jurisdiction *over any connected pipeline*. At Sable's request, PHMSA re-defined Lines CA-324/325 to include a non-pipeline facility and a different pipeline that reaches outside of California. 2-CalER-206-09 (Sable request); 1-CalER-24 (PHMSA response). Under PHMSA's

35

interpretation, it could redefine essentially any crude oil pipeline in California by including it as part of another pipeline connected through yet another facility, combined with another connected to that, combined with any further connected facilities until the newly-defined facility includes either a pipeline reaching federal waters or into another state. *Cf.* 2-CalER-66 (discussing pipelines connecting to Arizona and Nevada). This approach would effectively divest the states of the regulatory jurisdiction Congress intended to preserve and all but eliminate the congressional distinction between intrastate and interstate facilities.

### F. PHMSA's Federalization Order Is Inconsistent With its Own Regulations

An agency action that is inconsistent with federal regulations—even the agency's own regulations—is not in accordance with law, and therefore subject to challenge under the Administrative Procedure Act. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) ("Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own policies."). PHMSA's inclusion, in part, of the LFC Facilities as part of a "pipeline facility" is inconsistent with the relevant regulations.

Federal regulations define a "pipeline facility" as "new and existing pipe, rights-of-way and any equipment, facility, or building used in the transportation of

36

hazardous liquids or carbon dioxide." 49 C.F.R. § 195.2. The same regulation

defines a "pipeline or pipeline system" as:

> all parts of a pipeline facility through which a hazardous liquid or carbon dioxide moves in transportation, including, but not limited to, line pipe, valves, and other appurtenances connected to line pipe, pumping units, fabricated assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks.

*Id.* These definitions include the pipelines themselves and any appurtenances "used

in the transportation of" oil through the pipelines, and nothing more. Under this

definition, a pipeline facility includes pipelines like CA-324 and CA-325, as well

as attached valves, pumps, and metering stations. But none of these definitions

describe the processing, treatment, and storage facilities at Las Flores Canyon,

which "separate oil, propane, butane, sulfur products, and fuel quality gas." 1-

CalPSE-61 (Complaint, *Pacific Pipeline Co. v. California*, Case No. BCV-25-

103508 (Kern County Sup. Court), ¶ 19). PHMSA's categorization is inconsistent

with its own regulations, because the LFC Facilities do not fit within the

regulation's definitions of *pipeline*, *pipeline facility*, or *pipeline system*. 49 C.F.R.

§ 195.2.

In its Federalization Order, PHMSA relies on 49 C.F.R. Part 195, Appendix

A, Example 7, to support its new position that Lines CA-324/325 are interstate. 1-

CalER-25. Example 7 depicts a pipeline running from Point A in the Gulf of

Mexico to Point B in Texas. *See* 1-CalPSE-181 (Liquid Pipeline

37

Interstate/Intrastate Delineation Map). But Example 7 is equally consistent with PHMSA's prior position that the Offshore Emulsion Pipeline, as a separate facility, is an interstate pipeline, which starts in federal waters and terminates at the LFC Facilities. Example 7 says nothing about where one facility ends and the next begins, which is the question PHMSA purported to answer in its letter.

The above-cited regulations are unambiguous in their limitation of a "pipeline facility" to infrastructure "used in the transportation of" oil. PHMSA has never offered a contrary interpretation. Instead, PHMSA has simply parted ways with its past interpretation and understanding of Lines CA-324/325 as an intrastate pipeline. The Court should reject this deviation.

### G. The Federalization Order Sidestepped Section 60105's Requirements for Asserting Federal Jurisdiction Over Intrastate Pipelines

The Pipeline Safety Act does provide a way for PHMSA to assert federal jurisdiction over intrastate pipelines. *See* 49 U.S.C. § 60105(f). But that provision is limited to cases where the state is not satisfactorily enforcing compliance with federal standards, and it requires prior notice and an opportunity for a hearing. 49 U.S.C. § 60105(f). Here, PHMSA gave no such notice, afforded no hearing, and made no determination of the State's regulatory insufficiency. Indeed, PHMSA does not assert jurisdiction over Line CA-324/325 in order to "achieve adequate enforcement" of federal safety standards. *See* 49 U.S.C. § 60105(f). To the

contrary, PHMSA has broadly signaled in its January 12, 2026, Limited Enforcement Discretion Policy that it does not intend to enforce certain federal safety standards. *See* 1-CalPSE-49-51 (Limited Enf. Disc. Policy (Jan. 12, 2026)).

The Federalization Order is an unlawful attempt to circumvent the procedural and substantive requirements that Congress imposed before PHMSA may take jurisdiction over an intrastate pipeline. But no matter how much PHMSA believes that it should be the regulator here, it is Congress's choice—not PHMSA's—that matters. The Federalization Order should be vacated.

### H. PHMSA (and Sable) Are Bound by the Consent Decree Which Delegates Regulatory Authority over Lines CA-324/325 to the State

PHMSA's Federalization Order is barred by the Consent Decree. As an initial matter, the Consent Decree—which is the judgment of an Article III court—settles the question of who the regulator is for Lines CA-324/325. The Consent Decree assigns the task of issuing waivers and approving restart to OSFM, not PHMSA. 5-CalER-860, 876-82. PHMSA asked the District Court to impose this rule. *See* 4-CalER-606-715 (United States' Memorandum in Support of Motion to Enter Consent Decree and supporting exhibits). In support of the Motion to Enter Consent Decree filed with the District Court, the United States presented the declaration of James Hosler, Assistant Deputy Director of the Pipeline Safety Division of OSFM. 4-CalER-652-56. Mr. Hosler's declaration explains that Lines

39

CA-324/325 are intrastate pipelines subject to OSFM jurisdiction and attests that OSFM will carry out its responsibilities under the Consent Decree. 4-CalER-655-56 at ¶¶ 10, 15.

PHMSA may certainly return to court to try to lift or revise that decree. 5-CalER-838-39 (¶¶ 98-99); *see Jeff D. v. Kempthorne*, 365 F.3d 844, 851 (9th Cir. 2004) (explaining that relief from consent judgment must be through motion under Rule 60(b)). Indeed, PHMSA has conferred with OSFM in advance of submitting such a request to the District Court. But unless and until the judicial decree is altered, Sable must obtain "a State Waiver through the OSFM." 5-CalER-860.

Moreover, PHMSA is effectively barred from taking a contrary position by the doctrine of judicial estoppel. Judicial estoppel applies when: (1) the party against whom estoppel is asserted took an inconsistent position, and (2) a tribunal relied on the previously inconsistent position. *See Interstate Fire & Cas. Co., an Illinois Corp. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998), as amended (May 13, 1998) (citing *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997)).

PHMSA proposed, and the federal District Court adopted, the Consent Decree assigning regulatory responsibility to OSFM. *See* 4-CalER-606-715. PHMSA had been Plains' regulator before and during the 2015 Refugio Oil Spill, and its own regulatory efforts had been insufficient to prevent the pipeline's catastrophic

failure. By assuring the District Court that another government would be responsible for pipeline safety going forward, PHMSA gave the District Court a reason to approve the Consent Decree without having to question why PHMSA would not fail again. 4-CalER-638-39. Relying on these and other representations, PHMSA obtained the entry of a favorable judgment against Plains and its successors.

Nor may Respondent-Intervenor Sable contest the Consent Decree's determination that these pipelines are subject to state rather than federal regulation. The doctrine of claim preclusion (or res judicata) applies to a new suit when there was a previous case featuring "1) an identity of claims, 2) a final judgment on the merits, and 3) identity or privity between parties." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). As to Sable, the Consent Decree satisfies all three elements:

First, there is an identity of claims. Here, OSFM asserts—and Sable contests— OSFM's jurisdiction over CA-324/325. 2-CalER-206 ("Sable . . . is writing to notify [PHMSA] of its determination that a pipeline facility that it operates . . . constitutes an interstate pipeline facility"). But the Consent Decree was a judgment that OSFM *does* have such jurisdiction. The fact that no party to the Consent Decree case in fact asserted preemption based on the pipelines' interstate status during the pre-judgment proceedings at the District Court is

41

immaterial. Claim preclusion "bars the subsequent application of all *defenses* that could have been asserted in a previous action between the same parties on the same cause of action, even if such contentions were not raised." *Littlejohn v. United States*, 321 F.3d 915, 919–20 (9th Cir. 2003) (emphasis added.) This bars Sable's position because it could have been asserted to bar the relief obtained by OSFM in the Consent Decree.

Second, "[a] consent decree approved by a court is an enforceable, final judgment with the force of res judicata." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 982 (9th Cir. 2024). In addition, the Consent Decree states that it is a binding final judgment. 5-CalER-841 (Consent Decree, ¶ 108).

Third, while Sable itself was not a party to the Consent Decree at the time it was entered, the previous owner of the pipelines, Plains, was. 5-CalER-781, 85. And Sable agreed to be bound by the Consent Decree to become the successor to Plains. 3-CalER-558-65 (Assumption Agreement). That privity satisfies the identity-of-parties requirement for claim preclusion to apply. "A person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (quoting 1 Restatement (Second) of Judgments § 40, p. 390 (1980)). Sable chose to accept the judgment binding Plains as a condition of its purchase.

Because PHMSA and Sable (as Plains' successor) agreed to be bound by the terms of the Consent Decree, they should be held to their agreement. A consent decree is both a judgment and a contract. *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986).

### III. THE FEDERALIZATION ORDER IS ARBITRARY AND CAPRICIOUS, NOT SUPPORTED BY THE RECORD, AND CONTRADICTED BY PHMSA'S PRIOR DETERMINATION

The Federalization Order should also be set aside because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). PHMSA's redefinition of the "facility" is not supported by the record and is contradicted by PHMSA's own prior understanding of Lines CA-324/325.

An agency action is arbitrary and capricious if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no rational connection between the facts found and the choice. *See Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA requires "[t]he agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons

43

that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

When an agency is not writing on a "blank slate," but is "changing [its] position," the agency must give "good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (citation and quotations omitted), including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). Specifically, the agency must "provide a more detailed justification than what would suffice for a new policy" when the "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 515.

The intrastate nature of Lines CA-324/325 was endorsed by PHMSA for more than nine years. *See* 5-CalER-894-96. And before that, PHMSA regulated Lines CA-324/325 only because they were subject to FERC tariffs, not because they were seen as part of a larger, interstate pipeline facility that included the Offshore Emulsion Pipeline and LFC Facilities. *See supra*, Statement of the Case, Section A.2. PHMSA concedes that federal jurisdiction based on FERC tariffs.[13] 1-

---

[13] Although it is true that PHMSA has traditionally relied on FERC tariffs as an indication that a pipeline is interstate, 1-CalER-25, it is difficult to square PHMSA's practice of relying on FERC tariffs with the text of the Pipeline Safety Act. *Compare W. Ref. Sw., Inc. v. FERC*, 636 F.3d 719, 723 (5th Cir. 2011) (citing
(continued…)

44

CalER-25. The Federalization Order provided no reasoned basis for PHMSA abruptly reversing its prior stance and failed to consider alternatives within the ambit of the prior policy.

First, PHMSA failed to reasonably explain its decision to suddenly treat Lines CA-324/325 as part of a single interstate facility rather than a distinct intrastate facility that transports hazardous materials between Las Flores Canyon, where they are first isolated, and Pentland Station. *See State Farm*, 463 U.S. at 43. The Federalization Order is not explained nor supported by evidence in the sparse administrative record. And the Order was issued at Sable's request when it petitioned to PHMSA in November 2025 to step in and unilaterally assume jurisdiction over the pipelines. 2-CalER-206-09. In a barely three-page letter, PHMSA responded and merely asserted that Lines CA-324/325 are now interstate, and thus exclusively regulated by PHMSA, because they are part of a "single pipeline system" originating in federal waters on the Outer Continental Shelf. 1-CalER-24. That is an entirely new view: In the approximately 40-year lifespan of Lines CA-324/325, neither OSFM nor PHMSA have ever maintained that these onshore pipelines are but a portion of an interstate pipeline facility. *Id.*

---

49 U.S.C. app. § 1(1)(b) (1988)) (defining FERC jurisdiction) *with* 49 U.S.C. § 60101(a)(8)(B), (a)(10) (defining PHMSA jurisdiction). But because there is no FERC tariff for the Lines CA-324/325, 1-CalER-24, that issue is not presented in this case.

45

The sole reason PHMSA articulates for its change in position is that Sable's 2024 acquisition of disparate assets, which PHMSA claims Sable operates together as a "single pipeline system," "merits reassessment" of the pipelines' intrastate status. 1-CalER-24; *see* 2-CalER-207. But neither the Pipeline Safety Act nor PHMSA's regulations has ever treated common ownership as a basis for redesignating or defining the scope of a pipeline facility. PHMSA did not and cannot point to any such authority. *See* 2-CalER-207 (distinguishing that at the time of PHMSA's 2016 designation, all the assets were operated by "different, unrelated entities"). And there is no reason why common ownership should matter, as it does not implicate the operational and safety requirements under the Act. Rather, defining the relevant "facility" turns on the real-world physical and operational nature of the pipelines—not on whether title to the pipelines is held by any particular entity and whether that entity holds title to any other facilities.

This Court should find persuasive the D.C. Circuit's rejection of a similar attempt by a federal agency to redesignate pipeline jurisdiction. In *Williams Gas Processing-Gulf Coast Co. L.P. v. FERC*, 475 F.3d 319, 321 (D.C. Cir. 2006), FERC reversed its prior classification of a pipeline segment as non-jurisdictional "gathering" facilities and determined instead that the segments served a transportation function subject to FERC's jurisdiction under the Natural Gas Act. The court held that FERC's multiple rationales for the reclassification lacked

46

reasoned supporting analysis in the orders themselves. *Id.* at 330. The court explained that if FERC intended to rely on two unstated principles supporting its decisions—that there is one point on any route where gathering stops and transportation begins, and that a transportation pipeline cannot feed into a gathering pipeline—it had to "acknowledge the need to reconsider precedent, announce its definitive adoption of those principles," and explain "any intended extension of the law." *Williams Gas*, 475 F.3d at 329. The court concluded that the agency's orders were "devoid of reasoned decisionmaking" and set them aside as arbitrary and capricious. *Id.* at 330.

The same analysis applies here. PHMSA attempts to advance a changed conception of Lines CA-324/325 without explaining a reasonable basis for reconsidering precedent, including the judicially binding Consent Decree. *See Williams Gas*, 475 F.3d at 329. PHMSA claims that the Offshore Emulsion Pipeline is interconnected with Lines CA-324/325 through the LFC Facilities. But like *Williams Gas*, PHMSA fails to provide a reasoned explanation of how its new interpretation of Lines CA-324/325 impacts prior and existing conceptions of the same infrastructure.[14] *See id.* (citing *PG & E Gas Transmission, Nw. Corp. v.*

---

[14] It is telling that the administrative record is devoid of detailed physical description of the LFC Facilities, or any detail about what activities take place there, except for statements by the Environmental Defense Center and Center for Biological Diversity in their comments in a prior, related proceeding. *See, e.g.*, 3-

(continued…)

47

*FERC,* 315 F.3d 383, 390 (D.C. Cir. 2003) ("FERC has given no explanation whatsoever for this apparent shift in Commission policy. FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process.").

Indeed, the violation here is even more clear than it was in than *Williams Gas.* The *Williams Gas* case arose under the Natural Gas Act, which vests FERC with discretion to answer jurisdictional questions related to gathering versus transport lines. *See Williams Gas*, 475 F.3d at 323 ("Because the [Natural Gas Act] does not define gathering and transportation, FERC is responsible for drawing the 'not always clear' line between the two.") (citation omitted); 15 U.S.C. §§ 717–717z. The Natural Gas Act gave FERC discretion to create a test that "rationally and reliably" distinguishes between the two types of pipeline for jurisdictional determinations. *Williams Gas*, 475 F.3d at 321. By contrast, here, PHMSA's authority to determine jurisdiction is governed by the Pipeline Safety Act, which itself defines an "interstate pipeline facility." *See* 49 U.S.C. § 60101(a)(7). The Pipeline Safety Act does not afford PHMSA the same "line drawing" authority as the Natural Gas Act, so PHMSA's jurisdictional determination both exceeds

---

CalER-383 (describing LFC Facilities). Given that PHMSA determined that it is a component of the "assets comprising the Las Flores Pipelines," 1-CalER-24-26, knowing what occurs there is necessary to its determination that the LFC Facilities constitute an "interstate hazardous liquid pipeline facility." 49 U.S.C. § 60101(a)(7).

statutory authority and is arbitrary and capricious for lack of reasoned decision making. *See Williams Gas*, 475 F.3d at 330.

Furthermore, PHMSA offers no findings of fact that rationally connect its reclassification to changes to CA-325/325 on the ground. Instead, PHMSA states that it "confirm[ed]" that Lines CA-324/325 begin in the Outer Continental Shelf, and "continues" the transportation of crude oil through the LFC Facilities to Pentland Station. 1-CalER-24. However, PHMSA fails to explain its departure from its previous treatment of the Offshore Emulsion Pipeline as separate from Lines CA-324/325 and the LFC Facilities. Instead of providing evidence or explanation as to how three previously distinct assets became one, the Federalization Order merely makes vague reference to its "review" of CA-324/325, including an "on-site inspection," review of Sable's "written procedures and records," and "field observations" of Sable's various assets. 1-CalER-24-26. PHMSA does not explain what it found in its "inspection" and "review." *Id.* PHMSA's vague explanation is not supported by record evidence of any observed physical changes to the pipelines. Indeed, the scant record lacks evidence of any facts found or observations made by PHMSA during its site visit that explain the redesignation. The record is devoid of any notes, memoranda, or reports of its "inspection" and "review." *See* Motion to Motion to Complete the Administrative Record, and for Judicial Notice (filed concurrently); *see also Burlington*, 371 U.S.

49

at 168 ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence.") The "Inspection Output Report," which is the only evidence seemingly related to PHMSA's "inspection," mentions that PHMSA was conducting a "jurisdictional analysis" of Lines CA-324/325. But the document contains no description of PHMSA's findings regarding jurisdiction.[15] 2-CalER-27-29. As the State explains in its pending Motion to Complete the Administrative Record, any competent physical inspection would have observed evidence that Las Flores is a facility for oil *treatment*—as would any competent consideration of the actual documentation surrounding these pipelines. The agency's failure to acknowledge and evaluate such evidence constitutes the antithesis of reasoned decisionmaking.

PHMSA's redesignation was based not on the evaluation of evidence, nor on the assessment of necessary considerations, but on its mere say-so and desire to reach a predetermined outcome. That was not a lawful basis for a change in agency policy. "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that . . . work a violation of the arbitrary-and-capricious

---

[15] It appears that PHMSA included, in the Administrative Record, the computer-generated output containing answers to questions from the site inspection, 2-CalER-27-29, but omitted the questions or subjects that this output responds to. The document, on its own, is unintelligible.

standard." *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quotation marks omitted).

PHMSA fails to grapple with the fact findings underpinning its intrastate classification set forth in the 2016 Letter Agreement and 2020 Consent Decree; namely, (i) the absence of a FERC tariff, (ii) PHMSA's findings that Lines CA-324/325 are intrastate, and (iii) that OSFM has regulatory authority pursuant to its section 60105 certification. *See* 5-CalER-894-96 (2016 Letter Agreement), 4-CalER-622 (Memorandum in Support of Consent Decree).

The facts here are similar to *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015). In *Village of Kake*, this Court held that the United States Department of Agriculture's ("USDA") attempt to reverse its prior determination that the "Roadless Rule" did not apply to the Tongass National Forest in Alaska was arbitrary and capricious. *Village of Kake*, 795 F.3d at 968. The Court based its reasoning on the fact that USDA "did not simply rebalance old facts to arrive at a new policy," but rather made a factual finding that the Roadless Rule was unnecessary for the preservation of the Tongass that directly contradicted its original record of decision two years earlier that the Roadless Rule was necessary to preserve the Tongass's unique wilderness. *Id.*

Here, too, PHMSA did not "rebalance old facts" to reach the interstate redesignation, conveniently ignoring its prior rationale. *See Village of Kake*, 795

51

F.3d at 968. The 2016 Letter Agreement states that the agreement "is subject to change" based on "future events or newly discovered facts," but neither in the unilateral Federalization Order—nor elsewhere in this administrative record— does PHMSA state that there are "newly discovered facts," let alone adequately explain what those facts are, or square any new finding with those underpinning its intrastate determination in the 2016 Letter Agreement. *See* 5-CalER-894-96.

The only legal analysis in PHMSA's Federalization Order is an application of 49 C.F.R. Part 195, Appendix A, Example 7, which says that a pipeline originating on the Outer Continental Shelf is an interstate pipeline. But, as explained in Part III, *supra*, this example is nonresponsive to the issue in dispute. The undersea Offshore Emulsion Pipeline, from the offshore platforms to the LFC Facilities, has always been understood as an interstate pipeline. PHMSA's change is to determine that the LFC Facilities and Lines CA-324/325 are part of the same "pipeline facility" as the Offshore Emulsion Pipeline. That question turns on whether all three parts of PHMSA's new "facility" determination are in fact a single "hazardous liquid pipeline facility." In its 2016 determination and 2020 entry into the Consent Decree, PHMSA concluded that they were not. PHMSA "cannot simply disregard contrary or inconvenient factual determinations that it made in the past" without adequately explaining why its findings have changed. *Village of Kake*, 795 F.3d at 969 (citing *Fox*, 556 U.S. at 537 (Kennedy, J.,

concurring)). PHMSA's determination cannot be "upheld on the basis of impermissible *post hoc* rationalization." *Dept of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 21 (2020) ("*Regents*") (internal quotation marks omitted). "[A]n agency's decision can be upheld only on the basis of the reasoning in that decision." *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

PHMSA also failed to consider any alternatives to federal regulation of Lines CA-324/325, or to identify any alternatives that would have preserved the intrastate classification and California's regulatory jurisdiction. *See Regents*, 591 U.S. at 30 ("[W]hen an agency rescinds a prior policy its reasoned analysis must [also] consider the alternatives that are within the ambit of the existing policy." (citation and internal quotation marks omitted)). PHMSA failed to consider obvious alternatives less drastic than declaring exclusive regulatory jurisdiction over Lines CA-324/325. PHMSA should have considered an alternative that preserved some form of continued concurrent jurisdiction with OSFM, since such an alternative is within the ambit of the prior policy. *See* 1-CalER-24-26.

## IV. THE RESTART APPROVAL IS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS, AND IN EXCESS OF AUTHORITY

PHMSA's Restart Approval also violates the APA because it also is not in accordance with law, is arbitrary and capricious, and is in excess of its authority. *See* 5 U.S.C. § 706. The Restart Approval is the consummation of PHMSA's

53

review and approval of Sable's restart plan and authorizes Sable to return Lines CA-324/325 to service. *Compare* 1-CalER-22 (PHMSA assertion of jurisdiction) *with* 5-CalER-876-82 (Consent Decree assigning restart approval to OSFM).

The Restart Approval is contrary to law because it violates the Pipeline Safety Act by purportedly authorizing the restart of Lines CA-324/325 even though the Pipeline Safety Act designates the state regulator as the relevant decisionmaker for intrastate pipelines.

The Restart Approval also violates the Consent Decree, which provides OSFM, not PHMSA, the authority to approve a Restart Plan. 5-CalER-876-82. In addition to being an enforceable, final judgment, a consent decree "binds the parties with the same force and effect as if a final decree has been rendered after a full hearing upon the merits." *Moore v. Deal*, 240 F. Supp. 1004, 1006 (E.D. Pa. 1965). Parties bound by a consent decree include government agencies that were a party thereto. *Hook. v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1017 (9th Cir. 1992) (holding that a state agency was bound by a consent decree the agency was a party to until the court ruled otherwise). "As a final judgment, a consent decree 'may not lawfully be revised, overturned or refused faith and credit by another Department of Government.'" *Mi Familia Vota v. Fontes*, 111 F.4th 976, 982 (9th Cir. 2024) (quoting *Taylor v. United States*, 181 F.3d 1017, 1024 (9th Cir. 1999)). If there are changes in the law or facts, such changes do not do away with a

54

consent decree. Only "a *court* may decide in its discretion to reopen and set aside a consent decree[.]" *Taylor*, 181 F.3d at 1024 (emphasis in original) (citations omitted).

The Consent Decree explicitly provides that any Restart Plan for Lines CA-324/325 must be reviewed and approved by OSFM, and it provides OSFM with "the sole regulatory oversight" over approval of the Restart Plan. 5-CalER-876. By ignoring these explicit terms and awarding itself regulatory authority over the restart of Lines CA-324/325, PHMSA acted as if it were not bound by the Consent Decree and failed to give faith and credit to the District Court's final judgment.

Even if Lines CA-324/325 were interstate pipelines, PHMSA would still need to seek modification of the Consent Decree before it could assert jurisdiction and approve a Restart Plan. *See Hook*, 972 F.2d at 1016. A party may obtain relief from a consent decree when the judgment is no longer equitable, but "not when it is no longer convenient to live with the terms of a consent decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992); *see also Hook*, 972 F.2d at 1016-1017 (noting that a state agency cannot simply ignore a consent decree without following the proper procedure to obtain relief). The party seeking relief from a consent decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383.

55

The Consent Decree provides that a modification may occur only "by a subsequent written agreement signed by the Parties." 5-CalER-838-39. If the modification is a "material change" then it must be approved by the federal District Court. *Id.* If there are disputes concerning modification, then the Consent Decree provides dispute resolution provisions that must be followed. *Id.* PHMSA had done none of this when it issued the Restart Approval. Instead, PHMSA unilaterally, and without explanation, determined that Lines CA-324/325 are interstate pipelines, and, because of that determination, PHMSA now contends it has sole regulatory authority over review and approval of the Restart Plan.

In failing to give faith and credit to the Consent Decree, PHMSA not only acted contrary to law, it also acted arbitrarily and capriciously by taking an unreasonable action and failing to provide any justification for it. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (the APA "requires that agency action be reasonable and reasonably explained.") The Restart Approval—a one-page letter—provides no explanation for ignoring the express terms of the Consent Decree, which conveys authority to review and approve a restart plan to OSFM. Indeed, the restart plans that PHMSA approved were initially submitted to OSFM and expressly acknowledge that "the Plan[s] must be submitted to the California OSFM at least 60-days in advance of a planned restart[.]" 3-CalER-511, 519.

56

Despite this acknowledgment by Sable, PHMSA's Restart Approval ignores OSFM's authority and nevertheless approves a restart.

PHMSA also acted in excess of its authority by issuing the Restart Approval. 5 U.S.C. § 706(2)(C). If the Court agrees that Lines CA-324/325 are intrastate, then PHMSA does not have authority to prescribe or enforce safety standards. 49 U.S.C. § 60105(a). And even if Lines CA-324/325 were correctly designated as interstate pipelines, the Consent Decree imparts sole authority to review and approve a restart plan to OSFM, not PHMSA. 5-CalER-876. Absent modification of the Consent Decree, PHMSA has no power to usurp OSFM's authority and in attempting to do so acts in excess of its authority.

## V. THE EMERGENCY SPECIAL PERMIT IS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS, AND FAILS TO JUSTIFY ISSUING THE PERMIT ON AN "EMERGENCY" BASIS

The Emergency Special Permit violates the APA for the same reasons that the Restart Approval does. The Emergency Special Permit is the consummation of PHMSA's determination that certain safety standards may and are waived on an emergency basis and waives compliance with such standards. *See* 49 U.S.C. § 60118(c)(2); 49 C.F.R. § 190.341(g). This final agency action relies on the unlawful determination that Lines CA-324/325 are interstate pipelines; fails to give faith and credit to the Consent Decree; and, finally, was issued without authority. Additionally, the Emergency Special Permit fails to provide a reasoned explanation

for how it satisfies the conditions required for issuing a special permit on an emergency basis.[16]

### A. The Emergency Special Permit is Contrary to Law, Arbitrary and Capricious, and Without Authority

Sable's Application for Emergency Special Permit states that Sable is seeking relief from 49 C.F.R. § 195.452(h)(4)(iii)(H) and that it is seeking an "Emergency Special Permit pursuant to Appendix B.1.A and B of the Consent Decree[.]" 2-CalER-166. According to Sable, PHMSA's designation of Lines CA-324/325 as interstate removes "any regulatory jurisdiction of OSFM over these pipelines" and instead requires obtaining a special permit from PHMSA. 2-CalER-179. Not so. As discussed above, just like "[i]t is beyond dispute that the separation of powers principal forbids Congress from reopening the final judgments of Article III courts[,]" the same principal forbids the executive branch, through PHMSA, from revising, overturning or refusing faith and credit to a district court's final judgment. *Taylor*, 181 F.3d at 1024 ("once court decisions achieve finality they 'may not lawfully be revised, overturned or refused faith and credit by another Department of Government.'" (citations omitted)). Appendix B.1.A. and B of the

---

[16] The Emergency Special Permit expired on its own terms on February 21, 2026. On February 24, 2026, PHMSA published a notice soliciting public comments on Sable's request for a non-emergency special permit. 91 Fed. Reg. 8949. The last day of the comment period is April 3, 2026. Currently, no permit is in force.

Consent Decree explicitly dictates that an application for a State Waiver shall go through, and be reviewed and approved by, *OSFM*, not PHMSA. PHMSA has no authority to unilaterally modify the Consent Decree and, in purporting to do so, violates the separation of powers doctrine. To the extent that PHMSA relies on the Executive Order, the same principle applies. The Executive Order, as an act of the executive branch, has no power to modify a final judgment of a district court, a separate branch of government. Therefore, the Emergency Special Permit is contrary to law.

Like the Restart Approval, the Emergency Special Permit is also arbitrary and capricious because it fails to provide a reasoned explanation for ignoring the express authority conveyed to OSFM by the Consent Decree to issue State Waivers. 5-CalER-860.

### B. The Emergency Special Permit Fails to Meet the Conditions Set by Statute and Regulation for Emergency Special Permits

Additionally, even if PHMSA had the authority to issue an Emergency Special Permit, the Emergency Special Permit fails to meet the conditions set forth in the statute and regulations that would allow such extraordinary relief. Pursuant to PHMSA's regulations, an emergency special permit may be issued only if the Associate Administrator determines that: "(i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline

59

transportation, including an emergency caused by a natural or manmade disaster." 49 U.S.C. § 60118(c)(2)(A); *see also* 49 C.F.R. § 190341(g).

PHMSA provides scant reasoning for how the emergency special permit addresses an actual or impending emergency.[17] In its Special Permit Analysis and Findings, PHMSA states that the Emergency Special Permit is necessary because it "would enable and facilitate the ***special permit segments*** to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." 1-CalER-20 (emphasis in original). However, PHMSA does not explain *how* the granting of the Emergency Special Permit will enable and facilitate, reduce, mitigate, or meet any of these purported needs. PHMSA gives no indication that it examined any data or considered any factors to conclude that the granting of an emergency special permit would indeed address the energy "emergency." PHMSA's brief "explanation" is nothing more than a few conclusory statements and is insufficient

---

[17] The State of California disputes the lawfulness of Executive Order 14156, which asserts a multi-year energy emergency. *See Washington v. Trump*, No. 2:25-cv-00869 (W.D. Wash. May 9, 2025); *see* Statement of the Case, Part E, *supra*. However, the State does not raise that issue in this case, and only argues whether there was a proper determination that the emergency special permit addresses that purported emergency.

to establish that the Emergency Special Permit indeed addresses an impending or actual emergency.

The Emergency Special Permit springs from an unlawful determination, wholly ignores a court's final judgment, is without authority, and fails to justify how it addresses an actual or impending emergency. As such, the Emergency Special Permit must be set aside.

## CONCLUSION

The petition should be granted, the Federalization Order, Restart Approval, and Emergency Special Permit should be vacated, and the case should be remanded to the agency for further proceedings.

Respectfully submitted this 23rd day of March, 2026.

*s/ Michael S. Dorsi*

MICHAEL S. DORSI
  *Deputy Attorneys General*
ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
  *Senior Assistant Attorneys General*
MYUNG PARK
VANESSA C. MORRISON
  *Supervising Deputy Attorneys General*
MATTHEW BULLOCK
MICHAEL S. DORSI
REBECCA HUNTER
RAFAEL J. HURTADO
MITCHELL RISHE
  *Deputy Attorneys General*

61

## STATEMENT OF RELATED CASES

The State of California is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court, other than the case already consolidated, case no. 25-8059, *Environmental Defense Center, et al. v. PHMSA, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s):**        26-508

I am the attorney or self-represented party.

**This brief contains <u>13,989</u> words,** including <u>78</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>*s/Michael Dorsi*</u>        **Date:** <u>March 23, 2026</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                                      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s) :**      26-508

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

Petitioner's Opening Brief; Petitioner's Excerpts of Record (CalER) Volumes 1 Through 7; and Petitioner's Proposed Supplemental Evidence (CalPSE)

**Signature** *s/Michael Dorsi*          **Date** March 23, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/18*

# ADDENDUM

5 U.S.C. § 702…………………………………………………………...1a

5 U.S.C. § 704………………………………………………………..….2a

5 U.S.C. § 706……………………………………………...…………3a

15 U.S.C. § 717……………………………………………..…………..5a

49 U.S.C. § 60101……………………………………………….8a

49 U.S.C. § 60104(c)…………………………………...…………16a

49 U.S.C. § 60105(a), (f)……………………………………………17a

49 U.S.C. § 60118(c)……………………………………………..…….18a

49 U.S.C. § 60118(d)………………………………….…19a

49 U.S.C. § 60119(a)…………………………………………………...21a

40 C.F.R. § 112, Appendix A, § II(1)(F)…………………………………23a

49 C.F.R. § 190.341……………………………………………………26a

49 C.F.R. § 192.625(b)……………………………………...……..39a

49 C.F.R. § 195, Appendix A, Example 7……………….…………42a

49 C.F.R. § 195.2……………………………………………………43a

49 C.F.R. § 195.452(h)(4)(iii)(H)……………………….…………..53a

49 C.F.R. § 195.563………………………………………………59a

Executive Order 14156, 90 FR 8353 (Jan. 29, 2025)………………..61a

**5 U.S. Code § 702. Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**5 U.S.C. § 704. Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

2a

**5 U.S.C. § 706 Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

3a

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**15 U.S.C. § 717. Regulation of natural gas companies**

(a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

(b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

(c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

(d) Vehicular natural gas jurisdiction

6a

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is--

(1) not otherwise a natural-gas company; or

(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

**49 U.S.C. § 60101. Definitions**

(a) General.--In this chapter--

(1) "existing liquefied natural gas facility"--

(A) means a liquefied natural gas facility for which an application to approve the site, construction, or operation of the facility was filed before March 1, 1978, with--

(i) the Federal Energy Regulatory Commission (or any predecessor); or

(ii) the appropriate State or local authority, if the facility is not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.); but

(B) does not include a facility on which construction is begun after November 29, 1979, without the approval;

(2) "gas" means natural gas, flammable gas, or toxic or corrosive gas;

(3) "gas pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used in transporting gas or treating gas during its transportation;

(4) "hazardous liquid" means--

(A) petroleum or a petroleum product;

8a

(B) nonpetroleum fuel, including biofuel, that is flammable, toxic, or corrosive or would be harmful to the environment if released in significant quantities; and

(C) a substance the Secretary of Transportation decides may pose an unreasonable risk to life or property when transported by a hazardous liquid pipeline facility in a liquid state (except for liquefied natural gas);

(5) "hazardous liquid pipeline facility" includes a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid;

(6) "interstate gas pipeline facility" means a gas pipeline facility--

(A) used to transport gas; and

(B) subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.);

(7) "interstate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce;

(8) "interstate or foreign commerce"--

(A) related to gas, means commerce--

9a

(i) between a place in a State and a place outside that State; or

(ii) that affects any commerce described in subclause (A)(i) of this clause; and

(B) related to hazardous liquid, means commerce between--

(i) a place in a State and a place outside that State; or

(ii) places in the same State through a place outside the State;

(9) "intrastate gas pipeline facility" means a gas pipeline facility and transportation of gas within a State not subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.);

(10) "intrastate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility;

(11) "liquefied natural gas" means natural gas in a liquid or semisolid state;

(12) "liquefied natural gas accident" means a release, burning, or explosion of liquefied natural gas from any cause, except a release, burning, or explosion that, under regulations prescribed by the Secretary, does not pose a threat to public health or safety, property, or the environment;

(13) "liquefied natural gas conversion" means conversion of natural gas into liquefied natural gas or conversion of liquefied natural gas into natural gas;

10a

(14) "liquefied natural gas pipeline facility"--

(A) means a gas pipeline facility used for transporting or storing liquefied natural gas, or for liquefied natural gas conversion, in interstate or foreign commerce; but

(B) does not include any part of a structure or equipment located in navigable waters (as defined in section 3 of the Federal Power Act (16 U.S.C. 796));

(15) "municipality" means a political subdivision of a State;

(16) "new liquefied natural gas pipeline facility" means a liquefied natural gas pipeline facility except an existing liquefied natural gas pipeline facility;

(17) "person", in addition to its meaning under section 1 of title 1 (except as to societies), includes a State, a municipality, and a trustee, receiver, assignee, or personal representative of a person;

(18) "pipeline facility" means a gas pipeline facility and a hazardous liquid pipeline facility;

(19) "pipeline transportation" means transporting gas and transporting hazardous liquid;

11a

(20) "State" means a State of the United States, the District of Columbia, and Puerto Rico;

(21) "transporting gas"--

(A) means--

(i) the gathering, transmission, or distribution of gas by pipeline, or the storage of gas, in interstate or foreign commerce; and

(ii) the movement of gas through regulated gathering lines; but

(B) does not include gathering gas (except through regulated gathering lines) in a rural area outside a populated area designated by the Secretary as a nonrural area;

(22) "transporting hazardous liquid"--

(A) means--

(i) the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce; and

(ii) the movement of hazardous liquid through regulated gathering lines; but

(B) does not include moving hazardous liquid through--

(i) gathering lines (except regulated gathering lines) in a rural area;

(ii) onshore production, refining, or manufacturing facilities; or

(iii) storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities;

(23) "risk management" means the systematic application, by the owner or operator of a pipeline facility, of management policies, procedures, finite resources, and practices to the tasks of identifying, analyzing, assessing, reducing, and controlling risk in order to protect employees, the general public, the environment, and pipeline facilities;

(24) "risk management plan" means a management plan utilized by a gas or hazardous liquid pipeline facility owner or operator that encompasses risk management;

(25) "Secretary" means the Secretary of Transportation; and

(26) "underground natural gas storage facility" means a gas pipeline facility that stores natural gas in an underground facility, including--

(A) a depleted hydrocarbon reservoir;

(B) an aquifer reservoir; or

(C) a solution-mined salt cavern reservoir.

13a

(b) Gathering lines.--(1)(A) Not later than October 24, 1994, the Secretary shall prescribe standards defining the term "gathering line".

(B) In defining "gathering line" for gas, the Secretary--

(i) shall consider functional and operational characteristics of the lines to be included in the definition; and

(ii) is not bound by a classification the Commission establishes under the Natural Gas Act (15 U.S.C. 717 et seq.).

(2)(A) Not later than October 24, 1995, the Secretary, if appropriate, shall prescribe standards defining the term "regulated gathering line". In defining the term, the Secretary shall consider factors such as location, length of line from the well site, operating pressure, throughput, and the composition of the transported gas or hazardous liquid, as appropriate, in deciding on the types of lines that functionally are gathering but should be regulated under this chapter because of specific physical characteristics.

(B)(i) The Secretary also shall consider diameter when defining "regulated gathering line" for hazardous liquid.

(ii) The definition of "regulated gathering line" for hazardous liquid may not include a crude oil gathering line that has a nominal diameter of not more

14a

15a

than 6 inches, is operated at low pressure, and is located in a rural area that

is not unusually sensitive to environmental damage.

15a

**49 U.S.C. § 60104(c). Requirements and limitations**

(c) Preemption.--A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation. Notwithstanding the preceding sentence, a State authority may enforce a requirement of a one-call notification program of the State if the program meets the requirements for one-call notification programs under this chapter or chapter 61.

**49 U.S.C. § 60105(a), (f). State pipeline safety program certifications**

(a) General requirements and submission.--Except as provided in this section and sections 60114 and 60121 of this title, the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority (including a municipality if the standards and practices apply to intrastate gas pipeline transportation) that submits to the Secretary annually a certification for the facilities and transportation that complies with subsections (b) and (c) of this section.

(f) Rejections of certification.--If after receiving a certification the Secretary decides the State authority is not enforcing satisfactorily compliance with applicable safety standards prescribed under this chapter, the Secretary may reject the certification, assert United States Government jurisdiction, or take other appropriate action to achieve adequate enforcement. The Secretary shall give the authority notice and an opportunity for a hearing before taking final action under this subsection. When notice is given, the burden of proof is on the authority to demonstrate that it is enforcing satisfactorily compliance with the prescribed standards.

17a

**49 U.S.C. § 60118(c), (d). Compliance and waivers**

(c) Waivers by Secretary.--

(1) Nonemergency waivers.--

(A) In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing.

(2) Emergency waivers.--

(A) In general.--The Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter on terms the Secretary considers appropriate without prior notice and comment if the Secretary determines that--

(i) it is in the public interest to grant the waiver;

(ii) the waiver is not inconsistent with pipeline safety; and

18a

(iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster.

(B) Period of waiver.--A waiver under this paragraph may be issued for a period of not more than 60 days and may be renewed upon application to the Secretary only after notice and an opportunity for a hearing on the waiver. The Secretary shall immediately revoke the waiver if continuation of the waiver would not be consistent with the goals and objectives of this chapter.

(3) Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver.

(d) Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt

19a

opportunity for a hearing. The Secretary shall make the final decision on granting the waiver.

**49 U.S.C. § 60119. Judicial review**

(a) Review of regulations, orders, and other final agency actions.--(1) Except as provided in subsection (b) of this section, a person adversely affected by a regulation prescribed under this chapter or an order issued under this chapter may apply for review of the regulation or order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 89 days after the regulation is prescribed or order is issued. The clerk of the court immediately shall send a copy of the petition to the Secretary of Transportation.

(2) A judgment of a court under paragraph (1) of this subsection may be reviewed only by the Supreme Court under section 1254 of title 28. A remedy under paragraph (1) is in addition to any other remedies provided by law.

(3) A judicial review of agency action under this section shall apply the standards of review established in section 706 of title 5.

(b) Review of financial responsibility orders.--(1) A person adversely affected by an order issued under section 60111 of this title may apply for

21a

review of the order by filing a petition for review in the appropriate court of appeals of the United States. The petition must be filed not later than 60 days after the order is issued. Findings of fact the Secretary makes are conclusive if supported by substantial evidence.

(2) A judgment of a court under paragraph (1) of this subsection may be reviewed only by the Supreme Court under section 1254(1) of title 28.

**40 C.F.R. § 112, Appendix A, § II(1)(F). Appendix A to Part 112— Memorandum of Understanding Between the Secretary of Transportation and the Administrator of the Environmental Protection Agency**

section ii—definitions

The Environmental Protection Agency and the Department of Transportation agree that for the purposes of Executive Order 11548, the term:

(1) Non-transportation-related onshore and offshore facilities  means:

(A) Fixed onshore and offshore oil well drilling facilities including all equipment and appurtenances related thereto used in drilling operations for exploratory or development wells, but excluding any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

(B) Mobile onshore and offshore oil well drilling platforms, barges, trucks, or other mobile facilities including all equipment and appurtenances related thereto when such mobile facilities are fixed in position for the purpose of drilling operations for exploratory or development wells, but excluding any

23a

terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

(C) Fixed onshore and offshore oil production structures, platforms, derricks, and rigs including all equipment and appurtenances related thereto, as well as completed wells and the wellhead separators, oil separators, and storage facilities used in the production of oil, but excluding any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

(D) Mobile onshore and offshore oil production facilities including all equipment and appurtenances related thereto as well as completed wells and wellhead equipment, piping from wellheads to oil separators, oil separators, and storage facilities used in the production of oil when such mobile facilities are fixed in position for the purpose of oil production operations, but excluding any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

(E) Oil refining facilities including all equipment and appurtenances related thereto as well as in-plant processing units, storage units, piping, drainage systems and waste treatment units used in the refining of oil, but excluding

24a

any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

(F) Oil storage facilities including all equipment and appurtenances related thereto as well as fixed bulk plant storage, terminal oil storage facilities, consumer storage, pumps and drainage systems used in the storage of oil, but excluding inline or breakout storage tanks needed for the continuous operation of a pipeline system and any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel.

**49 C.F.R. § 190.341 Special permits.**

(a) What is a special permit?  A special permit is an order by which PHMSA waives compliance with one or more of the Federal pipeline safety regulations under the standards set forth in 49 U.S.C. 60118(c) and subject to conditions set forth in the order. A special permit is issued to a pipeline operator (or prospective operator) for specified facilities that are or, absent waiver, would be subject to the regulation.

(b) How do I apply for a special permit?  Applications for special permits must be submitted at least 120 days before the requested effective date using any of the following methods:

(1) Direct fax to PHMSA at: 202-366-4566; or

(2) Mail, express mail, or overnight courier to the Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue, SE., East Building, Washington, DC 20590.

(c) What information must be contained in the application?  Applications must contain the following information:

26a

(1) The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;

(2) A detailed description of the pipeline facilities for which the special permit is sought, including:

(i) The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located;

(ii) Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas;

(iii) Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type; and

(iv) Relevant operating information including operating pressure, leak history, and most recent testing or assessment results;

(3) A list of the specific regulation(s) from which the applicant seeks relief;

(4) An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;

27a

(5) A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks;

(6) A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest;

(7) A certification that operation of the applicant's pipeline under the requested special permit would not be inconsistent with pipeline safety;

(8) Any other information PHMSA may need to process the application including environmental analysis where necessary.

(d) How does PHMSA handle special permit applications? —

(1) Public notice.  Upon receipt of an application or renewal of a special permit, PHMSA will provide notice to the public of its intent to consider the application and invite comment. In addition, PHMSA may consult with other Federal agencies before granting or denying an application or renewal on matters that PHMSA believes may have significance for proceedings under their areas of responsibility.

28a

(2) Grants, renewals, and denials. If the Associate Administrator determines that the application complies with the requirements of this section and that the waiver of the relevant regulation or standard is not inconsistent with pipeline safety, the Associate Administrator may grant the application, in whole or in part, for a period of time from the date granted. Conditions may be imposed on the grant if the Associate Administrator concludes they are necessary to assure safety, environmental protection, or are otherwise in the public interest. If the Associate Administrator determines that the application does not comply with the requirements of this section or that a waiver is not justified, the application will be denied. Whenever the Associate Administrator grants or denies an application, notice of the decision will be provided to the applicant. PHMSA will post all special permits on its Web site at http://www.phmsa.dot.gov/.

(e) How does PHMSA handle special permit renewals?

(1) The grantee of the special permit must apply for a renewal of the permit 180 days prior to the permit expiration.

(2) If, at least 180 days before an existing special permit expires the holder files an application for renewal that is complete and conforms to the

29a

requirements of this section, the special permit will not expire until final administrative action on the application for renewal has been taken:

(i) Direct fax to PHMSA at: 202-366-4566; or

(ii) Express mail, or overnight courier to the Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue SE., Washington, DC 20590.

(f) What information must be included in the renewal application?

(1) The renewal application must include a copy of the original special permit, the docket number on the special permit, and the following information as applicable:

(i) A summary report in accordance with the requirements of the original special permit including verification that the grantee's operations and maintenance plan (O&M Plan) is consistent with the conditions of the special permit;

(ii) Name, mailing address and telephone number of the special permit grantee;

(iii) Location of special permit—areas on the pipeline where the special permit is applicable including: Diameter, mile posts, county, and state;

30a

(iv) Applicable usage of the special permit—original and future; and

(v) Data for the special permit segment and area identified in the special permit as needing additional inspections to include, as applicable:

(A) Pipe attributes: Pipe diameter, wall thickness, grade, seam type; and pipe coating including girth weld coating;

(B) Operating Pressure: Maximum allowable operating pressure (MAOP); class location (including boundaries on aerial photography);

(C) High Consequence Areas (HCAs): HCA boundaries on aerial photography;

(D) Material Properties: Pipeline material documentation for all pipe, fittings, flanges, and any other facilities included in the special permit. Material documentation must include: Yield strength, tensile strength, chemical composition, wall thickness, and seam type;

(E) Test Pressure: Hydrostatic test pressure and date including pressure and temperature charts and logs and any known test failures or leaks;

(F) In-line inspection (ILI): Summary of ILI survey results from all ILI tools used on the special permit segments during the previous five years or latest ILI survey result;

31a

(G) Integrity Data and Integration: The following information, as applicable, for the past five (5) years: Hydrostatic test pressure including any known test failures or leaks; casings(any shorts); any in-service ruptures or leaks; close interval survey (CIS) surveys; depth of cover surveys; rectifier readings; test point survey readings; alternating current/direct current (AC/DC) interference surveys; pipe coating surveys; pipe coating and anomaly evaluations from pipe excavations; stress corrosion cracking (SCC), selective seam weld corrosion (SSWC) and hard spot excavations and findings; and pipe exposures from encroachments;

(H) In-service: Any in-service ruptures or leaks including repair type and failure investigation findings; and

(I) Aerial Photography: Special permit segment and special permit inspection area, if applicable.

(2) PHMSA may request additional operational, integrity or environmental assessment information prior to granting any request for special permit renewal.

(3) The existing special permit will remain in effect until PHMSA acts on the application for renewal by granting or denying the request.

32a

(g) Can a special permit be requested on an emergency basis? Yes. PHMSA may grant an application for an emergency special permit without notice and comment or hearing if the Associate Administrator determines that such action is in the public interest, is not inconsistent with pipeline safety, and is necessary to address an actual or impending emergency involving pipeline transportation. For purposes of this section, an emergency event may be local, regional, or national in scope and includes significant fuel supply disruptions and natural or manmade disasters such as hurricanes, floods, earthquakes, terrorist acts, biological outbreaks, releases of dangerous radiological, chemical, or biological materials, war-related activities, or other similar events. PHMSA will determine on a case-by-case basis what duration is necessary to address the emergency. However, as required by statute, no emergency special permit may be issued for a period of more than 60 days. Each emergency special permit will automatically expire on the date specified in the permit. Emergency special permits may be renewed upon application to PHMSA only after notice and opportunity for a hearing on the renewal.

33a

(h) How do I apply for an emergency special permit?  Applications for emergency special permits may be submitted to PHMSA using any of the following methods:

(1) Direct fax to the Crisis Management Center at: 202-366-3768;

(2) Direct e-mail to PHMSA at: phmsa.pipeline-emergencyspecpermit@dot.gov; or

(3) Express mail/overnight courier to the Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration, 1200 New Jersey Avenue, SE., East Building, Washington, DC 20590.

(i) What must be contained in an application for an emergency special permit?  In addition to the information required under paragraph (c) of this section, applications for emergency special permits must include:

(1) An explanation of the actual or impending emergency and how the applicant is affected;

(2) A citation of the regulations that are implicated and the specific reasons the permit is necessary to address the emergency (e.g., lack of accessibility, damaged equipment, insufficient manpower);

34a

(3) A statement indicating how operating the pipeline pursuant to an emergency special permit is in the public interest (e.g., continuity of service, service restoration);

(4) A description of any proposed alternatives to compliance with the regulation (e.g., additional inspections and tests, shortened reassessment intervals); and

(5) A description of any measures to be taken after the emergency situation or permit expires—whichever comes first—to confirm long-term operational reliability of the pipeline facility.

Note to paragraph (g):

If PHMSA determines that handling of the application on an emergency basis is not warranted, PHMSA will notify the applicant and process the application under normal special permit procedures of this section.

(j) In what circumstances will PHMSA revoke, suspend, or modify a special permit?

(1) PHMSA may revoke, suspend, or modify a special permit on a finding that:

35a

(i) Intervening changes in Federal law mandate revocation, suspension, or modification of the special permit;

(ii) Based on a material change in conditions or circumstances, continued adherence to the terms of the special permit would be inconsistent with safety;

(iii) The application contained inaccurate or incomplete information, and the special permit would not have been granted had the application been accurate and complete;

(iv) The application contained deliberately inaccurate or incomplete information; or

(v) The holder has failed to comply with any material term or condition of the special permit.

(2) Except as provided in paragraph (h)(3) of this section, before a special permit is modified, suspended or revoked, PHMSA will notify the holder in writing of the proposed action and the reasons for it, and provide an opportunity to show cause why the proposed action should not be taken.

36a

(i) The holder may file a written response that shows cause why the proposed action should not be taken within 30 days of receipt of notice of the proposed action.

(ii) After considering the holder's written response, or after 30 days have passed without response since receipt of the notice, PHMSA will notify the holder in writing of the final decision with a brief statement of reasons.

(3) If necessary to avoid a risk of significant harm to persons, property, or the environment, PHMSA may in the notification declare the proposed action immediately effective.

(4) Unless otherwise specified, the terms and conditions of a corrective action order, compliance order, or other order applicable to a pipeline facility covered by a special permit will take precedence over the terms of the special permit.

(5) A special permit holder may seek reconsideration of a decision under paragraph (h) of this section as provided in paragraph (i) of this section.

(k) Can a denial of a request for a special permit or a revocation of an existing special permit be appealed?  Reconsideration of the denial of an application for a special permit or a revocation of an existing special permit

may be sought by petition to the Associate Administrator. Petitions for reconsideration must be received by PHMSA within 20 calendar days of the notice of the grant or denial and must contain a brief statement of the issue and an explanation of why the petitioner believes that the decision being appealed is not in the public interest. The Associate Administrator may grant or deny, in whole or in part, any petition for reconsideration without further proceedings. The Associate Administrator's decision is the final administrative action.

(l) Are documents related to an application for a special permit available for public inspection? Documents related to an application, including the application itself, are available for public inspection on regulations.gov or the Docket Operations Facility to the extent such documents do not include information exempt from public disclosure under 5 U.S.C. 552(b). Applicants may request confidential treatment under part 7 of this title.

(m) Am I subject to enforcement action for non-compliance with the terms and conditions of a special permit? Yes. PHMSA inspects for compliance with the terms and conditions of special permits and if a probable violation is identified, PHMSA will initiate one or more of the enforcement actions under subpart B of this part.

38a

**49 C.F.R. § 192.625(b). Odorization of gas.**

(b) After December 31, 1976, a combustible gas in a transmission line in a Class 3 or Class 4 location must comply with the requirements of paragraph (a) of this section unless:

(1) At least 50 percent of the length of the line downstream from that location is in a Class 1 or Class 2 location;

(2) The line transports gas to any of the following facilities which received gas without an odorant from that line before May 5, 1975;

(i) An underground storage field;

(ii) A gas processing plant;

(iii) A gas dehydration plant; or

(iv) An industrial plant using gas in a process where the presence of an odorant:

(A) Makes the end product unfit for the purpose for which it is intended;

(B) Reduces the activity of a catalyst; or

(C) Reduces the percentage completion of a chemical reaction;

39a

(3) In the case of a lateral line which transports gas to a distribution center, at least 50 percent of the length of that line is in a Class 1 or Class 2 location; or

(4) The combustible gas is hydrogen intended for use as a feedstock in a manufacturing process.

(c) In the concentrations in which it is used, the odorant in combustible gases must comply with the following:

(1) The odorant may not be deleterious to persons, materials, or pipe.

(2) The products of combustion from the odorant may not be toxic when breathed nor may they be corrosive or harmful to those materials to which the products of combustion will be exposed.

(d) The odorant may not be soluble in water to an extent greater than 2.5 parts to 100 parts by weight.

(e) Equipment for odorization must introduce the odorant without wide variations in the level of odorant.

(f) To assure the proper concentration of odorant in accordance with this section, each operator must conduct periodic sampling of combustible gases using an instrument capable of determining the percentage of gas in air at

40a

which the odor becomes readily detectable. Operators of master meter systems may comply with this requirement by—

(1) Receiving written verification from their gas source that the gas has the proper concentration of odorant; and

(2) Conducting periodic "sniff" tests at the extremities of the system to confirm that the gas contains odorant.

**49 C.F.R. § 195, Appendix A, Example 7. Delineation Between Federal and State Jurisdiction—Statement of Agency Policy and Interpretation**

Example 7.   Pipeline Company P operates a pipeline that originates on the

Outer Continental Shelf. P does not file any tariff for that line with FERC.

DOT will consider the pipeline to be an interstate pipeline facility.

**49 C.F.R. § 195.2. Definitions**

As used in this part—

Abandoned   means permanently removed from service.

Administrator   means the Administrator, Pipeline and Hazardous Materials Safety Administration or his or her delegate.

Alarm   means an audible or visible means of indicating to the controller that equipment or processes are outside operator-defined, safety-related parameters.

Barrel   means a unit of measurement equal to 42 U.S. standard gallons.

Breakout tank   means a tank used to

(a) relieve surges in a hazardous liquid pipeline system or

(b) receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline.

Carbon dioxide   means a fluid consisting of more than 90 percent carbon dioxide molecules compressed to a supercritical state.

43a

Component   means any part of a pipeline which may be subjected to pump pressure including, but not limited to, pipe, valves, elbows, tees, flanges, and closures.

Computation Pipeline Monitoring (CPM)   means a software-based monitoring tool that alerts the pipeline dispatcher of a possible pipeline operating anomaly that may be indicative of a commodity release.

Confirmed Discovery   means when it can be reasonably determined, based on information available to the operator at the time a reportable event has occurred, even if only based on a preliminary evaluation.

Control room   means an operations center staffed by personnel charged with the responsibility for remotely monitoring and controlling a pipeline facility.

Controller   means a qualified individual who remotely monitors and controls the safety-related operations of a pipeline facility via a SCADA system from a control room, and who has operational authority and accountability for the remote operational functions of the pipeline facility.

Corrosive product   means "corrosive material" as defined by § 173.136 Class 8-Definitions of this chapter.

44a

Entirely replaced onshore hazardous liquid or carbon dioxide pipeline segments, for the purposes of §§ 195.258, 195.260, and 195.418, means where 2 or more miles of pipe, in the aggregate, have been replaced within any 5 contiguous miles within any 24-month period. This definition does not apply to any gathering line.

Exposed underwater pipeline means an underwater pipeline where the top of the pipe protrudes above the underwater natural bottom (as determined by recognized and generally accepted practices) in waters less than 15 feet (4.6 meters) deep, as measured from mean low water.

Flammable product means "flammable liquid" as defined by § 173.120 Class 3-Definitions of this chapter.

Gathering line means a pipeline 219.1 mm (8⅝ in) or less nominal outside diameter that transports petroleum from a production facility.

Gulf of America and its inlets means the waters from the mean high water mark of the coast of the Gulf of America and its inlets open to the sea (excluding rivers, tidal marshes, lakes, and canals) seaward to include the territorial sea and Outer Continental Shelf to a depth of 15 feet (4.6 meters), as measured from the mean low water.

45a

Hazard to navigation means, for the purposes of this part, a pipeline where the top of the pipe is less than 12 inches (305 millimeters) below the underwater natural bottom (as determined by recognized and generally accepted practices) in waters less than 15 feet (4.6 meters) deep, as measured from the mean low water.

Hazardous liquid means petroleum, petroleum products, anhydrous ammonia, and ethanol or other non-petroleum fuel, including biofuel, which is flammable, toxic, or would be harmful to the environment if released in significant quantities.

Highly volatile liquid or HVL means a hazardous liquid which will form a vapor cloud when released to the atmosphere and which has a vapor pressure exceeding 276 kPa (40 psia) at 37.8 °C (100 °F).

In-Line Inspection (ILI) means the inspection of a pipeline from the interior of the pipe using an in-line inspection tool. Also called intelligent or smart pigging.

In-Line Inspection Tool or Instrumented Internal Inspection Device means a device or vehicle that uses a non-destructive testing technique to inspect the pipeline from the inside. Also known as intelligent or smart pig.

In-plant piping system   means piping that is located on the grounds of a plant and used to transfer hazardous liquid or carbon dioxide between plant facilities or between plant facilities and a pipeline or other mode of transportation, not including any device and associated piping that are necessary to control pressure in the pipeline under § 195.406(b).

Interstate pipeline   means a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce.

Intrastate pipeline   means a pipeline or that part of a pipeline to which this part applies that is not an interstate pipeline.

Line section   means a continuous run of pipe between adjacent pressure pump stations, between a pressure pump station and terminal or breakout tanks, between a pressure pump station and a block valve, or between adjacent block valves.

Low-stress pipeline   means a hazardous liquid pipeline that is operated in its entirety at a stress level of 20 percent or less of the specified minimum yield strength of the line pipe.

47a

Maximum operating pressure (MOP) means the maximum pressure at which a pipeline or segment of a pipeline may be normally operated under this part.

Nominal wall thickness means the wall thickness listed in the pipe specifications.

Notification of potential rupture means the notification to, or observation by, an operator of indicia identified in § 195.417 of a potential unintentional or uncontrolled release of a large volume of commodity from a pipeline. This definition does not apply to any gathering line.

Offshore means beyond the line of ordinary low water along that portion of the coast of the United States that is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters.

Operator means a person who owns or operates pipeline facilities.

Outer Continental Shelf means all submerged lands lying seaward and outside the area of lands beneath navigable waters as defined in Section 2 of the Submerged Lands Act (43 U.S.C. 1301) and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control.

Person   means any individual, firm, joint venture, partnership, corporation, association, State, municipality, cooperative association, or joint stock association, and includes any trustee, receiver, assignee, or personal representative thereof.

Petroleum   means crude oil, condensate, natural gasoline, natural gas liquids, and liquefied petroleum gas.

Petroleum product   means flammable, toxic, or corrosive products obtained from distilling and processing of crude oil, unfinished oils, natural gas liquids, blend stocks and other miscellaneous hydrocarbon compounds.

Pipe or line pipe   means a tube, usually cylindrical, through which a hazardous liquid or carbon dioxide flows from one point to another.

Pipeline or pipeline system   means all parts of a pipeline facility through which a hazardous liquid or carbon dioxide moves in transportation, including, but not limited to, line pipe, valves, and other appurtenances connected to line pipe, pumping units, fabricated assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks.

Pipeline facility   means new and existing pipe, rights-of-way and any equipment, facility, or building used in the transportation of hazardous liquids or carbon dioxide.

Production facility   means piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation or treating of petroleum or carbon dioxide, or associated storage or measurement. (To be a production facility under this definition, piping or equipment must be used in the process of extracting petroleum or carbon dioxide from the ground or from facilities where CO2 is produced, and preparing it for transportation by pipeline. This includes piping between treatment plants which extract carbon dioxide, and facilities utilized for the injection of carbon dioxide for recovery operations.)

Rupture-mitigation valve   (RMV) means an automatic shut-off valve (ASV) or a remote-control valve (RCV) that a pipeline operator uses to minimize the volume of hazardous liquid or carbon dioxide released from the pipeline and to mitigate the consequences of a rupture. This definition does not apply to any gathering line.

Rural area   means outside the limits of any incorporated or unincorpated city, town, village, or any other designated residential or commercial area

50a

such as a subdivision, a business or shopping center, or community development.

Significant Stress Corrosion Cracking means a stress corrosion cracking (SCC) cluster in which the deepest crack, in a series of interacting cracks, is greater than 10% of the wall thickness and the total interacting length of the cracks is equal to or greater than 75% of the critical length of a 50% through-wall flaw that would fail at a stress level of 110% of SMYS.

Specified minimum yield strength means the minimum yield strength, expressed in p.s.i. (kPa) gage, prescribed by the specification under which the material is purchased from the manufacturer.

Stress level means the level of tangential or hoop stress, usually expressed as a percentage of specified minimum yield strength.

Supervisory Control and Data Acquisition (SCADA) system means a computer-based system or systems used by a controller in a control room that collects and displays information about a pipeline facility and may have the ability to send commands back to the pipeline facility.

51a

Surge pressure   means pressure produced by a change in velocity of the moving stream that results from shutting down a pump station or pumping unit, closure of a valve, or any other blockage of the moving stream.

Toxic product   means "poisonous material" as defined by § 173.132 Class 6, Division 6.1-Definitions of this chapter.

Unusually Sensitive Area (USA)   means a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release, as identified under § 195.6.

Welder   means a person who performs manual or semi-automatic welding.

Welding operator   means a person who operates machine or automatic welding equipment.

**49 C.F.R. § 195.452(h)(4)(iii)(H). Pipeline integrity management in high consequence areas.**

(h) What actions must an operator take to address integrity issues? —

(1) General requirements.  An operator must take prompt action to address all anomalous conditions in the pipeline that the operator discovers through the integrity assessment or information analysis. In addressing all conditions, an operator must evaluate all anomalous conditions and remediate those that could reduce a pipeline's integrity, as required by this part. An operator must be able to demonstrate that the remediation of the condition will ensure that the condition is unlikely to pose a threat to the long-term integrity of the pipeline. An operator must comply with all other applicable requirements in this part in remediating a condition. Each operator must, in repairing its pipeline systems, ensure that the repairs are made in a safe and timely manner and are made so as to prevent damage to persons, property, or the environment. The calculation method(s) used for anomaly evaluation must be applicable for the range of relevant threats.

(i) Temporary pressure reduction.  An operator must notify PHMSA, in accordance with paragraph (m) of this section, if the operator cannot meet the schedule for evaluation and remediation required under paragraph (h)(3)

53a

of this section and cannot provide safety through a temporary reduction in operating pressure.

(ii) Long-term pressure reduction. When a pressure reduction exceeds 365 days, the operator must notify PHMSA in accordance with paragraph (m) of this section and explain the reasons for the delay. An operator must also take further remedial action to ensure the safety of the pipeline.

(2) Discovery of condition. Discovery of a condition occurs when an operator has adequate information to determine that a condition presenting a potential threat to the integrity of the pipeline exists. An operator must promptly, but no later than 180 days after an assessment, obtain sufficient information about a condition to make that determination, unless the operator can demonstrate the 180-day interval is impracticable. If the operator believes that 180 days are impracticable to make a determination about a condition found during an assessment, the pipeline operator must notify PHMSA in accordance with paragraph (m) of this section and provide an expected date when adequate information will become available.

(3) Schedule for evaluation and remediation. An operator must complete remediation of a condition according to a schedule prioritizing the conditions for evaluation and remediation. If an operator cannot meet the

54a

schedule for any condition, the operator must explain the reasons why it cannot meet the schedule and how the changed schedule will not jeopardize public safety or environmental protection.

(4) Special requirements for scheduling remediation —

(i) Immediate repair conditions. An operator's evaluation and remediation schedule must provide for immediate repair conditions. To maintain safety, an operator must temporarily reduce the operating pressure or shut down the pipeline until the operator completes the repair of these conditions. An operator must calculate the temporary reduction in operating pressure using the formulas referenced in paragraph (h)(4)(i)(B) of this section. If no suitable remaining strength calculation method can be identified, an operator must implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two months prior to the date of inspection, until the anomaly is repaired. An operator must treat the following conditions as immediate repair conditions:

(A) Metal loss greater than 80% of nominal wall regardless of dimensions.

(B) A calculation of the remaining strength of the pipe shows a predicted burst pressure less than the established maximum operating pressure at the location of the anomaly. Suitable remaining strength calculation methods

55a

include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see § 195.3).

(C) A dent located on the top of the pipeline (above the 4 and 8 o'clock positions) that has any indication of metal loss, cracking or a stress riser.

(D) A dent located on the top of the pipeline (above the 4 and 8 o'clock positions) with a depth greater than 6% of the nominal pipe diameter.

(E) An anomaly that in the judgment of the person designated by the operator to evaluate the assessment results requires immediate action.

(ii) 60-day conditions.  Except for conditions listed in paragraph (h)(4)(i) of this section, an operator must schedule evaluation and remediation of the following conditions within 60 days of discovery of condition.

(A) A dent located on the top of the pipeline (above the 4 and 8 o'clock positions) with a depth greater than 3% of the pipeline diameter (greater than 0.250 inches in depth for a pipeline diameter less than Nominal Pipe Size (NPS) 12).

(B) A dent located on the bottom of the pipeline that has any indication of metal loss, cracking or a stress riser.

56a

(iii) 180-day conditions.  Except for conditions listed in paragraph (h)(4)(i) or (ii) of this section, an operator must schedule evaluation and remediation of the following within 180 days of discovery of the condition:

(A) A dent with a depth greater than 2% of the pipeline's diameter (0.250 inches in depth for a pipeline diameter less than NPS 12) that affects pipe curvature at a girth weld or a longitudinal seam weld.

(B) A dent located on the top of the pipeline (above 4 and 8 o'clock position) with a depth greater than 2% of the pipeline's diameter (0.250 inches in depth for a pipeline diameter less than NPS 12).

(C) A dent located on the bottom of the pipeline with a depth greater than 6% of the pipeline's diameter.

(D) A calculation of the remaining strength of the pipe shows an operating pressure that is less than the current established maximum operating pressure at the location of the anomaly. Suitable remaining strength calculation methods include, but are not limited to, ASME/ANSI B31G and PRCI PR-3-805 (R-STRENG).

(E) An area of general corrosion with a predicted metal loss greater than 50% of nominal wall.

(F) Predicted metal loss greater than 50% of nominal wall that is located at a crossing of another pipeline, or is in an area with widespread circumferential corrosion, or is in an area that could affect a girth weld.

(G) A potential crack indication that when excavated is determined to be a crack.

(H) Corrosion of or along a longitudinal seam weld.

58a

**49 C.F.R. § 195.563 Which pipelines must have cathodic protection?**

(a) Each buried or submerged pipeline that is constructed, relocated, replaced, or otherwise changed after the applicable date in § 195.401(c) must have cathodic protection. The cathodic protection must be in operation not later than 1 year after the pipeline is constructed, relocated, replaced, or otherwise changed, as applicable.

(b) Each buried or submerged pipeline converted under § 195.5 must have cathodic protection if the pipeline—

(1) Has cathodic protection that substantially meets § 195.571 before the pipeline is placed in service; or

(2) Is a segment that is relocated, replaced, or substantially altered.

(c) All other buried or submerged pipelines that have an effective external coating must have cathodic protection.[1]   Except as provided by paragraph (d) of this section, this requirement does not apply to breakout tanks and does not apply to buried piping in breakout tank areas and pumping stations until December 29, 2003.

(d) Bare pipelines, breakout tank areas, and buried pumping station piping must have cathodic protection in places where regulations in effect before

59a

January 28, 2002 required cathodic protection as a result of electrical inspections. See previous editions of this part in 49 CFR, parts 186 to 199.

(e) Unprotected pipe must have cathodic protection if required by § 195.573(b).

**Executive Order 14156, 90 FR 8353 (Jan. 29, 2025)**

Declaring a National Energy Emergency

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the National Emergencies Act (50 U.S.C. 1601

et seq.) ("NEA"), and section 301 of title 3, United States Code, it is hereby ordered:

Section 1.

Purpose.

The energy and critical minerals ("energy") identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs. We need a reliable, diversified, and affordable supply of energy to drive our Nation's manufacturing, transportation, agriculture, and defense industries, and to sustain the basics of modern life and military preparedness. Caused by the harmful and shortsighted policies of the previous administration, our Nation's inadequate energy supply and infrastructure causes and makes

61a

worse the high energy prices that devastate Americans, particularly those living on low- and fixed-incomes.

This active threat to the American people from high energy prices is exacerbated by our Nation's diminished capacity to insulate itself from hostile foreign actors. Energy security is an increasingly crucial theater of global competition. In an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets. An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation.

The integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security. It is imperative that the Federal government puts the physical and economic wellbeing of the American people first.

Moreover, the United States has the potential to use its unrealized energy resources domestically, and to sell to international allies and partners a reliable, diversified, and affordable supply of energy. This would create jobs

62a

and economic prosperity for Americans forgotten in the present economy, improve the United States' trade balance, help our country compete with hostile foreign powers, strengthen relations with allies and partners, and support international peace and security. Accordingly, our Nation's dangerous energy situation inflicts unnecessary and perilous constraints on our foreign policy.

The policies of the previous administration have driven our Nation into a national emergency, where a precariously inadequate and intermittent energy supply, and an increasingly unreliable grid, require swift and decisive action. Without immediate remedy, this situation will dramatically deteriorate in the near future due to a high demand for energy and natural resources to power the next generation of technology. The United States' ability to remain at the forefront of technological innovation depends on a reliable supply of energy and the integrity of our Nation's electrical grid. Our Nation's current inadequate development of domestic energy resources leaves us vulnerable to hostile foreign actors and poses an imminent and growing threat to the United States' prosperity and national security.

These numerous problems are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our

63a

Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population. The United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy. In light of these findings, I hereby declare a national emergency.

Sec. 2.

Emergency Approvals.

(a) The heads of executive departments and agencies ("agencies") shall identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands. If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act (Public Law 81-774, 50 U.S.C. 4501

et seq.) are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the President, through the Assistant to the President for National Security Affairs.

64a

(b) Consistent with 42 U.S.C. 7545(c)(4)(C)(ii)(III), the Administrator of the Environmental Protection Agency, after consultation with, and concurrence by, the Secretary of Energy, shall consider issuing emergency fuel waivers to allow the year-round sale of E15 gasoline to meet any projected temporary shortfalls in the supply of gasoline across the Nation.

Sec. 3.

Expediting the Delivery of Energy Infrastructure.

(a) To facilitate the Nation's energy supply, agencies shall identify and use all relevant lawful emergency and other authorities available to them to expedite the completion of all authorized and appropriated infrastructure, energy, environmental, and natural resources projects that are within the identified authority of each of the Secretaries to perform or to advance.

(b) To protect the collective national and economic security of the United States, agencies shall identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States, Northeast of the United States, and Alaska.

(c) The Secretaries shall provide such reports regarding activities under this section as may be requested by the Assistant to the President for Economic Policy.

Sec. 4.

Emergency Regulations and Nationwide Permits Under the Clean Water Act (CWA) and Other Statutes Administered by the Army Corps of Engineers.

(a) Within 30 days from the date of this order, the heads of all agencies, as well as the Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works shall:

(i) identify planned or potential actions to facilitate the Nation's energy supply that may be subject to emergency treatment pursuant to the regulations and nationwide permits promulgated by the Corps, or jointly by the Corps and EPA, pursuant to section 404 of the Clean Water Act, 33 U.S.C. 1344, section 10 of the Rivers and Harbors Act of March 3, 1899, 33 U.S.C. 403, and section 103 of the Marine Protection Research and Sanctuaries Act of 1972, 33 U.S.C. 1413 (collectively, the "emergency Army Corps permitting provisions"); and

66a

(ii) shall provide a summary report, listing such actions, to the Director of the Office of Management and Budget ("OMB"); the Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works; the Assistant to the President for Economic Policy; and the Chairman of the Council on Environmental Quality (CEQ). Such report may be combined, as appropriate, with any other reports required by this order.

(b) Agencies are directed to use, to the fullest extent possible and consistent with applicable law, the emergency Army Corps permitting provisions to facilitate the Nation's energy supply.

(c) Within 30 days following the submission of the initial summary report described in subsection (a)(ii) of this section, each department and agency shall provide a status report to the OMB Director; the Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works; the Director of the National Economic Council; and the Chairman of the CEQ. Each such report shall list actions taken within subsection (a)(i) of this section, shall list the status of any previously reported planned or potential actions, and shall list any new planned or potential actions that fall within subsection (a)(i). Such status reports shall thereafter be provided to these officials at least every 30 days for the duration of the national emergency

67a

and may be combined, as appropriate, with any other reports required by this order.

(d) The Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works, shall be available to consult promptly with agencies and to take other prompt and appropriate action concerning the application of the emergency Army Corps permitting provisions. The Administrator of the EPA shall provide prompt cooperation to the Secretary of the Army and to agencies in connection with the discharge of the responsibilities described in this section.

Sec. 5.

Endangered Species Act (ESA) Emergency Consultation Regulations.

(a) No later than 30 days from the date of this order, the heads of all agencies tasked in this order shall:

(i) identify planned or potential actions to facilitate the Nation's energy supply that may be subject to the regulation on consultations in emergencies, 50 CFR 402.05, promulgated by the Secretary of the Interior and the Secretary of Commerce pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. 1531 et seq.; and

68a

(ii) provide a summary report, listing such actions, to the Secretary of the Interior, the Secretary of Commerce, the OMB Director, the Director of the National Economic Council, and the Chairman of CEQ. Such report may be combined, as appropriate, with any other reports required by this order.

(b) Agencies are directed to use, to the maximum extent permissible under applicable law, the ESA regulation on consultations in emergencies, to facilitate the Nation's energy supply.

(c) Within 30 days following the submission of the initial summary report described in subsection (a)(ii) of this section, the head of each agency shall provide a status report to the Secretary of the Interior, the Secretary of Commerce, the OMB Director, the Director of the National Economic Council, and the Chairman of CEQ. Each such report shall list actions taken within the categories described in subsection (a)(i) of this section, the status of any previously reported planned or potential actions, and any new planned or potential actions within these categories. Such status reports shall thereafter be provided to these officials at least every 30 days for the duration of the national emergency and may be combined, as appropriate, with any other reports required by this order. The OMB Director may grant discretionary exemptions from this reporting requirement.

69a

(d) The Secretary of the Interior shall ensure that the Director of the Fish and Wildlife Service, or the Director's authorized representative, is available to consult promptly with agencies and to take other prompt and appropriate action concerning the application of the ESA's emergency regulations. The Secretary of Commerce shall ensure that the Assistant Administrator for Fisheries for the National Marine Fisheries Service, or the Assistant Administrator's authorized representative, is available for such consultation and to take such other action.

Sec. 6.

Convening the Endangered Species Act Committee.

(a) In acting as Chairman of the Endangered Species Act Committee, the Secretary of the Interior shall convene the Endangered Species Act Committee not less than quarterly, unless otherwise required by law, to review and consider any lawful applications submitted by an agency, the Governor of a State,

or any applicant for a permit or license who submits for exemption from obligations imposed by Section 7 of the ESA.

70a

(b) To the extent practicable under the law, the Secretary of the Interior shall ensure a prompt and efficient review of all submissions described in subsection (a) of this section, to include identification of any legal deficiencies, in order to ensure an initial determination within 20 days of receipt and the ability to convene the Endangered Species Act Committee to resolve the submission within 140 days of such initial determination of eligibility.

(c) In the event that the committee has no pending applications for review, the committee or its designees shall nonetheless convene to identify obstacles to domestic energy infrastructure specifically deriving from implementation of the ESA or the Marine Mammal Protection Act, to include regulatory reform efforts, species listings, and other related matters with the aim of developing procedural, regulatory, and interagency improvements.

Sec. 7.

Coordinated Infrastructure Assistance.

(a) In collaboration with the Secretaries of Interior and Energy, the Secretary of Defense shall conduct an assessment of the Department of Defense's ability to acquire and transport the energy, electricity, or fuels needed to

71a

protect the homeland and to conduct operations abroad, and, within 60 days, shall submit this assessment to the Assistant to the President for National Security Affairs. This assessment shall identify specific vulnerabilities, including, but not limited to, potentially insufficient transportation and refining infrastructure across the Nation, with a focus on such vulnerabilities within the Northeast and West Coast regions of the United States. The assessment shall also identify and recommend the requisite authorities and resources to remedy such vulnerabilities, consistent with applicable law.

(b) In accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of the Army, acting through the Assistant Secretary of the Army for Civil Works, to address any vulnerabilities identified in the assessment mandated by subsection (a). Any such recommended actions shall be submitted to the President for review, through the Assistant to the President for National Security Affairs and the Assistant to the President for Economic Policy.

Sec. 8.

Definitions.

72a

For purposes of this order, the following definitions shall apply:

(a) The term "energy" or "energy resources" means crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. 1606 (a)(3).

(b) The term "production" means the extraction or creation of energy.

(c) The term "transportation" means the physical movement of energy, including through, but not limited to, pipelines.

(d) The term "refining" means the physical or chemical change of energy into a form that can be used by consumers or users, including, but not limited to, the creation of gasoline, diesel, ethanol, aviation fuel, or the beneficiation, enrichment, or purification of minerals.

(e) The term "generation" means the use of energy to produce electricity or thermal power and the transmission of electricity from its site of generation.

(f) The term "energy supply" means the production, transportation, refining, and generation of energy.

Sec. 9.

General Provisions.

73a

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.