Nos. 25-8059, 26-508

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*,

and

SABLE OFFSHORE CORP., et al.,
*Intervenors*.

On Petition for Review of Actions Taken by the
Pipeline & Hazardous Materials Safety Administration

## PETITIONERS' JOINT OPENING BRIEF

Linda Krop
Jeremy M. Frankel
Margaret M. Hall

Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
lkrop@environmentaldefensecenter.org
jfrankel@environmentaldefensecenter.org
mhall@environmentaldefensecenter.org

*Attorneys for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

Julie Teel Simmonds
David Pettit
Talia Nimmer

Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
tnimmer@biologicaldiversity.org

*Attorneys for Petitioners
Center for Biological Diversity
and Wishtoyo Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1-1, Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation state as follows:

These Petitioners are non-profit organizations and do not have any parent corporations or any publicly held corporations that own ten percent or more of their stock.

Dated: March 23, 2026

Respectfully submitted,

s/ *Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES .................................................................................... vi

TABLE OF ACRONYMS AND TERMS.................................................................. xii

INTRODUCTION ....................................................................................................1

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATUTORY AND REGULATORY AUTHORITIES ...........................................3

STATEMENT OF THE CASE...................................................................................3

    I.     Overview of the Santa Ynez Unit and the Pipelines at Issue................3

        A.     SYU Infrastructure and Development .........................................3

        B.     Onshore Pipelines CA-324 and CA-325....................................5

    II.     The 2015 Refugio Oil Spill and Defects in the Onshore Pipelines ........................................................................................9

    III.     Transfer of Jurisdiction to OSFM and Conditions for Restarting..........................................................................................10

    IV.     Sable's Acquisition and Efforts to Restart the Onshore Pipelines ..........................................................................................12

    V.     PHMSA's Unlawful Federalization of the Onshore Pipelines and the Approvals at Issue ................................................14

SUMMARY OF THE ARGUMENT ........................................................................17

ARGUMENT .................................................................................................22

I.      Standard of Review .............................................................................22

II.     The Onshore Pipelines Are under the Exclusive Regulatory Authority of OSFM, and Thus Any Attempt to Regulate Them Exceeds PHMSA's Jurisdiction and Authority and Is Otherwise Unlawful. ......................................................................23

        A.    The Scope of PHMSA's Authority .........................................24

        B.    Because the Consent Decree Vests OSFM With "Sole Regulatory Oversight" of the Pipelines, the Approvals Are *Ultra Vires* and Contrary to Law. ......................................26

        C.    The Onshore Pipelines Are *Intra*state Facilities, and PHMSA's Attempt to Classify Them Otherwise Contravenes the PSA and Forty Years of Its Own Regulatory Precedent. ............................................................27

                1.    The Infrastructure Here Cannot Be Considered a Single "Pipeline Facility" Because Hazardous Liquid Is Taken Out of Transportation at the LFC Facilities. ............................................................28

                2.    Production, Manufacturing, and Refining Facilities—Like the LFC Facilities—are Expressly Excluded from the Definition of "Pipeline Facility." ........................................................33

                3.    PHMSA's Reclassification Defies, Without Justification, Decades of Its Own Regulatory Precedent, Discounts the Relevant History of the Facilities, and Ignores the Functional Differences Between Them. .........................................35

III.    PHMSA Was Not Authorized Under the PSA to Grant the ESP and Otherwise Abused Its Discretion in Doing So. ...................40

iii

A.    There Is No Actual or Impending "Emergency" to Justify Issuance of the ESP. ........................................41

      1.    The Purported "Emergency" Cited by PHMSA Is Entirely Fabricated, and the ESP Is Not Necessary to Address It. ...............................41

      2.    In any Event, a General Dissatisfaction in Energy Development Is Not an "Emergency" for Purposes of the PSA....................................45

B.    The ESP Is Inconsistent With Pipeline Safety Because It Fails to Ensure the Pipelines Have an Equivalent Level of Safety as Cathodic Protection....................................50

C.    The ESP Poses an Unacceptable Risk to the Public and Is Not in the Public Interest. ......................................56

IV.    PHMSA Failed to Comply with Its Obligations Under NEPA in Approving the ESP and Restart Plan. .............................59

A.    Applicable Law .......................................................60

B.    PHMSA was Required to Conduct Environmental Review Prior to Approving the ESP. ........................................62

      1.    There is No "Emergency" for Purposes of NEPA, and PHMSA's Proposal to Prepare a Post-Approval EA Violates NEPA......................62

      2.    Approval of the ESP Constitutes Major Federal Action. ........................................................64

      3.    Approval of the ESP Will Result in Reasonably Foreseeable Impacts, Requiring Preparation of an EIS..............................................................65

C.    PHMSA's Failure to Prepare an EIS Prior to the Restart Approval Violated NEPA............................................66

iv

1.    The Restart Approval Constitutes a Major
      Federal Action. .................................................67

2.    The Restart Approval has a Reasonably
      Foreseeable Significant Effect on the Quality of
      the Human Environment................................69

CONCLUSION .............................................................70

STATEMENT OF RELATED CASES.................................71

CERTIFICATE OF COMPLIANCE....................................72

v

# TABLE OF AUTHORITIES

**Cases**

*Blue Mountains Biodiversity Proj. v. Blackwood*,
 161 F.3d 1208 (9th Cir. 1998)..................................................................63

*Ctr. for Biological Diversity v. Kempthorne*,
 588 F.3d 701 (9th Cir. 2009)....................................................................61

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
 867 F.3d 564 (5th Cir. 2017)....................................................................70

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) ................................................................................48

*Fischer v. United States*,
 603 U.S. 480 (2024) ................................................................................46

*GPA Midstream Ass'n v. U.S. Dep't of Transp.*,
 67 F.4th 1188 (D.C. Cir. 2023) ...............................................................70

*Greenpeace Action v. Franklin*,
 14 F.3d 1324 (9th Cr. 1992)....................................................................61

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
 468 F.3d 549 (9th Cir. 2006)....................................................................61

*Marsh v. Or. Nat. Res. Council*,
 490 U.S. 360 (1989) ................................................................................63

*Metcalf v. Daley*,
 214 F.3d 1135 (9th Cir. 2000)........................................................... 63, 64

*Mi Familia Vota v. Fontes*,
 129 F.4th 691 (9th Cir. 2025)...................................................................27

*Mont. Wildlife Fed'n v. Haaland*,
 127 F.4th 1 (9th Cir. 2025)............................................................... 23, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................ 23, 42, 49

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ........................................................................23

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024)..............................................................42

*New York v. Trump*,
  No. 25-cv-112211-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ................42

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
  128 F.4th 1089 (9th Cir. 2025)..........................................................60

*Ramsey v. Kantor*,
  96 F.3d 434 (9th Cir. 1996)..............................................................67

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ......................................................................27

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985)............................................................63

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
  878 F.3d 725 (9th Cir. 2017)............................... 23, 39, 44, 45, 55, 56

*Waterkeeper All. v. EPA*,
  140 F.4th 1193 (9th Cir. 2025)............................... 23, 42, 43, 49

*Williams v. Taylor*,
  529 U.S. 420 (2000) ......................................................................46

**Federal Statutes**

5 U.S.C. § 706(2)(A), (C), (D)................................... 19, 21, 22, 24, 27, 40, 41, 59

42 U.S.C. § 4332(2)(C)......................................................................60

42 U.S.C. § 4336(b) ...................................................................................69

42 U.S.C. § 4336(b)(1)...............................................................................60

42 U.S.C. § 4336(b)(2)...............................................................................61

42 U.S.C. § 4336e(10)(B) ..........................................................................68

42 U.S.C. § 4336e(10)(B)(vii) ...................................................................68

42 U.S.C. §§ 4321–4370m-12 ......................................................................2

49 U.S.C. §§ 60101–60143 ..........................................................................2

49 U.S.C. § 60101(a)(10).............................................................. 11, 24, 40

49 U.S.C. § 60101(a)(22) ...........................................................................28

49 U.S.C. § 60101(a)(22)(A)(i) .................................................. 28, 31, 32, 33

49 U.S.C. § 60101(a)(22)(B)(ii) ........................................................... 33, 35

49 U.S.C. § 60101(a)(5)................................................ 18, 28, 32, 33, 35, 38

49 U.S.C. § 60101(a)(7)..............................................................................24

49 U.S.C. § 60101(a)(8)(B)(i).....................................................................24

49 U.S.C. § 60104(c) .......................................................................... 10, 25

49 U.S.C. § 60105 ............................................................................... 25, 40

49 U.S.C. § 60105(a) ......................................................................... 11, 25

49 U.S.C. § 60118 ............................................................................... 45, 48

49 U.S.C. § 60118(a)(1)..............................................................................40

49 U.S.C. § 60118(c)(1)(A) ........................................................................40

49 U.S.C. § 60118(c)(1)(B) ................................................................41

49 U.S.C. § 60118(c)(2)(A) ......................................................... 19, 41

49 U.S.C. § 60118(c)(2)(A)(ii) ..........................................................51

49 U.S.C. § 60118(c)(2)(A)(iii) ........................................... 45, 46, 48, 49

49 U.S.C. § 60118(c)(2)(B) ................................................................17

49 U.S.C. § 60119 .............................................................................70

49 U.S.C. § 60119(a) .......................................................................1, 2

49 U.S.C. § 60119(a)(3)................................................................ 19, 22

**State Statutes**

Cal. Gov't Code § 51010 ....................................................................25

Cal. Pub. Res. Code § 30262(b)(2) ......................................................44

**Rules**

9th Cir. R. 28-2.7 .................................................................................3

Fed. R. App. P. 28(f) ............................................................................3

**Federal Regulations**

40 C.F.R. § 112.1(b) ..................................................................... 32, 34

40 C.F.R. § 112.2 ...............................................................................34

40 C.F.R. Pt. 112, App. A ...................................................................32

40 C.F.R. Pt. 112, App. A § (1) ....................................................34

40 C.F.R. Pt. 112, App. A § (2) ....................................................34

49 C.F.R. § 190.341(b) ..............................................................48

49 C.F.R. § 190.341(g) ......................................................... 46, 49

49 C.F.R. § 195.2 ............................................................... 29, 31

49 C.F.R. § 195.452(h)(4)(iii)(H) .............................................. 50, 51

49 C.F.R. §§ 195.551–195.591 .....................................................68

## State Regulations

19 Cal. Code Regs. § 2000....................................................26

## Federal Register Notices

90 Fed. Reg. 8363 (Jan. 20, 2025) ............................................43

90 Fed. Reg. 8433 (Jan. 29, 2025) ............................................42

## Legislative History

*Ensuring the Safety of Our Nation's Pipelines: Hearing Before the
Subcomm. on Surface Transp. of the S. Comm. on Com., Sci., & Transp.*,
111th Cong. (2010)...........................................................47

H.R. 5782, 109th Cong. (2006)................................................47

## Other Authorities

Consent Decree, *United States v. Plains All American Pipeline*, No. 2:20-cv-02415 (filed Mar. 13, 2020).............................................................2

Dep't of Transp., Order 5610.1D.................................................... 64, 66

*Emergency*, Black's Law Dictionary (12th ed. 2024) ............................................46

*Manufacture*, Merriam-Webster, https://www.merriam-webster.com/dictionary/manufacture (last updated Mar. 16, 2026) ....................34

*Refine*, Merriam-Webster, https://www.merriam-webster.com/dictionary/refine (last updated Mar. 19, 2026)................................33

## TABLE OF ACRONYMS AND TERMS

| | |
|---|---|
| CalGEM | California Geologic Energy Management Division |
| CCC | California Coastal Commission |
| Certification | Annual certification provided to the Secretary of Transportation under 49 U.S.C. § 60105 |
| CDP | Coastal Development Permit |
| Consent Decree | Consent Decree entered in *United States v. Plains All American Pipeline*, U.S. District Court for the Central District of California, No. 2:20-cv-02415 |
| County | Santa Barbara County, California |
| CSLC | California State Lands Commission |
| DOT | Department of Transportation |
| DPP | Development and Production Plan |
| EIS | Environmental Impact Statement |
| ESP | Emergency Special Permit |
| FONSI | Finding of No Significant Impact |
| ILI | In-Line Inspection |
| LFC Facilities | Oil and Gas Facilities in Las Flores Canyon |

| | |
|---|---|
| MMS | United States Minerals Management Service |
| MOU | Memorandum of Understanding |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12 |
| Offshore Pipeline | Subsea produced emulsion pipeline that extends from federal waters to the LFC Facilities |
| Onshore Pipelines | Pipelines CA-324 and CA-325, f/k/a Lines 901 and 903 |
| OSFM | California Office of the State Fire Marshal |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| POPCO | Pacific Offshore Pipeline Company |
| PSA | Hazardous Liquid Pipeline Safety Act, 49 U.S.C. §§ 60101–60143 |
| Secretary | Secretary of the Department of Transportation |
| SPCC | Spill Prevention, Control, and Countermeasure Rule |
| SYU | Santa Ynez Unit |

## INTRODUCTION

In this Petition for Review, Petitioners challenge two actions of the Pipeline and Hazardous Materials Safety Administration (PHMSA), which arise from the efforts of Intervenors Sable Offshore Corp. and Pacific Pipeline Company (together, "Sable") to restart defective oil pipelines CA-324 and CA-325, the former of which ruptured in 2015, causing one of the worst oil disasters in California history. Specifically, Petitioners seek judicial review of the following: PHMSA's (1) December 23, 2025, issuance of an Emergency Special Permit (ESP) for CA-324 and CA-325, and (2) related December 22, 2025, approval of a Restart Plan for the pipelines (the "Restart Approval," and together with the ESP, the "Approvals").

## JURISDICTIONAL STATEMENT

"Regulations, orders, and other final agency actions" of PHMSA must be challenged by filing, within eighty-nine days, a Petition for Review in the U.S. Court of Appeals for the District of Columbia Circuit or in the court of appeals for the circuit in which the petitioner resides. 49 U.S.C. § 60119(a).

Petitioners are non-profit organizations that are headquartered or operate in California and whose members would be directly harmed by the restart of the pipelines at issue. *See* Bradshaw Decl., Ellenberger Decl., Hough Decl., Katz Decl., Lyons Decl., Morton Decl., Miller Decl., and Schmitt Decl. (filed

1

concurrently herewith). Petitioners timely filed their Petition for Review on December 24, 2025—within two days of PHMSA issuing the Approvals. Thus, jurisdiction in this Court is proper. *See* 49 U.S.C. § 60119(a).

## STATEMENT OF THE ISSUES

This Petition for Review presents the following issues:

1.     In issuing the Approvals, did PHMSA exceed the limits of its jurisdiction and authority established by the Consent Decree entered in *United States v. Plains All American Pipeline*, U.S. District Court for the Central District of California, Civil Action No. 2:20-cv-02415 (the "Consent Decree"), and the Hazardous Liquid Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101–60143, or otherwise unlawfully invade the province of the California Office of the State Fire Marshal (OSFM)?

2.     In issuing the ESP, PHMSA made three specific findings required by the PSA: the ESP (i) is in the public interest; (ii) is not inconsistent with pipeline safety; and (iii) is necessary to address an actual or impending emergency involving pipeline transportation. Were any of these three findings arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law?

3.     Did PHMSA violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370m-12, by failing to conduct environmental review *before*

issuing the Approvals and by failing to prepare an environmental impact statement (EIS)?

## STATUTORY AND REGULATORY AUTHORITIES

In accordance with Federal Rule of Appellate Procedure 28(f) and Ninth Circuit Rule 28-2.7, all relevant statutory and regulatory authorities are provided in the Addendum to this brief.

## STATEMENT OF THE CASE

**I.      <u>Overview of the Santa Ynez Unit and the Pipelines at Issue</u>**

Pipelines CA-324 and CA-325—long known as the "Las Flores Pipelines," but referred to herein as the "Onshore Pipelines"—were constructed in the late 1980s to transport treated crude oil from Santa Barbara County to inland refineries. As relevant here, when operational, the pipelines have provided service to the Santa Ynez Unit (SYU)—a project that develops oil and gas reserves from federal waters in the Santa Barbara Channel. The Approvals at issue are part of Sable's broader effort to restart the Onshore Pipelines, which, along with the SYU, were idled after causing a catastrophic oil spill in 2015.

### A.      SYU Infrastructure and Development

When operational, the SYU develops crude oil and natural gas reserves from three offshore platforms that sit in federal waters: Harmony, Heritage, and Hondo.

Oil emulsion produced offshore—consisting of oil, water, brine, gasses, and other impurities—is transported onshore via a subsea produced emulsion pipeline (the "Offshore Pipeline"). 2-PSE-372.[1] The Offshore Pipeline originates in federal waters, travels through three miles of state waters, and terminates at an oil and gas processing plant located in Las Flores Canyon, just west of Goleta, California (the "LFC Facilities"). 2-PSE-334; *see also* 1-PSE-198.[2]

The Offshore Pipeline operates pursuant to two primary entitlements: the SYU's Development and Production Plan (DPP), approved in 1985 and revised from time to time (the "Operative DPP"), which is overseen by the federal Bureau of Ocean Energy Management; and, for the portion in state waters, a lease issued and overseen by the California State Lands Commission (CSLC). PHMSA, meanwhile, ensures that the Offshore Pipeline complies with federal pipeline safety laws and regulations.

Once delivered to the LFC Facilities, the raw emulsion produced offshore undergoes extensive treatment and refinement. Through a series of chemical

---

[1] All citations to "PSE" are to Petitioners' Supplemental Evidence, consisting of two consecutively paginated volumes of documents, which were filed with Petitioners' concurrent Motion to Complete and Supplement the Administrative Record and Request for Judicial Notice ("Motion").

[2] Natural gas extracted offshore is transported by a separate pipeline and delivered directly to an onshore gas processing plant that is also located in Las Flores Canyon. The gas plant is owned by Pacific Offshore Pipeline Company (POPCO), now a wholly owned subsidiary of Sable, and referred to as the "POPCO Gas Plant." 1-PSE-198.

processes, the emulsion is "dehydrate[d], stabilize[d], and sweeten[ed] . . . to meet product specifications," and natural gasses are stripped and separated, including propane, butane, sulfur products, and fuel quality gas. 2-PSE-269–270; 1-PSE-198; *see also* 2-PSE-373–375. Ultimately, several new products are created from the raw emulsion, including "treated and stabilized crude" and marketable natural gasses. *See* 2-PSE-270; 2-PSE-373–376.

The LFC Facilities operate pursuant to permits issued and overseen by Santa Barbara County (the "County"). As relevant here, while PHMSA has historically regulated certain safety aspects of the Offshore Pipeline, PHMSA has never regulated the LFC Facilities. Since their inception, the LFC Facilities have been exclusively regulated by state and local entities (primarily, the County and the California Geologic Energy Management Division (CalGEM)).

Notably, the SYU was designed to function without onshore transportation of treated crude oil. Indeed, both the initial 1974 DPP and the Operative DPP contemplated that crude oil produced at the SYU would be transported offshore by marine vessel. 2-PSE-366; 2-PSE-395–398. And, after development began in the 1970s, that is what occurred for nearly two decades.

## B. Onshore Pipelines CA-324 and CA-325

In 1984, well after development of the SYU was underway, an unaffiliated company, Celeron Pipeline Company ("Celeron"), proposed building two buried

5

pipelines that would service oil projects in the Gaviota Coast area, including the SYU. The proposal was a subset of a larger project, known and referred to as the Celeron/All American Pipeline Project, which envisioned a pipeline route that would ultimately extend all the way to refineries in Midland, Texas.

The Onshore Pipelines—then known as Lines 901 and 903—were permitted by the County in 1986 and went into service in or around 1992. When active, they carry treated and stabilized crude from the LFC Facilities approximately 120 miles to Pentland Station in Kern County, California.



2-ER-190.

The first pipeline, CA-324, is an eleven-mile pipeline that originates at the LFC Facilities and travels westward along the Gaviota Coast in close proximity to the Pacific Ocean. Near Gaviota State Park, oil product is transferred to CA-325, which extends the remaining 110 miles to Pentland Station.

Along the way, CA-325 passes directly through six major groundwater basins that provide domestic and public water supply; the Santa Ynez, Sisquoc, and Cuyama rivers; dozens of creeks and drainages; renowned recreation and conservation areas, including Gaviota State Park and the Carrizo Plain National Monument; and critical habitat for over a dozen special-status species, like the California red-legged frog. 2-PSE-350–357; 2-PSE-247–248; Hunt Decl. ¶¶ 13–19. Perhaps most concerning, however, is that CA-325 passes directly through a suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes. 1-PSE-124.

Of the pipelines' technical specifications, two features are particularly relevant here.

The first is the pipelines' coating and insulation system. As depicted below, the Onshore Pipelines were installed with three "layers" of material: (1) a coal tar urethane coating; then (2) polyurethane foam thermal insulation, intended to maintain the viscous oil product at an elevated temperature to facilitate

7

transportation; and, lastly, (3) a wrap of polyethylene tape, which would act as a moisture barrier.



2-ER-36.

The second is the pipelines' cathodic protection system—the foremost means by which the pipelines were intended to be protected from corrosion. In short, a cathodic protection system imparts an electric current onto a pipeline through a process that, when effective, causes a substitute source of metal to corrode in place of the pipeline. 3-ER-409. As long as the current is sufficient, the system theoretically prevents external corrosion of the pipeline or at least holds it in check.

The importance of the pipelines' cathodic protection system cannot be overstated. "Protection of a pipeline from corrosion is of *critical importance* to the

environment"; without such protection, the strength of the wall can deteriorate, leading to a break in the pipe and a possible oil spill. 2-PSE-358 (emphasis added).

## II.     The 2015 Refugio Oil Spill and Defects in the Onshore Pipelines

On May 19, 2015, pipeline CA-324, then owned by Plains All American Pipeline, L.P. ("Plains"), ruptured near Refugio Beach State Park, releasing more than 120,000 gallons of heavy crude oil into the surrounding environment (the "Refugio Oil Spil"). 2-PSE-282.

The spill was one of the largest oil disasters in California history, and it affected approximately 150 miles of the California coast. 2-PSE-283. Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals—including marine mammals—were injured or killed. 2-PSE-281. The spill also forced the closure of fisheries and beaches, costing local businesses hundreds of millions of dollars and causing an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties. *Id.*

Upon investigation, PHMSA determined that the rupture was the result of "progressive external corrosion" and that the pipeline's cathodic protection system—intended to prevent such corrosion—was ineffective. 3-ER-386. Without proper protection from corrosion, the pipeline wall had thinned as much as 89 percent, leaving it unable to withstand the internal pressure of operations. 3-ER-385.

9

As it turns out, the ineffectiveness of cathodic protection on CA-324 was a product of the pipeline's flawed design. Specifically, the various layers of material installed on the pipeline—its non-conductive coating, foam insulation, and outer protective tape wrap—created conditions that prevented the pipeline's cathodic protection system from functioning properly. *See, e.g.,* 3-ER-386.

Concerningly, the above issues were not limited to CA-324: PHMSA found pervasive metal loss throughout the entirety of the Onshore Pipelines. *See* 3-ER-385. PHMSA ultimately concluded that, by flaw of design, cathodic protection is ineffective on *both* CA-324 and CA-325. 3-ER-385; 3-ER-410. It further concluded that, writ large, "[cathodic protection] is ineffective on buried, insulated pipelines" like the Onshore Pipelines. 3-ER-410.

Following the spill, the Onshore Pipelines were purged and shut down. 3-ER-381. Due to the unavailability of the pipelines, the SYU was likewise idled, and extraction at the offshore field ceased.

## III.  **Transfer of Jurisdiction to OSFM and Conditions for Restarting**

Recall that, when initially permitted in the 1980s, the Onshore Pipelines were intended to be part of a larger pipeline system that would extend from Las Flores Canyon to Texas. Thus, the Onshore Pipelines were initially classified as *inter*state facilities, which, pursuant to the PSA, placed them under PHMSA's jurisdiction. *See* 49 U.S.C. § 60104(c).

10

However, while the Onshore Pipelines were installed in the early 1990s, it is unclear if the broader project connecting them to Texas ever came to fruition, and, as early as 2000, it was acknowledged that the pipelines were not actually being used to transport crude oil out of state. 2-PSE-295. Recognizing as much, after the 2015 spill, Plains cancelled its Federal Energy Regulatory Commission (FERC) certificates for the pipelines, and PHMSA formally reclassified them as *intra*state facilities that would be subject, per the PSA, to the exclusive regulatory authority of OSFM. 3-ER-370; *see* 49 U.S.C. §§ 60101(a)(10), 60105(a). The reclassification of the Onshore Pipelines as *intra*state, and the corollary transfer of jurisdiction to OSFM, was memorialized in a 2016 Memorandum of Understanding (MOU) between PHMSA and OSFM. 3-ER-370–372.[3]

Several years later, PHMSA, OSFM, and a number of other state and federal agencies sued Plains in federal court seeking civil penalties and compensation for natural resources damages associated with the 2015 spill. 3-ER-318–369. The parties settled, and the agreement was memorialized in a Consent Decree entered by the court. 2-ER-213–316.

In addition to imposing monetary penalties on Plains, the Consent Decree contemplated the future of the Onshore Pipelines. It offered three paths forward for

---

[3] The pipelines were later rebranded from "Line 901" and "Line 903" to "CA-324" and "CA-325," respectively.

11

Plains (and any subsequent owner) in light of the pipelines' design defects. First, Plains could simply abandon and decommission the defunct pipelines. 2-ER-294–295. Second, Plains could replace the pipelines with new, non-insulated pipe, which would potentially allow cathodic protection to function properly. *Id*. And, as a third and final option, Plains could restart the existing pipelines, but only under strict conditions. 2-ER-295. As relevant here, those restart conditions included, *inter alia*, obtaining from OSFM (1) waivers for "the limited effectiveness of cathodic protection" on both CA-324 and CA-325 and (2) approval of a Restart Plan for each line. 2-ER-294; 2-ER-310–314. Notably, the Consent Decree expressly provided that the Onshore Pipelines, and any proposed restart thereof, are "subject to the sole regulatory oversight of the OSFM." 2-ER-310.

## IV.  Sable's Acquisition and Efforts to Restart the Onshore Pipelines

In light of the Onshore Pipelines' dangerous design defects, few suspected that an operator would attempt to bring them back online. In fact, since they were idled in 2015, a series of proposals were advanced to replace the pipelines, ostensibly due to their obvious risks to public safety and the environment.

Indeed, Plains went so far as to apply to the County for necessary land use permits to construct new, safer pipelines. 2-PSE-275. However, as Plains' application to the County was pending, Plains sold the Onshore Pipelines to Pacific Pipeline Company (PPC), then a wholly owned subsidiary of Exxon, which was

the longtime owner of the SYU. Shortly thereafter, PPC withdrew the application.

Then, in February 2024, Sable acquired the SYU and all its associated assets from Exxon: the three offshore platforms, the Offshore Pipeline, and the LFC Facilities. It also acquired PPC, and with it, the defunct Onshore Pipelines.

Because Sable—a new, speculative company—was severely undercapitalized, the deal was financed almost entirely by a loan from Exxon; in return, Sable agreed that the SYU assets and Onshore Pipelines may revert to Exxon if it fails to restart the SYU within two years. Notably, these assets are Sable's only assets, leaving it without any source of revenue so long as they are idled.

Because of these constraints, Sable has a limited window to try and resuscitate the SYU. Hence, after the acquisition, Sable began attempts to restart, rather than replace, the defective Onshore Pipelines. And, in its haste to do so, it began willfully disregarding state law, ignoring agency directives, and otherwise cutting regulatory corners.

Indeed, in its rush to repair the severely corroded pipelines—which had sat languishing for nearly a decade—Sable performed dozens of excavations along the pipeline route without obtaining requisite authorizations from local and state agencies, including the California Coastal Commission (CCC), leading to Notices of Violations, Cease-and-Desist Orders, several lawsuits, and felony criminal

13

charges against the company. 1-PSE-130; 1-PSE-220; 2-PSE-243. The CCC also imposed on Sable a historic $18,000,000 fine and, later, obtained an injunction in state court preventing Sable from conducting further, unpermitted repairs in the Coastal Zone. 1-PSE-225–226; 2-PSE-243.

Meanwhile, pursuant to the Consent Decree, Sable applied to OSFM for waivers for the "limited effectiveness of cathodic protection" on the pipelines. 2-ER-178–204. In December 2024, OSFM issued the waivers—called "State Waivers"—without inviting public comment, conducting environmental review, or providing written justification for its decisions. 2-ER-148–177. The State Waivers became final in February 2025 when, pursuant to the PSA, PHMSA did not object to OSFM's Waivers. 2-ER-139–142. In April 2025, Petitioners filed companion lawsuits challenging the State Waivers in the Superior Court for the County of Santa Barbara, Case Numbers 25CV02244 and 25CV02247, which are still pending.

## V.     PHMSA's Unlawful Federalization of the Onshore Pipelines and the Approvals at Issue

As those lawsuits proceeded, Sable requested authorization from OSFM to restart the Onshore Pipelines. 1-PSE-125. The agency refused, citing the fact that

14

additional repairs are needed to ensure the pipelines are safe to operate. *Id*.[4]

However, instead of making those repairs, Sable attempted to circumvent OSFM's authority. To that end, it sent a letter to PHMSA suddenly claiming, unilaterally, that the Onshore Pipelines were *inter*state facilities over which OSFM lacked jurisdiction. 2-ER-69–72. In response, on December 17, 2025, PHMSA sent a letter to Sable concurring in its determination and purporting to wrest jurisdiction of the Onshore Pipelines from the State. 1-ER-25–27. In a sudden departure from the 2016 MOU with OSFM, as well as nearly forty years of its own precedent, PHMSA claimed that the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines formed a single, contiguous "pipeline" that extends from federal waters to Kern County. *Id*. According to PHMSA, that renders the Onshore Pipelines "segments" of a single *inter*state pipeline and, pursuant to the PSA, relegates them to PHMSA's exclusive jurisdiction.[5] *Id*.

Never in the history of these facilities had they been construed as a single "pipeline." In fact, while PHMSA has at various times regulated both the Offshore

---

[4] As addressed in Petitioners' accompanying Motion, the administrative record prepared by PHMSA is incomplete and fails to include, among other critical documents, the correspondence referenced here.

[5] Sable has branded this newly imagined pipeline as the "Santa Ynez Pipeline System." PHMSA, however, appears to use the original name for CA-324 and CA-325, "Las Flores Pipelines," and suggests that the Offshore Pipeline is a new segment of the "Las Flores Pipelines." To avoid confusion, Petitioners in this brief refer to lines CA-324 and CA-325 simply as the Onshore Pipelines.

15

and Onshore Pipelines (as separate facilities), it has never regulated, or even purported to regulate, the LFC Facilities, which are overseen exclusively by the State and County.

On December 22, 2025, less than a week after asserting jurisdiction, PHMSA issued a one-page, cursory letter approving a Restart Plan for CA-324 and CA-325 and purporting to authorize restart of the pipelines (i.e., the Restart Approval). 1-ER-23.

The next day, PHMSA issued, under the PSA, a new waiver (called a Special Permit) for the Onshore Pipelines on an emergency basis—i.e., the ESP at issue. 1-ER-2. The "emergency" necessitating the ESP, said PHMSA, was the President's general dissatisfaction with nationwide energy development. 1-ER-21. Under that pretext, PHMSA refused to provide public notice and solicit comment, as is generally required under the PSA, or conduct environmental review of the ESP under NEPA. Notably, the ESP has several material differences from the State Waivers issued by OSFM, particularly regarding repair criteria.

Given the unprecedented nature of the ESP and the critical resources that the Onshore Pipelines can impact, the need for public comment, independent expert scrutiny, and environmental review was and remains especially critical here. Without the benefit of such review, the ESP has a number of glaring deficiencies, and the conditions included therein fail to ensure that the pipelines will be safe to

16

operate. Indeed, operating in the manner envisioned by the ESP "will likely result in another failure of the [Pipelines]," and poses a "persistent and unresolved threat to the people, property, and environment around [the Pipelines]." Bodell Decl. ¶¶ 94, 95.

Accordingly, Petitioners immediately filed a Petition for Review with this Court and, concurrently, an Emergency Motion to Stay the ESP and Restart Approval. On December 31, 2025, the Court issued an order denying Petitioners' Motion and setting an expedited briefing schedule.

As this Petition was pending, the 60-day ESP expired, and Sable applied to PHMSA for a non-emergency Special Permit. However, shortly before the ESP expired, Sable sent a letter to PHMSA indicating it would still rely on the ESP to restart and operate the Onshore Pipelines while its Special Permit application is pending. 1-PSE-50. Sable also retains the option to renew the ESP. *See* 49 U.S.C. § 60118(c)(2)(B).

## SUMMARY OF THE ARGUMENT

First, and dispositive of this entire action, PHMSA does not have jurisdiction or authority to regulate the Onshore Pipelines, which properly lie with OSFM.

The Consent Decree—by which PHMSA and Sable are both bound— expressly vests OSFM with "sole regulatory oversight" over the Onshore Pipelines

17

exclusive of PHMSA. And, Consent Decree aside, the Onshore Pipelines are *intra*state pipelines, falling, pursuant to the PSA, within OSFM's exclusive jurisdiction.

PHMSA's attempt to reclassify the Onshore Pipelines as *inter*state—and thereby wrest jurisdiction from OSFM—is premised on a novel and absurd theory that the Offshore Pipeline, LFC Facilities, and Onshore Pipelines constitute a single "pipeline facility" extending from federal waters to Kern County. However, such a construction defies the plain language of the PSA, as oil emulsion produced offshore is taken out of "transportation" at the LFC Facilities, where it is processed into treated and stabilized crude and various natural gasses. 49 U.S.C. § 60101(a)(5) (defining a "hazardous liquid pipeline facility" as "a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in *transporting* hazardous liquid" (emphasis added)). Thus, per the controlling definitions of the PSA, all the infrastructure here, inclusive of the LFC Facilities, cannot be cast as a single "pipeline facility." *See id.*

PHMSA's about-face also defies, without justification, decades of its own regulatory precedent, ignores the relevant history of the facilities, and discounts the functional differences between them. Indeed, for over forty years, the Offshore Pipeline and Onshore Pipelines have been classified and regulated as *separate*

18

pipeline facilities—*including by PHMSA*—with the former terminating at the LFC Facilities and the latter beginning after treated crude oil leaves the facilities.

Accordingly, in issuing the Approvals, PHMSA exceeded the bounds of its jurisdiction and authority, improperly invaded the province of OSFM and the State of California, and otherwise acted not in accordance with the law, requiring that the Court vacate the Approvals. *See* 49 U.S.C. § 60119(a)(3); 5 U.S.C. § 706(2)(A), (C), (D).

Second, PHMSA did not—and could not—properly make any of the findings necessary to issue an ESP: that the waiver (i) is in the public interest, (ii) is not inconsistent with pipeline safety, and (iii) is necessary to address an actual or impending emergency involving pipeline transportation. 49 U.S.C. § 60118(c)(2)(A).

PHMSA claims that, after more than ten years sitting idle, an "emergency" has suddenly arisen that necessitates waiving critical safety standards for the Onshore Pipelines. That "emergency," says PHMSA, is a purported nationwide "insufficien[cy]" in energy development. 1-ER-21. However, in support of this finding, PHMSA merely points to a conclusory assertion from a 2025 Executive Order. PHMSA does not actually explain why energy development is "insufficient," explain why the ESP is necessary to address that purported

19

insufficiency, or cite any record evidence to substantiate its finding. Nor could it, as the great weight of available evidence confirms that no such insufficiency exists.

But more importantly, a general dissatisfaction with energy development is not, as a matter of law, an "emergency" for purposes of the PSA. As borne out by the plain language of the statute, an "emergency" refers to a specific incident that poses a threat to public health and safety, prevents compliance with the PSA, and must be addressed so urgently that it justifies bypassing the normal timeline and procedures for Special Permits. A general "insufficien[cy]" in energy development does not qualify as an "emergency," and issuance of an ESP under that pretext is patently inconsistent with Congressional intent.

Additionally, the ESP is inconsistent with pipeline safety, as the conditions therein fail to ensure the pipelines will be as safe as if they had effective cathodic protection. Indeed, it actually *allows* pervasive corrosion on the pipelines to continue, inviting another disaster on the Central Coast. Relatedly, any purported public benefit of restarting the Onshore Pipelines is outweighed by the likely risk of another catastrophic oil spill, the potential impacts of which are well-documented.

Accordingly, PHMSA did not—and could not—properly make any of the three findings necessary to issue an ESP. Thus, it abused its discretion in issuing

20

the ESP and exceeded the bounds of its authority, requiring that the ESP be set aside. 5 U.S.C. § 706(2)(A), (C), (D).

Third, PHMSA violated NEPA by failing to conduct environmental review *before* approving the ESP and Restart Plan and by failing to prepare an EIS, as there was no actual emergency and its Approvals constitute major Federal actions with reasonably foreseeable significant environmental effects.

In its approval of the ESP, PHMSA admitted that, even in emergency situations, environmental review should be conducted where practicable. However, without justifying why such review was not practicable here, PHMSA instead committed to preparing an environmental assessment (EA) after the fact. Such post-hoc review violates the fundamental requirement of NEPA that agencies consider the potential environmental consequences of their actions *before* making decisions, as only then will they be able to prevent irreversible environmental harm.

PHMSA also violated NEPA by failing to prepare an EIS, given the absence of an actual or impending emergency and the clear potential for the Approvals to significantly affect the environment. The defective design of the Onshore Pipelines creates an inevitable risk of another major oil spill that would cause devastating impacts to wildlife, habitat, fishing, recreation, and public health and safety. Such impacts are not merely hypothetical or speculative; they are well-documented from

21

the 2015 rupture and oil spill *from the same pipeline*. The underlying cause of that spill—the lack of an effective cathodic protection system—has not been remedied. In fact, the ESP exempts Sable from providing effective cathodic protection, rendering the risk of further corrosion and another failure of the Onshore Pipelines reasonably foreseeable. Accordingly, PHMSA must prepare an EIS *before* issuing either the ESP or Restart Approval.

## ARGUMENT

### I.  Standard of Review

Pursuant to the PSA, final agency actions taken by PHMSA—e.g., the ESP and Restart Approval—are reviewable under the standards set forth in section 706 of the Administrative Procedure Act (APA). 49 U.S.C. § 60119(a)(3).

In pertinent part, section 706 requires that reviewing courts hold unlawful and set aside agency action, findings, and conclusions found to be (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or (3) " without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

Reviewing courts

> will strike down agency action as "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before

22

the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732–33 (9th Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Compliance with this standard further requires that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Waterkeeper All. v. EPA*, 140 F.4th 1193, 1214 (9th Cir. 2025) (quoting *Motor Vehicle*, 463 U.S. at 43).

Additionally, an "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 36 (9th Cir. 2025) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

## II.   The Onshore Pipelines Are under the Exclusive Regulatory Authority of OSFM, and Thus Any Attempt to Regulate Them Exceeds PHMSA's Jurisdiction and Authority and Is Otherwise Unlawful.

PHMSA's attempt to regulate the Onshore Pipelines, which begin and end entirely within state boundaries, was an extraordinary breach of state sovereignty that contravenes both the Consent Decree and the PSA.

The Consent Decree—by which PHMSA and Sable are both bound—expressly vests OSFM with "sole regulatory oversight" over any restart of the

23

Onshore Pipelines, exclusive of PHMSA. 2-ER-310. Moreover, and irrespective of the Consent Decree, the Onshore Pipelines are *intra*state pipelines; thus, pursuant to the PSA, they fall within OSFM's exclusive jurisdiction. PHMSA's attempt to reclassify them as *inter*state—and thereby wrest jurisdiction from the state—defies both the plain language of the PSA and decades of PHMSA's own regulatory precedent.

Accordingly, in issuing the Approvals, PHMSA exceeded the bounds of its jurisdiction and authority; improperly invaded the province of OSFM and the State of California; and otherwise acted "not in accordance with the law"—requiring that the Court vacate the Approvals. 5 U.S.C. § 706(2)(A), (C), (D).

## A. The Scope of PHMSA's Authority

Pipeline safety is generally regulated by the federal government pursuant to the PSA, which is administered by PHMSA. However, the extent of PHMSA's regulatory authority varies between interstate and intrastate pipeline facilities.

Per the PSA, a hazardous liquid pipeline facility is "*inter*state" if it is "used to transport hazardous liquid in interstate or foreign commerce"—i.e., commerce between "a place in a State and a place outside that State." 49 U.S.C. § 60101(a)(7), (a)(8)(B)(i). Any hazardous liquid pipeline facility that does not meet that definition is considered "*intra*state." *See id.* § 60101(a)(10).

24

For *inter*state pipeline facilities, PHMSA has exclusive jurisdiction over matters of pipeline safety. *See id*. § 60104(c). However, PHMSA's authority over *intra*state pipeline facilities is merely provisional. Pursuant to 49 U.S.C. Section 60105, states have the option to assume exclusive jurisdiction of intrastate pipelines by submitting an annual certification to the Secretary of Transportation ("Certification"). Among other things, the Certification must affirm that the state has adopted the minimum federal pipeline safety standards, which are outlined in Title 49 of the Code of Federal Regulations, Part 195 (the "Part 195 Regulations").

Once a state has submitted a valid Certification, exclusive regulatory and enforcement authority over intrastate pipeline facilities passes to the state. 49 U.S.C. § 60105(a). Indeed, PHMSA is expressly prohibited from "prescrib[ing] or enforc[ing] safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority." *Id*.

Like most other states, California has and maintains such a Certification, giving it exclusive authority to regulate its intrastate pipelines and intrastate pipeline transportation. That authority is delegated to OSFM, which administers the State's pipeline safety laws and regulations. *See* Cal. Gov't Code § 51010. OSFM also administers the federal safety standards outlined in the Part 195

25

Regulations, which, as required for Certification, are incorporated by reference in California's pipeline safety regulations. *See* Cal. Code Regs. § 2000.

> **B.  Because the Consent Decree Vests OSFM With "Sole Regulatory Oversight" of the Pipelines, the Approvals Are *Ultra Vires* and Contrary to Law.**

As discussed, whether PHMSA can regulate a specific pipeline facility generally turns on whether it is considered *inter*state or *intra*state. However, here, the Court need not delve into that distinction. Notwithstanding the contours of jurisdiction outlined in the PSA, the Consent Decree vests OSFM with exclusive regulatory authority over the Onshore Pipelines. Thus, any attempt by PHMSA to regulate them—e.g., by issuing the Approvals—exceeds its authority and is otherwise unlawful.

Again, the Consent Decree contemplates that the Onshore Pipelines are "subject to the sole regulatory oversight of the OSFM." 2-ER-310. And, as relevant here, that oversight expressly extends to any efforts to restart the pipelines. Indeed, the Consent Decree provides that an operator "shall not operate [the Onshore Pipelines] until authorized to do so *by the OSFM*." 2-ER-310 (emphasis added); 2-ER-313 (emphasis added). Likewise, prior to restarting, the operator "must receive a State Waiver *from the OSFM*," and any Restart Plan must be submitted "*to the OSFM* for review and approval." 2-ER-294 (emphasis added); 2-ER-310 (emphasis added).

So long as the Consent Decree remains valid and effective, the Consent Decree controls and is dispositive here: OSFM retains sole authority to regulate the Onshore Pipelines exclusive of PHMSA. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 717–18 (9th Cir. 2025) (unless set aside, a consent decree remains in force and is binding on all parties thereto); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992) (A consent decree is "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." (citation omitted)). Thus, in issuing the Approvals, PHMSA exceeded the bounds of its jurisdiction, authority, and limitations, and otherwise acted "not in accordance with the law."[6] 5 U.S.C. § 706(2)(A), (C), (D).

### C. The Onshore Pipelines Are *Intra*state Facilities, and PHMSA's Attempt to Classify Them Otherwise Contravenes the PSA and Forty Years of Its Own Regulatory Precedent.

In any event, the Onshore Pipelines, which begin and end in state boundaries, are *intra*state pipelines that lie beyond PHMSA's jurisdictional reach.

PHMSA's arbitrary reclassification of the Onshore Pipelines as *inter*state is premised on the fiction that the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines form a single, contiguous "pipeline facility" that extends from federal waters to Kern County. However, PHMSA's reimagining of the facilities

---

[6] Petitioners' join Part II.H of the Argument section of the State of California's Opening Brief in Case No. 26-508, which likewise addresses the effect of the Consent Decree.

contravenes the controlling definitions of the PSA that delineate where one pipeline facility ends and another begins. It also represents a sudden departure, without any justification, from over forty years of PHMSA's own regulatory precedent, and a willful ignorance of the practical realities that render these facilities separate and distinct. That includes, for example, that the facilities were reviewed and constructed as part of different projects, are intended for entirely different purposes, and have at all times operated under different entitlements and regulatory schemes.

1.     <u>The Infrastructure Here Cannot Be Considered a Single "Pipeline Facility" Because Hazardous Liquid Is Taken Out of Transportation at the LFC Facilities</u>.

A "hazardous liquid pipeline facility" includes "a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in *transporting hazardous liquid*." 49 U.S.C. § 60101(a)(5) (emphasis added). "Transporting hazardous liquid," in turn, means "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce." *Id*. § 60101(a)(22)(A)(i).

So, taken together, a "hazardous liquid pipeline facility" means a pipeline or other infrastructure used, or intended to be used, in the movement of hazardous liquid by pipeline or storage incidental thereto. *Id*. § 60101(a)(5), (22). Such

28

infrastructure includes, for example, "line pipe, valves, and other appurtenances connected to line pipe, pumping units, fabricated assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks"—i.e., infrastructure that causes or facilitates the actual flow of hazardous liquid through a pipeline or provides storage incidental thereto. 49 C.F.R. § 195.2.

From the above definitions, two inferences can be drawn that, as relevant here, help delineate the scope of a "pipeline facility." First, to constitute a *single* "pipeline facility," it must be comprised solely of pipelines and other infrastructure used in the movement of hazardous liquid by pipeline or storage incidental thereto. And second, a "pipeline facility" terminates, or ceases to be a "pipeline facility," when hazardous liquid enters infrastructure that is *not* used, or intended to be used, in the movement of hazardous liquid by pipeline—i.e., when it is taken out of transportation.

And herein lies the folly of PHMSA's recharacterization of the infrastructure here as a single "pipeline facility": hazardous liquid is plainly taken out of transportation at the LFC Facilities, where raw emulsion produced offshore undergoes extensive treatment and refining. "Treated and stabilized crude"—one of the resulting products—is then reintroduced into transportation via the Onshore Pipelines.

29

Relevant here, the Operative DPP for the SYU provides an in-depth explanation of the treatment and refinement process that occurs at LFC Facilities.

First, "[a] stock tank mixture of emulsified crude and free brine [is] delivered to the crude oil treating . . . facilities from the offshore production platforms via [the Offshore Pipeline]." 2-PSE-372. Upon delivery to the facilities, the "emulsion stream . . . enter[s] the free water knockout drums," where "free brine [is] separated from the oil emulsion." 2-PSE-373.

"After leaving the free water knockout drum, the oil emulsion [is] heated . . . to approximately 220 [degrees]" before entering "electrostatic emulsion treaters." *Id.* Here, "[e]mulsion breaking [is] achieved by a combination of elevated temperature, chemical addition, and the electrostatic field provided within the treater." 2-PSE-374. "[P]roduced water (brine) liberated in the electrostatic emulsion treaters . . . flow[s] through the water/emulsion heat exchanger to transfer the waste heat available in the stream." *Id.*

From there, the product is further heated to 250 degrees and enters a "crude stripping tower," which strips and separates natural gases. 2-PSE-375. Specifically, "the treated crude [is] counter-currently contacted with sweet natural gas," which "strip[s] the majority of the light sulfur compounds as well as a portion of the light end components from the treated crude." *Id.* This, in turn, creates a stream of "hot sour gas" from which commercial grade natural gas liquids (NGLs) are

30

manufactured, including propane and a mixed butane product that get trucked from the facilities to market. *Id.*; *see also* 2-PSE-271–272.

Lastly, and "prior to leaving the treating facilities," the resulting product— "treated and stabilized crude"—"flow[s] through the oil/emulsion heat exchanger" before being moved to a transportation terminal for future transportation. 2-PSE-376. Notably, the above process is addressed in a section of the Operative DPP titled "Oil Treating Plant"; transportation is addressed in an entirely different section titled "Crude Transportation." 2-PSE-369–371; 2-PSE-377.

Plainly, the above treatment and refining process is not only a *substantial* operation, but a clear interruption in transportation. As illustrated, after receiving raw emulsion, the LFC Facilities extensively treat that emulsion, separate out brine and natural gasses, and, ultimately, convert it into entirely different products. And the equipment used in that process is intended for just that—treatment, separation, and the production of "treated and stabilized crude" and marketable natural gasses. None of the equipment described above is used, or intended to be used, in the mere "movement of hazardous liquid by pipeline" or storage incidental thereto. 49 U.S.C. § 60101(a)(22)(A)(i); *see* 49 C.F.R. § 195.2 (in defining "pipeline or pipeline system," describing infrastructure that is used in the movement of hazardous liquid by pipeline, which does not include the type of facilities at Las Flores Canyon).

31

And lest there is any doubt, both Sable and PHMSA have already recognized that these are "non-transportation" facilities. Per Sable, the LFC Facilities are "subject to the federal [Spill Prevention, Control, and Countermeasure (SPCC)] rule." 1-PSE-27. As expressly recognized by PHMSA, the SPCC rule only applies to facilities that are "*non-transportation-related*" and, accordingly, lie beyond PHMSA's jurisdiction. 40 C.F.R. § 112.1(b) (emphasis added); 40 C.F.R. Pt. 112, App. A. Like Sable, PHMSA has never disavowed that the facilities are subject to the SPCC rule and, therefore, "non-transportation related."

Accordingly, the LFC Facilities are not used in "transporting hazardous liquid," as the term is defined, and thus cannot be considered a "pipeline facility." 49 U.S.C. § 60101(a)(5), (22)(A)(i). Consequently, the totality of the infrastructure here—the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines—cannot properly be cast as a single "pipeline facility." To do so would contravene, unambiguously, the statutory definition of the term, as oil is no longer in "transport" at the LFC Facilities. *See* 49 U.S.C. § 60101(a)(5), (22)(A)(i).

Instead, pursuant to the controlling definitions of the PSA, the LFC Facilities mark a clear delineation between where the Offshore Pipeline terminates and a separate "pipeline facility"—the Onshore Pipelines—begins. Hence, for over forty years, the Offshore and Onshore Pipelines have at all times been regulated as separate "pipeline facilities," *including by PHMSA.*

32

2. Production, Manufacturing, and Refining Facilities—Like the LFC Facilities—are Expressly Excluded from the Definition of "Pipeline Facility."

That these facilities ought to be considered separate and distinct—the *status quo* for over forty years—is supported by additional provisions of the PSA.

Again, whether a facility constitutes a "hazardous liquid pipeline facility" turns on whether it is "used or intended to be used in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5). As noted above, the PSA affirmatively defines "transporting hazardous liquid" as the "movement of hazardous liquid by pipeline." *Id*. § 60101(a)(22)(A)(i). But it also adds that the term specifically "does not include moving hazardous liquid through . . . onshore production, refining, or manufacturing facilities." *Id.* § 60101(a)(22)(B)(ii). And the LFC Facilities are facilities used for "production," "refining," and/or "manufacturing," as explained below.

"Refining facility" is not defined in the PSA. But to "refine" means "to free (something, such as metal, sugar, or *oil*) from impurities or unwanted material." *Refine*, Merriam-Webster, https://www.merriam-webster.com/dictionary/refine (last updated Mar. 19, 2026) (emphasis added). During processing at the LFC Facilities, oil emulsion is "freed," through a series of chemical processes, of various "impurities or unwanted material," including "brine," "light sulfur compounds," and other "light end components." 2-PSE-373–375. Thus, the

33

treatment process at the facilities is one of "refinement," rendering it a "refining facility."

"Manufacturing facility" is likewise not defined in the PSA. However, the common meaning of "manufacture" is "to make from raw materials by hand or by machinery." *Manufacture*, Merriam-Webster, https://www.merriam-webster.com/dictionary/manufacture (last updated Mar. 16, 2026). As explained, the LFC Facilities take "raw material" (i.e., raw emulsion delivered from offshore), "dehydrates, stabilizes, and sweetens [it] . . . to meet product specifications," and creates from it treated and stabilized crude and marketable natural gases. 2-PSE-270. Thus, the facilities engage in the process of "manufacturing" and therefore fall under the ambit of "manufacturing facilities."

"Production facility" too lacks a statutory definition. However, by virtue of accepting the facilities' SPCC status, both PHMSA and Sable have recognized, at least implicitly, that the LFC Facilities constitute a "production facility." Indeed, being subject to the SPCC, the LFC Facilities must fall into one of the categories of "non-transportation-related" facilities enumerated in an MOU between PHMSA and the Environmental Protection Agency. 40 C.F.R. § 112.1(b); 40 C.F.R. § 112.2 (defining "non-transportation-related"); 40 C.F.R. Pt. 112, App. A § (2). And the only category the facilities arguably fit into is that encompassing production facilities. *See* 40 C.F.R. Pt. 112, App. A § (1).

34

So, not only do the LFC Facilities fail to meet the affirmative definition of a "pipeline facility," they are expressly excluded from that definition by virtue of being "production, refining, and manufacturing facilities." 49 U.S.C. § 60101(a)(5), (22)(B)(ii). Thus, again, the totality of the infrastructure here, inclusive of the LFC Facilities, cannot be characterized as a single "pipeline facility" per the plain language of the PSA. *Id*. § 60101(a)(5), (22)(B)(ii).

   3. <u>PHMSA's Reclassification Defies, Without Justification, Decades of Its Own Regulatory Precedent, Discounts the Relevant History of the Facilities, and Ignores the Functional Differences Between Them.</u>

To the extent there is any ambiguity as to whether the Offshore and Onshore Pipelines are separate "pipeline facilities," a review of the history of the facilities, their distinct characteristics and intended uses, *and decades of PHMSA's own regulatory precedent* resolves any such ambiguity. It also underscores the arbitrary nature of PHMSA's sudden recharacterization.

Construction of the Offshore Pipeline and LFC Facilities was initially proposed by Exxon in 1982 as part of a planned expansion of SYU operations to its modern configuration. The envisioned expansion would include the addition of two new platforms and, as relevant here, a shift from offshore oil processing (using an offshore storage and treatment vessel) to processing at the onshore LFC Facilities. 2-PSE-366. All SYU oil production would be transported via "a new 20-inch emulsion line extending from Platform Harmony to the Las Flores Canyon oil

35

treating facilities"—i.e., via the Offshore Pipeline. 2-PSE-334. Once treated, "[c]rude oil transportation w[ould] be via marine vessels from a modernized nearshore marine terminal in approximately 140 feet of water." 2-PSE-366.

Environmental review of Exxon's proposed DPP was jointly conducted by the U.S. Minerals Management Service (MMS), CSLC, and the County—each of which would have discrete regulatory oversight over the various facilities. *See* 2-PES-360. While MMS was the agency charged with approval of the DPP, Exxon required further approval to construct and operate the Offshore Pipeline from CSLC, since it passed through state waters. *See id.* And construction and operation of the LFC Facilities was to be separately permitted by the County. *See id.*

Eventually, the DPP was approved, and Exxon received all necessary entitlements from CSLC, the County, and other relevant agencies for the Offshore Pipeline and LFC Facilities. Notably, while PHMSA has historically regulated safety aspects of the Offshore Pipeline, *PHMSA has never regulated the LFC Facilities*. Since their inception, the LFC Facilities have been exclusively regulated by state and local entities (primarily, the County and CalGEM).

Separately, in or around 1984, installation of the Onshore Pipelines was proposed by Celeron as part of the Celeron/All American Pipeline Project. *See* 2-PSE-344. Celeron proceeded with construction in the late 1980's, and the Onshore Pipelines went into service in or around 1992. The Onshore Pipelines have since

36

been regulated, primarily, by the County pursuant to a County-issued operating permit and the SPCC rule. PHMSA regulated safety aspects of the Onshore Pipelines until 2016, when they were reclassified from inter- to intrastate. Notably, *during that entire period, PHMSA regulated the Offshore and Onshore Pipelines as separate pipeline facilities*.

The above history reveals three things: that the Offshore and Onshore pipelines were intended to be separate facilities with different purposes, they have always been considered separate facilities, and they have always been regulated as separate facilities by all relevant agencies.

Indeed, from the start, the Offshore Pipeline was intended to function as a single pipeline facility, entirely independent of the later-installed Onshore Pipelines, and in a closed-loop system that did not even involve onshore transportation. *See* 2-PSE-366 (envisioning use of a marine terminal); 2-PSE-263–264 (same). It was also intended, and has always been used, for *subsea* transportation of *emulsion*.

The Onshore Pipelines were proposed as part of a different project and subjected to an entirely different review process. And they serve an entirely different purpose: *onshore* transportation of *treated and stabilized crude*. Because of that, the Onshore Pipelines have different specifications than the Offshore Pipeline and are operated in a different manner. For example, because of the high

37

viscosity of the treated crude it transports, they must maintain the product at an elevated temperature to facilitate transportation. 2-PSE-349.

Underscoring the distinct nature of each of the facilities here, they all operate under different entitlements: the Offshore Pipeline pursuant to the Operative DPP and a CSLC lease; the LFC Facilities pursuant to a County operating permit; and the Onshore Pipelines pursuant to separate County permits. Relatedly, the facilities operate under different regulatory schemes, and have been regulated as separate and distinct facilities since their inception. And that includes by PHMSA.

Again, even before 2016, when both the Offshore and Onshore Pipelines were considered "interstate" and under PHMSA's jurisdiction, PHMSA never considered them to be a single, contiguous "pipeline facility." Instead, it regulated the Offshore Pipeline as one "pipeline facility," and the Onshore Pipelines as a separate "pipeline facility." Presumably, that is at least in part because it never considered the LFC Facilities to be facilities used for transportation—i.e., a "pipeline facility." *See* 49 U.S.C. § 60101(a)(5). Indeed, PHMSA has *never* regulated, or even sought to regulate, the LFC Facilities, which remain under the jurisdiction of the County and CalGEM.

Aside from the conditions imposed by the ESP, there have been no functional changes as to how these facilities operate or their intended uses. In other

38

words, nothing has changed to warrant PHMSA's sudden departure from over forty years of regulatory history and precedent. Thus, PHMSA's reimagining of the infrastructure here as a single "pipeline facility" is entirely arbitrary.

Indeed, PHMSA's "Determination of Interstate Classification" does not even address the determinative issue here: whether the LFC Facilities constitute a "pipeline facility." It merely states, in conclusory fashion, that "the Las Flores Pipeline . . . transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from the Las Flores Canyon to Pentland Station."[7] 1-ER-26.

In sum, then, PHMSA's characterization of the infrastructure here as a single "pipeline facility" not only contravenes the plain language of the PSA, it also defies—without any justification—decades of its own regulatory precedent, rendering it arbitrary and capricious. *See Turtle Island*, 878 F.3d at 732–33; *see also Mont. Wildlife Fed'n*, 127 F.4th at 36 (An "unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change." (citation modified). Consistent with the controlling definitions of the PSA and the forty-year history of these facilities, the Offshore

---

[7] The only thing that PHMSA *does* purport to address is the pipelines' continued lack of a FERC tariff—the absence of which, according to PHMSA, "generally means a pipeline is *intra*state." 1-ER-26 (emphasis added). That said, Petitioners disagree that the presence of a FERC tariff has any bearing on a whether a pipeline is intrastate or interstate.

and Onshore Pipelines are separate "pipeline facilities." And while the Offshore Pipeline originates in federal waters, the Onshore Pipelines do not: they begin and end within state boundaries, rendering them "intrastate." *See* 49 U.S.C. § 60101(a)(10).

Accordingly, the Onshore Pipelines are a distinct, *intra*state "pipeline facility" and thus lie beyond the reach of PHMSA's jurisdiction. *Id*. § 60105. Plus, as discussed, they are expressly entrusted by the Consent Decree to the "sole regulatory oversight" of OSFM. Thus, in issuing the Approvals, PHMSA exceeded the bounds of its jurisdiction and authority and acted contrary to law, requiring that the Approvals be vacated and set aside. 5 U.S.C. § 706(2)(A), (C), (D).

## III. PHMSA Was Not Authorized Under the PSA to Grant the ESP and Otherwise Abused Its Discretion in Doing So.

Generally, a pipeline operator must "comply with applicable safety standards prescribed under [the PSA]," 49 U.S.C. § 60118(a)(1), including, most notably, those codified in the Part 195 Regulations. However, upon application, the Secretary of the Department of Transportation (the "Secretary") "may waive compliance with any part of an applicable standard . . . on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). Such waivers are known as "Special Permits."

40

Typically, the Secretary may issue a Special Permit "only after notice and an opportunity for a hearing." *Id*. § 60118(c)(1)(B). However, in extraordinary circumstances, the Secretary may issue an Emergency Special Permit (ESP) without prior notice and comment, if the Secretary determines that:

(i) it is in the public interest to grant the waiver;

(ii) the waiver is not inconsistent with pipeline safety; and

(iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster.

49 U.S.C. § 60118(c)(2)(A).

As explained below, because PHMSA did not—and could not—properly make any of these findings, it abused its discretion in issuing the ESP and exceeded the bounds of its authority, requiring that the ESP be set aside. 5 U.S.C. § 706(2)(A), (C), (D).

**A. There Is No Actual or Impending "Emergency" to Justify Issuance of the ESP.**

1. The Purported "Emergency" Cited by PHMSA Is Entirely Fabricated, and the ESP Is Not Necessary to Address It.

PHMSA claims that, after more than ten years sitting idle, an "emergency" has suddenly arisen that necessitates waiving critical safety standards for the Onshore Pipelines. That "emergency," says PHMSA, is a purported nationwide "insufficien[cy]" in energy development. 1-ER-21.

41

In support of this finding, PHMSA does not cite any evidence in the record before it. Instead, PHMSA relies wholesale on Executive Order (EO) 14156, and specifically, the following statement: "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." 1-ER-21. As PHMSA notes, the EO also directs agencies to use all "lawful emergency or other authorities available to them" to address that purported "insufficien[cy]." 1-ER-21. Notably, however, the EO itself does not cite to or include any evidence in support of its assertion regarding "insufficient" energy development.[8] *See* 90 Fed. Reg. 8433, 8433–37 (Jan. 29, 2025).

As an initial matter, PHMSA has an independent obligation to "examine the relevant data and articulate a satisfactory explanation for its action." *Waterkeeper All.*, 140 F.4th at 1214 (quoting *Motor Vehicle*, 463 U.S. at 43). An EO cannot supplant or excuse that obligation. *New York v. Trump*, No. 25-cv-112211-PBS, 2025 WL 3514301, at *9 (D. Mass. Dec. 8, 2025) (an agency cannot claim to have fulfilled its statutory duties "whenever it acts pursuant to a presidential command"); *see also Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule from APA review because it carried

---

[8] The EO is currently being challenged by a coalition of states in the U.S. District Court for the Western District of Washington, Case No. 2:25-cv-00869.

out a presidential directive."). In other words, PHMSA could not simply co-opt the conclusory finding of the EO; PHMSA was required to explain why, based on relevant data in the record, there exists an "insufficien[cy]" in energy development, and why the ESP is necessary to address it. Because PHMSA failed to do so, its finding was arbitrary and capricious. *See Waterkeeper All.*, 140 F.4th at 1214.

That PHMSA failed to provide any justification for its finding was no accident. There is simply no factual basis in the record establishing that there is a nationwide "energy emergency." And the great weight of available evidence confirms that that nation is not suffering from "insufficient" energy development.

In 2024 alone, the United States produced more crude oil than any other country in history, exported more crude oil than ever before, and remained the world's largest liquified natural gas exporter. 2-PSE-257–261; 2-PSE-273–274. And other actions taken by the federal administration simply belie the fact that there exists some type of energy emergency. For example, the administration has actively inhibited the development of substantial energy resources, including by withholding funding and freezing permitting for wind energy projects. *See* 90 Fed. Reg. 8363, 8363-65 (Jan. 20, 2025).

As to California specifically, recent state actions similarly confirm that the region is not in the midst of some urgent energy shortage. Just a few months ago, the State legislature passed a law that requires operators of long-idled oil and gas

43

facilities—including, e.g., the Onshore Pipelines—to obtain a new Coastal Development Permit (CDP) prior to restarting such facilities. Cal. Pub. Res. Code § 30262(b)(2) (as codified). That the State would require Sable to apply for a CDP to restart the Onshore Pipelines (and defunct infrastructure like it) confirms two things: (1) there is no regional energy insufficiency or emergency; and (2) even if there were, the Onshore Pipelines are not necessary to address it.

Importantly, none of the above was apparently considered by PHMSA in its decision-making process. *See Turtle Island*, 878 F.3d at 732–33 (an agency acts arbitrarily when it "fail[s] to consider an important aspect of the problem" (citation omitted)).

In any event, even if there was some "insufficien[cy]" in energy development, PHMSA has not explained why the ESP would do anything to address the issue. Nor could it. Restarting the Onshore Pipelines—and by extension, the SYU—"will not markedly benefit statewide or national energy markets." Mahdavi Decl. ¶ 7. The ten-year pause of SYU operations "had no statistical effect on imports of foreign oil." Mahdavi Decl. Ex. B, at 3. Indeed, "well-established economic models of oil supply and a statistical evaluation of the SYU show that . . . foreign imports are not likely to increase in the absence of SYU production." Mahdavi Decl. Ex. B, at 1. They also show that "restarting oil

44

production will have limited to no impacts on California oil markets through 2045." *Id.*

Accordingly, PHMSA's purported basis for the ESP—"insufficient" energy development—is entirely fabricated, unjustified by any explanation, and lacks any evidentiary support. Nor, even if such insufficiency existed, would the ESP do anything to meaningfully address it. Thus, PHMSA's finding that the ESP was "necessary to address an actual or impending emergency," 49 U.S.C. § 60118(c)(2)(A)(iii), was arbitrary and capricious, *see Turtle Island*, 878 F.3d at 732–33.

2. <u>In any Event, a General Dissatisfaction in Energy Development Is Not an "Emergency" for Purposes of the PSA.</u>

The term "emergency" is not defined in the PSA. Nor were undersigned counsel able to find any case law that clarifies what constitutes an "emergency" for purposes of section 60118. However, as borne out by the plain language of the statute, an "emergency," as used in section 60118, refers to a specific incident that poses a threat to public health and safety, prevents compliance with the PSA, and must be addressed so urgently that it justifies bypassing the normal timeline and procedures for Special Permits. A general, purported energy "insufficien[cy]" does not qualify and cannot support the issuance of an ESP.

To begin, Section 60118 specifies that "an actual or impending emergency" includes "an emergency caused by a natural or manmade disaster." 49 U.S.C.

45

§ 60118(c)(2)(A)(iii). Expanding on this, PHMSA's regulation addressing ESPs provides that

> [a]n emergency *event* may be local, regional, or national in scope and includes significant fuel supply disruptions and natural or manmade disasters such as hurricanes, floods, earthquakes, terrorist acts, biological outbreaks, releases of dangerous radiological, chemical, or biological materials, war-related activities, or other similar events.

49 C.F.R. § 190.341(g) (emphasis added). The examples listed in the statute and regulation are emblematic of what type of incidents ESPs are intended to address, and what the term "emergency" is intended to encompass: specific, unforeseen, and severe disasters. *See, e.g., Fischer v. United States*, 603 U.S. 480, 481 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" (citation omitted)). That interpretation is also consistent with the plain and ordinary meaning of the term "emergency": "a sudden and serious event or unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or "an exigent circumstance in which immediate assistance is needed to protect property, public health, or safety, or to lessen or avert the threat of disaster." *Emergency*, Black's Law Dictionary (12th ed. 2024); *see also Williams v. Taylor*, 529 U.S. 420, 431 (2000) (courts "give the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication" to the contrary from Congress (citation omitted)).

46

Petitioners' reading of "emergency" finds further support in the statute's legislative history. The ESP provisions were added in 2006 in direct response to Hurricane Katrina. H.R. 5782, 109th Cong. § 1 (2006). Apparently, as a prior administrator of PHMSA observed, the disaster prompted "Congress to recognize[] that in an emergency, it would not be feasible to provide for notice and opportunity for a hearing, as required for other waivers." *Ensuring the Safety of Our Nation's Pipelines: Hearing Before the Subcomm. on Surface Transp. of the S. Comm. on Com., Sci., & Transp.*, 111th Cong. 9 (2010) (statement of Cynthia Quarterman, Adm'r, PHMSA). And, expounding further, the administrator indicated that PHMSA has authority to "process emergency special permits when necessary to address an actual or impending emergency *caused by a natural or manmade disaster*." *Id.* (emphasis added).

Along with the examples enumerated above, the genesis of the ESP provisions, as elucidated by PHMSA's prior administrator, helps clarify the type of incidents that Congress envisioned would be addressed by ESPs: major disasters. Tellingly, the *only* instance the undersigned counsel could find of an ESP being issued for a pipeline facility was in response to Hurricane Sandy. 2-PSE-289.

Relevant, too, is the broader statutory scheme here, which provides a workable standard for determining whether an event has the requisite exigency to constitute an "emergency." *See FDA v. Brown & Williamson Tobacco Corp.*, 529

47

U.S. 120, 133 (2000) (It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)). The standard time for processing a Special Permit, inclusive of notice and comment, is 120 days. *See* 49 C.F.R. § 190.341(b). Thus, it can be deduced that an "emergency" involves a threat so exigent that it cannot wait 120 days to be addressed. There is no evidence that such urgency exists here.

Lastly, but critically, the statute qualifies that the "emergency" must be one "involving pipeline transportation." 49 U.S.C. § 60118(c)(2)(A)(iii). In other words, the "emergency" must have some physical nexus with the actual pipeline facility at issue. *See* 2-PSE-290. Indeed, if the "emergency" did not affect the functioning of the pipeline facility or otherwise frustrate compliance with relevant safety standards, there would be no need to waive compliance via an ESP.

Synthesizing the above, the term "emergency," as used in section 60118, unambiguously refers to the following: a specific, unforeseen incident that poses an immediate threat to public health and safety, prevents compliance with the PSA, and must be addressed so urgently that it is justifiable to bypass the standard 120-day timeline for Special Permits. The cited basis for the ESP at issue, however, has none of those characteristics.

48

Indeed, an "insufficien[cy]" in energy development is not a specific, unforeseen event. Nor does it have the gravitas of a major disaster akin to the emergent events enumerated above, which, again, are emblematic of what type of incidents ESPs are intended to address. 49 U.S.C. § 60118(c)(2)(A)(iii); 49 C.F.R. § 190.341(g).

Relatedly, PHMSA does not explain how this "emergency" poses a threat to public health and safety, let alone a threat so urgent that it would justify bypassing standard Special Permit procedures. Nowhere, for example, has PHMSA explained the scale of the purported production "insufficien[cy]," why that insufficiency affects public health and safety, or why waiting the normal 120 days to process Sable's waiver application would jeopardize public health and safety. *See Waterkeeper All.*, 140 F.4th at 1214 (9th Cir. 2025) (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (quoting *Motor Vehicle*, 463 U.S. at 43)).

Moreover, some abstract "insufficien[cy]" in energy development does not, in itself, affect the functioning of the Onshore Pipelines or Sable's ability to comply with relevant safety standards. *Cf.* 2-PSE-289. Thus, even if it were an "emergency," it is not an "emergency involving pipeline transportation" that could warrant an ESP.

49

Accordingly, the "insufficient" energy development cited by PHMSA does not, as a matter of law, constitute an "actual or impending emergency involving pipeline transportation" that could support issuance of the ESP.

**B. The ESP Is Inconsistent With Pipeline Safety Because It Fails to Ensure the Pipelines Have an Equivalent Level of Safety as Cathodic Protection.**

As an initial matter, the ESP appears to address only compliance with 49 C.F.R. § 195.452(h)(4)(iii)(H), which requires that "[c]orrosion of or along a longitudinal seam weld" be remediated within 180 days. However, the ESP is plainly intended to satisfy the requirement of the Consent Decree that Sable obtain a waiver for the "limited effectiveness of cathodic protection." 2-ER-294.

Sable's application for the ESP expressly states, on multiple occasions, that it "seeks waiver of certain PHMSA regulations . . . to implement Appendix B, Article I.1.A of [the] Consent Decree"—i.e., the provision requiring that it obtain "a State Waiver through the OSFM for the limited effectiveness of cathodic protection." 2-ER-294; 2-ER-29; 2-ER-42. And, in substance, the application proposes a number of "inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe." 2-ER-46. Moreover, PHMSA relied on the ESP to approve the restart of the Onshore Pipelines, indicating it construed the waiver as one that

50

addressed "the limited effectiveness of cathodic protection" in satisfaction of the Consent Decree.

To the extent PHMSA attempts to characterize the waiver otherwise—i.e., as only addressing 49 C.F.R. § 195.452(h)(4)(iii)(H)—it does so only to evade judicial review of the pipelines' cathodic protection issues. Consistent with how PHMSA and Sable have construed the ESP, the Court should likewise consider it a waiver of the "limited effectiveness of cathodic protection" and review it as such. If not, Petitioners request that the Court acknowledge the ESP is not a waiver of the "limited effectiveness of cathodic protection."

Returning to the merits, in order to issue an ESP, PHMSA must find, *inter alia*, that the waiver "is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(2)(A)(ii). According to PHMSA, this requires the applicant to demonstrate that the proposed waiver conditions "would provide an equivalent level of safety as compliance" with the waived requirements. 1-ER-20. Thus, the question for this Court is whether the proposed conditions of the ESP provide an equal level of safety as effective cathodic protection.

Recall that cathodic protection was intended to be the foremost means of corrosion control for the Onshore Pipelines. As the original 1985 EIS for the pipelines acknowledged, "[p]rotection of a pipeline from corrosion is of *critical importance* to the environment as well as the pipeline operator"; without such

51

protection, the strength of the pipeline wall can deteriorate, leading to a rupture. 2-PSE-358 (emphasis added).

As PHMSA observed after the Refugio Spill, without effective cathodic protection, the Onshore Pipelines were pervasively corroded throughout, and as much as 89 percent at the point where the rupture occurred. 3-ER-375; 3-ER-385; 3-ER-409-412. PHMSA also found that in-line inspection (ILI) tools used by pipeline operators to detect corrosion were inaccurate and unreliable in detecting areas of corrosion on the Onshore Pipelines (called "anomalies"). 3-ER-375; 3-ER-386; 3-ER-417–447. The alarming rate of corrosion of the pipelines in the absence of effective cathodic protection, and the systemic nature of the issue, is depicted in the table below:

| Metal Loss | 2007 | 2012 | 2015 | 2022 |
|---|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 | 3 |
| 60%–79% | 2 | 5 | 12 | 67 |
| 40%–59% | 12 | 54 | 80 | 817 |
| **TOTAL** | **14** | **59** | **94** | **887** |

3-ER-385; Bodell Decl. ¶ 39.

To address the pipelines' lack of effective cathodic protection, the ESP includes a number of conditions that, together, call for more frequent inspections

for corrosion and repairs of discovered anomalies. However, the conditions are patently inadequate to address the defects of the Onshore Pipelines, and they fail to ensure the pipelines will be as safe as if they had effective cathodic protection. Bodell Decl. ¶¶ 69–88.

First, the fundamental logic underpinning the ESP is flawed from the start. The ESP effectively substitutes cathodic protection, which prevents corrosion from occurring in the first place, with something akin to an enhanced management program. In other words, rather than *proactively* preventing corrosion with proven technology, the ESP instead relies on purely *reactive* measures—attempting to track down corrosion after the fact (with inherently unreliable tools), locate anomaly sites in the field, and properly repair them—which allow for technical and operator error.

Put differently, the ESP allows for the pervasive, progressive corrosion of the Onshore Pipelines to continue, and naively hopes that Sable will do a better job than its predecessor at detecting and remediating it. One does not need any particular expertise to see that the management program contemplated by the ESP, which *allows* the progressive corrosion of the pipelines to continue, is not, by any measure, as safe as preventing corrosion in the first place.

Second, and relatedly, we have already seen the shortcomings of the risk management measures on which the ESP relies. Per PHMSA's own Failure

Investigation Report, the failure of ILI tools was a contributing factor to the Refugio Oil Spill. 3-ER-430. Plains periodically conducted inspections of the Onshore Pipelines for corrosion using ILI tools, but the tools proved to be inaccurate and unreliable in detecting corrosion anomalies. Per PHMSA, the tools were only "accurate," per industry standards, 57 percent of the time, and wildly undercalled the corrosion in the area of the rupture. 3-ER-430–431. With the real possibility that anomalies are again undercalled or go unnoticed, effective cathodic protection is the only way to ensure the Onshore Pipelines do not again corrode to the point of rupture. *See* Bodell Decl. ¶¶ 69–88.

Third, and compounding the above concerns, the ESP puts an enormous amount of faith in Sable's capacity to properly and timely run ILI tools, review and corroborate the results of ILI surveys, precisely locate corrosion anomalies, and properly repair them. But Sable—a new, speculative company—has done little to assure that it can or will comply with the maintenance program contemplated by the ESP. Considering its pattern of regulatory aversion and violations, all we have definitively seen from Sable is the opposite. In fact, in its recent decision refusing to transfer operating permits for the Onshore Pipelines from Exxon to Sable, the County expressly found that Sable lacked the "skills, training, and experience" to safely and responsibly operate the pipelines. 1-PSE-61. There is no indication that PHMSA accounted for these operational concerns in issuing the ESP. *See Turtle*

*Island*, 878 F.3d at 732–33 (an action is arbitrary and capricious if the agency "fail[s] to consider an important aspect of the problem" (citation omitted)).

Fourth, the ESP is, inexplicably, less protective than the State Waivers that preceded it. Most notably, it does not require that Sable repair severe areas of corrosion—referred to as "immediate" and "180-day repair" conditions—on CA-324 before restarting. Sable's failure to make such repairs was, again, the principal reason OSFM refused to approve restart of the lines. 1-PSE-125. Worse still, and further differing from the State Waivers, the ESP does not even require that 180-day repair conditions be remediated with a permanent repair method. 2-ER-156.

Fifth, Sable is currently enjoined by a state court from undertaking any repairs to the portion of the pipelines that pass through the Coastal Zone—a consequence of its repeated violations of state law. 1-PSE-225–226. Thus, it is legally prohibited from carrying out certain conditions of the ESP—including Conditions 16 and 17, requiring repairs of severe corrosion—which PHMSA apparently failed to consider. *See Turtle Island*, 878 F.3d at 732–33.

Lastly, but most importantly, the extreme risk of operating without effective cathodic protection cannot be understated. According to OSFM, operating without effective cathodic protection increases the risk of a spill by as much as *five times*. 2-PSE-277. Per a separate analysis prepared for the County, that translates to a possible spill from these pipelines *every year* and a major rupture *every four*. *Id.*

Indeed, even with the conditions proposed in the ESP, operating the pipelines "will likely result in another failure," and they pose a "persistent and unresolved threat to the people, property, and environment around [them]." Bodell Decl. ¶¶ 94, 95.

Accordingly, the ESP does not merely fail to provide "an equivalent level of safety" as effective cathodic protection. It creates an imminent and unacceptable risk of another spill from these defective pipelines, and it recklessly endangers the communities, environment, and resources along the entire 120-mile pipeline route.

In sum, because PHMSA's pipeline safety finding "failed to consider" critical factors that would prevent the conditions of the ESP from being effective; "runs counter to the evidence before the agency," including its own Failure Investigation Report; and, based on the unique defects of these pipelines, is simply "implausible," the ESP must be struck down as arbitrary and capricious. *Turtle Island*, 878 F.3d at 732–33.

### C. The ESP Poses an Unacceptable Risk to the Public and Is Not in the Public Interest.

As to this last finding—that the ESP is in the "public interest"—the several justifications that PHMSA cites are unavailing, especially considering the potential harms the Onshore Pipelines pose to the public.

First, PHMSA claims that, by adopting similar conditions as OSFM's State Waivers, the ESP "ensure[s] a uniform and continuous exercise of regulatory oversight over the [Onshore Pipelines]." 1-ER-20. However, to the extent PHMSA

56

asserts that it is merely continuing in force the same standards as the State Waivers issued by OSFM, its assertion is simply disingenuous. As outlined above, the ESP substantially and materially deviates from the prior waivers.

Next, PHMSA parrots several justifications provided by Sable in its application: that granting the ESP "would contribute to local employment, reduce the need for anomaly digs and other field activities which could damage the local environment, and reduce ship traffic bringing imported oil to the West Coast." 1-ER-20.

That the ESP would reduce the need for anomaly digs is flatly contradicted by the conditions therein. The ESP affirmatively requires, over the course of just ten years, that Sable conduct a minimum of 144 excavations just to corroborate ILI inspection data. 1-ER-9–11 (requiring twelve ILI inspections per pipeline segment, and four corroboration digs per inspection (12x3x4=144)). Likely, many additional excavations will be needed for actual repairs of anomalies as the pipelines continue to pervasively corrode. Thus, despite PHMSA's claim here, the ESP will actually *increase* excavations along the pipeline route.

As to PHMSA's claim that the ESP will reduce foreign oil imports, there is no evidentiary basis in the record for that assertion. And, as discussed above, "well-established economic models of oil supply and a statistical evaluation of the

57

SYU show that . . . foreign imports are not likely to increase in the absence of SYU production." Mahdavi Decl. Ex. B, at 1.

To be sure, the ESP—and by extension, restart of the Onshore Pipelines— may offer some employment opportunities, as PHMSA claims. But the record does not include any data as to how many jobs would be created. And an unsubstantiated assertion about local employment alone does not tip the balance here in favor of the public interest.

Indeed, PHMSA also has to weigh the potential harms to the public of restarting the pipelines in the manner envisioned by the ESP. That includes the likely risk of another oil spill. As we saw in 2015, another spill on the coast could cause vast environmental degradation, hundreds of millions in losses to coastal-dependent businesses, and thousands of lost recreation days for residents and visitors of Santa Barbara County. 2-PSE-281–282.

Beyond the risk of a spill, and as explained above, the ESP mandates extensive excavations along the pipeline route. The CCC found that excavations unlawfully performed by Sable over the last year caused significant damage to a number of different environmentally sensitive areas, including areas that support special-status species. 2-PSE-244–250. As Petitioners recently saw, they can also restrict public access to recreational areas for weeks at a time. 2-PSE-251.

Additionally, restarting the pipelines—and, by extension, the infrastructure

58

they serve—will cause climate and air pollution impacts that have gone entirely unassessed. For example, when they were operational, the LFC Facilities were the single largest source of greenhouse gas emissions in Santa Barbara County, contributing 55 percent of total emissions. 1-PSE-57.

On balance, the above potential harms to the public far outweigh the public benefit of a potential (and unknown) increase in jobs. Thus, issuance of the ESP is not in the public interest.

In sum, then, because PHMSA did not—and could not—properly make any of the findings to support issuance of an ESP, its action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and in excess of its statutory authority. Thus, the ESP must be set aside. 5 U.S.C. § 706(2)(A), (C), (D).

## IV. PHMSA Failed to Comply with Its Obligations Under NEPA in Approving the ESP and Restart Plan.

PHMSA had a discrete duty to conduct NEPA review for the ESP and Restart Plan, as both approvals constitute major Federal actions that may significantly affect the environment. Indeed, the Approvals allow Sable to operate the Onshore Pipelines without effective protection from corrosion—creating a likely risk of another oil spill—and require ongoing repairs and excavations that will significantly impact creeks, wetlands, and habitats along the pipeline route. PHMSA's stated intent to prepare an EA "after-the-fact" by relying on its

59

unfounded emergency finding undermines the fundamental purpose of NEPA, which is to require agencies to consider potential environmental consequences *before* taking action. Furthermore, as discussed below, an EIS is required here for both Approvals.

## A. Applicable Law

NEPA was enacted to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. "NEPA achieves its sweeping policy goals through a set of action-forcing procedures that require that agencies take a hard look at the environmental consequences of their actions, and provide for broad dissemination of relevant environmental information." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1100 (9th Cir. 2025) (citation modified).

NEPA requires each federal agency to prepare, and circulate for public comment, a detailed statement prior to undertaking any "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS is required for a proposed agency action "that has a reasonably foreseeable significant effect on the quality of the human environment." *Id*. § 4336(b)(1). If a proposed federal action either "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of [the proposed action's] effect[s] is unknown," the federal agency

60

must prepare an EA. *Id*. § 4336(b)(2). The EA will result in a determination that an EIS is required or a finding of no significant impact (FONSI). *Id*. To adopt a FONSI, the agency "must supply a convincing statement of reasons to explain why a project's impacts are insignificant . . . to show that the agency took the requisite hard look at the consequences of its action." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir. 2009) (citation modified).

The Ninth Circuit has repeatedly determined that the trigger for requiring an EIS is a "low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). A "plaintiff need not show that significant effects *will in fact occur*." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cr. 1992). Instead, an EIS must be prepared merely if the plaintiff raises substantial questions whether a project may have a significant effect. *Id*.

Specific to actions of PHMSA, the Department of Transportation (DOT) requires that the agency analyze "the potentially affected environment and degree of the impacts of [a] proposed action" when considering a decision. 2-ER-79. When "considering whether the reasonably foreseeable impacts of the proposed action are significant," PHMSA should consider:

    (a) Both short- and long-term environmental impacts;
    (b) Both beneficial and adverse environmental impacts;
    (c) Impacts on public health and safety;
    (d) Economic Impacts; and
    (e) Impacts on the quality of life of the American people.

61

*Id.*

### B. PHMSA was Required to Conduct Environmental Review Prior to Approving the ESP.

Although PHMSA acknowledged that Special Permits, even those issued on an emergency basis, are subject to NEPA review, it improperly deferred review until later. 1-ER-21. No emergency exists here to warrant approval without first considering the potential environmental consequences of PHMSA's action. Moreover, it is clear that approval of the ESP will result in reasonably foreseeable adverse impacts to the environment, public health and safety, and quality of life of the American people.

1. There is No "Emergency" for Purposes of NEPA, and PHMSA's Proposal to Prepare a Post-Approval EA Violates NEPA.

As discussed *supra* Part III.A, no emergency exists under federal pipeline safety law. Nor does an emergency exist for purposes of NEPA. According to the Council on Environmental Quality, emergencies warranting immediate action must pose "*imminent* threats to life, property, or important natural, cultural, or historic resources." 1-PSE-53 (emphasis added).

Also as discussed *supra* Part III.A, Sable's proposal to restart the Onshore Pipelines does not demand *immediate* action. There is no *imminent* threat to life, property, or important resources. The pipelines and associated production facilities

62

have been offline for more than ten years without causing harm to life, property, or resources.

Therefore, there was no emergency that excused PHMSA from its obligation to conduct environmental review before taking action. Although PHMSA asserted an intention to conduct an after-the-fact EA, 1-ER-22, such deferral violates the long-standing requirement that NEPA review occur as early as possible to ensure that agency decisions consider environmental consequences.

This Circuit has emphasized the need to conduct environmental review before committing to a course of action. *See Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000) ("NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process." (citations omitted)); *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (emphasizing the importance of "up-front environmental analysis to ensure . . . 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct'" (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)); *Thomas v. Peterson*, 753 F.2d 754, 760–61 (9th Cir. 1985) (EIS should have been prepared and considered *before* a road project was approved), *abrogated on other grounds as recognized by Chilikat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425 (9th Cir. 2020).

63

The Court in *Metcalf* pointed out that "the comprehensive 'hard look' mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf*, 214 F.3d at 1142. Thus, the test for timeliness is whether the agency has conducted review before making an "irreversible and irretrievable commitment of resources." *Id.* Applying these principles, the Court in *Metcalf* held that the Federal Defendants acted improperly when they engaged in the NEPA process *after* they had already committed in writing to support a whaling proposal before the International Whaling Commission. *Id.* at 1143–44. The timing is even more egregious here. PHMSA did not just agree to support Sable's proposal; PHMSA took a *final* agency action to approve the ESP before initiating environmental review under NEPA. This action violates the requirement that NEPA review occur *before* decisions are made.

2.     Approval of the ESP Constitutes Major Federal Action.

Respondent DOT has already determined that Special Permits constitute major Federal actions subject to NEPA. According to DOT's Order 5610.1D (Procedures for Considering Environmental Impacts), PHMSA's major Federal actions subject to NEPA review include "regulatory actions, *special permits*, and

64

natural gas distribution grant actions." 2-ER-132 (emphasis added). Thus, the ESP issued to Sable constitutes a major Federal action.

>    3.    Approval of the ESP Will Result in Reasonably Foreseeable Impacts, Requiring Preparation of an EIS.

Issuance of the ESP meets the low threshold of NEPA requiring an EIS because the approval *may* have a significant effect. As discussed *supra* Part III.B, the purpose of the ESP is, in part, to allow the Onshore Pipelines to operate despite the "limited effectiveness of cathodic protection."

In its findings in support of the ESP, PHMSA downplayed the effect of the ESP, stating that the action merely "waives a requirement that certain corrosion along a longitudinal seam weld is mitigated within 180 days." 1-ER-21–22. PHMSA's characterization of the ESP is misleadingly narrow. As explained above, the ESP does not just waive the requirement to remediate corrosion along a longitudinal seam weld within 180 days; instead, the purpose of the ESP is to waive the much broader requirement for the pipelines to be equipped with effective cathodic protection. 2-ER-294.

It is the lack of effective cathodic protection that poses the primary risk of an oil spill and, again, was the direct cause of the Refugio Oil Spill. 3-ER-375. The continuing lack of effective cathodic protection increases the likelihood of another oil spill. Bodell Decl. ¶¶ 94, 95; 2-PSE-277. Such a spill will significantly impact sensitive ecosystems, including rare and endangered species and their habitats,

watersheds, and wetlands. Hunt Decl. ¶¶ 31–36. The potential impacts of a spill are not hypothetical or speculative—the devastating impacts of the 2015 spill from the very same pipeline are well documented. 2-PSE-281. That spill killed hundreds of marine mammals and seabirds, destroyed public beaches and nearshore habitats, closed fishing grounds, and blocked public enjoyment of the coast. 2-PSE-282.

Additionally, the lack of an effective corrosion prevention system means that Sable will need to conduct more frequent inspections, verification excavations, and repairs. 1-ER-7–18. These activities involve the use of major earth-moving equipment, removal of vegetation, and degradation of waterways, thereby impacting endangered and threatened species, environmentally sensitive habitats, and water quality. Hunt Decl. ¶¶ 21–30; 2-PSE-244–250; 2-PSE-254. Again, these impacts are not speculative; they are well documented as a result of the repairs Sable conducted from 2024 to 2025. 2-PSE-244–250; 2-PSE-254; 1-PSE-138–139.

PHMSA's failure to analyze these and other reasonably foreseeable impacts, including impacts related to restarting production from the SYU platforms, violated NEPA and DOT Order 5610.1D.

### C. PHMSA's Failure to Prepare an EIS Prior to the Restart Approval Violated NEPA.

PHMSA's approval of the Restart Plan not only violated the Consent Decree (which vested approval with OSFM), but even if PHMSA had authority to act on Sable's application, it was also required environmental review before a decision

was made. Restart of the Onshore Pipelines without effective cathodic protection significantly increases the risk of an oil spill. In addition, ongoing repairs and other work on the pipelines may cause harm to the environment.

### 1. The Restart Approval Constitutes a Major Federal Action.

NEPA defines "major Federal action" as an action that is "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). This Court has held that issuance of a permit or other regulatory decision constitutes a major Federal action if the approval "is a prerequisite for a project with adverse impact on the environment." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (citations omitted).

In issuing the Restart Approval, PHMSA asserted substantial control and responsibility over a project that, similar to the proposal in *Ramsey*, will have an adverse effect on the environment. Without Restart Approval, the Onshore Pipelines cannot operate. The fact that other approvals may also be required does not obviate the requirement for PHMSA to evaluate the effects of restarting the pipelines under NEPA. *See Ramsey*, 96 F.3d at 444 (that the states of Washington and Oregon also had to approve aspects of a project did not negate the need for an EA or EIS on the federal approval).

PHMSA's Restart Approval does not fall within any exception to the designation of a major Federal action. It was not a minor funding approval, an

67

enforcement action, or a decision with effects entirely outside the jurisdiction of the United States. 42 U.S.C. § 4336e(10)(B).

Nor was PHMSA's action merely ministerial. *Id*. § 4336e(10)(B)(vii). To the extent PHMSA had authority to approve Sable's Restart Plan (as discussed above, the Consent Decree only authorized OSFM to take such action), it had the discretion to approve, deny, or condition Sable's request. For example, PHMSA could have denied the request, as OSFM did, based on the need for additional repairs to ensure the safety of pipeline operations.

The Consent Decree also contains several subjective criteria that require the exercise of independent judgment regarding the Restart Plan. For example, the Consent Decree requires that the Restart Plan must include "*adequate* patrolling" and "*sufficient* surveillance." 2-ER-310 (emphasis added). The Consent Decree also requires a "long-term plan to address corrosion under insulation" pursuant to 49 C.F.R. §§ 195.551–195.591, which in turn invokes discretion to determine whether adequate corrosion control is provided. 2-ER-312.

PHMSA admits that the agency is not mandated to approve the Restart Plan. *See* PHMSA Opp'n to Mot. for Stay 23, Dkt. No. 14.1 ("To be sure, the consent decree does not mandate that PHMSA 'shall approve' any restart plan containing the requirement elements . . . ."). Moreover, the requirements set forth in the Consent Decree constitute more than a ministerial checklist and, instead, require

68

the agency to conduct an independent evaluation and determine whether the goals of the Decree are met. The outcome of PHMSA's decision, whether it be to deny, approve, or approve with conditions, must be informed by thorough environmental review.

2.     <u>The Restart Approval has a Reasonably Foreseeable Significant Effect on the Quality of the Human Environment.</u>

As discussed above, it is reasonably foreseeable that restarting the Onshore Pipelines without addressing the underlying cause of the 2015 oil spill creates an increased likelihood of an oil spill that would significantly affect natural resources as well as public health and safety. Bodell Decl. ¶¶ 94, 95; 2-PSE-277; 2-PSE-282; Hunt Decl. ¶¶ 31–36. In addition, the ongoing repairs and other work required during operations may significantly affect wildlife, habitats, watersheds, and other resources. *See supra*, Part III.C; Hunt Decl. ¶¶ 21–30.

Accordingly, PHMSA must prepare an EIS to address these and other reasonably foreseeable effects, including those resulting from restarting production from the SYU. 42 U.S.C. § 4336(b).

In sum, PHMSA's approvals of the ESP and Restart Plan constitute major Federal actions that will have reasonably foreseeable significant effects on the environment and thus require compliance with NEPA, including preparation of an EIS.

69

## CONCLUSION

For the reasons above, Petitioners request that this Court grant their Petition for Review, vacate the ESP, and vacate the Restart Approval. *See, e.g., GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1202 (D.C. Cir. 2023) (in successful challenge to a PHMSA action under 49 U.S.C. § 60119, remedy was to grant petition for review and vacate PHMSA's action); *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 584 (5th Cir. 2017) (partial vacatur of a PHMSA enforcement order).

Dated: March 23, 2026                    Respectfully submitted,

s/ *Jeremy Frankel*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

70

## STATEMENT OF RELATED CASES

This action is consolidated with the following related case: *State of California v. Pipeline and Hazardous Materials Safety Administration*, Case No. 25-8059. Undersigned counsel is unaware of any other related cases within the meaning of Ninth Circuit Rule 28-2.6.

Dated: March 23, 2026          s/ *Julie Teel Simmonds*
Julie Teel Simmonds

71

**CERTIFICATE OF COMPLIANCE**

**9th Cir. Case Number(s)** No. 25-8059

I am the attorney or self-represented party.

**This brief contains 15,190 words,** including 79 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[**X**] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [**X**] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _s/ Julie Teel Simmonds_       **Date:** _March 23, 2026_