No. 25-8059, consolidated with No. 26-508

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION, et al.,
*Respondents*.

On Petition for Review of Actions by the Pipeline & Hazardous Materials Safety
Administration

**FEDERAL RESPONDENTS' ANSWERING BRIEF**

|  |  |
|---|---|
| Of Counsel: | ADAM R.F. GUSTAFSON<br>*Principal Deputy Assistant Attorney General*<br>ROBERT N. STANDER<br>*Deputy Assistant Attorney General* |
| GREGORY ZERZAN<br>*General Counsel*<br>U.S. Dept. of Transportation | REBECCA JAFFE<br>MATTHEW R. OAKES<br>*Attorneys*<br>Environment and Natural Resources Division |
| KEITH COYLE<br>*Chief Counsel*<br>BENJAMIN FRED<br>*Assistant Chief Counsel*<br>TIMOTHY O'SHEA<br>KATHLEEN MAITLAND<br>*Attorneys*<br>Pipeline and Hazardous Materials Safety<br>Administration | U.S. Department of Justice<br>Post Office Box 7415<br>Washington, D.C. 20044<br>(202) 598-0402<br>matthew.oakes@usdoj.gov |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................iv

GLOSSARY........................................................................................................xi

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION....................................................................3

STATEMENT OF THE ISSUES..........................................................................4

PERTINENT STATUTES AND REGULATIONS ...........................................4

STATEMENT OF THE CASE.............................................................................4

    A.     Statutory and regulatory background ......................................................4

          1.     Pipeline Safety Act ......................................................................5

          2.     National Energy Emergency ........................................................7

    B.     Factual background ..................................................................................7

          1.     Consent Decree ...........................................................................8

          2.     Interstate Pipeline Determination .............................................10

          3.     Approval of Restart Plan.............................................................12

          4.     Emergency Special Permit.........................................................13

          5.     This litigation ............................................................................15

SUMMARY OF ARGUMENT ...........................................................................16

STANDARD OF REVIEW ................................................................................18

ARGUMENT ......................................................................................................18

i

I.   The Santa Ynez Pipeline System is an interstate hazardous liquid pipeline facility subject to PHMSA's exclusive jurisdiction. ....................................................................18

    A.   The Las Flores Canyon facility is a "midstream processing facility" that enables the transportation of crude oil. ...........................................................19

         1.   The "oil treating" process facilitates transportation. ................22

         2.   The breakout tanks and pumping station facilitate transportation. ......................................................24

         3.   The facility ensures safe transportation by housing key pipeline maintenance systems. ..........................27

         4.   The ancillary non-transportation functions do not create two pipelines. ..............................................29

    B.   The Las Flores Canyon facility is not a "production" or a "refining" facility, and any manufacturing is irrelevant. ...................30

    C.   PHMSA's jurisdiction is consistent with past practice and the purpose of the Pipeline Safety Act. ................................34

    D.   Judicial estoppel is a red herring. ........................................38

    E.   A consent decree cannot create authority for a state to regulate an interstate pipeline. ...........................................39

II.  Petitioners' challenges to the emergency special permit are moot. ...........................................................................42

III. The challenges to the emergency special permit fail on the merits in any event. ...............................................................45

    A.   PHMSA reasonably issued the emergency special permit. .................46

         1.   The emergency special permit was consistent with pipeline safety. .........................................................47

ii

2. The emergency special permit was in the public interest. ......................................................................51

3. The emergency special permit addressed an emergency. .......................................................................53

B. PHMSA was not required to prepare NEPA analysis before issuing the emergency special permit. ....................................54

IV. This Court lacks jurisdiction to review Petitioners' NEPA challenges to the restart plan, and it fails on the merits regardless. ..........................................................................................57

V. If the court does not rule in PHMSA's favor, remand is the appropriate remedy. .....................................................................60

CONCLUSION .................................................................................................62

CERTIFICATE OF COMPLIANCE ...........................................................64

iii

# TABLE OF AUTHORITIES

## Cases

*Alaska Center For Environment v. U.S. Forest Service*,
189 F.3d 851 (9th Cir. 1999) .................................................................43

*Alaska Wilderness League v. Jewell*,
788 F.3d 1212 (9th Cir. 2015) ...............................................................59

*ANR Pipeline Co. v. Iowa State Com. Comm'n*,
828 F.2d 465 (8th Cir. 1987) .................................................................35

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)..................................................................................51

*Beck Park Apartments v. U.S. Dept. of Housing and Urban Development*,
695 F.2d 366 (9th Cir. 1982) .................................................................40

*Bering Strait Citizens for Responsible Res. Dev. v. USACE*,
524 F.3d 938 (9th Cir. 2008) .................................................................51

*Bonneville Power Admin. v. F.E.R.C.*,
422 F.3d 908 (9th Cir. 2005) .................................................................42

*California Communities Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ...........................................................60, 61

*Church of Scientology v. United States*,
506 U.S. 9 (1992)....................................................................................42

*City and County of San Francisco v. U.S. Dept. of Transp.*,
796 F.3d 993 (9th Cir. 2015) ...................................................................4

*Compania Naviera Puerto Madrin S.A. Panama v. Esso Standard Oil Co Co.*,
1961 WL 102092 (S.D.N.Y. Mar. 22, 1961)..........................................22

*Conservation Cong. v. U.S. Forest Serv.*,
720 F.3d 1048 (9th Cir. 2013) ...............................................................50

*Ctr. For Biological Diversity v. Kempthorne,*
    588 F.3d 701 (9th Cir. 2009) ...................................................49

*Dehoog v. Anheuser-Busch InBev SA/NV,*
    899 F.3d 758 (9th Cir. 2018) ...................................................24

*Demery v. Arpaio,*
    378 F.3d 1020 (9th Cir. 2004) .................................................44

*DOT v. Pub. Citizen,*
    541 U.S. 752 (2004)................................................................59

*Exxon Corp. v. U.S. Secretary of Transp.,*
    978 F. Supp. 946 (E.D. WA 1997) ..........................................26

*Feldman v. Bomar,*
    518 F.3d 637 (9th Cir. 2008) ..............................................42, 43

*Greenpeace Action v. Franklin,*
    14 F.3d 1324 (9th Cir. 1992) ...................................................43

*Marshall v. Cities Service Oil Co.,*
    577 F.2d 126 (10th Cir. 1978) .................................................23

*Matter of BP Pipelines (North America) Inc.,*
    2009 WL 7812789 (PHMSA Nov. 23, 2009)........................25, 26

*Matter of Kinder Morgan CO2 Co.,*
    2010 WL 6539184 (PHMSA Oct. 12, 2010).............................23

*Matter of Kinder Morgan Energy Partners, L.P.,*
    2010 WL 6531634 (PHMSA Aug. 31, 2010).............................23

*Matter of ONEOK NGL Pipeline, L.P.,*
    *et al.*, 2016 WL 8315623 (PHMSA Oct. 12, 2016)....................32

*Matter of Plains Pipeline*, LP,
    2015 WL 9287190 (PHMSA Nov. 12, 2015)............................23

*Matter of Shore Terminals, LLC,*
    2010 WL 6518297 (PHMSA Mar. 17, 2010)........................25, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) .......................................................................... 18

*National Wildlife Federation v. DOT*,
  960 F.3d 872 (6th Cir. 2020) ......................................................... 59

*Natural Res. Def. Council, Inc. v. County of Los Angeles*,
  725 F.3d 1194 (9th Cir. 2013) ....................................................... 49

*Natural Resources Def. Council, Inc. v. Evans*,
  316 F.3d 904 (9th Cir.2003) .......................................................... 44

*Natural Resources Def. Council, Inc. v. McCarthy*,
  993 F.3d 1243 (10th Cir. 2021) ..................................................... 59

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ....................................................................... 38

*Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries
  Service*,
  56 F.3d 1060 (9th Cir. 1995) ......................................................... 45

*Olympic Pipe Line Co. v. City of Seattle*,
  437 F.3d 872 (9th Cir. 2006) .............................................. 5, 35, 41

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005) ......................................................... 61

*Pitts v. Terrible Herbst, Inc.*,
  653 F.3d 1081 (9th Cir. 2011) ....................................................... 42

*Powell v. McCormack*,
  395 U.S. 486 (1969) ....................................................................... 42

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ......................................................... 24

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................ 54, 55

vi

*Seaplane Adventures, LLC v. County of Marin,*
 71 F.4th 724 (9th Cir. 2023) ...................................................................44

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty,*
 605 U.S. 168 (2025).................................................................46, 55, 57, 62

*Syed v. M-I, LLC,*
 853 F.3d 492 (9th Cir. 2017) ...................................................................33

*United States v. FMC Corp.,*
 531 F.3d 813 (9th Cir. 2008) ...................................................................40

*United States v. Oakland Cannabis Buyers' Cooperative,*
 532 U.S. 483 (2001).................................................................................62

*Wallingford v. Bonta,*
 82 F.4th 797 (9th Cir. 2023) ...................................................................43

*Weinstein v. Bradford,*
 423 U.S. 147 (1975).................................................................................43

*West Coast Seafood Processors Ass'n v. Natural Resources Defense
 Council, Inc.,*
 643 F.3d 701 (9th Cir. 2011) ...................................................................43

*Wyler Summit P'ship v. Turner Broad. System, Inc.,*
 235 F.3d 1184 (9th Cir. 2000) .............................................................38, 39

**Statutes**

5 U.S.C. § 706(2)(A).........................................................................................18

42 U.S.C. § 4332...............................................................................................56

42 U.S.C. § 4332(2)(C)......................................................................................58

49 U.S.C. § 60101(3) ....................................................................................33, 34

49 U.S.C. § 60101(5) .........................................................................................20

49 U.S.C. § 60101(21)(A)(i)..............................................................................34

49 U.S.C. § 60101(22) ...............................................................................2, 20, 33

49 U.S.C. § 60101(22)(A)(i) ....................................................................................34

49 U.S.C. § 60101(22)(B) .......................................................................................34

49 U.S.C. § 60101(a)(5) ...........................................................................................5

49 U.S.C. § 60101(a)(7) ......................................................................................6, 30

49 U.S.C. § 60101(a)(22)(A) ..................................................................................26

49 U.S.C. § 60101(a)(22)(B) ..................................................................................31

49 U.S.C. § 60102(a)(2) .......................................................................................1, 5

49 U.S.C. § 60104(c) .................................................................................1, 5, 35, 42

49 U.S.C. § 60105 ...................................................................................................41

49 U.S.C. § 60106(a) ..............................................................................................41

49 U.S.C. § 60118(c)(1)(A) ....................................................................................46

49 U.S.C. § 60118(c)(2) ..........................................................................................56

49 U.S.C. § 60118(c)(2)(A) .................................................................................46, 47

49 U.S.C. § 60118(c)(2)(B) .....................................................................................47

49 U.S.C. § 60119(a) ............................................................................................3, 46

49 U.S.C. § 60120 ...................................................................................................50

49 U.S.C. § 60121 ...................................................................................................50

49 U.S.C. §  60101(a)(22) .......................................................................................29

49 U.S.C. §§ 60119(a)(1) ........................................................................................18

## Rules

Fed. R. App. P. 29(a)(5) ................................................................64

Fed. R. App. P. 32(a)(5) ................................................................64

Fed. R. App. P. 32(f) ....................................................................64

## Regulations

18 C.F.R. § 341.0 .........................................................................36

40 C.F.R. § 60.101(a) ...................................................................32

40 C.F.R. § 98.390(a) ...................................................................32

49 C.F.R. § 1.97 .............................................................................5

49 C.F.R. § 190 .............................................................................25

49 C.F.R. § 195 .........................................................6, 11, 21, 36

49 C.F.R. § 172.102 .....................................................................24

49 C.F.R. § 190.341 .....................................................................45

49 C.F.R. § 190.341(a) .................................................................47

49 C.F.R. § 190.341(g) ...........................................................47, 54

49 C.F.R. § 195.1 ....................................................................6, 21

49 C.F.R. § 195.2 ................................................6, 20, 25, 27, 31

49 C.F.R. § 195.304 .....................................................................49

49 C.F.R. § 195.428 .....................................................................24

49 C.F.R. § 195.452 .....................................................................23

49 C.F.R. § 195.452(j)(3)..............................................................49

49 C.F.R. § 195.501 ...................................................................................37

49 C.F.R. § 195.505 ...................................................................................37

49 C.F.R. § 195.579 ...................................................................................23

50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985) ...........................................7

85 Fed. Reg. 70,125/2 (Nov. 4, 2020) ...............................................21, 32

91 Fed. Reg. 1667 (Jan. 12, 2026) ............................................................7

91 Fed. Reg. 8,949 (Feb. 24, 2025) .........................................................45

## Other Authorities

Executive Order 14156 ....................................................................7, 54, 56

H.R. 1489, 102nd Cong., 2d Sess. (1992) .........................................35, 62

x

## GLOSSARY

| | |
|---|---|
| DOT | Department of Transportation |
| EPA | United States Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| NEPA | National Environmental Policy Act |
| OSFM | California Office of the State Fire Marshal |
| PHMSA | Pipeline & Hazardous Materials Safety Administration |

## INTRODUCTION

Under the Pipeline Safety Act, the Federal Pipeline and Hazardous Materials Safety Administration (PHMSA) exercises exclusive jurisdiction to regulate interstate pipeline facilities.  49 U.S.C. §§ 60102(a)(2), 60105(a).  States may regulate intrastate pipelines, but "may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  *Id.* § 60104(c).

The Santa Ynez Pipeline System transports crude oil from the Outer Continental Shelf in the Pacific Ocean to a terminal in Pentland, California.  Along the way, the crude oil runs through a facility in Las Flores Canyon that provides dewatering and anti-corrosion treatments necessary to ensure safe transportation. The key question in this case is whether Santa Ynez is an interstate hazardous liquid pipeline facility subject to PHMSA's exclusive jurisdiction. After a three-day inspection, PHMSA concluded that it is.  That decision is easily consistent with the statute and the record.

The bottom line is that the Santa Ynez pipeline transports crude oil from the Pacific Ocean (outside California) all the way to Pentland, California.  The statute defines a "hazardous liquid pipeline facility" as a facility used or intended to be used to transport hazardous liquid, *id.* § 60101(5), and it defines "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage

1

of hazardous liquid incidental to [its] movement." 49 U.S.C. § 60101(22).  That's what Santa Ynez pipeline does.  It transports the same crude oil from outside California through Las Flores and then to Pentland.  That should be the end of this case.

California contends that the Las Flores Canyon facility breaks the pipeline in two, transforming Santa Ynez into an interstate pipeline and a separate intrastate pipeline.  That is wrong for multiple reasons.  First, it is undisputed that the Las Flores Canyon facility is merely a way station that is "incidental to the movement" of the crude oil from the Pacific Ocean to Pentland.  *Id.* § 60101(22)(A).  Second, the Las Flores Canyon facility does no "production" or "refining" or relevant "manufacturing," which are the only applicable exclusions from the definition of "transporting." *Id.* § 60101(22)(B).  Third, the anti-corrosion and other treatments at Las Florez are essential to ensure safe transportation, and excluding them from PHMSA oversight would severely undercut the statute's safety purposes.  The Court should therefore affirm PHMSA's exclusive jurisdiction so that PHMSA, the dedicated agency with special expertise, can safely regulate Santa Ynez.

Petitioners' other two challenges are largely irrelevant.  They contest PHMSA's grant of an "emergency special permit" issued in December 2025 to the pipeline's owner and operator, but that permit has expired and will not be renewed, so the challenges to it are moot.

Petitioners also challenge PHMSA's approval of a restart plan for Santa Ynez as required by a consent decree that the pipeline's former owner signed in 2015. But challenges to that decision must be brought under the dispute-resolution provisions of the consent decree, not in this Court under the Pipeline Safety Act's judicial review provision. Regardless, Petitioners' arguments as to both the emergency permit and the restart plan fail on the merits. For these reasons, the Court should deny the petitions.

## STATEMENT OF JURISDICTION

The courts of appeals have exclusive jurisdiction to review PHMSA orders under 49 U.S.C. § 60119(a). California timely filed a petition for review of PHMSA's December 17, 2025, letter determining interstate jurisdiction over the Santa Ynez pipeline. *See* Dkt. 1.1, No. 26-508 (Jan. 23, 2026). PHMSA's December 22, 2025, approval of Sable's emergency restart plan is not an order under 49 U.S.C. § 60119(a), and thus this Court lacks jurisdiction. Petitioners challenged the emergency permit issued on December 23, 2025. The emergency permit expired February 21, 2026. These challenges to the emergency permit are moot, and this Court lacks jurisdiction.

3

## STATEMENT OF THE ISSUES

1.      Whether PHMSA properly determined that the Santa Ynez pipeline is an interstate pipeline facility subject to PHMSA's exclusive jurisdiction.

2.      Whether Petitioners' challenges to the emergency special permit are moot, where the permit expired before any crude oil flowed through the Santa Ynez pipeline and the permit has not been renewed.

3.      Whether this Court lacks jurisdiction to review the restart plan, which is not an order issued under the Pipeline Safety Act, and whether PHMSA acted rationally in approving the restart plan and granting the emergency special permit.

4.      Whether PHMSA correctly determined that National Environmental Policy Act (NEPA) analysis was not required before approving the restart plan and granting the emergency special permit.

## PERTINENT STATUTES AND REGULATIONS

Relevant statutes and regulations are in Petitioners' Addenda.

## STATEMENT OF THE CASE

### A.      Statutory and regulatory background

More than 2.5 million miles of pipeline crisscross the United States. *City and County of San Francisco v. U.S. Dept. of Transp.*, 796 F.3d 993, 996 (9th Cir.

4

2015). These pipelines transport the energy products and other commodities that are vital to all aspects of modern American life, including the fuel that powers our homes and business and the cars and trucks that we drive every day, as well as the raw materials that supply our petrochemical industry.

### 1. Pipeline Safety Act

Congress enacted the Pipeline Safety Act to ensure the safety of pipeline facilities. The Act authorizes the Secretary of Transportation to prescribe minimum federal safety standards for pipeline facilities that transport gas or hazardous liquid, including crude oil. 49 U.S.C. § 60102(a)(2). The Secretary, in turn, has delegated this authority to PHMSA. *See* 49 C.F.R. § 1.97.

The Pipeline Safety Act vests PHMSA with exclusive authority to regulate safety of interstate hazardous liquid pipeline facilities. 49 U.S.C. § 60104(c). States, on the other hand, may only regulate intrastate pipelines. *Id.*; *Olympic Pipe Line Co. v. City of Seattle,* 437 F.3d 872, 878 (9th Cir. 2006).

The Pipeline Safety Act defines a "hazardous liquid pipeline facility" to "include[] a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5). Congress defined "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce." *Id.* §

5

60101(a)(22). "Transporting hazardous liquid" does not include "onshore production, refining, or manufacturing facilities". *Id.* § 60101(a)(22)(B)(ii)-(iii).

An "interstate hazardous liquid pipeline facility" is "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce." 49 U.S.C. § 60101(a)(7). "[I]nterstate or foreign commerce" is defined in relevant part as commerce between "a place in a State and a place outside that State" or "places in the same State through a place outside the State." *Id.* § 60101(a)(8)(B). "Interstate pipeline" is "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids … in interstate or foreign commerce." 49 C.F.R. § 195.2. "Intrastate pipeline means a pipeline … that is not an interstate pipeline." *Id.* The ultimate determining factor for jurisdiction is whether the transportation of hazardous liquids is "associated with those facilities in or affecting interstate or foreign commerce, including pipeline facilities on the Outer Continental Shelf." 49 C.F.R. § 195.1(a) (establishing which pipelines are covered by PHMSA safety regulations).

PHMSA has long considered hazardous liquid pipeline facilities that originate on the Outer Continental Shelf and terminate in an adjoining coastal State to be interstate pipeline facilities under the Pipeline Safety Act. 49 C.F.R. pt. 195 App'x A ex. 7. Decades ago, Department of Transportation (DOT) regulations linked interstate jurisdiction directly to the jurisdiction of the Federal Energy

6

Regulatory Commission (FERC), but DOT changed its approach in 1985 when it amended the definition of the terms "interstate pipeline" and "intrastate pipeline" to track more closely with the language of the Hazardous Liquid Pipeline Safety Act. 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

### 2. National Energy Emergency

In January 2025, President Donald Trump issued Executive Order 14156, *Declaring a National Energy Emergency*; 90 Fed. Reg. 8,433 (Jan. 20, 2025); 91 Fed. Reg. 1,667 (Jan. 12, 2026) (continuing for one year the emergency declared in Executive Order 14156). The President determined that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." 90 Fed. Reg. at 8,434 § 1. The President directed agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

### B. Factual background

The Santa Ynez pipeline starts on the Outer Continental Shelf at a group of three crude oil production facilities named Heritage, Harmony, and Hondo and ends at a terminal at Pentland, California. 2-CalER-27, 32, 206. Crude oil from the offshore facilities is first pumped through the Las Flores Canyon facility, an

7

anticorrosion treatment facility necessary for safe transportation. 2 CalER-27,32, 206; SER-149-150. The Las Flores Canyon facility pumps the crude oil to Gaviota pump station, Gaviota pumps propel the oil to Sisquoc pump station, and Sisquoc pumps send the oil to Pentland. 2 CalER-27,32, 206; SER-149-150.

### 1. Consent Decree

More than a decade ago, on May 19, 2015, an oil spill occurred at an onshore segment of the Santa Ynez pipeline, then known as Line 901 (and now called CA-324) and owned and operated by Plains Pipeline, LP. 2-ER-19, 3-ER-373. Two days later, PHMSA issued a corrective action order directing Plains to shut down Line 901 and implement corrective measures. PHMSA later extended the shutdown order and corrective measures in the corrective action order to the adjoining Line 903 (which is now called CA-325). 2-ER-19.

After investigating, PHMSA determined that the cause of the Line 901 spill was pipe-wall thinning caused by external corrosion. 3-ER-375. External corrosion can typically be controlled with the installation of a cathodic protection system, but PHMSA found that the insulation and coating on Line 901 rendered its cathodic protection system ineffective. [1] 3-ER-375. In addition, PHMSA

---

[1] Cathodic protection is a process by which steel is protected from corrosion by introducing an electric current from an electrical device called a "rectifier." 3-ER-409. This current stops the corrosion process. 3-ER-410. External corrosion is typically inhibited as long as cathodic protection current is reaching the pipe. 3-ER-410.

determined that Plains failed to detect and mitigate the corrosion on Line 901, and that Plains failed to timely detect and respond to the spill.  3-ER-375.

In 2020, PHMSA and other federal and state agencies entered a consent decree with Plains to settle alleged violations of the Pipeline Safety Act and other claims related to the spill.  2-ER-214-215.  The consent decree superseded the corrective measures in the corrective action order, 2-ER-245, and designated the California Office of the State Fire Marshal (OSFM) (the certified State pipeline safety authority) to oversee certain compliance terms because Lines 901 and 903 were classified as intrastate at the time.

The consent decree required Plains to take certain steps before restarting Lines 901 and 903.  Those steps included repairing the pipeline, taking actions to prevent and mitigate future failures, and obtaining a waiver to address the inadequacies in the cathodic protection system.  2-ER-294-307, 310-316. Specifically, because the insulation on Lines 901 and 903 can decrease the effectiveness of cathodic protection, the consent decree directed Plains to get a waiver to manage corrosion risks through different methods, such as more frequent inspections and more stringent criteria for identifying and responding to potential anomalies in the pipeline wall.  2-ER-36, 312.

The consent decree also required Plains to obtain approval of its restart plan from OSFM.  2-ER-310.  Requirements for the restart plan included incremental

9

pressure increases, sufficient surveillance to ensure no leaks are present, and methods to address corrosion. 2-ER-310-316.

### 2. Interstate Pipeline Determination

In 2022, Pacific Pipeline Company purchased Lines 901 and 903 from Plains and then, in 2024, Sable purchased Pacific Pipeline Company. 2-ER-37. Sable agreed to be bound by the consent decree provisions that applied to Lines 901 and 903. 2-ER-205. Lines 901 and 903 were renamed CA-324 and CA-325.

In 2024, Sable also acquired three offshore drilling platforms and offshore subsea pipeline segments that transport oil from those platforms to CA-324/325, through the Las Flores Canyon facility to the Pentland terminal in Kern County, California. 2-ER-69. These assets are part of a single system, transporting oil from the Outer Continental Shelf to California, as shown in the map below.



2-CalER-32; 2-ER-69.

After conducting a multi-day onsite inspection in December 2025, PHMSA determined that CA-324/325 are interstate pipelines because they transport oil from the Outer Continental Shelf to the Pentland terminal in California. 1-ER-25-27; *see also* 49 C.F.R. pt. 195 App'x A ex. 7. Over the course of three days, PHMSA reviewed Sable's procedures and records, and observed operations at the Las Flores Canyon facility, pumping stations between Las Flores and Pentland, the control room, and the offshore Harmony platform. 1-ER-25, 2-CalER-27-29.

11

PHMSA also reviewed 2025 inspection results from tests that OSFM conducted. 1-ER-25; SER-686.

### 3. Approval of Restart Plan

Sable made extensive repairs and improvements to CA-324/325 to address the cause of the 2015 failure and prevent future recurrence. Sable conducted in-line inspections, analyzed all data indicating anomalies with 40 percent or more metal loss of the pipeline wall, and remediated 100 percent of the locations that had 40 percent or more metal loss, exceeding regulatory requirements which require remediating anomalies with 50 percent or more metal loss. 2-CalER-213; 49 C.F.R. § 195.452(h)(4)(iii)(F). Sable installed 27 safety valves on CA-324/325 and implemented enhanced leak detection and emergency response measures. 2-CalER-213. Sable also updated its control center, including the alarm configuration and alert notifications. 2-CalER-213. In 2025, OSFM inspected Sable's operations, maintenance of the pipelines, and control room, and did not document any unsatisfactory results or concerns. 2-CalER-214.

In September 2025, Sable submitted a restart plan to OSFM for CA-324/325, as specified in the consent decree. 1-ER-23. Then, after PHMSA assumed regulatory jurisdiction, Sable submitted the restart plan to PHMSA. PHMSA conducted field inspections to examine Sable's operations and maintenance procedures, corrosion-related records, pressure-test records, and start-up

12

procedures. 2-CalER-27-29. PHMSA did not identify any concerns or unsatisfactory items. 2-CalER-27-29.

In December 2025, PHMSA approved Sable's restart plan. 1-ER-23-24.

### 4. Emergency Special Permit

In December 2025, Sable applied to PHMSA for an emergency special permit to waive its obligation to comply with certain remediation requirements that apply to corrosion along longitudinal pipeline seams. 2-ER-29, 42 (citing 49 C.F.R. § 195.452(h)(4)(iii)(H)). Sable sought this waiver because the consent decree required it to apply for a waiver for the "limited effectiveness of cathodic protection." 2-ER-42.

Sable explained that PHMSA should grant the waiver because longitudinal seam corrosion is not problematic for CA-324/325, which contain pipe manufactured after 1970 that is not as susceptible to longitudinal seam corrosion as pipe manufactured before 1970. 2-ER-43. Sable further explained that it planned to use in-line inspection tools to identify the other types of corrosion (such as "blunt metal loss") that are more likely on CA-324/325. 2-ER-43. Sable noted that these tools and methods differentiate between the corrosion anomalies that present legitimate pipeline integrity risks and those that do not. 2-ER-43. Sable also explained that the waiver would allow it to avoid performing unnecessary excavations and environmental disturbance. 2-ER-45. Sable noted that OSFM had

13

approved similar waivers before PHMSA assumed jurisdiction and that PHMSA had stated its non-objection to those waivers. 2-ER-29, 42.

Sable requested an emergency special permit because of the national energy emergency. 2-ER-30. Sable noted that restarting the pipeline would provide energy security and reduce California's need to import oil. 2-ER-44. Sable further noted that it planned to apply for a non-emergency special permit to replace the emergency special permit, which would expire in 60 days. 2-ER-49.

On December 23, 2025, PHMSA issued the emergency special permit. 1-ER-3. PHMSA determined that Sable's program to locate and remediate any safety risks effectively reduced risk and that complying with the conditions in the special permit would provide at least an equivalent level of safety as complying with the waived regulation would provide. 1-ER-20

PHMSA determined that the national energy emergency warranted issuing the special permit on an emergency basis. 1-ER-21. PHMSA explained that the permit would enable CA-324/325 to "mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil." 1-ER-21.

In addition, because there was an emergency, PHMSA concluded that procedures for assessing environmental impacts in emergency circumstances applied, and that the need for immediate action precluded preparing a NEPA analysis. 1-ER-21. PHMSA noted that the permit's scope was narrow, and that

14

expected environmental impacts "will not be significant."  1-ER-21-22.  The permit waived only a requirement to repair, within 180 days, corrosion along a longitudinal seam weld, and the "conditions imposed by the special permit sufficiently address" any potential risks and provided an equivalent level of safety.  1-ER-21-22.  PHMSA noted that it planned to prepare a NEPA analysis as soon as practicable.  1-ER-22.[2]

Finally, PHMSA explained that the permit was within the public interest because it would ensure uniform and continuous regulatory oversight by continuing the waivers that OSFM had previously issued.  1-ER-20.

### 5.    This litigation

In December 2025, Environmental Petitioners moved for an emergency stay of PHMSA's emergency special permit and restart plan approval, arguing that they were likely to succeed on the merits.  ACMS 8.1.  That motion was summarily denied.  ACMS 21.1.  In January 2026, the State of California filed a petition for review.  *State of California v. PHMSA*, No. 26-508 (filed Jan. 23, 2026).  California's case was consolidated with Environmental Petitioners' challenges.  ACMS 39.1.  The emergency special permit expired on February 21, 2026, and has not been renewed.  1-ER-3.

---

[2] The environmental assessment, which was finalized on February 20, 2026, is now available on regulations.gov.  https://www.regulations.gov/document/PHMSA-2025-1502-0007.

**SUMMARY OF ARGUMENT**

I. The Santa Ynez pipeline is an interstate hazardous liquid pipeline facility that originates on the Outer Continental Shelf and terminates at Pentland station in California. PHMSA has long considered pipeline facilities that transport crude oil produced on the Outer Continental Shelf into an adjoining coastal State to be interstate hazardous liquid pipeline facilities for purposes of the Pipeline Safety Act. This well-established principle squarely applies here.

The Santa Ynez pipeline does not, as Petitioners claim, terminate at the Las Flores Canyon midstream processing facility. That facility performs functions that are necessary to continue the safe transportation of crude oil to the Pentland terminal. The crude oil is heated to ensure continuous flow and contaminants are removed to facilitate further downstream pipeline transportation. Other necessary transportation-related operations are also performed at the facility. Essentially, crude oil flows into the Las Flores Canyon facility, and after heating and removing some constituents to improve the transportation process the same crude oil flows out. Because the Las Flores Canyon facility provides services incidental to transportation, it is part of a single, continuous, pipeline facility stretching from the Outer Continental Shelf to the Pentland terminal.

Petitioners also argue that the jurisdictional status of the Santa Ynez pipeline is irrelevant because the 2020 consent decree "vested" or otherwise

16

granted California regulatory jurisdiction and withdrew Congress' grant of regulatory authority to PHMSA. But a contractual agreement cannot create or remove regulatory jurisdiction unless Congress granted PHMSA the authority for such a delegation. Congress did not, and Congress expressly granted the federal government authority over interstate pipelines.

II. Petitioners' challenge to the emergency special permit is moot. The emergency special permit expired under its own terms sixty days after it was signed. Sable never operated the CA-324/325 subject to the emergency special permit while it was in effect. Petitioners have not argued that any exception to the mootness doctrine applies, nor can they.

III. Petitioners' remaining arguments are equally unavailing. This Court lacks jurisdiction to review the restart plan challenges because that plan was issued under the 2020 Consent Decree and not under the Pipeline Safety Act. PHMSA reasonably issued the emergency special permit after determining that operation of the Santa Ynez pipeline would help to alleviate a national energy emergency.

Petitioners' NEPA arguments fail. DOT regulations recognize that NEPA analysis is not required for the emergency special permit, and such analysis will be undertaken if a non-emergency permit is issued. NEPA analysis is not required for approval of the restart plan both because that approval is not a significant federal

17

action and because PHMSA lacked discretion to deny Sable's request once it determined that the restart plan conditions were satisfied.

IV. Petitioners ask for vacatur, but the permit has expired so there is no permit to vacate, and this Court lacks jurisdiction over the challenge to the restart plan. Petitioners have not justified vacatur of PHMSA's decision on jurisdiction.

## STANDARD OF REVIEW

The Court applies the Administrative Procedure Act to review PHMSA orders issued under the Pipeline Safety Act. 49 U.S.C. §§ 60119(a)(1), (a)(3); 60119(a)(3). Under the Administrative Procedure Act, the Court reviews whether an agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

I. **The Santa Ynez Pipeline System is an interstate hazardous liquid pipeline facility subject to PHMSA's exclusive jurisdiction.**

After a three-day examination of the Las Flores Canyon facilities, PHMSA reasonably determined that the Santa Ynez pipeline is an interstate hazardous liquid pipeline facility because "it transports crude oil from the [Outer Continental Shelf] to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from the Las Flores Canyon facility to Pentland,

California." 1-ER-26. That decision was fully consistent with the statutory definition of interstate hazardous pipeline facility. As explained below, the bottom line is that the pipeline continuously transports oil from the Outer Continental Shelf to the shore and on through California, and the Las Flores Canyon facility merely facilitates that continuous transportation.

Petitioners, on the other hand, argue that CA-324/325 are intrastate pipelines because the Las Flores Canyon facility does not transport hazardous liquid by pipeline. Cal. Br. 25-39; Envtl. Br. 23-40. Specifically, California argues that the Santa Ynez pipeline cannot be a single pipeline because the Las Flores Canyon facility "interrupts the flow of oil." Cal. Br. 34. That is incorrect because Petitioners misunderstands what the facility does and therefore misapply the statutory and regulatory definition of a pipeline. Ultimately, the record here establishes that the Las Flores Canyon facility serves important transportation-related functions and is part of a single interstate pipeline system.

### A. The Las Flores Canyon facility is a "midstream processing facility" that enables the transportation of crude oil.

The Santa Ynez Pipeline is an interstate pipeline because it originates in the Outer Continental Shelf and transports oil continuously to shore and through California. The Las Flores Canyon facility is merely a midstream processing facility that facilitates transportation between offshore and onshore segments of the interstate pipeline.

19

Under the PSA, a "hazardous liquid pipeline facility" "includes ... a facility, a building, or equipment used or intended to be used in transporting hazardous liquid." 49 U.S.C. § 60101(5); *see also* 49 C.F.R. § 195.2. "Transporting hazardous liquid" means "movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce." 49 U.S.C. § 60101(22).

The Santa Ynez pipeline is an interstate pipeline. It originates on the Outer Continental Shelf at an offshore oil platform, named Harmony. 2 CalER-26-27. Harmony is connected by pipeline to another offshore oil platform, Hondo, which then connects by pipeline to the onshore Las Flores Canyon facility. 2-CalER-32. Crude oil is sent from the offshore production facilities to the Las Flores Canyon facility where it is processed to facilitate continued transportation. 2-CalER-206. The crude oil is then pumped to the end of pipeline segment CA-325. CA-324 connects the Las Flores Canyon facility to a pump station in Gaviota, and CA-325 connects from Gaviota through another pump station to the Pentland Station terminal in Kern County, California. 2-CalER-32, 206; 2-ER-54. Because the Santa Ynez pipeline goes from the Outer Continental Shelf to Pentland, it is an interstate pipeline. 49 C.F.R. § 195.1(a) (Pipeline facilities are subject to PHMSA regulation if they are "associated with those facilities in or affecting interstate or foreign commerce, including pipeline facilities on the Outer Continental Shelf.");

20

49 C.F.R. pt. 195 App'x A ex. 7 (Pipeline facilities that originate on the Outer Continental Shelf and terminate in an adjoining coastal state are interstate.).

The Las Flores Canyon facility does not transform this interstate pipeline into an intrastate pipeline. To the contrary, the facility is a "midstream processing facility" that receives products being transported by pipelines that everyone agrees are subject to PHMSA's jurisdiction and re-injects those products for continued transportation by pipeline. *See* Pipeline Safety: Midstream Facilities Frequently Asked Questions, 85 Fed. Reg. 70,125/2 (Nov. 4, 2020) (draft guidance). Such facilities consist of "piping or storage that is engaged in the transportation of gas or hazardous liquids by pipeline." *Id.* "Processing" is defined in PHMSA draft guidance as "the treatment of products including, but not limited to dehydration, removal of contaminants by separation or filtration, blending with other products, and heating or cooling units that separate or purify products and remove condensates by distillation." *Id.* at 70,126/1. PHMSA has historically treated midstream processing facilities as subject to its jurisdiction. *See* 85 Fed. Reg. 70,125/2. PHMSA took the same approach here in determining that the Las Flores Canyon facility is part of a pipeline facility.

The following discussion explains how the key processes performed at the Las Flores Canyon facility facilitate transportation.

21

### 1.     The "oil treating" process facilitates transportation.

Because the Las Flores Canyon facility facilitates the transportation of crude oil, it falls within the statutory definitions of a hazardous liquid pipeline facility and the regulatory definition of pipeline or pipeline system.  The "oil treating" process implemented at the facility facilitates transportation.  SER-149.

The crude oil pumped out of the ground at the offshore production facilities is an "emulsion" containing of gas, oil, water and other contaminants that flows into the Las Flores Canyon facility.  2-CalER-27; SER-149, 158.  After the emulsion enters the Las Flores Canyon facility, it is metered to establish its volume and then it is heated.  SER-149.  Heating the crude oil reduces its viscosity, rendering it readily flowable for pumping.  3-ER-376 ("The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport.").  *See generally Compania Naviera Puerto Madrin S.A. Panama v. Esso Standard Oil Co.*, 1961 WL 102092, at *3 (S.D.N.Y. Mar. 22, 1961) ("The temperature of the oil has practical importance because its viscosity has a direct bearing upon the rate at which it can be discharged ... If the oil is not adequately heated, the rate of discharge is slowed down.").  Put another way, without heating, oil would not readily flow, and transportation by pipeline would be more difficult.  CA-324/325 are insulated to maintain the temperature of the crude oil during transportation.  3-ER-325.  The heating aspect of the oil treatment,

which happens at the Las Flores Canyon facility, is key to the *transportation* process. SER-149.

The "free water knock out" or "F.W.K.O" process at the facility removes corrosive constituents. SER-149. A free-water-knock-out system works by separating "water and crude oil in order to render the oil deliverable to a pipeline." *Marshall v. Cities Service Oil Co.*, 577 F.2d 126, 127 (10th Cir. 1978). This process can also separate out other impurities, thereby preventing corrosion in tanks or pipelines. *Id.* Water and impurities in crude oil cause and accelerate pipeline corrosion. *See In the Matter of Plains Pipeline*, LP, 2015 WL 9287190, at *2 (PHMSA Nov. 12, 2015); *In the Matter of Kinder Morgan CO2 Co.*, 2010 WL 6539184, at *6 (PHMSA Oct. 12, 2010). PHMSA's safety regulations require a hazardous liquid pipeline operator to investigate the corrosive effect of the particular emulsion being transported and take steps to mitigate corrosion. 49 C.F.R. § 195.579; *In the Matter of Kinder Morgan Energy Partners, L.P.*, 2010 WL 6531634, at *9 (PHMSA Aug. 31, 2010). By treating the oil and removing impurities, the Las Flores Canyon facility is facilitating transportation by mitigating the risk of corrosion. *See* 49 C.F.R. § 195.452 (requiring pipeline operators to develop risk management strategies); SER-703.

The facility also processes crude oil through a stabilizer, which reduces vapor pressure to levels suitable for storage and conventional transportation

23

methods. SER-149; Spill Prevention, Control, and Countermeasure Plans Guidance at 5.[3] Reducing vapor pressure is crucial to safe transportation. This is why PHMSA safety regulations require hazardous liquid pipeline operators to inspect and test pressure control equipment at least twice each year. 49 C.F.R. § 195.428. *See generally* 49 C.F.R. § 172.102 (requiring crude oil container designs "to permit the release of gas or vapor to prevent a build-up of pressure that could rupture the packagings.").

> **2.  The breakout tanks and pumping station facilitate transportation.**

Following metering, heating, and the contaminant removal and stabilization processes, the oil is either sent straight to the outbound pipeline or returned to storage tanks where it can be held until it can be sent to the Las Flores pump station. SER-149, 158. Both the storage tanks and the pumping station facilitate transportation.

Storage tanks and rerun tanks temporarily store petroleum that can be subsequently reinjected into the pipeline and later provided to purchasers

---

[3] This guidance document assists inspectors implementing Spill Prevention, Control, and Countermeasure Plans and is available online: https://www.epa.gov/sites/default/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf. This Court may take judicial notice "matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). Such records include "government documents." *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018).

downstream. SER-2; 3-ER-375; SER-149, 158. These tanks qualify as "breakout tanks" that "receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline." 49 C.F.R. § 195.2.

PHMSA routinely asserts jurisdiction over breakout tanks because it considers the temporary storage and re-injection of oil to be a transportation-related activity. *See* PHMSA/Environmental Protection Agency (EPA) memo at 6-14.[4] In PHMSA's administrative enforcement cases, *see* 49 C.F.R. Pt. 190, the agency asserts jurisdiction over tanks such as those at the Las Flores Canyon facility. For example, in *In the Matter of BP Pipelines (North America) Inc.*, 2009 WL 7812789, at *3 (PHMSA Nov. 23, 2009), PHMSA considered whether a pair of breakout tanks were regulated as part of a pipeline transportation system. The agency found that because the tanks "receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline," each tank was a breakout tank, subject to PHMSA regulation. In *In the Matter of Shore Terminals, LLC*, 2010 WL 6518297, at *1 (PHMSA Mar. 17, 2010), PHMSA similarly concluded tanks that "store and transport hazardous liquids from the Olympic Pipeline prior to reinjection into the Kinder Morgan pipeline" are

---

[4] PHMSA/EPA Memo re. Jurisdiction over Breakout Tanks/Bulk Oil Storage Tanks (containers) at Transportation-Related and Non-Transportation-Related Facilities, Feb. 4, 2000, available at https://perma.cc/7UXQ-7ZFU. The Feb. 4, 2000, memo was withdrawn due to organizational changes within the Department of Transportation. Timothy P. Butters letter, June 25, 2013.

breakout tanks.  A district court has reached a similar conclusion.  In *Exxon Corp. v. U.S. Secretary of Transp.*, 978 F. Supp. 946, 949-50 (E.D. WA 1997), the court adopted DOT's argument that the definition of "transporting hazardous liquid" in 49 U.S.C. § 60101(a)(22)(A) is to be interpreted broadly.  The court held that storage tanks connected to a pipeline were "incidental" to pipeline transportation. *Id*.

The Las Flores Canyon breakout tanks are indistinguishable from the tanks addressed in the PHMSA administrative cases and in *Exxon*.  *Exxon*, 978 F. Supp. at 948-50.  In *Exxon* and in each of the administrative cases the tanks at issue were connected to a pipeline, received petroleum via the pipeline, and at least some of the petroleum was reinjected into the pipeline for further delivery.  *Id.* (process reinjected as much as 29% of hazardous liquid into tanks used for "temporary holding purposes for subsequent reinjection"); *In the Matter of BP Pipelines (North America) Inc.*, 2009 WL 7812789, at *3 (PHMSA Nov. 23, 2009) (tanks "receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline"); *In the Matter of Shore Terminals, LLC*, 2010 WL 6518297, at *1 (breakout tanks "store and transport hazardous liquids from the Olympic Pipeline prior to reinjection into the Kinder Morgan pipeline for transportation to Eugene, Oregon").  Similarly, here, tanks at the Las Flores Canyon facility are connected to the pipeline, receive crude oil from the pipeline,

26

and crude oil is reinjected back into the pipeline from the tanks for delivery to the Pentland terminal. SER-149.

The Las Flores Canyon facility also contains pumps that propel crude oil into CA-324 through a "transportation terminal." SER-149. These pumps and related valves and appurtenances are part of the pipeline too—PHMSA's regulation defines "pipeline" to include "pumping units" and "valves, and other appurtenances connected to line pipe." 49 C.F.R. 195.2. And PHMSA inspected these pump stations to ensure that they could be safely shut down in the event of an emergency and that valves were installed to isolate the pipeline in an emergency event. SER-692. PHMSA inspectors also considered whether overpressure safety devices and other pressure control equipment were installed at pump stations. SER-705. Pumping is plainly necessary for the transportation of crude oil through a pipeline, as is the proper operation of safety and pressure valves.

### 3. The facility ensures safe transportation by housing key pipeline maintenance systems.

Portions of maintenance systems necessary for the safe transportation of crude oil are located at the Las Flores Canyon facility. Pipeline operators address corrosion using cathodic protection, chemical treatments and monitoring assessments that include pressure testing and in-line inspections. The Las Flores Canyon facility houses (1) rectifiers necessary for cathodic protection; (2) points

27

for injecting corrosion inhibitors; and (3) launchers necessary for hydrostatic pressure testing and in-line inspection.

Cathodic protection and injecting corrosion inhibitors help prevent corrosion which could threaten a pipeline. Important cathodic protection tools called rectifiers are located at the Las Flores Canyon facility. 3-ER-409; SER-183; 2-ER-36; 3-ER-378, 381-382, 552; 4-ER-697. Chemical treatments intended to inhibit corrosion are injected into the Santa Ynez pipeline at the Las Flores Canyon facility as part of the pumping process. SER-712-713.

Spike hydrostatic pressure testing and in-line testing are used to discover pipeline integrity problems and remedy them to avoid the unnecessary interruption of crude oil transportation. Internal cleaning and inspection devices (also called "in-line inspection" or ILI tools or "pigs") are used to clean and inspect for potential internal corrosion. SER-183. Maintenance pigs are inserted into pipelines using specialized pressure vessels called launchers. SER-608. A launcher is located at the Las Flores Canyon facility. SER-720. That same launcher is used to support pressure testing that helps to ensure that the pipeline can handle the pressures associated with transportation. SER-601-603.

Rectifiers, corrosion inhibitor injection points, and launchers—all located at the Las Flores Canyon facility—support maintenance programs necessary to ensure that crude oil can be safely transported.

### 4. The ancillary non-transportation functions do not create two pipelines.

The equipment and systems located at the Las Flores Canyon facility are used to ensure safer and more efficient transportation of crude oil and are all essential elements of "movement of hazardous liquid by pipeline." 49 U.S.C. § 60101(a)(22). These aspects of the Las Flores Canyon facility are involved in transportation, constitute a continuous link from the offshore pipeline segments and CA-324/325, and are properly within PHMSA's jurisdiction.

To be sure, not every aspect of the Las Flores Canyon facility is related to transportation of hazardous liquids, but that separate equipment does not change the bottom line that petroleum passes through the facility after treatment— treatment that is essential to safety and transportability—to continue along the single connected pipeline. For example, the facility contains a power plant, a helipad, natural gas processing facilities, and equipment for biologically treating outfall water. SER-149, 158. These other operations are just areas where PHMSA lacks jurisdiction. Their existence does not strip PHMSA of jurisdiction over transportation-related aspects of the Las Flores Canyon facility and the pipeline.

The key question framed by the Pipeline Safety Act's definition of "interstate hazardous liquid pipeline facility" is whether that facility is used "to transport" a hazardous liquid. 49 U.S.C. § 60101(a)(7). Because the Las Flores Canyon facility facilitates transportation of crude oil so that the output from the

29

offshore production facilities can be moved to the Pentland terminal, it is properly considered an interstate pipeline facility. 2-CalER-87. This supports PHMSA's conclusion that the Santa Ynez pipeline "continues the transportation of crude oil" from the Outer Continental Shelf through the Las Flores Canyon facility to Pentland. 1-ER-26.

Environmental Petitioners argue that EPA jurisdiction over non-transportation related aspects of this facility establish that the entire facility is outside of PHMSA's jurisdiction. Envtl. Br. 34. However, PHMSA and EPA have long acknowledged that midstream processing facilities are "complex facilities" that involve both transportation-related and non-transportation-related activities and are subject to overlapping jurisdiction. PHMSA/EPA Memo re. Jurisdiction over Breakout Tanks/Bulk Oil Storage Tanks (containers) at Transportation-Related and Non-Transportation-Related Facilities, Feb. 4, 2000.

### B. The Las Flores Canyon facility is not a "production" or a "refining" facility, and any manufacturing is irrelevant.

Petitioners argue that the Las Flores Canyon facility is a non-jurisdictional production, refining, or manufacturing facility. Cal. Br. 28, Envtl. Br. 33-35. That is wrong. Production and refining are separate processes, and the facilities used to perform those functions are located upstream and downstream of the Las Flores Canyon facility. And to the extent that certain facilities at Las Flores Canyon are used for "manufacturing," those processes are distinct from its transportation-

30

related functions and do not break the continuous flow of crude oil through the facility.

"[T]ransporting hazardous liquid" does not include "onshore production, refining, or manufacturing facilities," or "storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B). A "production facility" means "piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation or treating of petroleum." 49 C.F.R. § 195.2. To qualify as a production facility, piping or equipment must be used "in the process of extracting petroleum ... from the ground ... and preparing it for transportation by pipeline." *Id.* The Las Flores Canyon facility is not used to extract petroleum from the ground; therefore, it is not a production facility.

The Las Flores Canyon facility is also not a refinery. The core characteristic of a refining facility is the processing of crude oil to produce refined petroleum products. *See generally* 40 C.F.R. § 60.101(a), (f); *see also* 40 C.F.R. § 98.390(a); 85 Fed. Reg. at 70,126 (defining "refining facilities" as "facilities used for the chemical conversion of crude oil into refined petroleum products"). Refining involves converting crude oil into other products like gasoline, diesel fuel, and heating oils. *See* Fact Sheet: Refineries (Dec. 1, 2011) https://perma.cc/AF7P-S532.

31

The Las Flores Canyon facility, by contrast, undertakes basic separation and storage operations (such as removing contaminants that cause pipeline corrosion) that occur before actual refining begins, and these operations facilitate transportation. SER-149, 158; *supra* § I.A. PHMSA has recognized that separation of a mixture, where no chemical change takes place, is not "refining," but is "merely a processing function." *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, 2016 WL 8315623 at *8 (PHMSA Oct. 12, 2016) ("[R]efining is a term commonly used in the industry to refer to the conversion of crude petroleum into new products, not the separation of a mixture."). Crude oil that flows through the Santa Ynes pipeline is eventually sold to refineries, but the separation and short-term storage operations that take place at the Las Flores Canyon facility are not part of the refining process. 85 Fed. Reg. at 70,126 (proposing to define "processing" to exclude refining facilities).

The term "manufacturing" is not defined in the Pipeline Safety Act, but its ordinary meaning is to make something from raw materials. *Manufacture*, Webster's New Collegiate Dictionary (1977). The crude oil is the raw material, and, as discussed above, that crude oil continues in transportation through Las Flores to Pentland. *Supra* § I.A. Even if portions of the Las Flores Canyon facility were considered "manufacturing," it would just mean that the manufacturing portions of the facility are not regulated by PHMSA, not that PHMSA lacks

32

jurisdiction to regulate transportation-related aspects of the Las Flores Canyon facility. The same would be true if portions of the Las Flores Canyon facility were devoted to "refining" (even though no refining actually occurs there) so long as the refining or production were tangential to, and did not interrupt, the continuous flow of crude oil.

The definition of "gas pipeline facility" includes "treating gas during its transportation." 49 U.S.C. § 60101(3). Petitions argue that an oil pipeline cannot include any treatment of crude oil because the definition of "hazardous liquid pipeline facility" does not include similar language. Cal. Br. 33. This argument disregards the language and structure of the Pipeline Safety Act. "Treatment" of crude oil is not excluded from the definition of "transporting hazardous liquid," and no such exclusion should be implied. 49 U.S.C. § 60101(22). If Congress wanted to exclude treatment facilities from transportation, it would have done so. *See id.* § 60101(22)(B) (listing exclusions, such as "refining," from the definition of "transporting hazardous liquid"). When a statute contains express exceptions, this Court counsels against finding additional, implied, exceptions. *Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017).

In addition, regulation of natural gas has historically been defined by specific functions, and the Pipeline Safety Act defines "transporting gas" consistent with that historic approach as "*gathering, transmission, or distribution*

33

of gas by pipeline, or the storage of gas, in interstate or foreign commerce." 49 U.S.C. § 60101(21)(A)(i) (emphasis added); *Phillips Petroleum Co. v. State of Wis.*, 347 U.S. 672, 677 (1954) (Recognizing that the natural gas industry is divided into production and gathering, interstate transmission by pipeline, and distribution to consumers.). "[T]ransporting hazardous liquid," by contrast, is defined broadly as "the *movement* of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to movement …." *Id.* § 60101(22)(A)(i). Movement is defined as "the act or process of moving *especially*: change of place or position." Movement, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/movement. (accessed 10 May 2026 (emphasis in original)). Because "transporting hazardous liquid" is defined broadly as "movement," where Congress intended to limit the scope of "transporting" it specifically *excluded* specific types of movement. *Id.* § 60101(22)(B). By contrast, "transporting gas" is defined more narrowly, thus Congress specifically *included* additional treatment facilities in the definition of a "gas pipeline facility." *Id.* § 60101(3).

## C. PHMSA's jurisdiction is consistent with past practice and the purpose of the Pipeline Safety Act.

**1.** PHMSA's jurisdiction is fully consistent with the purpose of the Pipeline Safety Act. *Contra* Cal. Br. 34. Congress passed the Pipeline Safety Act to "increase the safety to humans and the environment from the transportation by

34

pipeline of natural gas and hazardous liquids, and for other purposes." H.R. 1489, 102nd Cong., 2d Sess. (1992). A central purpose of the act is to provide "national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations." *Olympic Pipe Line Co. v. City of Seattle,* 437 F.3d 872, 883 (9th Cir. 2006); s*ee also ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) ("Congress intended to preclude states from regulating in any manner whatsoever with respect to the safety of interstate transmission facilities."). To help establish nationally uniform standards, Congress expressly eliminated the states' role in regulating interstate pipeline safety. Under a subsection entitled "Preemption," Congress concluded that a "State authority *may not adopt or continue in force safety standards* for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c) (emphasis added). While the Pipeline Safety Act preserved a role for states to regulate intrastate pipelines, Congress was clear that the federal government possesses sole regulatory authority over interstate pipelines like the Santa Ynez pipeline.

**2.** PHMSA's assertion of jurisdiction is consistent with its past practice and is not a "new policy." Cal. Br. 44. When CA-324/325 were operating prior to 2015, PHMSA asserted jurisdiction, 3-ER-370, 2-ER-70, and PHMSA similarly is asserting jurisdiction now that the pipeline is again transporting oil in interstate commerce.

35

When the pipeline was previously running before May 2015, it was subject to a FERC tariff, and PHMSA asserted jurisdiction over the pipeline on that basis. *See* 49 C.F.R. Part 195, Appendix A ("[I]f there is a tariff … filed with FERC governing the transportation of hazardous liquids … DOT will, as a general rule, consider the facility to be an interstate pipeline facility."). In 2015, PHMSA issued a corrective action order shutting down Plains Lines 901 and 903 (now CA-324/325). 3-ER-370. After the shutdown Plains cancelled its FERC tariffs, stating that the transportation service was no longer available in interstate commerce. 3-ER-370, 377. Because any crude oil pipeline operating as an interstate common carrier must file a tariff with FERC, 18 C.F.R. Pt. 341.0, when Plains cancelled its tariffs, it demonstrated that it did not intend to operate in interstate commerce. Where there was no intent to transport crude oil in interstate commerce.

In December of 2025, Sable informed PHMSA that it intended to operate an interstate pipeline. 2-ER-69-71. Following an inspection that confirmed that the Santa Ynez pipeline was designed to transport crude oil continuously from the Outer Continental Shelf, PHMSA confirmed that the Santa Ynez pipeline was interstate. 1-ER-26. Because Sable intends to transport oil continuously in interstate commerce, and because the Santa Ynez pipeline is designed to do so, the pipeline is within PHMSA's regulatory jurisdiction.

36

Environmental Petitioners argue that PHMSA never previously regulated the Las Flores Canyon facility. Envtl. Br. 36. This is incorrect. One example of PHMSA's exercise of regulatory jurisdiction over the Las Flores Canyon facility is its review of Pacific Pipeline Company's operator qualification written plan. PHMSA regulations require each pipeline operator to develop a written qualification program that contains specific elements. 49 C.F.R. § 195.505. This requirement only applies to work on a "pipeline" or on "pipeline facili[ties]" within PHMSA's jurisdiction. 49 C.F.R. § 195.501. Pacific Pipeline Company, the operator of portions of the Santa Ynez pipeline before Sable, produced a written operator qualification plan that included tasks at the Las Flores Canyon facility, including inspecting and testing cathodic protection rectifiers, adjusting inhibitor injection rates, inspecting and repairing valves, calibrating pressure limiting devices, and conducting pressure tests. SER-758-762.

Another example of PHMSA's exercise of authority at the Las Flores Canyon facility is the corrective action order that PHMSA issued to Plains following the 2015 spill. PHMSA ordered the pumps at the Las Flores Canyon facility to be shut down, and, if later restarted, to be operated at limited pressure. SER-5-7; 3-ER-381. Additionally, after the spill, PHMSA investigated and issued a "Failure Investigation Report," which focused in part on cathodic protection rectifiers and other pipeline safety equipment located at the Las Flores Canyon

37

facility that fall under PHMSA's jurisdiction. 3-ER-409. And following the corrective action order, a federal enforcement action was filed against Plains based on its failure to properly follow inspection practices, execution of which would have been initiated from the Las Flores Canyon facility launcher. 3-ER-347.

### D. Judicial estoppel is a red herring.

California argues that PHMSA is judicially estopped from determining that the Santa Ynez pipeline is an interstate pipeline facility because the United States represented to the District Court in 2020 that OSFM would exercise jurisdiction over CA-324/325 when those segments were not operational. Cal. Br. 40-41. But the explanation that California would have jurisdiction over the segments appears in the *background* section describing the injunctive relief in the consent decree, 4-CalER-621-622, not as a reason why the consent decree should be entered. Nothing in the record cited by California, Cal Br. at 40-41 (citing 4-CalER-610-719, 4-CalER-642-643), suggests that PHMSA sought to leverage California's changing role to induce the district court to approve the consent decree.

In all events, judicial estoppel applies when a party's later position is "clearly inconsistent" with its earlier position. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). The question of whether a party's positions are "clearly inconsistent" turns, in part, on intent: there must be "a knowing antecedent misrepresentation by the person or party alleged to be estopped." *Wyler Summit*

38

*P'ship v. Turner Broad. System, Inc.,* 235 F.3d 1184, 1190 (9th Cir. 2000).  Here, there was no misrepresentation.

In 2020, the Santa Ynez pipeline was not transporting crude oil at all and was not operating in interstate commerce.  There was no applicable FERC tariff, and the pipeline was not transporting crude oil produced on the Outer Continental Shelf.  The Santa Ynez pipeline was also not operating under common ownership as part of a single integrated pipeline system.  Under those very different circumstances, state regulation was appropriate.  Judicial estoppel does not apply when "the shift in the government's position" is "the result of a change in facts essential to the prior judgment."  *New Hampshire*, 532 U.S. at 755-56 (2001).  Facts have changed, and PHMSA's assertion of jurisdiction today is not inconsistent with its position in 2020 that CA-324/325 were properly regulated as an intrastate pipeline.

### E.     A consent decree cannot create authority for a state to regulate an interstate pipeline.

California argues that PHMSA's approval of the restart plan is arbitrary and capricious because the consent decree conveys "express authority" to OSFM.  Cal. Br. 59.  And Environmental Petitioners claim that the consent decree "vests" California with "exclusive regulatory authority."  Envtl. Br. 26.  Environmental Petitioners, who were not party to the 2020 consent decree, lack standing to

39

enforce its provisions. *United States v. FMC Corp.*, 531 F.3d 813, 820 (9th Cir. 2008).

As discussed above, *supra* § I.A, the Santa Ynez pipeline is a single interstate pipeline, and PHMSA has regulatory authority under the Pipeline Safety Act. As the regulator, PHMSA properly approved the restart plan. Furthermore, the consent decree could not contractually create or convey state regulatory authority, and federal regulatory authority similarly cannot be contractually extinguished. Thus, the only way the consent decree could convey California regulatory authority would be through a delegation consistent with PHMSA's statutory authority, but no such delegation exists.

This Court's decision in *Beck Park Apartments v. U.S. Dept. of Housing and Urban Development*, 695 F.2d 366, 370 (9th Cir. 1982), makes clear that PHMSA cannot surrender its regulatory authority through contract. *Beck Park* held that the Department of Housing and Urban Development could not contract away the right to exercise its statutory authority to initiate rent adjustments because it could not effectively discharge its congressionally mandated duties without the power to adjust rents. *Id.* at 370. This principle applies here: PHMSA cannot contract away its statutory obligation to regulate an interstate pipeline.

In any event, no terms in the consent decree read as a delegation. Rather than delegating authority, the consent decree recognizes that in 2020, when it was

40

finalized, California would act as regulator over CA-324/325 at a time when no FERC tariff applied, and there was no oil flowing through the pipeline. Supra § I.D. Under the facts in 2020, it was reasonable to recognize California as the proper regulator. Now, the facts are different.

Under the Pipeline Safety Act, a certified state authority may regulate the safety of intrastate hazardous pipeline facilities under 49 U.S.C. § 60105, but for interstate pipelines, the Act does not provide for state regulation. It does provide for state authorities to participate in overseeing interstate hazardous liquid pipelines in certain ways. A state may be granted limited authorities through a pipeline safety agreement that provides procedures for approval of inspection and maintenance. 49 U.S.C. § 60106(a). And a state may be authorized to participate in special investigations. *Id.* § 60106(b). But state authority to regulate interstate pipelines is limited to situations where PHMSA grants particular authority to the state. *See Olympic Pipe Line Co.*, 437 F.3d at 878. And California is claiming broader authority than PHMSA can grant. State pipeline safety agreements are limited by statute, and there is no pipeline safety agreement that gives California authority to exercise safety oversight of CA-324 or CA-325.

To the extent Petitioners claim that California was delegated regulatory authority, such a delegation was not authorized by Congress, and PHMSA lacked authority to make such a delegation through contract. *See generally Bonneville*

41

*Power Admin. v. F.E.R.C.*, 422 F.3d 908, 924 (9th Cir. 2005) (recognizing that FERC authority is bound by statute and utilities cannot opt into or out of FERC jurisdiction). Because regulatory authority derives from statute, it cannot be modified, expanded, or contracted through private agreements. The Pipeline Safety Act makes clear that a state cannot regulate an interstate pipeline. 49 U.S.C. § 60104(c).

## II. Petitioners' challenges to the emergency special permit are moot.

Petitioners challenge the emergency special permit that expired on February 21, 2026. 1-ER-3. Sable never operated its pipeline under the emergency special permit, and has not applied to extended the permit on an emergency basis. Therefore, these claims are moot.

"[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed." *Church of Scientology v. United States,* 506 U.S. 9, 12 (1992). "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome of the litigation." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)); *see also, e.g.*, *Feldman v. Bomar,* 518 F.3d 637, 642 (9th Cir. 2008) ("The basic question in determining mootness is whether there is a present controversy as to

42

which effective relief can be granted."). The expiration of a permit typically renders moot the specific issues regarding that permit. *Alaska Center For Environment v. U.S. Forest Service*, 189 F.3d 851, 855 (9th Cir. 1999).

The permit has expired, and it has not been renewed. Because the Court cannot award effectual relief, the challenge to the permit is moot.

Nor does the mootness exception for challenges that are capable of repetition but evading review apply here. *Weinstein v. Bradford,* 423 U.S. 147, 148–49 (1975). The exception is "to be used sparingly, only in exceptional situations," *Wallingford v. Bonta*, 82 F.4th 797, 801 (9th Cir. 2023) (cleaned up), where "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again," *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329 (9th Cir. 1992). The exception focuses on whether "the same complaining party will be subjected to the same action again." *West Coast Seafood Processors Ass'n v. Natural Resources Defense Council, Inc.*, 643 F.3d 701 (9th Cir. 2011) (citation omitted).

Though it is clear that a 60-day permit window would make it difficult to challenge an emergency permit prior to its expiration, *see Wallingford*, 82 F.4th at 801, Petitioners cannot establish that the emergency permit will come back—i.e., that there is a sufficient possibility of repetition. There is no reasonable

43

expectation that PHMSA will award Sable another emergency permit. A reasonable expectation means something more than "a mere physical or theoretical possibility." *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724, 733 (9th Cir. 2023) (cleaned up). Courts look for specific evidence to determine whether a reasonable expectation exists. Repeated past conduct is particularly probative of likely repetition. *Demery v. Arpaio,* 378 F.3d 1020, 1027 (9th Cir. 2004) (repeated past conduct on multiple occasions taken as evidence of likely repetition); *Natural Resources Def. Council, Inc. v. Evans,* 316 F.3d 904, 910 (9th Cir. 2003) (same, noting that agency repeatedly applied the same, challenged rationale, "year after year").

Petitioners have presented no evidence to indicate that PHMSA is likely to issue an emergency special permit again to Sable for this pipeline. And, given how rarely emergency special permits are issued, such evidence does not exist. PHMSA is only aware of issuing an emergency special permit one other time, in 2012. *See* PHMSA-2012-0303 at https://www.phmsa.dot.gov/standards-rulemaking/pipeline/special-permits-state-waivers/special-permits-withdrawn-expired-or-terminated. Because there is no history of past conduct to support likely repetition and no other indication that PHMSA will issue Sable another emergency permit, Petitioners cannot meet their burden to establish a reasonable expectation they will again be subjected to the challenged activity.

44

Sable has applied for a *non-emergency* special permit. That special permit application has been subject to public notice. 91 Fed. Reg. 8,949 (Feb. 24, 2025). And that special permit, if issued, would not be subject to the 60-day time limit of an emergency special permit. 49 C.F.R. § 190.341. Thus, if a special permit is issued, that permit could be challenged and would not evade review. When a temporary permit expires and is followed by a longer-term permit, the availability of review through the subsequent permit generally defeats the mootness exception. In *Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Service*, the Ninth Circuit held that a one-year permit followed by a five-year permit did not satisfy the exception because five years was "more than adequate time to obtain judicial review." 56 F.3d 1060, 1070 (9th Cir. 1995). Similarly, here, if a non-temporary permit is issued, Petitioners will have adequate time to obtain judicial review.

The expiration of the emergency special permit moots Petitioners' dispute with respect to that permit, and the challenges must be dismissed.

## III. The challenges to the emergency special permit fail on the merits in any event.

Even if the Court were to wade through Petitioners' challenges to the moot emergency permit, they fail on the merits.

### A.    PHMSA reasonably issued the emergency special permit.

In the Pipeline Safety Act, Congress authorized PHMSA to issue emergency special permits.  PHMSA can waive compliance with pipeline safety requirements on terms it "considers appropriate" if it "determines that the waiver is not inconsistent with pipeline safety."  49 U.S.C. § 60118(c)(1)(A).  In non-emergency situations, PHMSA may issue waivers only after providing notice.  *Id.* § 60118(c)(1)(B).  In emergencies, PHMSA may waive compliance without notice if it determines that the waiver is in the public interest, is not inconsistent with pipeline safety, and is necessary to address "an actual or impending emergency involving pipeline transportation."  *Id.* § 60118(c)(2)(A); 49 C.F.R. § 190.341(g).  Emergency waivers last no more than 60 days and may be renewed only after notice.  49 U.S.C. § 60118(c)(2)(B).  PHMSA calls these waivers "special permits."  49 C.F.R. § 190.341(a).  PHMSA satisfied the relevant criteria here.

The emergency special permit waived a regulatory requirement that is ineffective for CA-324-25.  Specifically, the emergency special permit waived Sable's obligation to comply with 49 C.F.R. § 195.452(h)(4)(iii)(H), which requires corrosion along a longitudinal seam weld to be scheduled for evaluation and remediation within 180 days of discovering the condition.  1-ER-3.  Cathodic protection uses electric current introduced from a "rectifier" to prevent corrosion.  3-ER-409.  This current inhibits the corrosion process.  3-ER-410.  Generally,

46

external corrosion cannot occur as long as adequate cathodic protection current is reaching the pipe. 3-ER-410.

However, segments CA-324/325 are not typical because they are buried and insulated. Cathodic protection is ineffective on buried insulated pipelines. 3-ER-410. Safety systems other than cathodic protection are necessary to protect the pipeline. Sable did not operate at all under the emergency special permit, but even if it had, corrosion would have been monitored and treated consistently with the extensive terms and conditions imposed by the emergency special permit. 1-ER-3-17. Evaluations for every incidence of external corrosion along longitudinal seam welds, which is a signal of cathodic protection failure, are not necessary.

### 1. The emergency special permit was consistent with pipeline safety.

The emergency special permit waived only the requirement to remediate certain corrosion that poses little risk to CA-324/325, and PHMSA imposed extensive protective conditions that exceed the standards in its regulations.

For example, Condition 13 in the permit required rigorous pressure testing. 1-ER-8. Before operating CA-324, under the permit (which is now expired) Sable had to conduct a "spike" pressure test at a minimum pressure that was at least 150 percent of CA-324's maximum operating pressure and then, immediately afterward, an 8-hour pressure test that was at least 125 percent of maximum operating pressure. 1-ER-8. This is more stringent than PHMSA's pressure-

47

testing regulation, which requires pressure tests for only four hours at 125 percent of maximum operating pressure and then another four hours at 110 percent of maximum operating pressure. 49 C.F.R. § 195.304.

As another example, Condition 14 required much more frequent in-line inspections than PHMSA's regulations. Condition 14 required Sable to conduct in-line inspections to detect metal loss twice a year during the first two years of operations and then once a year. 1-ER-9. Sable had to separately inspect for deformations on that same schedule. 1-ER-11. And Sable must use crack detection tools annually. 1-ER-6. By contrast, the comparable regulation requires operators to inspect pipelines once every five years. 49 C.F.R. § 195.452(j)(3). Condition 16 required Sable to immediately repair certain conditions (such as crack-like anomalies that are equal to or greater than 50 percent of the pipe wall thickness) that the regulations do not require operators to immediately repair. 1-ER-12; 49 C.F.R. § 195.452(h)(4)(i). PHMSA reasonably determined that compliance with emergency special permit conditions would, at a minimum, provide an "equivalent level of safety" as compliance with the waived regulation. 1-ER-20.

Environmental Petitioners argue that Sable might not comply with the terms of the emergency special permit and that such noncompliance would undermine the protectiveness of that permit. Envtl. Br. 53, 54. But if Sable had failed to

48

comply, it would have been subject to enforcement. 49 U.S.C. § 60120 (Pipeline Safety Act enforcement provisions); *see also Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (recognizing that a permittee violates the underlying statutory authority where it violates permit terms); 49 U.S.C. § 60121 (authorizing citizen suits). Congress requires PHMSA to determine that the permit is "not inconsistent with public safety," and PHMSA reasonably made that determination here.

Neither Petitioners nor courts may second-guess the agency's judgment on issues of predictive, scientific judgment and public policy. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 183 (2025); *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) ("[D]eference is especially warranted when reviewing the agency's technical analysis and judgments." (cleaned up)).

Environmental Petitioners also argue that any permitting program that allows corrosion is not as safe as a requirement for cathodic protection, which prevents corrosion. Envtl. Br. 53. This argument disregards the facts. When reviewing technical analysis, this Court is "most deferential" where a decision is within the agency's expertise. *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013). And PHMSA's expertise is focused on pipeline safety. PHMSA had determined that cathodic protection was ineffective for buried

49

insulated pipelines such as CA-324/325. 3-ER-410. Cathodic protection was insufficient to prevent the 2015 spill. The emergency special permit, rather than relying on a safety measure proven ineffective for CA-324-25, instead relied on alternative measures that PHMSA has determined will be effective. 1-ER-20.

Similarly, Environmental Petitioners question the emergency special permit's use of in-line inspection tools because they allege that those tools are accurate 57 percent of the time. Envtl. Br. 53. But those requirements constitute only a few of the 24 conditions imposed by the emergency special permit, 1-ER-5-17, and the permit requires more frequent in-line inspections than the regulations require, increasing the likelihood that such inspections will catch potential problems. The combination of these and other permit terms, in the aggregate, ensure that the emergency permit is consistent with pipeline safety. And in-line inspection tools are critical because they provide data to detect defects like corrosion, metal loss, dents and cracks, thus reducing risk. 1-ER-6-7, 9.

Environmental Petitioners try to support their argument by pointing to concerns raised by OSFM. Envt. Br. 55. But when examining agencies' "scientific determination[s]," the Court "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Bering Strait Citizens for*

50

*Responsible Res. Dev. v. USACE*, 524 F.3d 938, 957 (9th Cir. 2008) (cleaned up).

Moreover, aside from its general expertise in pipeline safety regulation, PHMSA

has been intimately involved with these pipelines since 2015. It prepared a

detailed Failure Investigation Report, 3-ER-373-616, 4-ER-618-914, and

conducted numerous inspections, *e.g.*, 2-ER-261, including its recent December

2025 inspections, 2-CalER-27. It has an extensive, expert understanding of the

unique attributes of CA-324/325.

Environmental Petitioners argue that the emergency special permit is

inconsistent with public safety because Sable is enjoined from undertaking repairs

of pipeline portions that pass through the Coastal Zone. Envtl. Br. 55. This is an

entirely hypothetical concern. Even assuming *arguendo* that the injunction is

valid, during the time the emergency special permit was in place the pipeline never

operated. And the emergency special permit has now expired.

### 2. The emergency special permit was in the public interest.

The emergency special permit was in the public interest because it ensured

uniform and continuous regulatory oversight over CA-324/325. In December

2024, OSFM issued two state waivers to Sable. 1-ER-3. These waivers approved

Sable's waiver request for regulatory relief for CA-324-25 from 49 C.F.R.

§ 195.452(h)(4)(iii)(H), the regulatory provision that sets standards for responding

to corrosion along a longitudinal seam weld. 2-ER-148, 163. The conditions of

the PHMSA emergency special permit had previously been applied to CA-324-25

through the OSFM permits when those segments were considered an intrastate

pipeline. 1-ER-20. Granting the emergency special permit ensured that the

conditions imposed by OSFM would continue under federal oversight. *Id.* In

addition, the permit reduces the need for unnecessary (and potentially destructive)

excavations to investigate anomalies that do not pose risks to these pipelines. 1-

ER-20.

The permit furthered the public interest in other ways. Sable's application to

PHMSA indicated that restarting CA-324/325 would reduce California's need for

imported oil, reduce refinery feedstock prices by over $3 per barrel, reduce

greenhouse gas emissions (including by reducing impacts associated with long-

haul tanker shipments of crude oil into California), and would contribute to local

employment. 2-ER-44-45. Sable also introduced expert evidence supporting these

conclusions. SER-14. Evidence indicated that California had the highest gasoline

prices in the United States and was producing only 23.7% of its in-state crude

production needs. SER-33, 41. No state in the United States imported more

foreign-sourced oil for its use than California. SER-56. Restarting CA-324-25

would reduce the need for marine tanker transport, reduce emissions risks, and

help restore a critical energy corridor. SER-70. It would help generate between

$21.5 and $41.6 million in revenues. SER-71. The introduction of Sable

52

production into the California refinery system had the potential to reduce the price of crude oil for refineries in California by more than $3.25 a barrel, as compared to imported oil. SER-75. Overall, this production had the potential to improve and strengthen California's, and the United States', energy and economic security.

### 3. The emergency special permit addressed an emergency.

Third, the permit was necessary to address an actual emergency involving pipeline transportation. Emergencies can be local, regional, or national in scope, and include significant fuel supply disruptions. 49 C.F.R. § 190.341(g). The President declared a national energy emergency and directed agencies to protect the country's national and economic security by using emergency authorities to facilitate the transportation of oil in the West Coast. E.O. 14156 § 3(b). The President described the "active threat to the American people from high energy prices" and the challenges of insufficient energy transportation. *Id.* § 1. The Executive Order described "a precariously inadequate and intermittent energy supply" and highlighted "inadequate development of domestic energy resources" that leaves the United States "vulnerable to hostile foreign actors." *Id.* These circumstances posed "an imminent and growing threat" to national security. *Id.*

PHMSA concluded that the national energy emergency involved pipeline transportation, stating that the special permit would facilitate the operation of pipeline segments, and that operation would "meet regional energy demands,

53

reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." 1-ER-21. This conclusion was supported by an expert report identifying how the permit is necessary to implement the Executive Order. California's energy security would benefit from the addition of oil produced on Sable's offshore platforms and transported through CA-324/325. SER-24. In addition, adding Sable's oil to the market would improve defense readiness for military forces stationed in California, Nevada, and Arizona that rely on California refineries for aviation, gasoline, and diesel fuels. SER-24. And California would be less reliant on foreign imports. SER-67.

PHMSA reasonably relied on an Executive Order declaring a national energy emergency, in conjunction with record evidence demonstrating that operation of this pipeline would help address that emergency, in determining that the emergency special permit was in the public interest.

## B. PHMSA was not required to prepare NEPA analysis before issuing the emergency special permit.

NEPA establishes the process by which federal agencies must evaluate the environmental effects of certain proposed federal actions. *See Seven Cnty.*, 605 U.S. at 173. The statute "'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Id*. at 177 (quoting *Robertson v. Methow Valley Citizens Council*, 490

54

U.S. 332, 350 (1989)).  Accordingly, "the central principle of judicial review in NEPA cases is deference."  *Id*. at 179.  The Supreme Court's recent decision in *Seven County* underscored that NEPA is not meant to be a "substantive roadblock" to agency action.  605 U.S. at 173.  "The goal of the law is to inform agency decisionmaking, not to paralyze it."  *Id*.

NEPA acknowledges that agencies may not be able to fully comply with its procedures, requiring instead that agencies comply "to the fullest extent possible." 42 U.S.C. § 4332.  PHMSA is part of DOT, and DOT procedures provide that "[e]mergency circumstances may require immediate actions that preclude following standard NEPA procedures."  *DOT's Procedures for Considering Environmental Impacts*, Order 5610.1D § 23 (July 1, 2025), available at https://perma.cc/4NYP-4UQC.  "Immediate emergency actions necessary to protect the lives and safety of the public or protect valuable resources should never be delayed in order to comply with NEPA."  *Id.* Instead, agencies should prepare environmental documentation "[w]hen time permits."  *Id.*

PHMSA's action here was consistent with DOT's NEPA procedures, which establish that "[e]mergency circumstances may require immediate actions that preclude following standard NEPA procedures."  Order 5610.1D § 23.  Delaying issuance of an emergency special permit to prepare a NEPA analysis would frustrate implementation of the emergency authority in the Pipeline Safety Act.  49

55

U.S.C. § 60118(c)(2).  And in the Executive Order, the President directed agencies to "use all lawful emergency ... authorities available to them to facilitate the ... transportation of energy in and through the West Coast."  E.O. 14156 § 3(b).  That is what PHMSA did here.

Although it could not prepare an environmental assessment before issuing the permit, PHMSA did consider the proposed action's scope and concluded that it "is narrow."  1-ER-21.  The permit does not authorize pipeline operations and therefore any NEPA analysis would not consider all pipeline operations.  1-ER-21.  The permit only waived the regulation requiring Sable to remediate corrosion along longitudinal pipeline seams within 180 days (while imposing other protective conditions).  1-ER-21-22.  So any environmental analysis would examine only whether waiving that requirement and imposing additional protections would have significant environmental impacts.  And PHMSA reasonably concluded that the permit would not have significant impacts because "[t]he full set of conditions imposed by the special permit sufficiently address the risk of a failure or release as a result of such corrosion and provide an equivalent level of safety."  1-ER-22.  PHMSA represented it would prepare NEPA analysis as soon as practicable.  1-ER-22.  On February 23, 2026, PHMSA posted the NEPA analysis analyzing the special permit request on regulations.gov.  https://www.regulations.gov/document/PHMSA-2025-1502-0007.

56

The Court should defer to PHMSA's determination that the emergency relieved it of any pre-action NEPA obligation and any impacts would not be significant. "[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty.*, 605 U.S. at 179. In any event, PHMSA has now completed an environmental assessment, and there is nothing to be gained by requiring anything else with respect to the expired permit.

## IV. This Court lacks jurisdiction to review Petitioners' NEPA challenges to the restart plan, and it fails on the merits regardless.

**1.** This Court lacks jurisdiction over Petitioners' challenge to the restart plan. The Pipeline Safety Act authorizes direct review in the courts of appeals of orders issued "under" Chapter 601 of the Pipeline Safety Act. 49 U.S.C. § 60119(a). But the restart plan was not issued under the PSA, as there is no "restart plan" provision of the PSA. The plan was instead issued under the terms of the 2020 Consent Decree. Because PHMSA issued the restart plan to satisfy the terms of the Consent Decree, rather than under any provision of the Pipeline Safety Act, any challenges to the restart plan are properly before the district court with jurisdiction over the 2020 Consent Decree, which contains its own dispute resolution procedures. 2-ER-272 (district court order retaining jurisdiction over consent decree implementation).

**2.** Petitioners' NEPA claim fails on the merits regardless. PHMSA's approval of Sable's restart plan was not subject to NEPA because it was not a

57

major federal action and because it was non-discretionary. NEPA applies only to "major Federal actions." 42 U.S.C. § 4332(2)(C). Major federal actions are actions subject to substantial federal control and responsibility, as determined by the agency conducting the actions. *Id.* § 4336e(10)(A). Major federal actions do not include "non-discretionary" activities "in accordance with the agency's statutory authority." *Id.* § 4336e(10)(B)(vii). No authority suggests PHMSA's approval of the restart plan was a major federal action under NEPA, and Petitioners point to none. To the contrary, it was a non-discretionary action that was part of the consent decree implementation process.

There is no statutory or regulatory requirement for operators to obtain PHMSA's approval before starting (or restarting) pipeline operations. Here, PHMSA had to approve Sable's restart plan only because the consent decree required it to do so. 2-ER-310.

The consent decree mandates ten elements for the restart plan. 2-ER-310-312. The consent decree provides that, if the company seeks to restart the pipelines, it "shall develop and submit ... a written Restart Plan to the [regulator] for review and approval." 2-ER-310. And then, "[o]nce approved ..., the Restart Plan shall be incorporated by reference into this Consent Decree." 2-ER-314. The consent decree does not provide any criteria for PHMSA to evaluate the restart plan—other than ensuring the required elements are satisfied.

58

Environmental analysis under NEPA is subject to a "rule of reason" and is only required when it would provide information that influences an agency's decision-making process. *DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Thus, "NEPA applies only where an agency action is discretionary." *Natural Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1251 (10th Cir. 2021). In *National Wildlife Federation v. DOT*, the Sixth Circuit held that PHMSA's approval of pipeline operators' plans for addressing potential oil spills was non-discretionary—and therefore not subject to NEPA—because PHMSA had to approve the plans if they "satisfie[d] the enumerated criteria" in the statute. 960 F.3d 872, 879 (6th Cir. 2020). If the plans met the required criteria, then PHMSA could not deny approval based on environmental effects. *Id.*; *see also Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015).

To be sure, the consent decree does not mandate that PHMSA "shall approve" any restart plan containing the required elements, but neither the consent decree nor the Pipeline Safety Act grants PHMSA authority to invent new requirements or deny approval based on environmental impacts. 2-ER-310-316. Petitioners failed to show that PHMSA violated NEPA in approving the restart plan.

## V. If the court does not rule in PHMSA's favor, remand is the appropriate remedy.

Finally, if the Court does not rule in PHMSA's favor, the Court should exercise its discretion by remanding *without* vacatur. In determining the appropriate remedy, the Court evaluates two factors: (1) "how serious the agency's errors are"; and (2) "the disruptive consequences of an interim change that may itself be changed." *California Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992, 994 (9th Cir. 2012). Both factors weigh against vacatur here.

*First*, at worst, any potential PHMSA error regarding PHMSA's jurisdictional determination is the result of a record developed over the course of considering an informal request in the face of an energy emergency. PHMSA can develop a robust record to respond to the Court's concerns. *See id*. at 993 ("any disadvantage petitioners suffered can be corrected on remand"). PHMSA, as noted, conducted extensive inspections of the Santa Ynez pipeline, and its pipeline experts considered whether the Las Flores Canyon facility was performing functions necessary to transportation of crude oil. *Supra* § I.A. Reducing additional aspects of PHMSA's consideration to written documents that can be produced in an administrative record would be a straightforward project.

*Second*, the "delay and trouble vacatur would cause are severe." *California Communities Against Toxics*, 688 F.3d at 993. On March 13, 2026, the Department of Energy invoked the Defense Production Act to order Sable to

60

immediately resume pumping and transportation in California. DOE Pipeline

Capacity Prioritization and Allocation Order, March 13, 2026

https://www.sec.gov/Archives/edgar/data/1831481/000183148126000030/a993doe

dpa_orderxsablex031.htm. This ensures a steady supply of domestically produced

crude oil during an energy emergency. Although the typical "effect of invalidating

an agency rule is to reinstate the rule previously in force," *Paulsen v. Daniels*, 413

F.3d 999, 1008 (9th Cir. 2005), that would cause severe issues here because it

would create uncertainty regarding PHMSA's authority to ensure the pipeline's

safe operation. For the reasons discussed in this brief, the Santa Ynez pipeline is

now operating as an interstate pipeline, and OSFM lacks regulatory authority. It is

important to avoid ambiguity regarding PHMSA's regulatory authority to ensure

the safe operation of the pipeline.

Congress passed the Pipeline Safety Act to "increase the safety to humans

and the environment from the transportation by pipeline of natural gas and

hazardous liquids, and for other purposes." H.R. 1489, 102nd Cong., 2d Sess.

(1992). If vacatur would allow the Santa Ynez pipeline to operate without

PHMSA oversight, that result undermines the purpose of the Pipeline Safety Act.

Although courts of equity enjoy "sound discretion" to consider the "necessities of

the public interest" when fashioning injunctive relief, they "cannot, in their

61

discretion, reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 496-97 (2001).

Finally, if the Court were to find a violation of NEPA, that violation would not justify vacatur. As the Supreme Court explained in *Seven County*, a deficiency does not require a court to vacate an agency approval "absent reason to believe that the agency might disapprove the project if it added more to the [Environmental Impact Statement]." 605 U.S. at 185. There is no indication that further NEPA analysis would lead to a different result here.

For all these reasons, vacatur is unwarranted.

## CONCLUSION

The Court should deny these petitions for review, dismiss challenges to the restart plan approval for lack of jurisdiction, and dismiss challenges to the emergency special permit as moot.

Respectfully submitted,

/s/ *Matthew R. Oakes*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of Counsel:                                    ROBERT N. STANDER
                                               *Deputy Assistant Attorney General*
GREGORY ZERZAN                                 REBECCA JAFFE
*General Counsel*                              MATTHEW R. OAKES
U.S. Dept. of Transportation                   *Attorneys*
                                               Environment and Natural Resources Division
KEITH COYLE                                    U.S. Department of Justice
*Chief Counsel*                                Post Office Box 7415
BENJAMIN FRED                                  Washington, D.C. 20044
*Assistant Chief Counsel*                      (202) 598-0402
TIMOTHY O'SHEA                                 matthew.oakes@usdoj.gov
KATHLEEN MAITLAND
*Attorneys*
Pipeline and Hazardous Materials Safety
Administration


May 11, 2026
90-13-1-18706

63

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 25-8059, consolidated with No. 26-508

I am the attorney or self-represented party.

**This brief contains 13,339 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
[  ] it is a joint brief submitted by separately represented parties;
[X] a party or parties are filing a single brief in response to multiple briefs; or
[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/*Matthew R. Oakes*

**Date**        May 11, 2026

64

Case: 25-8059, 05/11/2026, DktEntry: 78.1, Page 77 of 78

1a