Nos. 25-8059, 26-508

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ENVIRONMENTAL DEFENSE CENTER,
GET OIL OUT!, SANTA BARBARA
COUNTY ACTION NETWORK, SIERRA
CLUB, SANTA BARBARA
CHANNELKEEPER, CENTER FOR
BIOLOGICAL DIVERSITY, and
WISHTOYO FOUNDATION,

*Petitioners,*

v.

U.S. DEPARTMENT OF TRANSPORTATION,
SEAN DUFFY, in his official capacity as
Secretary of the U.S. Department of Transportation,
PIPELINE AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION, and PAUL ROBERTI,
in his official capacity as Administrator of
the Pipeline and Hazardous Materials Safety Administration,

*Respondents,*

and

SABLE OFFSHORE CORP. and PACIFIC
PIPELINE COMPANY,

*Respondent-Intervenors.*

---

## RESPONDENT-INTERVENORS' RESPONSE IN OPPOSITION

---

On Petition for Review of Actions Taken by the
Pipeline and Hazardous Materials Safety Administration

---

James W. Noe
jim.noe@hklaw.com
Rafe Petersen
rafe.petersen@hklaw.com
Ashley Akers
ashley.akers@hklaw.com
**HOLLAND & KNIGHT LLP**
800 17th Street N.W., Suite 1100
Washington, DC 20006
Tel: (202) 469-5525

Nicholas McDaniel
nmcdaniel@babstcalland.com
Lucille E. Wiesner
lwiesner@babstcalland.com
**BABST CALLAND CLEMENTS AND ZOMNIR, P.C.**
505 9th Street NW, Suite 602
Washington, DC 20004
Tel: (202) 853-3455

Jessica Stebbins Bina
jessica.stebbinsbina@lw.com
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5525

*Attorneys for Respondent-Intervenors*
*Sable Offshore Corp. and Pacific Pipeline Company*

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................2

STATEMENT OF ISSUES FOR REVIEW......................................................3

STATEMENT OF THE CASE...........................................................................3

I.     Statutory and Regulatory Background ...........................................3

     A.     PHMSA Regulation of Interstate Pipelines............................4

     B.     PHMSA Special Permits ..........................................................5

II.     Factual Background .........................................................................6

     A.     The Santa Ynez Pipeline .........................................................6

     B.     Processing and Other Transportation Functions at the LFC Facility.....................................................................................9

     C.     The 2015 Refugio Spill and 2020 Consent Decree............................12

     D.     Sable's Pipeline Repairs and Improvements .....................................13

     E.     The National Energy Emergency ..........................................15

III.     The Challenged PHMSA Letters and Actions ................................15

     A.     Regulatory Authority over the Pipeline Prior to 2025 ........................15

     B.     The Interstate Letter ..............................................................16

     C.     The Restart Plan Letter..........................................................18

     D.     The Special Permit ................................................................18

IV.     Procedural History .........................................................................22

SUMMARY OF ARGUMENT.........................................................................22

STANDARD OF REVIEW ..............................................................................23

i

ARGUMENT ........................................................................................................25

I.      THE SANTA YNEZ PIPELINE IS AN INTERSTATE PIPELINE..............25

        A.      PHMSA's Interstate Letter Properly Asserted Its Exclusive
                Jurisdiction Over An Interstate Pipeline Facility ................................25

                1.      The Santa Ynez Pipeline transports crude oil in interstate
                        commerce between the OCS and California............................26

                2.      The Santa Ynez Pipeline is an integrated pipeline facility .......29

                3.      PHMSA's determination of an integrated, interstate
                        pipeline is supported by substantial evidence..........................33

        B.      Petitioners' Arguments for OSFM Jurisdiction Over This
                Interstate Pipeline Fail..........................................................................35

                1.      CA-324 and CA-325 are properly regulated as segments
                        of the integrated, interstate Santa Ynez Pipeline ....................35

                2.      The LFC facility does not bifurcate the Pipeline.....................43

                3.      The Consent Decree does not, and cannot, alter Congress's
                        allocation of exclusive jurisdiction ..........................................51

II.     THIS COURT LACKS JURISDICTION OVER THE SPECIAL
        PERMIT AND RESTART PLAN CLAIMS .................................................55

        A.      The Special Permit Challenges Are Moot..............................................55

        B.      The Restart Plan Letter Is Not Reviewable...........................................56

        C.      Petitioners Lack Standing To Challenge The Restart Plan Letter
                And Special Permit..................................................................................58

III.    PETITIONERS' CHALLENGE TO THE SPECIAL PERMIT FAILS ........61

        A.      The Special Permit's Narrow Waiver And Extra Conditions Are
                Consistent With Pipeline Safety.............................................................61

        B.      PHMSA Reasonably Exercised Its Emergency Authority In
                Issuing The Special Permit.....................................................................63

ii

C.     NEPA Does Not Require Pre-Issuance Environmental Review For Emergency Actions ...........................................................65

IV.     PETITIONERS' CHALLENGE TO THE RESTART PLAN LETTER FAILS..................................................................................................66

     A.     PHMSA Did Not Exceed Its Authority In Issuing The Restart Plan Letter .........................................................................67

     B.     Restart Is Consistent With Pipeline Safety And Supported By Extensive Safeguards ...........................................................68

     C.     The Restart Plan Letter Did Not Require Public Comment Or NEPA Review .....................................................................69

CONCLUSION .................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aircraft Serv. Int'l, Inc. v. FERC*,
  985 F.3d 1013 (D.C. Cir. 2021)...................................................................*passim*

*Barrientos v. Lynch*,
  829 F.3d 1064 (9th Cir. 2016) .................................................................................25

*Bishop Paiute Tribe v. Inyo County*,
  863 F.3d 1144 (9th Cir. 2017) .................................................................................25

*Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*,
  860 F. App'x 542 (9th Cir. 2021) ............................................................................60

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..................................................................................................59

*Conservation Nw. v. Sherman*,
  715 F.3d 1181 (9th Cir. 2013) .............................................................................52, 58

*Couser v. Shelby Cnty.*,
  139 F.4th 664 (8th Cir. 2025) ..................................................................................49

*Entergy Ark., LLC v. FERC*,
  134 F.4th 576 (D.C. Cir. 2025)................................................................................58

*Exxon Corp. v. U.S. Sec'y of Transp.*,
  978 F. Supp. 946 (E.D. Wash. 1997)....................................................................42, 51

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..................................................................................................23

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*,
  426 U.S. 776 (1976)..................................................................................................65

*Gonzalez-Juarez v. Bondi*,
  137 F.4th 996 (9th Cir. 2025) ..................................................................................25

*Guttman Energy, Inc.*,
   161 FERC ¶ 61,180 (2017) ................................................................. 30

*Heckler v. Cmty. Health Servs., Inc.*,
   467 U.S. 51 (1984) .............................................................................. 53

*Hernandez v. Holder*,
   738 F.3d 1099 (9th Cir. 2013) ............................................................ 52

*In re ONEOK NGL Pipeline, L.P.*,
   2016 WL 8315623 (DOT Oct. 12, 2016) ..................................... 30, 45

*Jamul Action Comm. v. Chaudhuri*,
   837 F.3d 958 (9th Cir. 2016) .............................................................. 70

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ............................................................................ 34

*Lake v. Fontes*,
   83 F.4th 1199 (9th Cir. 2023) ............................................................ 60

*Littlejohn v. United States*,
   321 F.3d 915 (9th Cir. 2003) .............................................................. 54

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................ 24

*Louisiana Power & Light Co. v. Federal Power Commission*,
   483 F.2d 623 (5th Cir. 1973) ....................................... 41, 48, 49, 50

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
   590 U.S. 405 (2020) ..................................................................... 54, 55

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 58

*Marin-Rodriguez v. Holder*,
   612 F.3d 591 (7th Cir. 2010) ............................................................ 52

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ............................................................................ 28

*McElroy v. United States*,
455 U.S. 642 (1982)......................................................................28

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................24

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*,
372 U.S. 84 (1963).......................................................................44

*N.Y. State Dep't of L. v. FCC*,
984 F.2d 1209 (D.C. Cir. 1993).....................................................57

*Nat'l Distribution Servs., Inc. v. DOT*,
650 F. App'x 32 (D.C. Cir. 2016)..............................................33, 34

*Native Ams. for Enola v. U.S. Forest Serv.*,
60 F.3d 645 (9th Cir. 1995) ..........................................................56

*Nev. Ass'n of Cntys. v. U.S. Dep't of Interior*,
686 F. App'x 407 (9th Cir. 2017) ..................................................25

*New Hampshire v. Maine*,
532 U.S. 742 (2001).....................................................................53

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*,
56 F.3d 1060 (9th Cir. 1995) .........................................................55

*Okla. Nat. Gas Co. v. FERC*,
28 F.3d 1281 (D.C. Cir. 1994)......................................................40

*Organized Village of Kake v. USDA*,
795 F.3d 956 (9th Cir. 2015) .........................................................42

*Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*,
838 F.2d 536 (D.C. Cir. 1988).......................................................52

*Ruiz v. Bondi*,
163 F.4th 586 (9th Cir. 2025) ........................................................25

*Rybachek v. EPA*,
904 F.2d 1276 (9th Cir. 1990) ..................................................61, 68

*Saulque v. U.S.*,
663 F.2d 968 (9th Cir. 1981) ...................................................................42

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)....................................................................24, 63, 66

*Shell Oil Co. v. City of Santa Monica*,
830 F.2d 1052 (9th Cir. 1987) ............................................................26, 31

*Shell Pipeline Co. LP*,
157 FERC ¶ 61,158 (2016).......................................................................36

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..................................................................................60

*Stand Up for Cal.! v. U.S. Dep't of Interior*,
2021 WL 3418729 (E.D. Cal. Aug. 5, 2021)...........................................70

*Texaco Refin. & Mktg., Inc.*,
80 FERC ¶ 61,200 (1997) ........................................................................30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................................60

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
834 F. Supp. 2d 1004 (D. Haw. 2011)...............................................57, 70

*Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*,
558 U.S. 67 (2009)....................................................................................52

*United States v. Plains All Am. Pipeline, L.P.*,
No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020) ......................................12, 63

*Valley Citizens for a Safe Env't v. Vest*,
1991 WL 330963 (D. Mass. May 6, 1991)...............................................66

*W. Radio Servs. Co. v. Glickman*,
113 F.3d 966 (9th Cir. 1997) ...................................................................56

*Walling v. Jacksonville Paper Co.*,
317 U.S. 564 (1943)..................................................................................28

vii

*Wild Fish Conservancy v. Jewell*,
730 F.3d 791 (9th Cir. 2013) ................................................................25

*Wild Horse Educ. v. U.S. Dep't of Interior*,
2026 WL 483342 (D. Nev. Feb. 20, 2026)..............................................56

*Williams Gas Processing-Gulf Coast Co. L.P. v. FERC*,
475 F.3d 319 (D.C. Cir. 2006) ..............................................................41

## STATUTES

5 U.S.C.
    § 706.........................................................................................................24
    § 706(2)(A) .......................................................................................24, 67

33 U.S.C. § 1321(j)(1) .................................................................................50

42 U.S.C.
    § 4332.......................................................................................................65
    § 4336e(10)(B)(vii)...................................................................................70

49 U.S.C.
    § 60101(5)...........................................................................................30, 33
    § 60101(22).........................................................................................30, 33
    § 60101(22)(B)..........................................................................................30
    § 60101(a)(21)(A).....................................................................................47
    § 60101(a)(22) .......................................................................................4, 44
    § 60101 *et seq.* .................................................................................*passim*
    § 60102(a)(1) ..............................................................................................4
    § 60102(a)(1)–(2).......................................................................................4
    § 60104(c) ...................................................................................................5
    § 60118(c)(1)(A)...................................................................5, 6, 62, 63
    § 60118(c)(2)(A)..................................................................................6, 64
    § 60118(c)(3) ...........................................................................................64
    § 60119(a) .....................................................................................2, 22, 57
    § 60119(a)(1) .............................................................................22, 55, 57
    § 60119(a)(3) ...........................................................................................24

## REGULATIONS

28 C.F.R. § 61.4 .........................................................................................69

40 C.F.R.
§ 60.101 ................................................................................................45
§ 112.1 .................................................................................................51

49 C.F.R. pt. 195 ........................................................................10, 27

49 C.F.R. pt. 195, Appendix A ...........................................5, 28, 37

49 C.F.R. pt. 195, Appendix A, ex. 7 ........................................27, 37

49 C.F.R.
§ 1.97 .....................................................................................................4
§ 190.341(a) ..........................................................................................6
§ 190.341(c)(8) ...................................................................................65
§ 190.341(g) ........................................................................................64
§ 195.1 .................................................................................................27
§ 195.2 ..........................................................................................*passim*
§ 195.452(h)(4)(iii)(H) .........................................................19, 62, 63

## OTHER AUTHORITIES

91 Fed. Reg. 13,698 (Mar. 20, 2026) ..............................................21

91 Fed. Reg. 8949 (Feb. 24, 2026) ..............................................21, 56

*DOT's Procedures for Considering Environmental Impacts*, Order
5610.1D § 23 (July 1, 2025) ...........................................................65

*Environmental Assessment for Emergency Special Permit*, No.
PHMSA-2025-1502 (Feb. 23, 2026) ..............................................66

Executive Order 14156, *Declaring a National Energy Emergency*, 90
Fed. Reg. 8433 (Jan. 20, 2025) ......................................................15

*PHMSA Letter of Interpretation to THUMS Long Beach Company*, PI-
20-0008 (June 15, 2020) ....................................................32, 45, 46

*Pipeline Safety: Safety of Gas Transmission Pipelines; Midstream
Facilities Frequently Asked Questions*, 85 Fed. Reg. 70,126 ...........32

S. Rep. No. 96-182 (1979) ..............................................................29

*Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines*, 50 Fed. Reg. 39008, 39011 (Sept. 26, 1985) ....................36

Williams & Meyers, *Manual of Oil and Gas Terms* 1062 (Martin & Kramer eds., 19th ed. 2024)...............................................................45

## INTRODUCTION

Congress spoke clearly: the Pipeline Safety Act vests exclusive regulatory authority over interstate oil pipelines in the Pipeline and Hazardous Materials Safety Administration. The Santa Ynez Pipeline transports crude oil continuously from federal waters on the Outer Continental Shelf into California—the very definition of interstate commerce under the Act. PHMSA confirmed as much after conducting a comprehensive jurisdictional audit. It then approved a Restart Plan mandated by a federal consent decree, issued a narrow emergency Special Permit to facilitate safe operations, and documented each decision in a robust administrative record.

Petitioners now ask this Court to disregard Congress's allocation of exclusive federal jurisdiction, displace PHMSA's expert judgment, and assign state oversight over segments of an integrated interstate pipeline—all based on a brief interlude of state regulation that arose only because the pipeline was drained, not flowing oil, and under divided ownership. That interlude ended when Sable unified ownership of the entire system and resumed interstate oil transportation. Petitioners seek to permanently freeze a jurisdictional classification that was premised on facts that no longer exist, and the law forecloses that result. No provision of the Pipeline Safety Act, no consent decree, and no principle of administrative law supports Petitioners' effort.

1

Each petition fails on multiple independent grounds. PHMSA's Interstate Letter faithfully applies the statute, adheres to the agency's own regulations, and accords with decades of precedent governing pipelines engaged in interstate commerce. The challenge to the emergency Special Permit is moot: the permit has expired and now lacks legal force, and PHMSA has initiated a regular permitting process with full notice and comment. The Restart Plan Letter is similarly unreviewable, because it is part of the implementation of a judicially-entered consent decree, which is neither a reviewable "order" under the Pipeline Safety Act nor subject to the Administrative Procedure Act. And Petitioners lack standing to challenge either the Restart Plan or the Special Permit: the only cognizable injury they identify—preemption of state law—traces to the Interstate Letter alone, not to the downstream actions they attack.

This Court should dismiss or deny each petition for review, affirm PHMSA's exercise of its statutory authority, and leave undisturbed the federal government's exclusive oversight of this interstate pipeline.

## JURISDICTIONAL STATEMENT

California and the Environmental Petitioners (together, "Petitioners") invoke this Court's jurisdiction under 49 U.S.C. § 60119(a) to challenge purported agency "orders" by Respondents U.S. Department of Transportation ("DOT") and the Pipeline and Hazardous Materials Safety Administration ("PHMSA") relating to the

2

Santa Ynez Pipeline operated by Respondent-Intervenors Sable Offshore Corp. and Pacific Pipeline Company (together, "Sable"). This Court lacks jurisdiction in part because Petitioners' challenge to the emergency Special Permit is moot, the Restart Plan Letter is not reviewable here, and Petitioners lack standing to challenge either action.

## STATEMENT OF ISSUES FOR REVIEW

1.      Whether the Petitions for Review should be dismissed in part for lack of jurisdiction for failing to identify a reviewable final agency action with respect to the emergency Special Permit and the Restart Plan, and for lack of standing.

2.      Whether PHMSA acted beyond its authority or contravened its own regulations in issuing the Interstate Letter, the emergency Special Permit, and the Restart Plan Letter.

## STATEMENT OF THE CASE

### I.      Statutory and Regulatory Background

Congress enacted the Pipeline Safety Act ("PSA"), 49 U.S.C. § 60101 *et seq.*, to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and

3

enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1).[1]

PHMSA administers the federal pipeline safety laws. *See* 49 C.F.R. § 1.97.

Section 60102 authorizes PHMSA to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities" to protect the public "against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1)–(2).

## A. PHMSA Regulation of Interstate Pipelines

"Hazardous liquid pipeline facilities" subject to the PSA include all intrastate or interstate hazardous liquid pipelines, rights of way, and any "facility, [] building, or equipment used or intended to be used in transporting hazardous liquid." *Id.* § 60101(a)(5). "Hazardous liquid" includes "petroleum or a petroleum product," *id.* § 60101(a)(4)(A), and "transporting hazardous liquid" encompasses both "the movement of hazardous liquid by pipeline" and the "storage of hazardous liquid incidental to" that movement. *Id.* § 60101(a)(22).

A pipeline facility qualifies as an "*interstate* hazardous liquid pipeline facility" if it is "used to transport hazardous liquid in interstate or foreign

---

[1] The PSA consolidates and recodifies two earlier pipeline safety statutes—the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquid Pipeline Safety Act of 1979—without making substantive changes. Many cases relevant to interpreting the PSA were decided under substantively identical provisions of the earlier statutes.

commerce." *Id.* § 60101(a)(7) (emphasis added). The PSA defines "interstate or foreign commerce" to include commerce "between a place in a State and a place outside that State." *Id.* § 60101(a)(8)(B)(i). By contrast, an "*intrastate* hazardous liquid pipeline facility" is one that does not meet the definition of an interstate pipeline facility. *Id.* § 60101(a)(10) (emphasis added).

To help establish nationally uniform standards, the PSA contains a broad preemption provision providing that a "State authority *may not adopt or continue in force safety standards* for interstate pipeline facilities or interstate pipeline transportation." *Id.* § 60104(c) (emphasis added). While the PSA grants states some regulatory authority over *intrastate* pipeline facilities, it makes no exceptions for *interstate* pipeline facilities. Rather, the PSA "leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce." 49 C.F.R. pt. 195, app. A; *see also* 49 U.S.C. § 60104(c).

## B.     PHMSA Special Permits

PHMSA may waive compliance with any pipeline safety regulations on terms it "considers appropriate" if it "determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). PHMSA calls these waivers "special

5

permits."[2] 49 C.F.R. § 190.341(a). Special permits may be conditioned on the performance of alternative measures designed to provide an equal or greater level of safety as compared to the waived regulation(s). *See* 49 U.S.C. § 60118(c)(1)(A).

In non-emergency circumstances, PHMSA must provide notice and an opportunity for a hearing before issuing a special permit. *Id.* § 60118(c)(1)(B). However, in emergencies, PHMSA may waive compliance without notice if it determines that waiver is in the public interest, is not inconsistent with pipeline safety, and is necessary to address "an actual or impending emergency involving pipeline transportation." *Id.* § 60118(c)(2)(A). The Secretary is responsible for making the requisite emergency determination.

## II. Factual Background

### A. The Santa Ynez Pipeline

This dispute centers on PHMSA's classification of a single integrated hazardous liquid pipeline facility, owned by Sable, called the Santa Ynez Pipeline ("Pipeline") as an *interstate* pipeline facility, and its subsequent approvals of a Restart Plan mandated by a federal consent decree and a related emergency Special Permit. Sable uses the Pipeline to transport crude oil, moving it continuously from offshore oil platforms in federal waters into California, where it is ultimately sold.

---

[2] Special permits are not operating permits, and a pipeline is not generally required to obtain a PHMSA permit.

Sable produces crude oil and natural gas from three principal offshore platforms: Harmony, Heritage, and Hondo (the "OCS platforms"). 2-CalER-000206; 2-CalER-000209; 1-SableSER-0003-04; 1-SableSER-0053. Sable's platforms are operated pursuant to federal offshore oil and gas leases in federal waters on the Outer Continental Shelf ("OCS") off the coast of California, in an oil and gas field known as the Santa Ynez Unit. 2-CalER-000206; 1-SableSER-0003. Sable uses the Pipeline to transport oil produced on the OCS platforms to its delivery point at Pentland Station in Kern County, California. 1-CalER-000024; 2-CalER-000168-69; 1-SableSER-0053; 1-SableSER-0022-46.

The Pipeline is comprised of an offshore subsea pipeline segment that moves oil from offshore production platforms onshore, an onshore midstream processing facility, and onshore pipeline segments. 1-CalER-000020-21; 1-CalER-000004.



2-CalER-000209.

The produced oil is first separated from the gas at the OCS platforms and transported through the offshore pipeline segment to the Las Flores Canyon ("LFC") facility; then, after minimal and necessary processing at the LFC facility, through the onshore pipeline segments for continued transportation to Pentland Station. 2-CalER-000206; 1-CalER-000025; 2-CalER-000167; 2-CalER-000085; 2-CalER-000089; 1-SableSER-0018-20; 1-SableSER-0055; 1-SableSER-0022-46.

The onshore pipeline segments (segments CA-324, CA-325A, and CA-325B) were formerly owned by Plains Pipeline L.P. ("Plains"). In October 2022, Pacific Pipeline Company (then a subsidiary of ExxonMobil) acquired those segments and

related assets from Plains. 4-CalER-000596; 2-CalER-000174. In 2024, Sable Offshore Corp. purchased Pacific Pipeline Company. 3-CalER-000558. That same year, Sable Offshore Corp. also acquired the offshore pipeline segment and LFC facility from ExxonMobil. 2-CalER-000206; 1-CalER-000024. Sable now owns and operates all segments of the Pipeline.

### B. Processing and Other Transportation Functions at the LFC Facility

The LFC facility employs several processes to aid in the continued transportation of oil through the Pipeline. As is typical in oil and gas production, hydrocarbons produced from the OCS platforms form an emulsion—an oil and water mixture that cannot be easily separated. 1-SableSER-0080; 1-SableSER-0006, 1-SableSER-0013; 1-SableSER-0137-38. In addition, the crude contains elevated levels of hydrogen sulfide, a highly corrosive compound. 2-CalER-000046 n.7; 2-CalER-000047 ¶ 17; 1-SableSER-0006, 1-SableSER-0013. To meet product specifications and to prevent internal corrosion in the piping, residual water must be removed from the crude oil, and hydrogen sulfide must be stabilized prior to transport to its final destination. 1-SableSER-0006.

The onshore LFC facility employs a multi-step dehydration process. 1-SableSER-0006, 1-SableSER-0013; 1-SableSER-0104-105 (listing equipment used in crude oil processing at LFC). Crude oil arrives by pipeline and is directed through a heating system. 1-SableSER-0005-19. After heating, the crude flows into a free

9

water knock-out unit, where the majority of free water is separated. 1-SableSER-0006; 1-SableSER-0014. The partially dehydrated crude then passes into an emulsion treating unit which removes additional water content. 1-SableSER-0006; 1-SableSER-0014. Following dehydration, the crude is further processed in a stabilization unit that removes hydrogen sulfide and separates out condensate. 1-SableSER-00104-05; 1-SableSER-0006; 1-SableSER-0013. The recovered condensate is then routed to a condensate stabilization unit, where lighter gases and remaining impurities are removed through a similar process. 1-SableSER-0006; 1-SableSER-0013. The dehydration and stabilization units are integrated with the LFC facility piping infrastructure, enabling crude oil to flow continuously through the facility. 1-SableSER-0005-07; 1-SableSER-0013.

The dehydrated and stabilized crude oil is either sent back through the heat exchangers and through the on-site LFC facility pump station for further transport or is stored temporarily in one of two large tanks.[3] 1-SableSER-0005-06; 1-SableSER-0078 ("The facility processes and stores crude oil . . . ."); 1-SableSER-

---

[3] A "breakout tank" is used to relieve surges or temporarily store hazardous liquid before reinjection and continued transportation in a pipeline system. 49 C.F.R. § 195.2. At the time the Interstate Letter was issued, Sable did not label the two LFC tanks as "breakout tanks" under C.F.R. Part 195 because the Pipeline was not subject to those federal rules. Following PHMSA's confirmation that the Pipeline operates as an integrated pipeline system, they are now correctly classified as "breakout tanks."

0055-58. After temporary storage, the oil is routed back to the initial heat exchangers to be heated up before being sent to the on-site pump station. 1-SableSER-0005; 1-SableSER-0013. Heating is essential for transport because it reduces crude oil viscosity, helping the crude move more easily through the remainder of the Pipeline. 6-CalER-000899-000900; 1-SableSER-0055-57.

Sable does not sell or transfer crude oil at the LFC facility. 1-SableSER-0081; 1-SableSER-0005. After processing, the crude oil continues through the Pipeline for delivery at Pentland Station. The oil is pumped directly from the pump station into a 24-inch diameter pipeline segment (called "CA-324") that extends approximately 10.86 miles from the LFC facility to the Gaviota Pump Station. 2-CalER-000168; 1-SableSER-0005. From Gaviota, the oil flows through a 30-inch diameter pipeline segment (called "CA-325A") for about 38.72 miles to the Sisquoc Pump Station. 2-CalER-000168-69. Then the oil travels through another 30-inch pipeline segment (called "CA-325B") for approximately 74.84 miles until it arrives at Pentland Station. 2-CalER-000169.

PHMSA's evaluation of the Pipeline confirms that it "transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California." 1-CalER-000025.

11

### C. The 2015 Refugio Spill and 2020 Consent Decree

On May 19, 2015, a portion of segment CA-324 failed, causing an oil spill (the "Refugio Spill"). 6-CalER-000899; 5-CalER-000785; 2-CalER-000174. Following the Refugio Spill, the onshore segments were drained and filled with inert gas to facilitate investigation and repairs. 6-CalER-000899. The failure was determined to have been caused primarily by external corrosion along CA-324. 6-CalER-000899.

The Refugio Spill triggered a PHMSA investigation, the issuance of a corrective action order, and ultimately a Consent Decree between the United States, the State of California, and the onshore segments' then-owner, Plains, resolving related civil claims. 7-CalER-001422; 4-CalER-000731-80; *United States v. Plains All Am. Pipeline, L.P.,* No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), 5-CalER-000781-000882. The Consent Decree was approved and entered by the district court following public comment. 4-CalER-000604-05.

The Consent Decree imposed several requirements on Plains that had to be satisfied before oil flow could resume through the onshore segments. Two of those requirements are relevant to this Petition: First, the Consent Decree required Plains to obtain a waiver of certain pipeline safety regulations related to corrosion and cathodic protection for the onshore segments. 5-CalER-000860. Second, the Consent Decree required Plains to submit and receive approval of a "Restart Plan"

12

demonstrating completion of specified Consent Decree obligations, along with other protective measures set forth in the Decree. 5-CalER-000876-81. The Restart Plan exists solely as a product of the Consent Decree and is not required under any statute or regulation.

### D. Sable's Pipeline Repairs and Improvements

Following acquisition of the Pipeline in 2024, Sable entered into a Consent Decree Assumption Agreement, under which it contractually agreed to follow certain provisions of the Consent Decree that apply to the onshore segments. 3-CalER-000558. Since that time, Sable has made extensive repairs and improvements to the Pipeline to address the causes of the Refugio Spill and prevent future recurrence, consistent with the Consent Decree. These efforts include completing over 200 pipeline segment repairs;[4] installing new safety valves for enhanced section control;[5] implementing a new pipeline control system with real-time leak detection and

---

[4] These activities, called "anomaly repairs," involve routine maintenance of pipe sections exhibiting some level of metal loss and have been regularly performed on the onshore segments since their construction. By May 2025, Sable had completed all repairs required under the Consent Decree's heightened repair criteria. 2-CalER-000213-14; 1-SableSER-0049-50.

[5] Sable installed twenty-seven (27) safety valves along segments CA-324 and CA-325, in compliance with California Assembly Bill 864 and consistent with Consent Decree requirements. 2-CalER-000213; 1-SableSER-0139; 1-SableSER-0141. The new safety valves reduce the worst-case potential release volumes from segments CA-324 and CA-325 by almost 40%. 2-CalER-000213; 1-SableSER-0139.

13

automatic shutdown capabilities;[6] and comprehensive updates to its operating procedures, manuals, and safety systems.[7] Sable also conducted successful hydrostatic pressure testing, which confirmed that the onshore segments could operate safely beyond their defined maximum operating pressures for both short periods ("spike" hydrotests) and longer durations.[8]

On December 17, 2024, after extensive technical discussions and inspections, California's Office of the State Fire Marshal ("OSFM")—the state regulator for intrastate hazardous liquid pipelines—issued waivers addressing certain corrosion control and cathodic protection requirements for the onshore segments. 3-CalER-000456; 3-CalER-000471. These "State Waivers" imposed over sixty separate conditions on Sable's operation of the onshore segments, reflecting the enhanced safety standards in the Consent Decree. *Id.* PHMSA contemporaneously reviewed the State Waivers and indicated that it had no objection. 3-CalER-000339-42.

---

[6] 2-CalER-000213; 1-SableSER-0051-53.

[7] 1-SableSER-141-42. In August 2025, OSFM reviewed Sable's updated Integrity Management Plan, Control Room Management Plan, Operations & Maintenance Manual, and Standard Operating Procedures and confirmed that they satisfy all applicable Consent Decree requirements. 2-CalER-000214.

[8] 2-CalER-000176-77; 1-CalER-000007 n.11. These hydrotests were conducted under OSFM's supervision, as required by the then-effective State Waivers. 1-SableSER-0062-63.

Although not judicially bound by the Consent Decree, Sable submitted a Restart Plan for the onshore segments, with components that are consistent with the terms of Consent Decree. 2-CalER-000214; 1-SableSER-0141-42. OSFM did not make any final determination regarding the Restart Plan before PHMSA resumed jurisdiction over the Pipeline.

### E. The National Energy Emergency

In January 2025, the President issued Executive Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025). The President determined that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. And the President directed agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

## III. The Challenged PHMSA Letters and Actions

### A. Regulatory Authority over the Pipeline Prior to 2025

At the time of the Refugio Spill, and at all times prior, the onshore pipeline segments were regulated by PHMSA as an *interstate* pipeline facility and operated by Plains pursuant to a Federal Energy Regulatory Commission ("FERC") certificate of economic regulatory jurisdiction. 6-CalER-000901-02; 4-CalER-000733 ¶ 8.

Accordingly, PHMSA, as the pipeline safety regulator, issued a Corrective Action Order to Plains and conducted a failure investigation following the Refugio Spill. 7-CalER-001422.

In compliance with the PHMSA Corrective Action Order, the onshore segments were purged of oil to facilitate investigation and repairs. 7-CalER-001425; 6-CalER-000899. Because oil was no longer flowing through the onshore segments, Plains cancelled its FERC certificate in 2016. 6-CalER-000901-02. Thereafter, OSFM began regulating the onshore segments as an intrastate pipeline for the first time in the pipeline segments' history.[9] 4-CalER-000733 ¶ 9.

As a result of the transition to state regulation in 2016, the Consent Decree designated the OSFM to oversee certain compliance terms. The offshore segment of the Pipeline, then owned by ExxonMobil and its affiliates, continued to be regulated exclusively by PHMSA. 2-CalER-000167; 1-SableSER-0059.

### B.    The Interstate Letter

Since it acquired all segments in 2024, Sable has operated the Pipeline as a single, integrated system.[10] In fall 2025, in advance of resuming oil transportation,

---

[9] Sable does not concede that the 2016 reclassification, apparently designated by Plains and accepted by California and the United States without challenge, was correct.

[10] Before Sable acquired the Pipeline, oil had never flowed through both the offshore and onshore assets under a single owner.

16

Sable determined that the Pipeline should be regulated as an interstate pipeline facility because it is configured to transport crude oil continuously from a production point outside California (on the OCS) to a sales point within California (at Pentland Station). In November 2025, Sable sent a letter notifying PHMSA that it intended to operate the onshore segments as part of its integrated interstate system and requesting PHMSA's concurrence in its determination that the entire Pipeline, including the onshore segments, qualifies as an interstate pipeline facility under the PSA. 2-CalER-000206-08.

PHMSA then initiated a jurisdictional audit. The multi-day audit included on-site inspection of the onshore segments; field observations of the offshore Harmony platform, LFC facility, pump stations, and control room; and independent review of prior inspections conducted by OSFM and Sable's updated procedures and records. 1-CalER-000024; 1-SableSER-0022-46. PHMSA's independent review confirmed that the Pipeline transports crude oil from the OCS, through the LFC facility, to Pentland Station, and therefore qualifies as an interstate pipeline. 1-CalER-000025; 1-SableSER-0022-46. On December 17, 2025, PHMSA notified Sable and OSFM that it agreed with Sable's determination that the entire Pipeline, including the onshore segments, is an interstate pipeline facility, falling under PHMSA's regulatory oversight (the "Interstate Letter"). 1-CalER-000024-26; 1-SableSER-0022-46.

### C.     The Restart Plan Letter

The Restart Plan is a creature of the Consent Decree. 5-CalER-000876-81. Absent the Consent Decree, Sable would have no obligation to obtain any PHMSA approval to resume oil transportation through segments CA-324 and CA-325. The Restart Plan outlines the process of resuming oil flow in the pipeline segments. For example, the Plan must include documentation that certain actions have been completed, provisions for adequate patrolling of the pipeline during restart, and inspection procedures after restart. *Id.*

In response to Sable's Restart Plan submission in December 2025, PHMSA reviewed the Plan, confirmed that the submission included all required components, and did not identify any concerns or unsatisfactory items. 1-CalER-000022. On December 22, 2025, PHMSA sent a letter to Sable stating that PHMSA had reviewed and approved the Restart Plan (the "Restart Plan Letter"). *Id.*

### D.     The Special Permit

On December 23, 2025, PHMSA issued Sable an emergency special permit with substantially the same terms as the already-approved OSFM State Waivers (the "Special Permit"). 1-CalER-000001. Sable sought the Special Permit from PHMSA because of a Consent Decree provision requiring Plains to obtain waivers addressing certain corrosion control and cathodic protection requirements. 5-CalER-000860.

18

Like the Restart Plan, the waiver requirement is an obligation of the Consent Decree and imposes safety measures beyond those otherwise required by law.

The Special Permit is narrow in scope. It waives a single requirement in a single subsection of the PSA regulations applicable to segments CA-324 and CA-325: 49 C.F.R. § 195.452(h)(4)(iii)(H). 1-CalER-000001. That regulation provides that: "An operator must schedule evaluation and remediation . . . within 180 days of discovery of the condition [of] [c]orrosion of or along a longitudinal seam weld." 49 C.F.R. § 195.452(h)(4)(iii)(H). The Pipeline remains subject to the PSA and all other applicable pipeline safety regulations.

Under the Special Permit, Sable is subject to additional, extra-protective requirements related to corrosion control and cathodic protection. 1-CalER-000002. These conditions include limitations on the maximum operating temperature and maximum operating pressure for crude oil transported through the onshore segments, more stringent inspection frequency requirements, and thresholds for anomaly repairs, as well as detailed validation, data analysis, recordkeeping, and reporting requirements. 1-CalER-000004-16. PHMSA concluded that the conditions would ensure that issuance of the permit is not inconsistent with pipeline safety. 1-CalER-000016.

In issuing the Special Permit, PHMSA determined that Sable's ongoing program to locate and remediate any safety risks and compliance with the permit

19

conditions would provide at least an equivalent level of safety as complying with the waived regulation. 1-CalER-000019. As noted above, OSFM had approved substantially similar waivers before PHMSA resumed jurisdiction of the onshore pipeline segments. 3-CalER-000456; 3-CalER-000471. PHMSA determined that the Special Permit was in the public interest because it would ensure uniform and continuous regulatory oversight by continuing the waivers that OSFM had previously issued. 1-CalER-000003.

Sable requested the Special Permit on an emergency basis in light of the National Energy Emergency. 2-CalER-000185. In issuing the Special Permit, PHMSA determined that the permit would enable CA-324 and CA-325 to "mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil" and that emergency action was required because "the United States' 'current inadequate development of domestic energy resources leaves us vulnerable to hostile foreign actors and poses and imminent and growing threat to the United States' prosperity and national security.'" 1-CalER-000020. PHMSA also concluded that procedures for assessing environmental impacts in emergency circumstances applied and the need for immediate action precluded preparing an environmental assessment. *Id.* PHMSA noted that the permit's scope was "narrow," and that expected environmental impacts "will not be significant." 1-CalER-000020-21. PHMSA further advised that it planned to prepare an Environmental Assessment

20

("EA") under the National Environmental Policy Act ("NEPA") as soon as practicable. 1-CalER-000021.

On January 22, 2026, Sable submitted a request for a non-emergency special permit. *See Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)*, 91 Fed. Reg. 8949 (Feb. 24, 2026) (Docket No. PHMSA-2026-046). On February 23, 2026, PHMSA "preliminarily determined that the issuance of the special permit would not be inconsistent with pipeline safety" and noticed the non-emergency special permit application for public comment. *Id.* The public comment period for the non-emergency special permit ended on April 3, 2026. *See Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)*, 91 Fed. Reg. 13,698 (Mar. 20, 2026) (Docket No. PHMSA-2026-046).

The Special Permit expired on February 21, 2026. 1-CalER-000002. No oil flowed through segments CA-324 or CA-325 during the Special Permit's limited duration.[11]

---

[11] *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026) ("Lines CA-324 and CA-325 have not been used to transport hazardous liquid since the rupture"). Sable began flowing oil through segments CA-324 and CA-325 in March 2026 following issuance of an order by the U.S. Secretary of Energy under the Defense Production Act compelling Sable to resume transportation of hydrocarbons through the Pipeline to address energy scarcity and supply disruptions.

## IV. Procedural History

On December 24, 2025, Environmental Petitioners filed a petition for review under 49 U.S.C. § 60119(a) challenging the Special Permit and Restart Plan Letter. Petitioners moved for an emergency stay, which the Court denied on December 31, 2025. On January 23, 2026, California filed a petition for review pursuant to 49 U.S.C. § 60119(a)(1) challenging the Interstate Letter as well as the Special Permit and Restart Plan Letter. The actions were consolidated.

## SUMMARY OF ARGUMENT

The petitions for review fail on the merits and—with respect to two of the three claims—also fail on procedural grounds.

**Section I** explains that PHMSA's Interstate Letter is proper. The Pipeline operates as a single, integrated interstate pipeline subject to exclusive federal regulation, through PHMSA, under the Pipeline Safety Act. Crude oil is transported in interstate commerce from the OCS to an onshore delivery point in California, and intermediate facilities such as the LFC facility and pump stations perform functions integral to the continuous movement of hazardous liquid that do not break the chain of interstate transportation. None of the statutory exclusions for production, refining, or manufacturing apply, and the existence of overlapping state or federal regulatory regimes does not affect or displace PHMSA's jurisdiction. PHMSA's exercise of jurisdiction is not constrained by prior state regulatory involvement or the Consent

22

Decree, which cannot and does not alter or limit federal statutory authority over interstate pipeline facilities.

**Section II** provides independent, jurisdictional reasons this Court should reject Petitioners' challenges to the Special Permit and Restart: the challenge to the Special Permit is moot, Petitioners lack standing with respect to both claims, and the Restart Plan Letter is not independently reviewable in this Court.

Finally, **Sections III** and **IV** address the merits of Petitioners' challenge to the Special Permit and the Restart Plan Letter, and explain that neither were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Like the Interstate Letter, each reflects a lawful exercise of agency authority consistent with the Pipeline Safety Act and applicable regulations. Each action was reasonable, adequately explained, and supported by the administrative record. Further, the Special Permit was issued on an emergency basis, which does not require NEPA review. Regardless, this limited agency action does not require preparation of an Environmental Impact Statement ("EIS").

The petitions for review should be denied.

## STANDARD OF REVIEW

Section 706 of the Administrative Procedure Act ("APA") "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Under

the APA, final agency actions must be upheld unless they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* 49 U.S.C. § 60119(a)(3). "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the . . . deferential arbitrary-and-capricious standard." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* 605 U.S. 168, 179-80 (2025). "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* at 180. This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the APA, courts must "decide all relevant questions of law" and "determine the meaning or applicability of the terms of an agency action," holding unlawful any action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. The court decides questions of statutory interpretation by applying the traditional tools of statutory construction to determine the best reading of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399–401 (2024). "[A]lthough an agency's interpretation of a statute 'cannot bind a court,'" it can inform the court's decision, particularly "to the extent it rests on factual premises within [the agency's] expertise." *Id.* at 402 (alteration in original) (citation omitted). Agency determinations that turn on "mixed questions of law and fact that are

24

primarily factual" are reviewed under the substantial evidence standard. *Gonzalez-Juarez v. Bondi*, 137 F.4th 996, 1002 (9th Cir. 2025); *see also Ruiz v. Bondi*, 163 F.4th 586, 599 (9th Cir. 2025).

Petitioners bear the burden of establishing this Court's jurisdiction as the party invoking jurisdiction. *Barrientos v. Lynch*, 829 F.3d 1064, 1066 (9th Cir. 2016). "Federal courts lack jurisdiction over an APA claim that 'does not challenge final agency action.'" *Nev. Ass'n of Cntys. v. U.S. Dep't of Interior*, 686 F. App'x 407, 408 (9th Cir. 2017) (quoting *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 802 (9th Cir. 2013)). Likewise, "[a] federal court lacks jurisdiction to hear a case that is moot." *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1155 (9th Cir. 2017).

## ARGUMENT

## I. THE SANTA YNEZ PIPELINE IS AN INTERSTATE PIPELINE

The Santa Ynez Pipeline transports crude oil in interstate commerce from the OCS to a delivery point in Kern County, California. This integrated interstate transportation squarely meets the definition of an interstate pipeline under the PSA. PHMSA's determination that the Pipeline is an interstate pipeline facility was not arbitrary and capricious, and its conclusion is supported by substantial evidence.

### A. PHMSA's Interstate Letter Properly Asserted Its Exclusive Jurisdiction Over An Interstate Pipeline Facility

Under the PSA, PHMSA—and PHMSA alone—has authority to regulate interstate pipelines. 49 U.S.C. § 60101 *et seq*. This is undisputed. *See* Pet'r's

25

Opening Br. at 1, Dkt. 51.1 ("Cal. Op. Br."); Pet'rs' Joint Opening Br. at 25, Dkt. 53.1 ("Env. Petitioner Op. Br."). Accordingly, the parties' entire jurisdictional dispute collapses to a single inquiry: is the Santa Ynez Pipeline an interstate pipeline? If so, PHMSA has exclusive jurisdiction and OSFM has none. None of Petitioners' equitable and procedural arguments alter that fundamental and dispositive fact. The answer to the jurisdictional question is yes, and the Court's inquiry should begin and end there.

### 1. The Santa Ynez Pipeline transports crude oil in interstate commerce between the OCS and California

The Santa Ynez Pipeline is an interstate pipeline facility because it is operated with the intent to, and does, transport crude oil from the OCS to California. Whether a hazardous liquid pipeline is classified as interstate or intrastate is a question of fact defined by the PSA. *See Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1064 (9th Cir. 1987). A pipeline facility is interstate if it is "used to transport hazardous liquid in interstate or foreign commerce." *Id.* § 60101(7). Such transportation includes both "the movement of hazardous liquid by pipeline" and the "storage of hazardous liquid incidental to" that movement "*between a place in a State and a place outside that State.*" *Id.* § 60101(22), (8)(B)(i) (emphasis added). "[P]ipeline facilities and the transportation of hazardous liquids . . . in or affecting interstate or

26

foreign commerce, including facilities on the Outer Continental Shelf" are thus regulated by PHMSA. 49 C.F.R. § 195.1.

Consistent with these provisions, Appendix A to 49 C.F.R. Part 195 explains that a pipeline originating on the Outer Continental Shelf and entering a state is an interstate pipeline:



49 C.F.R. pt. 195, app. A, ex. 7. PHMSA's regulations thus illustrate the exact interstate pipeline configuration here: the Pipeline transports crude oil from the SYU on the OCS (akin to point A above) to an inland delivery point in Pentland Station in Kern County, California (akin to point B). As the map demonstrates, interstate

27

transportation from the OCS into a state does not suddenly become intrastate transportation at the point where the pipeline comes onshore. Rather, as explained in the analogous context of FERC jurisdiction—which "approximates," but is narrower than, interstate pipeline jurisdiction under the PSA—*see* 49 C.F.R. pt. 195, app. A— there is a "presumption that the fuel's entire journey is interstate commerce" unless a "stop within a state breaks the continuity of interstate transportation" based on the shipper's intent. *See Aircraft Serv. Int'l, Inc. v. FERC*, 985 F.3d 1013, 1017 (D.C. Cir. 2021).

The record demonstrates that Sable operates the entire Pipeline with the intent of moving Sable's crude oil from the OCS platforms (a place outside California) to Pentland Station (a place in California), where the oil is sold. Sable produces crude oil from the OCS platforms, pursuant to federal leases, and that oil is in interstate commerce from the moment it enters the Pipeline through its delivery at Pentland Station. *See, e.g.*, *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) (explaining that goods moving in commerce remain in commerce until they reach their final destination); *McElroy v. United States*, 455 U.S. 642, 653 n.17 (1982) ("[G]enerally when this interstate character has been acquired it continues at least until the load reaches the point where the parties originally intended that the movement should finally end."); *Maryland v. Louisiana*, 451 U.S. 725, 754-56 (1981) (holding that gas originating on the OCS remains in interstate commerce from

28

the wellhead through downstream transportation to ultimate consumers, even though "interrupted by certain events" like intermediate processing activities). The Pipeline therefore satisfies the PSA's definition of an interstate hazardous liquid pipeline facility.

### 2. The Santa Ynez Pipeline is an integrated pipeline facility

California argues that the Pipeline is *interstate* until it comes ashore, but that the onshore segments must be metaphorically cut off at the LFC facility and treated as a separate, *intrastate* pipeline. There is no basis in law or fact for this assertion. PHMSA's jurisdiction over interstate pipelines covers the *entire* Pipeline from the OCS to Kern County—including the offshore segment, the LFC facility, and the onshore segments—because the Pipeline is a single, continuous system engaged in interstate transportation. The LFC facility functions as a midstream processing point within that integrated system. The crude oil processing and limited, temporary storage that occur there are contemplated by the PSA and do not take Sable's crude oil out of its intended interstate transportation from the OCS to Kern County.

Congress intended PHMSA's jurisdiction over crude oil in interstate "transportation" to be broad, and to encompass "***all*** aspects of ***any*** pipeline transportation in or affecting interstate commerce." S. Rep. No. 96-182, at 18 (1979) (emphasis added). The statutory definition of "pipeline facility" accordingly is not limited to the piping itself, but also recognizes that "a facility, a building, or

29

equipment" may be used in transportation. 49 U.S.C. § 60101(5). Similarly, the PSA recognizes that hazardous liquid may flow "through" certain types of facilities on its transportation journey. *See* 49 U.S.C. § 60101(22)(B). The PSA and its implementing regulations also include storage incidental to pipeline movement within the definition of "transportation." 49 U.S.C. § 60101(22); 49 C.F.R. § 195.2. The regulations further recognize storage tanks as components of a pipeline system when they "relieve surges" or "receive and *store* hazardous liquid *for reinjection and continued transportation*." 49 C.F.R. § 195.2 (emphasis added).

Temporary stops or processing steps thus do not terminate interstate commerce where they are "incidental to and supportive of continued movements." *Aircraft Serv.*, 985 F.3d at 1019; *see also Texaco Refin. & Mktg., Inc.*, 80 FERC ¶ 61,200, 61,804-05 (1997) ("[D]espite a stop in movement at one city, the shippers' intent was always to transport to their final destination so [] the transportation would be considered a single interstate trip."); *Guttman Energy, Inc.*, 161 FERC ¶ 61,180, at *12 (2017) (same). Thus, administrative determinations have concluded that a facility is "engaged in pipeline transportation subject to the Act" when it "receives hazardous liquids in transportation by pipeline, stores hazardous liquids incidental to their movement by pipeline, and transports hazardous liquids from the facility by pipeline." *In re ONEOK NGL Pipeline, L.P.*, 2016 WL 8315623, at *4 (DOT Oct. 12, 2016).

30

Similarly, when considering its own, narrower interstate jurisdiction, "FERC begins with the presumption that the fuel's entire journey is interstate commerce" when "fuel crosses state lines and subsequently moves within a state by pipeline." *Aircraft Serv.*, 985 F.3d at 1017 (citation omitted). The presence of a midpoint facility only surmounts that presumption if that facility "break[s] the continuity of interstate movement," "as determined by the original and persisting intent of the shipper." *Id*. at 1016; *see also Shell Oil*, 830 F.2d at 1064 ("[W]hether the pipeline is interstate or intrastate in this case turns on a disputed issue of fact—the shipper's intent."). A "break" in continued interstate movement in commerce only occurs if (1) "[a]t the time of shipment, there is no specific order being filled for a specific quantity . . . beyond terminal storage" at the midpoint, (2) the midpoint is "a distribution point or local marketing facility from which specific amounts of the product are sold," or (3) intrastate transportation is "arranged only after a sale or allocation from storage." *Aircraft Serv.*, 985 F.3d at 1017.

Here, there is no dispute that Sable intends to and does transport *all* of the SYU-produced oil to Pentland Station, so it is unsurprising that none of the three indicia of a break in interstate transportation are present at the LFC facility. The LFC facility is neither a "distribution" nor "marketing" hub for crude oil, and (when the Pipeline is flowing oil) the crude is not indefinitely stored in Las Flores Canyon awaiting some uncertain future sale. Indeed, the oil can only be transported to one

31

place—there are no connecting pipelines or other configurations allowing movement elsewhere. From the moment the oil leaves the offshore platforms, it is destined for delivery to buyers at Pentland Station.

The processing undertaken at the LFC facility is transportation-driven—*i.e.*, the processing supports the interstate movement of the crude oil from the OCS to its delivery point. At the LFC facility, the crude oil emulsion piped from the OCS is dehydrated, stabilized to meet pipeline specifications, and purified of contaminants to support further transportation and delivery. *See supra* at 9–11. These processes are characteristic of midstream facilities performing transportation-related functions. *See Pipeline Safety: Safety of Gas Transmission Pipelines; Midstream Facilities Frequently Asked Questions*, 85 Fed. Reg. 70,126 (explaining that midstream processing includes "treatment of products including, but not limited to dehydration, removal of contaminants by separation or filtration, [and] heating or cooling units that separate or purify products"). Separation and dehydration units—like those used to remove water and caustic compounds at LFC, *see supra* at 9–11—support safe transportation and thus are commonly part of interstate PHMSA-regulated facilities. *See, e.g.*, *PHMSA Letter of Interpretation to THUMS Long Beach Company*, PI-20-0008 (June 15, 2020) ("THUMS Letter") (recognizing the role of separation in aiding transportation and finding PHMSA jurisdiction over pipeline segments both before and after a facility performing separation of oil, gas,

and water).[12] Similarly, breakout storage tanks are explicitly mentioned as components of a pipeline system, *see* 49 C.F.R. § 195.2, so their presence does not suggest a break in interstate transportation.

The midstream separation/processing, incidental storage, and pumping activities at the LFC facility all fall squarely within transportation under the PSA. *See* 49 U.S.C. § 60101(5), (22); 49 C.F.R. § 195.2. At no point does crude oil pass through any "facility," "building," or "equipment" at the LFC facility that is beyond the scope of PHMSA's statutory jurisdiction, nor is the crude otherwise diverted from its intended interstate transportation from the OCS to Pentland Station.

> **3.  PHMSA's determination of an integrated, interstate pipeline is supported by substantial evidence**

PHMSA's conclusion in the Interstate Letter is not only factually correct and consistent with the PSA, it is supported by substantial evidence and is neither arbitrary nor capricious.

PHMSA decisions are reviewed under the arbitrary and capricious standard, which approximates the substantial evidence test "to the requirement of factual support" for the agency's decisionmaking. *See Nat'l Distribution Servs., Inc. v. DOT*, 650 F. App'x 32, 33 (D.C. Cir. 2016). The Interstate Letter was issued after a comprehensive jurisdictional audit of the entire Pipeline system, including a full

---

[12] Available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-20-0008.

review of legal, factual, and regulatory materials. Prior to issuing the letter, PHMSA evaluated: (i) the ownership and operational history of the Pipeline; (ii) the regulatory history of the Pipeline; (iii) applicable statutory and regulatory definitions; (iv) DOT guidance; and (v) the physical route and use of the system. *See supra* at 16–17; 1-CalER-000024; 1-SableSER-0022-46. PHMSA also conducted a site-specific investigation of pipeline facilities from December 9 through December 11, 2025, in addition to an earlier joint onsite inspection with OSFM. *See id.* PHMSA inspected the LFC facility, pump stations, and control systems, and it reviewed Sable's written procedures, operational records, and prior OSFM inspection materials. *See id.*

Based on this record, PHMSA reasonably concluded that segments CA-324 and CA-325 operate as a component of Sable's integrated pipeline system, which is properly regulated as an interstate pipeline. 1-CalER-000024-26. PHMSA's application of the PSA, its implementing regulations, and DOT guidance merit this Court's deference. *See Kisor v. Wilkie*, 588 U.S. 558, 563 (2019) (affirming *Auer* deference to agencies' reasonable readings of ambiguous regulations). It reflects the agency's expertise and constitutes a straightforward and technically-grounded interpretation of its own regulations. That Petitioners would weigh the evidence differently does not render PHMSA's determination arbitrary or unsupported. The relevant standard is whether the agency considered the relevant factors and

34

articulated a rational connection between the facts found and the determination made—which PHMSA did here.

### B. Petitioners' Arguments for OSFM Jurisdiction Over This Interstate Pipeline Fail

Petitioners' kitchen-sink challenge to PHMSA's exercise of its statutorily exclusive jurisdiction all fail. Petitioners first argue that the onshore segments must be considered in isolation, rather than as part of an integrated pipeline facility with the rest of the Pipeline; next, that the LFC facility divides the Pipeline into two separate pipelines; and finally, that the Consent Decree precludes PHMSA's exercise of its statutory jurisdiction. Each argument lacks merit.

#### 1. CA-324 and CA-325 are properly regulated as segments of the integrated, interstate Santa Ynez Pipeline

***The fact that the segments are within California is meaningless.*** California first asserts that segments CA-324 and CA-325 cannot be regulated as part of *any* interstate pipeline facility because they themselves start and end in California. Cal. Op. Br. at 25. Petitioners offer no support for this position, which is wrong. As explained above, courts look to the interstate character of the *pipeline system* as a whole, not just at one individual segment. *See supra* at 27–28. One could always artificially identify *any* individual segment of an interstate pipeline facility and say it is solely "within one state" (other than if the segment itself spans a border), but

that is not what determines whether those segments are part of an interstate pipeline facility.[13]

California's argument also contradicts the record in this case. As California elsewhere admits, at all times prior to 2016, segments CA-324 and CA-325 were regulated under PHMSA's exclusive jurisdiction specifically *as interstate pipelines* notwithstanding their unchanged start and end points. *See*, *e.g.*, 5-CalER-000894. The argument that the mere physical presence of the segment within California precludes interstate status fails at the threshold.

***Lack of FERC Tariffs is also irrelevant.*** California next argues PHMSA lacks jurisdiction because segments CA-324 and CA-325 are not currently subject to FERC tariffs. *See* Cal. Op. Br., at 25. This is wrong, too. As a threshold matter, this argument misses the critical point that, with respect to pipeline facilities involving the OCS, *PHMSA's jurisdiction is broader than FERC's*. FERC's authority extends only to transportation *between* "State[s]" or "Territor[ies]," and *excludes* the OCS. *Shell Pipeline Co. LP*, 157 FERC ¶ 61,158 (2016). PHMSA's jurisdiction, however, extends to transportation between "a place in a State and a place outside the State"

---

[13] PHMSA has previously rejected California's argument that the definition of "interstate hazardous liquid pipeline facility" should include only those specific pipeline segments or pieces of equipment that are situated outside of the facility's originating state. *See Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines*, 50 Fed. Reg. 39008, 39011 (Sept. 26, 1985).

and thereby encompasses "a pipeline that originates on the Outer Continental Shelf," regardless of FERC status. *See* 49 C.F.R. pt. 195, app. A, ex. 7. As a result, pipelines transporting oil from the OCS to a state may fall outside FERC's jurisdiction but *within* PHMSA's.

Further, contrary to California's assertions, while the presence of FERC tariffs may *support* an interstate designation, the absence of FERC tariffs does not *preclude* such a designation. FERC tariffs are but one of the factors that PHMSA considers which can suggest an interstate pipeline. *See* 49 C.F.R. pt. 195, app. A. PHMSA has never said it previously regulated CA-324 and CA-325 *solely* because of the FERC tariffs; that is an inference California appears to draw from PHMSA's 2016 letter allowing state regulation beginning on the date the FERC tariffs were cancelled. *See* Cal. Op. Br. at 44 (citing 5-CalER-000899). But California confuses correlation with causation. The FERC tariffs did not (and could not) *grant* PHMSA jurisdiction over CA-324 and CA-325. Rather, FERC tariffs and PHMSA jurisdiction *both generally apply* to interstate pipelines, and Plains' cancellation of its FERC tariffs in 2016 (in conjunction with the complete pause in oil transportation) also effectively withdrew Plains' previously stated and undisputed intent to operate CA-324 and CA-325 to transport oil in interstate commerce. *See*, *e.g.*, Cal. Op. Br. at 7-8 (acknowledging CA-324 and CA-325 "were planned to extend to other states"); *Aircraft Serv.,* 985

37

F.3d at 1016–17 (discussing the role of shipper's intent in identifying interstate pipelines).

California also gets the FERC history wrong. Before 2000, Plains operated segments CA-324 and CA-325 as part of an integrated pipeline system transporting crude oil from California to Texas. *All Am. Pipeline, L.P., FERC Tariff Nos. 4 & 5*, No. IS00-148-000 (FERC filed Feb. 18, 2000) (No. 20000224-0094).[14] In 2000, Plains disconnected the portions of the pipeline system that transported the oil out-of-state, but *maintained* its FERC tariff. *Id.* Segments CA-324 and CA-325 remained part of an interstate pipeline system—subject to both PHMSA and FERC jurisdiction—for 16 years after Plains confirmed that the segments did not themselves transport oil to another state outside of California. Only in 2016—when the onshore segments were no longer flowing oil—did PHMSA relinquish jurisdiction.

***The 2016 designation does not preclude the 2025 reclassification.*** California also argues that PHMSA's prior concurrence in the intrastate status of the segments (between 2016 and 2025) renders PHMSA's reevaluation arbitrary and capricious. *See* Cal. Op. Br. at 44. This, too, lacks merit. PHMSA properly reevaluated its

---

[14] Available at
https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20000224-0094.

statutory jurisdiction on changed facts in both 2016 (as discussed above) and 2025, when the entire Pipeline was under single ownership with the intent to operate as a single facility transporting crude oil from the OCS to Kern County. PHMSA has consistently exercised its exclusive federal jurisdiction over segments CA-324 and CA-325 whenever they are operating as part of an interstate pipeline facility (*i.e.*, prior to 2016 and from 2025). PHMSA's reevaluation of its jurisdiction as facts change is neither "rescinding a prior policy," Cal. Op. Br. at 53, nor functionally different from OSFM's own decision to accept state jurisdiction for the first time in 2016 despite the segments' previous regulation by PHMSA.

***PHMSA adequately explained its reasoning.*** Finally, California claims that PHMSA's basis for its jurisdictional reevaluation is "not explained," despite also finding fault with the "reason PHMSA articulates for its change in position." Cal. Op. Br. at 45-46. Environmental Petitioners similarly argue that the offshore and onshore segments were previously "regulated as separate 'pipeline facilities' *including by PHMSA*," and thus should remain separate. Env. Petitioner Op. Br. at 32 (emphasis in original).[15]  However, at all prior times when oil flowed through this

---

[15] This argument also ignores that both segments of the system were previously regulated as *interstate* for most of their history. There is no reason that two segments individually regulated as interstate in the past, now joined as a single system, cannot be jointly regulated as interstate.

pipeline system, the OCS platforms and LFC facility were owned by Exxon, whereas segments CA-324 and CA-325 were owned by Plains or its predecessor, so the LFC facility was a demarcation between one regulated entity and another.

That is no longer the case. The entire Pipeline is under the common ownership of a single regulated entity intending to operate—and actually operating—the Pipeline in interstate commerce. Petitioners assert, without support, that common ownership is irrelevant, but as analogous FERC precedent demonstrates, courts *do* consider common ownership in determining whether an integrated pipeline system exists. *See, e.g., Okla. Nat. Gas Co. v. FERC*, 28 F.3d 1281, 1286–87 (D.C. Cir. 1994) (denying petition for review where FERC determined, "[a]s a practical matter a branch line owned and operated by a single jurisdictional pipeline . . . is necessarily integrated into an interstate system, and hence inherently has the jurisdictional attributes which an unaffiliated, unintegrated branch line does not." (internal quotation marks and citation omitted)). And common ownership of course matters for evaluating Sable's intent—Sable's ownership of the entire system supports its intent to transport oil from the beginning point of its ownership (the OCS) to the end (Pentland Station in Kern County). *See Aircraft Serv.,* 985 F.3d at 1016–17.

Similarly, courts have held that the flow of hydrocarbons from an interstate source through a previously classified intrastate pipeline segment supports reclassifying that segment as interstate when the segments are under common

40

ownership. In *Louisiana Power & Light Co. v. Federal Power Commission*, 483 F.2d 623 (5th Cir. 1973), the Fifth Circuit held that portions of a pipeline system switched from intrastate to interstate status "[b]y virtue of the flow of interstate gas" into the system. *Id.* at 634. That flow of interstate gas turned the segment into "a local branch of an integrated interstate pipeline," especially considering its operation by a single entity. *Id.*

The two cases California offers as purported analogies are distinguishable. In *Williams Gas*, FERC reversed its prior decision of whether the gas lines in question were a "transportation pipeline" or a "gathering pipeline," even though the pipelines themselves had not changed, and attempted to justify that decision with argument that did not appear in the actual decisions. *See Williams Gas Processing-Gulf Coast Co. L.P. v. FERC*, 475 F.3d 319, 322 (D.C. Cir. 2006). Importantly, FERC's transportation/gathering distinction for gas pipeline segments depends on the *function* of the individual segment, so the *Williams Gas* court faulted FERC for not explaining what functional changes resulted in their reclassification. *See id.* Here, under the PSA, the interstate movement of oil is all that matters—not the transportation/gathering function of any individual segment. As the Interstate Letter explains, PHMSA properly evaluated whether the integrated Pipeline, under common ownership, was intended to be and actually engaged in interstate transportation of oil from the OCS to Kern County. 1-CalER-000024. PHMSA has

41

not subsequently advanced any new justification that does not appear in the Interstate Letter.

Second, California also asserts that PHMSA failed to "rebalance old facts" as required by *Organized Village of Kake v. USDA*, 795 F.3d 956 (9th Cir. 2015). *See* Cal. Op. Br. at 51. But unlike in *Kake*, the Interstate Letter does not "rest[] upon factual findings that contradict those which underlay [the agency's] prior policy." 795 F.3d at 968 (internal quotation marks and citation omitted). It is no contradiction to find, as PHMSA did here, that previously classified intrastate pipeline segments fall under federal jurisdiction once they are commonly owned and intended to be or actually operating as part of an integrated, interstate pipeline facility. PHMSA merely reapplied the same jurisdictional test to changed facts—and explained that rationale in the Interstate Letter. *See* 1 CalER-25; *see also, e.g., Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 954 (E.D. Wash. 1997) ("Plaintiff contends its Spokane tankage has been under EPA jurisdiction since it was built in 1954 and that defendant (DOT) now seeks to expand its jurisdiction to also cover this tankage. . . . DOT has not 'expanded' its jurisdiction. It is merely exercising jurisdiction it has always had under the HLPSA and accompanying regulations.").

Finally, rather than concretizing the 2016 determination for all eternity, regardless of changed circumstances, it is also worth considering that the 2016 intrastate classification may have been incorrect. *See Saulque v. U.S.*, 663 F.2d 968,

42

975 (9th Cir. 1981) (holding that agency "was not required to perpetuate [a] mistake" and may "change [its] opinion and position in this case in order to comply with the law"). For thirty years, during periods when the pipeline system transported crude oil to places outside California (pre-2000) and periods when the pipeline system transported crude oil produced on the OCS only to places within California (from 2000-2015), segments CA-324 and CA-325 were classified as interstate and subject to PHMSA jurisdiction. The 2016 letter re-classified the segments as intrastate without significant analysis. The Interstate Letter, by contrast, offers clear, reasoned analysis for the 2025 reclassification. Regardless of whether this brief non-operational interlude into intrastate pipeline status was correct or not, the jurisdictional answer is clear now, on this record—Sable owns and operates the Pipeline as an interstate pipeline.

### 2. The LFC facility does not bifurcate the Pipeline

Petitioners concede that the offshore segment of the Santa Ynez Pipeline (from the OCS to the LFC facility) is properly understood as interstate. So to win on their challenge, Petitioners must show that the Pipeline is actually *two* (or more) pipeline systems transporting oil—one pipeline that stops at the LFC facility and another that begins after the LFC facility. But nothing about the LFC facility's operations severs the integrated Santa Ynez Pipeline into separate PSA-regulated pipeline facilities.

***The LFC facility does not engage in production, refining, or manufacturing***. California first asserts, without factual support, that "activities like separation of different hydrocarbons and sulfur products or treatment of crude oil" fall outside the definition of "hazardous liquid pipeline facility" because they "are the kind of activities completed as part of "production, refining, or manufacturing." Cal. Op. Br. at 27-28 (quoting 49 U.S.C. § 60101(a)(22)). California does not specify which of those three they allege occurs at the LFC facility, but none apply, and California's argument is inconsistent with the PSA and its implementing regulations.

The LFC facility aids in the *transportation* of crude oil; it does not produce, refine, or manufacture it. *See supra* at 9–11.

First, the LFC is not engaged in "production." California's arguments ignore the statutory definitions, which define "production" as removing hydrocarbons from the ground and preparing them for initial movement into transportation. *See N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 90 (1963); 49 C.F.R. § 195.2. All crude oil at the LFC facility was previously produced offshore before entering the Pipeline, and no production or extraction occurs at the LFC facility. Separation— a key process undertaken at the LFC facility—is not a production function, particularly when performed downstream of extraction at the wells. PHMSA has limited the definition of "production facility" to equipment used in *extraction*, preventing operators from recharacterizing downstream processing as production.

44

49 C.F.R. § 195.2 ("To be a production facility under this definition, piping or equipment must be used in the process of extracting petroleum . . . from the ground[.]"); *see also* THUMS Letter, *supra*. The LFC facility is thus not a production facility.

Second, the LFC facility is not a refining facility. In the oil and gas industry, refining is a process "by which the physical or chemical characteristics of petroleum . . . are changed, exclusive of the operations of passing petroleum through separators to remove gas, . . . dehydrating petroleum and generally cleaning or purifying petroleum." Williams & Meyers, *Manual of Oil and Gas Terms* 1062 (Martin & Kramer eds., 19th ed. 2024) (defining "refiner"). Consistent with this understanding, PHMSA has advised that "separating a[] [hydrocarbon] mixture, where no chemical change takes place, is not refining but merely a processing function." *ONEOK*, 2016 WL 8315623, at *6. Other federal regulatory regimes define "petroleum refineries" as facilities "engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other products through distillation of petroleum or through redistillation, cracking or reforming of unfinished petroleum derivatives." 40 C.F.R. § 60.101 (Clean Air Act regulations). The separation, dehydration, and stabilization processes at the LFC facility do not alter the chemical identity of the crude oil or produce new petroleum products. The product entering and leaving the facility for

delivery at Pentland Station remains crude oil and thus it has not been "refined" within the meaning of the PSA.

Third, the LFC facility is also not a crude oil "manufacturing" facility. Manufacturing involves the creation of something new or distinct from raw materials. The LFC facility does not transform crude oil into a new product.[16] Rather, the LFC facility processes the produced oil to facilitate the Pipeline's intended purpose—the delivery of crude oil, and nothing else, to Pentland Station. This requires removing brine as well as the other hydrocarbons (such as butane, sulfur, or other separated constituents) from the oil. But those other outputs are incidental to the physical separation and stabilization steps necessary for safe transportation and delivery of crude oil through the Pipeline. The LFC facility does not manufacture a new product, and the crude oil entering and leaving LFC remains fundamentally the same commodity, confirming that the facility's role is transportation.

---

[16] The fact that natural gas is separated and sold separately does not impact the jurisdictional status of the crude oil pipelines. *See* 1-SableSER-0015-16; 1-SableSER-0078 ("The facility processes and stores crude oil and produced gas."). This is common for a facility immediately downstream of production where wells produce a mixture of hydrocarbons. *See, e.g., PHMSA Letter of Interpretation to THUMS Long Beach Company*, PI-20-0008 (Jun. 15, 2020). Unlike the crude oil, the natural gas exits the LFC and is delivered to a utility company. 1-SableSER-0015-17. While the additional processing functions related to the natural gas and other products may add operational complexity to the facility, the processing of the crude oil itself is clearly transportation related.

Petitioners are also wrong about the significance of including gas treatment in the statutory definition of "gas pipeline facility," without a similar reference to treatment in the definition for hazardous liquid pipelines. *See* Cal. Op. Br. at 32–33. This argument ignores the entirely different structure of the two definitions. The PSA defines "transporting gas" in much narrower terms, only encompassing "the gathering, transmission, or distribution of gas" by pipeline, or the movement of gas only through regulated gathering lines. 49 U.S.C. § 60101(a)(21)(A). By contrast, "transporting hazardous liquid" means *all* "movement of hazardous liquid by pipeline," with only clearly identified exceptions for movement through production, refining, or manufacturing facilities. *See id.* There is thus no need to include a reference to treatment—treatment is already included within the scope of hazardous liquid transportation, because it is not production, refining, or manufacturing.

***There is no "function" test under the PSA.*** Next, California manufactures a novel test that every component of an interstate pipeline facility must serve the same "function." Cal. Op. Br. at 28-29 ("[T]he LFC Facilities perform vastly different functions than CA-324/325."). But the regulations define a "pipeline or pipeline system" to include "*all* parts of a pipeline facility through which a hazardous liquid or carbon dioxide moves in transportation." 49 C.F.R. § 195.2 (emphasis added). That definition expressly encompasses components serving different functions, "*including, but not limited to*, line pipe, valves, and other appurtenances connected

47

to line pipe, pumping units, fabricated assemblies associated with pumping units, metering and delivery stations and fabricated assemblies therein, and breakout tanks." *Id.* (emphasis added). The definition precludes a component-by-component "function" test because even the different types of components referenced in the definition serve different functions. For example, a "breakout tank" serves a storage function and a "pumping unit[]" serves a propulsion function, but both are included within the definition of "pipeline or pipeline facility." 49 C.F.R. § 195.2. By California's flawed logic, the presence of a storage tank would split a single pipeline into multiple, distinct systems, but courts have long rejected efforts to "lop off" segments of an integrated interstate system to create artificial intrastate components. *La. Power & Light*, 483 F.2d at 635. Any contrary rule would contravene the "congressional intent not to exempt local segments of integrated interstate pipeline systems." *Id.* at 633.

At bottom, California loses sight of the relevant inquiry. Every component of the Pipeline facilitates Sable's intent to transport crude oil in interstate commerce from the OCS to Pentland Station. The very concepts of a "pipeline *system*" and "interstate pipeline *facility*" do not support California's stilted interpretation, and no court has ever applied or even recognized this made-up "function" test.

**Unified regulation of the Pipeline is consistent with congressional intent.**
California also asserts PHMSA's interstate determination is "inconsistent with the

48

purpose of the Pipeline Safety Act," because it would "effectively remove state jurisdiction over any connected pipeline," if that pipeline, through connected facilities, reached "federal waters or into another state." Cal. Op. Br. at 34-36. This hypothetical situation lacks merit—and is an invitation to a patchwork of conflicting state regulations. Congress gave PHMSA exclusive jurisdiction over interstate pipelines, and "intended to preclude states from regulating *in any manner whatsoever . . . .*" *Couser v. Shelby Cnty.*, 139 F.4th 664, 669 (8th Cir. 2025) (emphasis in original). The rule urged by California would contravene the "congressional intent not to exempt local segments of integrated interstate pipeline systems" from federal regulation. *La. Power & Light*, 483 F.2d at 633; *see also id.* at 635.

Further, California's argument is counter-factual and ignores PHMSA's basis for the Interstate Letter: unified ownership and operation of a single, integrated pipeline system engaged in interstate commerce. PHMSA did not claim the authority to daisy-chain *unrelated* pipelines and facilities until it reaches a border crossing; it designated a *connected* system operated by a single owner as a single, integrated facility engaged in interstate transportation. There is no evidence in the record of any pipeline in California (or anywhere else) operating the way California proposes, in which a single owner-operator is subject to regulation by PHMSA for the offshore portion of its pipeline but OSFM for the onshore portion. If any party invites a

49

slippery slope here, it is California—the arbitrary segmentation of interstate pipelines into many separate pieces could allow states to encroach into PHMSA's exclusive authority over pipelines in interstate commerce. *See La. Power & Light*, 483 F.2d at 635.

***Storage at the LFC facility is incidental to transportation.*** Finally, California asserts the storage tanks at the LFC facility cannot be incidental to transportation because they are regulated under other regimes. *See* Cal. Op. Br. at 27 n.6. California's reliance on classifications under the California Aboveground Petroleum Storage Act ("APSA") and the federal Spill Prevention, Control, and Countermeasure ("SPCC") program is misplaced.[17] Those regimes serve different statutory purposes and do not define the scope of the PSA. The fact that certain components of the LFC facility may be subject to other regulatory programs does not negate the facility's transportation-related functions or bear on the interstate character of the Pipeline. Otherwise, the existence of a non-PHMSA-regulated parking lot at the LFC facility would negate federal jurisdiction over the entire Pipeline, an absurd result not supported by logic or the law.

---

[17] The APSA is California's counterpart to the federal SPCC program, which is promulgated by the EPA under the Clean Water Act. The SPCC program establishes requirements to prevent oil discharges into navigable waters and adjoining shorelines. *See* 33 U.S.C. § 1321(j)(1).

50

Unsurprisingly, the SPCC regulations thus expressly provide that "[c]ompliance with this part does not in any way relieve the owner or operator" of compliance with other federal, state, or local requirements. 40 C.F.R. § 112.1. Courts have likewise held that overlapping EPA jurisdiction does not displace PHMSA authority under the PSA. *See Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 954 (E.D. Wash. 1997). Consistent with Congress's allocation of authority, the LFC facility's SPCC plan confirms that it "does not apply to the DOT regulated piping" at the facility. 1-SableSER-0080. Accordingly, the fact that certain components of LFC may be subject to other federal or state requirements has no bearing on whether the Pipeline is engaged in the interstate transportation of hazardous liquid.

### 3. The Consent Decree does not, and cannot, alter Congress's allocation of exclusive jurisdiction

The Consent Decree did not permanently fix the jurisdictional classification of segments CA-324 and CA-325, and California's suggestion that it could do so—against its *co-plaintiff in that case* and no matter the factually changed circumstances—is inconsistent with federal law. Neither judicial estoppel nor claim preclusion applies here, and neither doctrine bars Sable or PHMSA from advancing the correct interpretation of federal law.

California's facile statement that the Consent Decree "settles the question of who the regulator is for Lines CA-324/325," Cal. Op. Br., at 39, is inconsistent with

51

the law and the facts. Congress granted PHMSA exclusive authority over interstate hazardous liquid pipelines. An agency cannot waive, delegate, or alter an unambiguous statutory grant of exclusive jurisdiction without an act of Congress. *See Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 542 n.3 (D.C. Cir. 1988) ("Agency jurisdiction, like subject matter in the federal courts, cannot be achieved by consent of the parties."). There is a "presumption that when jurisdiction is conferred, a court may not decline to exercise it," a rule which "also holds for administrative agencies." *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 558 U.S. 67, 71 (2009). And an "agency is not entitled to contract its own jurisdiction by regulations or by decisions in litigated proceedings." *Marin-Rodriguez v. Holder*, 612 F.3d 591, 594 (7th Cir. 2010); *see also Hernandez v. Holder*, 738 F.3d 1099, 1102 (9th Cir. 2013) ("the originating statute . . . does nothing to . . . authorize the Board to diminish its own jurisdiction.").

Consent decrees are no exception, and "a district court may not approve a consent decree that conflicts with or violates an applicable statute." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (internal quotation marks omitted).

Moreover, the Consent Decree did not purport to *grant* jurisdiction over the segments to OSFM. Rather, as between two co-plaintiffs—California and the United States—the Consent Decree *acknowledged* the then-existing jurisdictional premise

(state regulation of non-oil-flowing segments within California and not under common ownership or operation with an interstate facility). Nothing in the Consent Decree purports to redefine *interstate* jurisdiction or to assign regulatory authority over *interstate* pipeline facilities to a state agency (both of which would violate the PSA). Nor does the Consent Decree address, let alone purport to resolve, the legal classification of segments CA-324 and CA-325 as interstate or intrastate. Accordingly, it has no preclusive effect on PHMSA's independent statutory authority to determine interstate status based on current operations.

Not only does the Consent Decree lack preclusive effect on its own terms, California's arguments with respect to judicial estoppel and claim preclusion also misapply those doctrines. Judicial estoppel does not apply against the government on the same terms as private litigants, particularly where significant policy interests are implicated. "[T]he Government may not be estopped on the same terms as any other litigant," because doing so can undermine the public interest in the enforcement of law. *Heckler v. Cmty. Health Servs., Inc.*, 467 U.S. 51, 60 (1984); *see also New Hampshire v. Maine*, 532 U.S. 742, 755 (2001) (recognizing that public policy considerations may justify permitting the government to change positions). Courts therefore routinely decline to apply estoppel where it would interfere with governmental enforcement authority. *See, e.g.*, *Heckler*, 467 U.S. at 66 (reversing

53

finding of estoppel and noting that the Government many not be estopped on the same terms as a private party).

Moreover, as above, the Consent Decree does not address whether segments CA-324 and CA-325 are interstate or intrastate, nor does it make any jurisdictional findings. It expressly preserves federal regulatory authority and does not purport to limit PHMSA's future jurisdictional determinations. Because the decree neither resolved nor foreclosed the jurisdictional issue, there is no inconsistency that could support estoppel.

California makes a similar argument based on claim preclusion, on the theory that Plains should have raised preemption as a defense in the Consent Decree action. *See* Cal. Op. Br. at 41. But it is entirely unclear how Plains could have asserted PSA preemption as a defense in the Consent Decree action, or why it would have had any reason to do so. PHMSA was a party to the Consent Decree action, the claims involved federal pipeline safety violations, and the pipeline segments were indisputably regulated as interstate pipeline facilities at the time of the Refugio Spill. "[A]ny [] preclusion of defenses must, at a minimum, satisfy the strictures of issue preclusion or claim preclusion." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020). Preclusion does not apply where, as here, the asserted defense could not have been raised in the prior action. *Littlejohn v. United States*, 321 F.3d 915, 920 (9th Cir. 2003).

Nor is there an identity of claims between this case and the Consent Decree action. Claim preclusion requires a "common nucleus of operative fact[s]." *Lucky Brand*, 590 U.S. at 412. The Consent Decree arose from a civil enforcement action addressing Plains' compliance with federal pipeline safety and environmental laws following the Refugio Spill in 2015. This case, by contrast, challenges PHMSA actions taken in 2025 under the APA and NEPA. The two matters involve distinct agency actions, different parties, different time periods, and different legal questions.

## II. THIS COURT LACKS JURISDICTION OVER THE SPECIAL PERMIT AND RESTART PLAN CLAIMS

This Court need not reach a merits determination with respect to the Special Permit and Restart Plan because it lacks jurisdiction to do so. The challenge to the Special Permit is moot as it expired months ago. Further, the Restart Plan Letter is not a reviewable final agency action because it is not an "order" under 49 U.S.C. § 60119(a)(1) and is committed to agency discretion. Finally, neither California nor the Environmental Petitioners have standing to challenge either action: California identifies only a non-cognizable "preemption" injury, and Environmental Petitioners lack *any* injury.

### A. The Special Permit Challenges Are Moot

"Where the activities sought to be enjoined have already occurred, and the . . . courts cannot undo what has already been done, the action is moot." *Nw. Res. Info.*

*Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995) (citation omitted); *see also Native Ams. for Enola v. U.S. Forest Serv.*, 60 F.3d 645, 646 (9th Cir. 1995). For that reason, "challenges to 'superseded,' 'expired,' or 'withdrawn' agency [actions] . . . are 'moot.'" *Wild Horse Educ. v. U.S. Dep't of Interior*, 2026 WL 483342, at *5 (D. Nev. Feb. 20, 2026). The Special Permit expired months ago. While Sable has voluntarily agreed to abide by the Special Permit conditions, it is not required to do so.

Were this Court to vacate the expired Special Permit, the situation would be unchanged: Sable has already chosen to follow the permit conditions even though the document lacks any legal force. Because the challenged directive itself has "no current effect or continuing consequences, . . . [the] challenge[s] to it [are] moot." *W. Radio Servs. Co. v. Glickman*, 113 F.3d 966, 974 (9th Cir. 1997). PHMSA has now proceeded through the ordinary process for a non-emergency special permit, which includes notice-and-comment and environmental review. *See* Request for Special Permit, 91 Fed. Reg. 8949 (Feb. 24, 2026). Petitioners may raise an appropriate challenge to a subsequently issued regular permit. But vacating (or sustaining) the expired, superseded Special Permit will have no effect; the challenges to it are moot.

## B. The Restart Plan Letter Is Not Reviewable

56

The Restart Plan Letter is not a reviewable PHMSA action under 49 U.S.C. § 60119(a). It arises solely from PHMSA's implementation of a judicially-entered Consent Decree and has no independent legal basis. Accordingly, it is neither subject to the APA nor subject to direct review in this Court of PHMSA " order[s]" under the PSA.

This Court only has original jurisdiction over petitions for "an order issued under" the PSA. 49 U.S.C. § 60119(a)(1). The Restart Plan fails that test. It is not required by statute or other federal law, but rather is a contractual framework embodied in the Consent Decree, subsequently entered by a federal district court as a judicial order. Because "[a] consent decree is a judicial act, rather than an agency act," "the APA is not applicable to . . . consent decree[s]." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 834 F. Supp. 2d 1004, 1013-14 (D. Haw. 2011), *aff'd*, 672 F.3d 1160 (9th Cir. 2012).

For similar reasons, PHMSA's decision to enter into the Consent Decree, and to adopt the Restart Plan process as part of it, is likewise unreviewable. *See N.Y.*

57

*State Dep't of L. v. FCC*, 984 F.2d 1209, 1214-15 (D.C. Cir. 1993) (agency decision to settle enforcement action is committed to unreviewable agency discretion).[18]

As a challenge to a Consent Decree requirement, rather than a challenge to an "order" under the PSA, this Court lacks jurisdiction under the APA. Indeed, the Consent Decree itself provides for an "exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree." 5-CalER-000637 . California cannot escape that agreement by shoehorning the Consent Decree into an inapplicable APA framework.

### C. Petitioners Lack Standing To Challenge The Restart Plan Letter And Special Permit

Petitioners must demonstrate the "irreducible constitutional minimum of standing": an injury-in-fact that is "actual or imminent, not 'conjectural' or 'hypothetical,'" traceable to the defendant's conduct, and redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation omitted). Because a direct petition for review approximates summary judgment, *see Entergy Ark., LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025), petitioners lack

---

[18] Although otherwise reviewable agency actions cannot be shielded from judicial review merely by embedding them in a consent decree, *see, e.g., Conservation Nw.*, 715 F.3d at 1188, that principle is inapplicable here where the Restart Plan exists only as a mechanism created by, and implemented under, the Consent Decree. No law or regulation requires the Restart Plan or requires PHMSA to review it.

58

standing if they "set forth no specific facts demonstrating" an imminent injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).

The Environmental Petitioners lack any "imminent" injury-in-fact, which "'must be *certainly impending*'" and not merely "'[a]llegations of *possible* future injury.'" *Id.* at 409. They assert that their members would be "directly harmed" by pipeline restart and point to eight attached declarations, *see* Env. Petitioners Op. Br. at 1, but those declarations merely make unsubstantiated assertions that there is some "risk of another oil spill." Declarations of Michael Lyons ¶¶ 9, 13-14, ECF 56.13; Maureen Ellenberger ¶ 12, ECF 56.10; Ken Hough ¶ 12, ECF 56.11 (same); Walter Edward Morton ¶ 11, ECF 56.15 (similar); Alex Katz ¶ 9, ECF 56.12. Other declarants—none of whom purport to have any expertise in pipeline safety—assert without evidence that an oil spill is inevitable. *See* Declarations of Brady Bradshaw ¶¶ 12, 14, ECF 56.9; Jeffrey Miller ¶ 17, ECF 56.14 (same); Tevin Schmitt ¶ 12, ECF 56.16 (similar). The Environmental Petitioners thus offer only "'conjectural

59

allegations of potential injuries'" that are insufficient for standing. *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023).[19]

California also lacks standing to challenge either the Restart Plan Letter or the Special Permit. The State "must demonstrate standing for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). California's sole asserted injury is an "interest in the continued enforceability of its own statutes." Cal. Op. Br. at 23.[20] But only the Interstate Letter—the document declaring that California's laws are preempted and thus preventing their "continued enforceability"—inflicts that harm. A preemption-based injury is thus neither traceable to the Restart Plan Letter and the Special Permit, nor redressable by their invalidation. Those petitions should be dismissed.

---

[19] Nor do the declarations demonstrate standing separate from the risk of an oil spill. The PHMSA actions at issue do not concern either offshore oil production at the SYU—which has been ongoing since last year—or pipeline repair activities. Harms arising from those actions are therefore neither traceable nor redressable. *See* Bradshaw Decl. ¶¶ 13, 15 (complaining about "[o]il production" at the SYU); Ellenberger Decl. ¶ 9 (injuries from construction). And to the extent the Schmitt Declaration attempts to claim a cognizable injury from alleged NEPA violations, "a bare procedural violation, divorced from any concrete harm, [cannot] satisfy the injury-in-fact requirement of Article III." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

[20] California only asserted one basis for standing and has thus "forfeited any argument that it has standing" via a different theory "by failing to raise such an argument in its opening brief." *Cedar Park Assembly of God of Kirkland, Wash. v. Kreidler*, 860 F. App'x 542, 544 n.3 (9th Cir. 2021).

## III. PETITIONERS' CHALLENGE TO THE SPECIAL PERMIT FAILS

Even were the Court to reach the merits of Petitioners' challenge to the Special Permit, that challenge fails. The Special Permit's narrow waiver of a single regulatory requirement is not inconsistent with pipeline safety, PHMSA acted well within its statutory authority in issuing the permit on an emergency basis and PHMSA's Environmental Assessment was sufficient under NEPA.

### A. The Special Permit's Narrow Waiver And Extra Conditions Are Consistent With Pipeline Safety

Environmental Petitioners improperly rely on extra-record materials to argue that PHMSA failed to consider reasonably foreseeable environmental impacts in issuing the Special Permit. *See* Env. Petitioner Op. Br., at 50-59. Environmental Petitioners' argument should be rejected on that basis alone. *See Rybachek v. EPA*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) ("Judicial review of agency actions should generally be confined to the original record upon which the actions were based." (internal citations omitted)).

Yet even if Environmental Petitioners could point to record evidence, their argument would be meritless because they use the wrong lens to judge PHMSA's decision. Absent a special permit, the Pipeline would be subject to the default PSA rules that apply to all interstate pipelines. Here, PHMSA's decision to issue the Special Permit should be upheld because PHMSA properly determined that

61

imposing additional requirements on the Pipeline in exchange for a narrow waiver of 49 C.F.R. § 195.452(h)(4)(iii)(H) was "not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A).

The Special Permit is narrow in scope and limited in purpose. As Petitioners admit, *see* Cal. Op. Br. at 58; Env. Petitioners' Op. Br. at 50, the Special Permit temporarily waived only a single requirement of the PSA, 49 C.F.R. § 195.452(h)(4)(iii)(H), in return for which it imposed enhanced safety conditions, including stricter limits on operating pressure and temperature, increased inspection frequency, more stringent repair criteria, and expanded requirements for validation, monitoring, recordkeeping, and reporting obligations. *See supra* at 18–21; 1-CalER-000001. In all other respects, the Pipeline remained and remains subject to the PSA and all applicable safety regulations. In issuing the Special Permit, PHMSA reasonably determined that this trade-off—a one-sided tradeoff in its many extra safety conditions for a single narrow waiver—addressed any risks and ensured an equivalent level of safety, as compared to the standard PSA rules.

Environmental Petitioners contend, without any supporting evidence, that the Special Permit is "plainly intended" to address "cathodic protection" under the Consent Decree, and that it "[f]ails to [e]nsure the [p]ipelines [h]ave an [e]quivalent [l]evel of [s]afety as [c]athodic [p]rotection." Env. Petitioner Op. Br., at 50. In so doing, the Environmental Plaintiffs go beyond the bounds of this case, asking this

62

Court to consider not whether PHMSA appropriately determined that the permit's conditions ensured that waiver of 49 C.F.R. § 195.452(h)(4)(iii)(H) was "not inconsistent with pipeline safety," but instead to weigh in on the requirements of the Consent Decree. Adherence to the terms of the Consent Decree, and indeed the enforceability of the Consent Decree itself, are currently being litigated in *United States v. Plains All American Pipeline, L.P.*, No. 20-cv-02415 (C.D. Cal.). Arguments about the Consent Decree are properly brought in that matter, and have no bearing on compliance with 49 U.S.C. § 60118(c)(1)(A).

PHMSA's determination fully complied with 49 U.S.C. § 60118(c)(1)(A). This is evidenced in part because it aligns with prior determinations by OSFM, which had substantially similar waivers before PHMSA assumed jurisdiction over segments CA-324 and CA-325. *See supra*, at 18. PHMSA reasonably exercised its expert judgment in concluding that the Special Permit is "not inconsistent with pipeline safety."

## B.  PHMSA Reasonably Exercised Its Emergency Authority In Issuing The Special Permit

"[U]nder the Administrative Procedure Act's deferential arbitrary-and-capricious standard . . . , a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180. The PSA authorizes PHMSA to issue a Special Permit

"without prior notice and comment" if the Secretary of Transportation determines, *inter alia*, that "it is in the public interest to grant the waiver" and "the waiver is necessary to address an actual or impending emergency involving pipeline transportation." 49 U.S.C. 60118(c)(2)(A). "[A]n emergency event may be local, regional, or national in scope and includes significant fuel supply disruptions[.]" 49 C.F.R. § 190.341(g).

PHMSA's Special Permit Analysis and Findings constituted a "[s]tatement of reasons" for issuing the Special Permit on an emergency basis that addressed each of the statutory factors. *See* 49 U.S.C. § 60118(c)(3); 1-CalER-000018. PHMSA explained that "[g]ranting this special permit is necessary to address the emergency declared by the President in Executive Order 14156." 1-CalER-000020. Relying on this Executive Order and additional analysis provided by Sable as part of the application, PHMSA determined that issuing the Special Permit "would enable and facilitate the special permit segments to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." 1-CalER-000020. PHMSA's determination was thus reasonable and supported by the record.

64

### C. NEPA Does Not Require Pre-Issuance Environmental Review For Emergency Actions

Petitioners incorrectly allege that PHMSA violated NEPA by failing to conduct environmental review before issuing the Special Permit. Env. Petitioner Op. Br. at 21, 62–66. Although NEPA generally requires preparation of an EIS or an EA, in exigent circumstances, full pre-decisional compliance may be excused where impracticable. *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 788-92 (1976) (identifying circumstances to excuse compliance with NEPA); *cf.* 42 U.S.C. § 4332 (directing federal agencies to implement NEPA "to the fullest extent *possible*" (emphasis added)); 49 C.F.R. § 190.341(c)(8) (PHMSA special permit regulations providing that applications should include "environmental analysis *where necessary*" (emphasis added)).

Here, PHMSA issued the Special Permit on an emergency basis, which does not require pre-issuance NEPA compliance. *See DOT's Procedures for Considering Environmental Impacts*, Order 5610.1D § 23 (July 1, 2025). Further, PHMSA did conduct a focused environmental assessment, concluding that the action was narrow in scope and would not result in significant environmental impacts. *See* 1-CalER-000020-21. This conclusion is supported by the fact that segments CA-324 and -325 have previously undergone substantial NEPA and state-level environmental review prior to initial construction and operation, including an EIS, as noted in California's

65

own brief. *See* 3-CalER-000376; Cal. Op. Br. at 7. The Court should defer to PHMSA's determination regarding environmental impacts, *see Seven Cnty.,* 605 U.S. at 185, particularly in the case of an emergency.

PHMSA also expressly stated that it would conduct a full EA as soon as practicable, consistent with agency guidance. *See* 1-CalER-000021. The full EA was completed in February 2026 and is publicly available. *See Environmental Assessment for Emergency Special Permit*, No. PHMSA-2025-1502 (Feb. 23, 2026).[21] Such arrangement is permissible under NEPA during emergency circumstances. *Valley Citizens for a Safe Env't v. Vest,* 1991 WL 330963, at *5 (D. Mass. May 6, 1991).

## IV. PETITIONERS' CHALLENGE TO THE RESTART PLAN LETTER FAILS

Petitioners' challenge to the Restart Plan likewise fails on the merits. PHMSA acted within its statutory authority and correctly determined that the Restart Plan should be approved. Petitioners' disagreement about how a Consent Decree-created submission should be judged does not establish error under the APA, particularly where the record demonstrates coordinated federal and state review and substantial safety safeguards.

---

[21] Available at: https://www.regulations.gov/document/PHMSA-2025-1502-0007.

### A. PHMSA Did Not Exceed Its Authority In Issuing The Restart Plan Letter

California has not met its burden under the APA to show that PHMSA's approval of the Restart Plan was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). California's core argument is that PHMSA lacked authority to enter the Restart Plan because OSFM, and not PHMSA, has jurisdiction over the Pipeline under the Consent Decree. This argument fails for the reasons explained *supra*, with respect to the Interstate Letter. *See supra*, at 25–56. If the Pipeline is properly classified as interstate, PHMSA's jurisdiction applies as a matter of federal law and cannot be constrained by the Consent Decree as California suggests. Further, as explained above, the Restart Plan arises from the Consent Decree, not from any independent requirement under the PSA. In any event, PHMSA has moved to terminate the Consent Decree,[22] and California has moved to enforce it.[23] The parties are actively litigating the applicability and continued effect of the Consent Decree in that district court proceeding. California's arguments concerning the Restart Plan and other Consent

---

[22] United States' Notice of Mot. to Terminate or Modify the Consent Decree, *Plains All Am. Pipeline*, ECF 49 (C.D. Cal. Mar. 30, 2026).

[23] *See* California Pl.'s Notice of Mot. and Mot. to Enforce Consent Decree, *Plains All Am. Pipeline*, ECF 55 (C.D. Cal. Apr. 13, 2026).

Decree requirements are properly addressed in that forum and do not establish that PHMSA violated the APA by issuing the Restart Plan Letter.

### B. Restart Is Consistent With Pipeline Safety And Supported By Extensive Safeguards

Environmental Petitioners' assertion that the Pipeline "may significantly affect wildlife, habitats, watersheds, and other resources," *see* Env. Petitioners' Op. Br. at 69, fails for the same reason as its argument with respect to the Special Permit: The Environmental Petitioners improperly rely on extra-record materials, and so their claim should be dismissed. *See Rybachek*, 904 F.2d at 1296. Moreover, this argument ignores the purpose and scope of the Restart Plan Letter. The Restart Plan is not a referendum on Pipeline operation. Instead, it is a contractual requirement to document completion of certain measures and specify the process for resuming oil flow. 5-CalER-000876-81. Sable's Restart Plan included these components, which is why PHMSA's approval was non-discretionary. *See* Dkt. No. 14.1 at 22–23; *see also* 1-SableSER-0141-42.

Moreover, Sable's Restart Plan documented the extensive repairs and improvements to segments CA-324 and CA-325 that have addressed the causes of the Refugio Spill and will prevent recurrence. *See* 3-CalER-000511-26; 1-SableSER-0141-42. These measures include repairs satisfying enhanced criteria beyond federal requirements. *See supra* at 18-19. And Sable's heightened safety

68

commitments are ongoing. For example, the Restart Plan and Appendix D of the Consent Decree describe in-line inspections after restart and attainment of "steady-state operation." 5-CalER-000878. These inspections use sensor-equipped tools to detect wall thinning, cracks, dents, and metal loss, to identify needed repairs and ensure safe operation. 1-SableSER-0064.

Importantly, Petitioners' argument ignores the congressional delegation of pipeline safety to PHMSA. Environmental Petitioners' speculation that the Pipeline cannot be operated safely under PHMSA's authority—even if this were the correct inquiry—lacks any basis in the record. PHMSA has actively regulated the Pipeline restart process and operation, including through review of restart plans and issuance of the Special Permit—with safety conditions mirroring prior state waivers. *See* 1-CalER-000022; 1-CalER-000001. This sustained regulatory oversight underscores that the system is functioning as intended to protect public safety and the environment.

### C. The Restart Plan Letter Did Not Require Public Comment Or NEPA Review

Finally, Environmental Petitioners are wrong that NEPA applies to the Restart Plan Letter. There is no statutory or regulatory requirement for public comment on the Restart Plan Letter. Implementation of a Consent Decree does not constitute a discretionary agency action triggering environmental review. *See* 28 C.F.R. § 61.4

(excluding Department of Justice enforcement actions and settlements, including consent decrees, from NEPA review); *Turtle Island,* 834 F. Supp. 2d at 1016 (explaining that consent decrees are judicial acts not subject to NEPA).

The Restart Plan Letter is an action "where the agency is without discretionary authority to consider the environment in its decision-making process." *Stand Up for Cal.! v. U.S. Dep't of Interior*, No. 216CV02681AWIEPG, 2021 WL 3418729 (E.D. Cal. Aug. 5, 2021); *see also* 42 U.S.C. § 4336e(10)(B)(vii); *Jamul Action Comm. v. Chaudhuri,* 837 F.3d 958, 964 (9th Cir. 2016) (holding that NEPA did not apply to non-discretionary federal decisions required to be made within 90 days of an application). Because PHMSA's role in implementing the Consent Decree is ministerial rather than discretionary, no NEPA review or public comment obligation attaches to the Restart Plan Letter.

## CONCLUSION

For the foregoing reasons, the petitions to review the Interstate Letter should be denied, and the petitions to review the Special Permit and Restart Plan Letter should be dismissed for lack of jurisdiction or, in the alternative, denied.

Alternatively, should the Court identify any deficiency in PHMSA's explanation or reasoning, the appropriate remedy would be remand without vacatur to allow PHMSA to further explain or supplement the administrative record while preserving the status quo.

Dated: May 11, 2026

Respectfully submitted,

By: /s/ Jessica Stebbins Bina
Jessica Stebbins Bina
jessica.stebbinsbina@lw.com
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5525

James W. Noe
jim.noe@hklaw.com
Rafe Petersen
rafe.petersen@hklaw.com
Ashley Akers
ashley.akers@hklaw.com
**HOLLAND & KNIGHT LLP**
800 17th Street N.W., Suite 1100
Washington, DC 20006
Tel: (202) 469-5525

Nicholas McDaniel
nmcdaniel@babstcalland.com
Lucille E. Wiesner
lwiesner@babstcalland.com
**BABST CALLAND CLEMENTS
AND ZOMNIR, P.C.**
505 9th Street NW, Suite 602
Washington, DC 20004
Tel: (202) 853-3455

*Attorneys for Respondent-Intervenors
Sable Offshore Corp. and Pacific
Pipeline Company*

71

## CERTIFICATE OF COMPLIANCE

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** Nos. 25-8059, 26-508

I am the attorney or self-represented party.

**This brief contains 15,068 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (*select only one*):

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):

    [ ] it is a joint brief submitted by separately represented parties;
    [X] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jessica Stebbins Bina
Date: May 11, 2026

72