Nos. 25-8059, 26-508

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*,

and

SABLE OFFSHORE CORP., et al.,
*Intervenors*.

On Petition for Review of Actions Taken by the
Pipeline & Hazardous Materials Safety Administration

**PETITIONERS' JOINT REPLY BRIEF**

| | |
|---|---|
| Linda Krop | Julie Teel Simmonds |
| Jeremy M. Frankel | David Pettit |
| Margaret M. Hall | Talia Nimmer |
| | |
| Environmental Defense Center | Center for Biological Diversity |
| 906 Garden Street | 2100 Franklin Street, Suite 375 |
| Santa Barbara, CA 93101 | Oakland, CA 94612 |
| Tel: (805) 963-1622 | Tel: (510) 844-7100 |
| lkrop@environmentaldefensecenter.org | jteelsimmonds@biologicaldiversity.org |
| jfrankel@environmentaldefensecenter.org | dpettit@biologicaldiversity.org |
| mhall@environmentaldefensecenter.org | tnimmer@biologicaldiversity.org |

*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

TABLE OF ACRONYMS AND TERMS.....................................................x

INTRODUCTION ....................................................................................1

RELEVANT POST-DECISIONAL DEVELOPMENTS ........................................2

    I.      PHMSA's Record Abuses and Violations of FRAP 16 and 17 ............2

    II.    Sable Restarted the Onshore Pipelines in Open Defiance of the Consent Decree, a State Court Injunction, and Federal and State Law. ..........................................................................5

ARGUMENT ..........................................................................................5

    I.      Petitioners Have Standing. ...................................................5

    II.    The Onshore Pipelines Are Under OSFM's Exclusive Jurisdiction. ........................................................................7

            A.    The Consent Decree Remains Dispositive...............................8

            B.    Respondents' Claims That the LFC Facilities Are a Transportation-Oriented "Pipeline Facility" Are Specious and Post-Decisional. .....................................9

                       1.    PHMSA's Post-Hoc Characterizations of the LFC Facilities Are Not Entitled to Deference and Confirm It Acted Arbitrarily....................................10

                       2.    Respondents' Rebranding of the LFC Facilities as "Midstream Processing Facilities" Is Unavailing.................................................11

3.      Respondents Mischaracterize the LFC Facilities as Transportation-Oriented. ..............................13

4.      Facilities Engaged in Refining, Manufacturing, and Production Cannot Be "Pipeline Facilities." ..........16

C.      Sable's Other Jurisdictional Theories Are Neither Invoked by PHMSA nor Tethered to the PSA. ........................16

D.      PHMSA's Characterization of the Facilities as a Single Pipeline Is Unprecedented. ......................................18

III.      Petitioners Are Entitled to Relief on Their ESP Claims. ...................21

A.      Petitioners' ESP Claims Present Ripe and Justiciable Issues. ..................................................................21

1.      The ESP Claims Are Not Moot Because Effectual Relief Remains Available. .............................22

2.      Even If Moot, the ESP Claims Are Capable of Repetition but Evading Review. ....................................23

B.      PHMSA Could Not and Did Not Properly Make the Required PSA Findings for the ESP. .......................................24

1.      There Is No Actual Emergency Justifying the ESP. ................................................................24

2.      The ESP's Purported "Narrow Scope" and Conditions Do Not Render It Consistent with Pipeline Safety. ............................................................25

3.      PHMSA's Sable-Friendly Public Interest Analysis Ignored Public Safety and Environmental Risks. ......................................................28

C.      Respondents Violated NEPA by Approving the ESP Without Conducting Environmental Review. ..........................29

ii

1.      The Asserted Emergency Does Not Absolve Respondents of Their NEPA Obligations. .....................29

2.      PHMSA's Scope of Review Is Improperly Narrow. ...................................................30

3.      Sable's Reliance on Prior Environmental Review Is Misplaced. ....................................30

4.      Respondents Cannot Rely on Subsequent Environmental Review to Cure Their NEPA Violation. ............................................31

IV.    The Restart Plan Is Reviewable and Unlawful. ..................................31

A.    This Court Has Jurisdiction to Address the Restart Plan Approval. .............................................31

B.    Approval of the Restart Plan Was a Discretionary Action Subject to NEPA. .......................................35

V.    The Court Should Vacate PHMSA's Approvals...............................37

CONCLUSION..............................................................39

CERTIFICATE OF COMPLIANCE...................................................40

# TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022)................................................................38

*Alaska Wilderness League v. Jewell*,
  788 F.3d 1212 (9th Cir. 2015)..............................................................36

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
  412 U.S. 800 (1973) (plurality opinion)...............................................19

*Brower v. Evans,*
  257 F.3d 1058 (9th Cir. 2001)..............................................................27

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ........................................................... 11, 16, 27

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012)................................................................38

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982) .............................................................................23

*Chafin v. Chafin*,
  568 U.S. 165 (2013) ....................................................................... 21, 23

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
  341 F.3d 961 (9th Cir. 2003)..................................................................7

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...............................................................................6

*Defs. of Wildlife v. Babbitt*,
  958 F. Supp. 670 (D.D.C. 1997) ..........................................................27

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  766 F. Supp. 3d 39 (D.D.C. 2025) .......................................................33

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022)................................................................34

*Flint Ridge Dev'l Co. v. Scenic Rivers Ass'n of Okla.*,
426 U.S. 776 (1976) ................................................................ 29, 30

*Forelaws on Bd. v. Johnson*,
743 F.2d 677 (9th Cir. 1985)................................................................36

*Friends of the Clearwater v. Dombeck*,
222 F.3d 552 (9th Cir. 2000)................................................................30

*Friends of the Earth, Inc., v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................6

*Greenpeace Action v. Franklin*,
14 F.3d 1324 (9th Cir. 1992)................................................................23

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ................................................................38

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010)................................................................11

*Jamul Action Comm. v. Chaudhuri*,
837 F.3d 958 (9th Cir. 2016)................................................................36

*Jones v. Gordon*,
792 F.2d 821 (9th Cir. 1986)................................................................36

*Kescoli v. Babbitt*,
101 F. 3d 1304 (9th Cir. 1996)................................................................22

*Laycock v. Kenney*,
270 F.2d 580 (9th Cir. 1959)................................................................29

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003)................................................................4

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ..................................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................ 11, 25

*N.Y. Cent. Sec. Corp. v. United States*,
287 U.S. 12 (1932) ...................................................................29

*N.Y. State Dep't of L. v. FCC*,
984 F.2d 1209 (D.C. Cir. 1993) ...............................................34

*Nat. Res. Def. Council v. EPA*,
38 F.4th 34 (9th Cir. 2022)........................................................39

*Nat. Res. Def. Council v. McCarthy*,
993 F.3d 1243 (10th Cir. 2021)..................................................36

*Nat. Res. Def. Council v. Winter*,
527 F.Supp.2d 1216 (C.D. Cal. 2008)........................................31

*Nat'l Wildlife Fed'n v. U.S. Dep't of Transp.*,
960 F.3d 872 (6th Cir. 2020)......................................................36

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024)........................................................25

*Nehmer v. U.S. Dep't of Veteran Affs.*,
494 F.3d 846 (9th Cir. 2007).......................................................8

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) .......................................25

*Nw. Env't Def. Ctr. v. Gordon*,
849 F.2d 1241 (9th Cir. 1988).....................................................21

*Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*,
56 F.3d 1060 (9th Cir. 1995)............................................. 21, 24

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005)....................................................................6, 7

*ONEOK Hydrocarbon, L.P. v. U.S. Dep't of Transp.*,
  No. 12-cv-660-JHP-FHM, 2013 WL 1412823 (N.D. Okla. Apr. 8, 2013) ... 32, 33

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015)................................................................ 38, 39

*Ruud v. U.S. Dep't of Lab.*,
  347 F.3d 1086 (9th Cir. 2003)......................................................................34

*S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*,
  796 F.2d 539 (D.C. Cir. 1986) ....................................................................18

*S. Utah Wilderness All. v. Dabney*,
  222 F.3d 819 (10th Cir. 2000).....................................................................12

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022)........................................................................4

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
  65 F.4th 1012 (9th Cir. 2023).........................................................................6

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ............................................................................ 29, 38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ...................................................................38

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
  834 F. Supp. 2d 1004 (D. Haw. 2011),
  *aff'd,* 672 F.3d 1160 (9th Cir. 2012) ..................................................... 34, 35, 36

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ...................................................................37

*Valley Citizens for a Safe Env't v. Vest.*,
  No. 91-30077, 1991 WL 330963 (D. Mass. May 6, 1991)...............................31

*Waterkeeper All. v. EPA*,
   140 F.4th 1193 (9th Cir. 2025)..................................................................25


**Statutes**

5 U.S.C. § 551(6) ..................................................................................................32

5 U.S.C. § 551(13) ................................................................................................33

5 U.S.C. § 706(2) ..................................................................................................37

5 U.S.C. § 706(2)(A).............................................................................................8

5 U.S.C. § 706(2)(C).............................................................................................8

42 U.S.C. § 4336e(10)(A).....................................................................................35

49 U.S.C. § 60101(a)(5)......................................................... 12, 13, 15, 17, 18

49 U.S.C. § 60101(a)(7)......................................................................... 17, 18

49 U.S.C. § 60101(a)(8)(B) ..................................................................................17

49 U.S.C. § 60101(a)(22)(A) ......................................................... 12, 15, 17, 18

49 U.S.C. § 60101(a)(22)(B) ................................................................................16

49 U.S.C. § 60112...................................................................................................32

49 U.S.C. § 60118...................................................................................................26

49 U.S.C. § 60118(c)(2)(A) ..................................................................................24

49 U.S.C. § 60118(c)(2)(B) ......................................................................... 22, 23

49 U.S.C. § 60119(a) ..................................................................... 31, 32, 33

49 U.S.C. § 60119(a)(3)........................................................................................33

## Rules

Fed. R. App. P. § 16(b) ................................................................................3

Fed. R. App. P. § 17(a) ...............................................................................3

Fed. R. Evid. 201(b) .................................................................................20

## Regulations

49 C.F.R. § 195.2 ......................................................................................15

49 C.F.R. §§ 195.551–195.563 ................................................................26

49 C.F.R. pt. 195, app. A ..........................................................................17

## Federal Register Notices

85 Fed. Reg. 70,124 (Nov. 4. 2020)................................................... 11, 12

## Executive Material

Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025)...................25

## TABLE OF ACRONYMS AND TERMS

| | |
|---|---|
| Approvals | The Challenged Emergency Special Permit and Restart Plan |
| Consent Decree | Consent Decree entered in *United States v. Plains All American Pipeline*, U.S. District Court for the Central District of California, No. 2:20-cv-02415 |
| DOT | Department of Transportation |
| EIS | Environmental Impact Statement |
| ESP | Emergency Special Permit |
| ILI | In-Line Inspection |
| LFC Facilities | Oil and Gas Facilities in Las Flores Canyon |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12 |
| OCS | Outer Continental Shelf |
| Offshore Pipeline | Subsea produced emulsion pipeline that extends from federal waters to the LFC Facilities |
| Onshore Pipelines | Pipelines CA-324 and CA-325, f/k/a Lines 901 and 903 |
| OS&T | Offshore Storage and Treatment Vessel |
| OSFM | California Office of the State Fire Marshal |

| PHMSA | Pipeline and Hazardous Materials Safety Administration |
|---|---|
| PSA | Hazardous Liquid Pipeline Safety Act, 49 U.S.C. §§ 60101–60143 |
| Record Motion | Petitioners' Motion to Complete and Supplement the Record and for Judicial Notice (Dkt. No. 56.1) |
| SYU | Santa Ynez Unit |

**INTRODUCTION**

At the core of this case is a jurisdictional dispute: are the Onshore Pipelines[1] inter- or intrastate facilities?

In their Opening Brief, Petitioners explain the fundamental flaw in PHMSA's "interstate" determination: the LFC Facilities are not a "pipeline facility," and thus cannot link together the Onshore and Offshore Pipelines into a single interstate pipeline. As Petitioners also point out, PHMSA did not even consider this issue below. Instead, it cursorily claimed jurisdiction it did not have, and then rushed the Approvals through, eschewing the reasoned decision-making, statutory findings, and environmental review required by law.

To salvage the Approvals, PHMSA employs a two-part strategy. First, *after* reviewing Petitioners' Opening Brief, it unilaterally supplemented the record with thousands of pages of documents. Then, together with Sable (collectively, "Respondents"), it attempts to, *inter alia*, rebrand the LFC Facilities as transportation-oriented; advance theories of jurisdiction that are post-decisional and untethered to the PSA; and sow doubt about the reviewability of the Approvals. But Respondents' efforts are as futile as they are improper: the Onshore Pipelines are, as a matter of law, *intra*state facilities. The Approvals are thus *ultra vires*, and PHMSA's decisions are otherwise pervasively flawed.

---

[1] All capitalized terms have the same meaning as in Petitioners' Opening Brief.

Nonetheless, PHMSA continues to assert authority over the Onshore Pipelines; Sable continues to operate under the Approvals; and the Approvals continue to shape ongoing litigation, regulatory oversight, and public safety and environmental risks. The Court should conclusively resolve the matter of jurisdiction in favor of the State; find that PHMSA acted in excess of authority, unlawfully, and arbitrarily; and vacate the Approvals.

## RELEVANT POST-DECISIONAL DEVELOPMENTS

I.     **PHMSA's Record Abuses and Violations of FRAP 16 and 17**

As early as January 16, 2026, Petitioners brought to PHMSA's attention that the record it certified was incomplete and inadequate to allow for meaningful judicial review. Teel Simmonds Decl. Ex. A, Dkt. No. 56.2. And indeed, it appeared to Petitioners that may have been by design—i.e., that PHMSA seized on the public's exclusion from the agency actions at issue to curate an unduly narrow and self-serving record. PHMSA rebuked Petitioners, and it did little, if anything, to investigate whether it had certified a complete record. *Id.* at Ex. B.

Left with a record that was shockingly deficient, Petitioners were forced to compile documents that were missing from the record and/or necessary to allow for meaningful judicial review, and to ask the Court to consider them via their Motion to Complete and Supplement the Record and for Judicial Notice (Dkt. No. 56.1) ("Record Motion"). PHMSA opposed.

2

Then came a marked escalation in PHMSA's record abuses: *after* Petitioners filed their Opening Brief, PHMSA began unilaterally supplementing the record, seemingly to aid in its defense. First, PHMSA announced it had "discovered" a new document that, conveniently, plugged a glaring hole in the record revealed by Petitioners' brief—i.e., the absence of *any* information regarding what occurs at the LFC Facilities, which is fundamental to the jurisdictional question presented here. PHMSA Opp'n at 3, Dkt. No. 63.1. Then, a week prior to filing its Answering Brief, PHMSA announced it had discovered 1,500 more pages of record documents, which later became 2,500 pages, and ultimately, close to 6,000 pages.

On May 9, 2026, PHMSA unilaterally supplemented the record with these new purported "record" documents—*quadrupling* the size of the record PHMSA had certified, and on which Petitioners had briefed this case. Revised Certification, Dkt. No. 77.1. It did so without seeking leave from the Court, without agreement from Petitioners, and, thus, in violation of the Federal Rules of Appellate Procedure. *See* Fed. R. App. P. §§ 16(b), 17(a) (after the record is certified, an agency can only add documents by (1) order of the court, (2) stipulation of the parties, or, perhaps, (3) an extension of time).[2]

---

[2] PHMSA has since found yet more record documents, which it added to the record on June 9, 2026—this time by Court order. *See* Dkt. No. 96. These documents were only produced to Petitioners yesterday, June 10, 2026.

At best, PHMSA's omission of, and subsequent unilateral supplementation of the record with, thousands of pages of documents was a result of its own gross negligence. At worst, PHMSA curated a self-serving record and then supplemented it post-hoc—with documents it may or may not have actually considered—to attempt to counter Petitioners' Opening Brief. In either case, PHMSA's indifference to its duty to prepare an accurate record has left Petitioners materially prejudiced.

Indeed, Petitioners have effectively "argued the case on a record different from the one the agency relied on"—and on which the agency argued its responsive brief. *Lowry v. Barnhart*, 329 F.3d 1019, 1025 (9th Cir. 2003). Moreover, with thousands of pages missing from the record, Petitioners were forced to rely on documents proffered under their Record Motion, thereby staking some of their arguments on the success of their motion.

To avoid delaying this case further, Petitioners have foregone requesting that the Court order new briefing. However, Petitioners ask that the Court consider PHMSA's record abuses as it evaluates their Record Motion and decides whether to grant PHMSA's record any "presumption of regularity." *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1177 (9th Cir. 2022).

4

**II.**     **Sable Restarted the Onshore Pipelines in Open Defiance of the Consent Decree, a State Court Injunction, and Federal and State Law.**

On March 13, 2026, the Secretary of Energy issued an order under the Defense Production Act that purported to sweep aside all impediments to Sable's restart project—whether federal or state, regulatory or judicial.[3] The next day, Sable restarted the Onshore Pipelines, openly defying the Consent Decree, Petitioners' injunction in Santa Barbara County Superior Court (Case Nos. 25CV02244 and 25CV02247), and federal and state law.

Sable's unlawful restart prompted a flurry of emergent litigation in both federal and state courts, bringing the total number of lawsuits involving Sable to over a dozen. In many of these cases, Sable has claimed, *inter alia*, that the Onshore Pipelines are *inter*state facilities and thereby asserted some variation of a preemption theory under the PSA. This Court's resolution of that jurisdictional question will thus have a material effect on a number of these pending cases.

## ARGUMENT

**I.**     **Petitioners Have Standing.**

Petitioners have established standing with injuries due to (1) the increased risk of oil spills, (2) procedural violations, and (3) pipeline repair activities,

---

[3] Sable's solicitation of this order is now the subject of a formal Congressional inquiry. *See* Letter from Congressional Delegation to Jim Flores, Chairman and CEO, Sable (May 27, 2026), https://www.schiff.senate.gov/wp-content/uploads/2026/05/ABS-Sable-DPA-letter.pdf.

contrary to Sable's arguments otherwise. *See* Sable Br. at 58–60, Dkt. No. 80.1. Petitioners need not "demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Instead, "a credible threat of harm" can be enough to establish injury. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1025 (9th Cir. 2023) (citation omitted).

Restarting the Onshore Pipelines without effective cathodic protection or necessary remediation creates an increased risk of harm, which Petitioners have adequately supported with declarations. *See Friends of the Earth, Inc., v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000) (sworn statements are sufficient to document injury in fact); Declarations of Bodell ¶¶ 94, 95 ("[F]uture operation under the ESP … is likely to result in another [pipeline] failure"); Lyons ¶¶ 9, 13; Ellenberger ¶¶ 10, 12; Morton ¶¶ 6, 11; Hough ¶¶ 7, 12; Katz ¶¶ 7–8; Bradshaw ¶ 14; Miller ¶¶ 17–18; and Schmitt ¶¶ 7, 10–11. This injury falls squarely in line with this Court's precedent, in which the increased risk of an oil spill has been found sufficient to demonstrate injury. *See Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005).

Further, PHMSA's failure to timely conduct a NEPA analysis results in concrete harm that "environmental consequences might be overlooked" in areas where Petitioners have interests, which is a cognizable injury for standing

6

purposes. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–72 (9th Cir. 2003) (citation omitted).

Finally, Petitioners' injuries from pipeline monitoring and repair activities are traceable to PHMSA's Approvals. *See* 1-ER-3–18 (the ESP mandates regular and extensive excavations); Declarations of Hunt ¶¶ 21–30, 37–38; Lyons ¶ 12; Ellenberger ¶ 9; Morton ¶ 10; Hough ¶ 9; and Schmitt ¶¶ 10–11. A favorable ruling would "alleviate" that harm, which demonstrates redressability. *Ocean Advocs.*, 402 F.3d at 860–61.

## II. The Onshore Pipelines Are Under OSFM's Exclusive Jurisdiction.

The jurisdictional inquiry here—whether the Onshore Pipelines are inter- or intrastate—turns on a relatively narrow question: are the LFC Facilities a "pipeline facility" under the PSA?

Because the answer to that question is "no," the PSA precludes a finding that the LFC Facilities form, together with the Onshore and Offshore Pipelines, a single pipeline that stretches from federal waters to Pentland Station. Instead, the Onshore Pipelines constitute a separate, *intra*state facility that begins and ends in state boundaries.

PHMSA, however, never addressed this question in making its jurisdictional determination. Respondents' attempts to do so now—by padding the record, rebranding the LFC Facilities as "midstream processing facilities," and

7

characterizing them as transportation-oriented—are not only post-decisional, but specious. The clear purpose of the LFC Facilities is to process oil emulsion into sales-quality crude oil and natural gases—*not* to facilitate pipeline transportation.

Mired in this inevitability, Sable advances two other theories to salvage PHMSA's interstate determination: (1) it intends to operate the Onshore Pipelines as part of an "integrated facility" in interstate commerce, and (2) a related theory of unified ownership. Neither theory has any basis in the PSA. Nor was either theory invoked by PHMSA.

In sum, the Onshore Pipelines cannot, as a matter of law, be considered *inter*state facilities; thus the Approvals exceeded PHMSA's jurisdiction. At the very least, on this record, PHMSA's jurisdictional finding was arbitrary and capricious. For both reasons, the Approvals must be set aside. 5 U.S.C. § 706(2)(A), (C).

### A.    The Consent Decree Remains Dispositive.

Petitioners maintain that the Consent Decree—a final judgment from which PHMSA cannot unilaterally excuse itself, *see Nehmer v. U.S. Dep't of Veteran Affs.*, 494 F.3d 846, 860 (9th Cir. 2007)—conclusively resolves the matter of jurisdiction in favor of the State and, in this regard, join in Part IV.B of the State's Reply Brief.

**B.**   **Respondents' Claims That the LFC Facilities Are a Transportation-Oriented "Pipeline Facility" Are Specious and Post-Decisional.**

Respondents claim, for the first time in their respective Answering Briefs, that the LFC Facilities are "midstream processing facilities" that merely facilitate transportation. Any other function of the facilities, they say, is purely incidental— including the production of sales-quality crude oil and natural gases. Accordingly, Respondents claim, the LFC Facilities are a "pipeline facility" that, together with the Onshore and Offshore Pipelines, form a "single, integrated pipeline."

In essence, Respondents argue—for the first time—that *this* is a "pipeline":



2-PHMSA-SER-148

9

Respondents' position is untenable. Their characterizations of the LFC Facilities, in addition to being post-decisional, are unsupported by the record and contrary to all available evidence.

> 1.  PHMSA's Post-Hoc Characterizations of the LFC Facilities Are Not Entitled to Deference and Confirm It Acted Arbitrarily.

As an initial matter, the record lacks any findings or explanation from PHMSA regarding how the LFC Facilities function, what their intended purpose is, or, more to the point, whether they constitute a "pipeline facility" for purposes of 49 U.S.C. section 60101(a)(5). Nor is there any indication that PHMSA even considered these questions. *See* 4-PHMSA-SER-686–710 (PHMSA's jurisdictional analysis did not review, for example, the dehydration, separation, or stabilization processes at the core of this inquiry).

Even more damning, PHMSA's jurisdictional analysis actually concluded that "[t]he Sable Offshore pipeline system consists of [the Offshore Pipeline] and [the Onshore Pipelines]"—i.e., not the LFC Facilities. 4-PHMSA-SER-686. In other words, despite the contrary position now espoused by PHMSA, the agency appears to have presumed that the LFC Facilities do *not* constitute, and are *not* part of, a "pipeline facility."

Accordingly, PHMSA's characterizations of the LFC Facilities, advanced for the first time in its Answering Brief, and corresponding conclusion that they constitute a "pipeline facility" are post-hoc rationalizations that are undeserving of

10

deference or, even, consideration. *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (Post-hoc rationalizations are "not part of our review."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action."). They "serve only to underscore the absence of an adequate explanation in the administrative record itself," *Locke*, 626 F.3d at 1050—an absence that, here, proves fatal to the Approvals.

Indeed, without *any* explanation in the record as to why the LFC Facilities constitute a "pipeline facility," or even an indication that PHMSA considered this pivotal issue, the Approvals are *per se* arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action …." (citation omitted)). Importantly, however, remanding to the agency for further consideration would be futile: the uncontroverted evidence before the Court confirms the LFC Facilities are not, as a matter of law, a "pipeline facility."

2. Respondents' Rebranding of the LFC Facilities as "Midstream Processing Facilities" Is Unavailing.

PHMSA joins Sable in an effort to rebrand the LFC Facilities as "midstream processing facilities," which Respondents claim, relying entirely on a *draft* agency document, are categorically "pipeline facilities." PHMSA Br. at 21, Dkt. No. 79.1 (citing 85 Fed. Reg. 70,124 (Nov. 4. 2020) ("Draft FAQs")).

11

Nowhere in the record are the LFC Facilities referred to as "midstream processing facilities." Rather, it appears that Respondents rebranded the LFC Facilities as such so they could advance this form-over-substance argument.

In any event, the Draft FAQs, released for comment in 2020, were abandoned and never finalized. As such, they are of no effect, lack persuasive value, and should be disregarded. *See S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 829 (10th Cir. 2000) (draft agency guidance is afforded no judicial deference).

But even if the Court were to consider the Draft FAQs—which are merely "explanatory in nature," and "not substantive rules"—it would find they do not support Respondents' cause. 85 Fed. Reg. at 70,125. All they purport to do is "delineate the boundary between pipeline transportation and a processing facility"—the latter of which, the guidance suggests, does *not* fall under PHMSA's regulatory oversight. *Id.* at 70,126 (Question 2). Indeed, the Draft FAQs actually indicate that a "processing facility" is separate and distinct from "pipeline transportation." *See id.*

To the extent the Draft FAQs can be read to suggest, as Respondents claim, that all "midstream processing facilities" are "pipeline facilities," such a construction is untethered to the statutory definition of the term—as explained below—which is perhaps why the guidance was abandoned altogether. *See* 49 U.S.C. § 60101(a)(5), (a)(22)(A).

12

3.     Respondents Mischaracterize the LFC Facilities as
Transportation-Oriented.

Regardless of what Respondents now call them, the LFC Facilities are not "used in transporting hazardous liquid"—which remains the pertinent inquiry here. 49 U.S.C. § 60101(a)(5). Rather, they have the distinct function of processing oil emulsion into sales-quality crude oil and natural gases.

The uncontroverted history here confirms as much. Recall that, prior to the LFC Facilities, all oil emulsion produced at the SYU was processed at an Offshore Storage and Treatment Vessel (OS&T) and transported by marine vessel. 2-PSE-366; 2-PSE-395–398. Then, in 1982, Exxon proposed moving that processing function onshore—i.e., to the LFC Facilities. 2-PSE-366. Importantly, this proposal *predated* the Onshore Pipelines. Hence, the proposal contemplated that, after treatment at the LFC Facilities, "[c]rude oil transportation w[ould]," as before, be "by marine vessel." *Id*.

Accordingly, *the LFC Facilities were designed without any regard for pipeline transportation, which did not yet exist*. They were intended simply to perform the same function as the OS&T before it, which was to process oil emulsion into sales-quality crude oil—*not* to facilitate pipeline transportation.

Respondents' post-hoc characterization of the facilities as transportation-oriented not only ignores this history, but it is unsupported by the record. For example, PHMSA claims that the free-water-knock-out system facilitates

13

transportation by removing corrosive impurities. PHMSA Br. at 23. But the only record documents it cites, 2-PHMSA-SER-149 and 4-PHMSA-SER-703, do not even explain what the free-water-knock-out system does. The same goes for the emulsion heating process: the record evidence PHMSA cites, 3-ER-376, does not suggest that it is intended to facilitate transportation. PHMSA Br. at 22. Rather, the record indicates its function is "crude dehydration," which is just the first step in creating a sellable product, irrespective of how it is ultimately transported. 2-PHMSA-SER-150. Likewise, regarding stabilization, the only record evidence PHMSA points to is an aerial photo from which it is impossible to draw the conclusions PHMSA reaches. PHMSA Br. at 23–24.

Additionally, PHMSA makes much of the storage tanks and pump station at the LFC Facilities, the former of which Respondents now refer to as "breakout tanks." This, too, is part of Respondents' post-hoc rebrand—previously, "Sable did not label the two LFC tanks as 'breakout tanks.'" Sable Br. at 10, n. 3; *see also* 1-FER-3 ("[T]he facility does not include breakout tanks."). In any event, that the storage tanks or pump station may be transportation-related does not help Respondents. Oil is only directed here *after* being taken out of transportation for

14

processing,[4] which is the point the Offshore and Onshore Pipelines become bifurcated. *See* 49 U.S.C. § 60101(a)(5), (a)(22)(A).

Respondents also fail to meaningfully address that, in addition to creating "treated and stabilized crude," the LFC Facilities manufacture oil emulsion into other products, like commercial grade natural gas, propane, butane, and sulfur. 2-PSE-376. Sable's writing off of these functions as "incidental" to pipeline transportation simply strains credulity, particularly in light of the history discussed above. Sable Br. at 46. Indeed, manufacturing sellable oil and gas products is the entire point of the facilities.

In sum, Sable cannot sell "oil emulsion"; it needs to be dehydrated, separated, and extensively treated to create a marketable product. As the history here reveals, *that* is the function of the LFC Facilities, and any purported effect they have on pipeline transportation is purely incidental.

---

[4] Again, dehydration, separation, and stabilization are not processes that propel or cause movement of oil emulsion through a pipeline. Opening Br. at 29-32. Thus, they are not used in "transportation"—i.e., in the actual "movement of hazardous liquid by pipeline." 49 U.S.C. § 60101(a)(22)(A); *see also* 49 C.F.R. § 195.2 (in defining "pipeline or pipeline system," describing infrastructure that is used in the movement of hazardous liquid by pipeline). Hence, there are no Part 195 Regulations that purport to regulate such processes.

4.      Facilities Engaged in Refining, Manufacturing, and Production Cannot Be "Pipeline Facilities."

Lastly, to prevail here, Respondents must *also* establish that the LFC Facilities are not "production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B). Petitioners maintain that the LFC Facilities engage in production, refining, and manufacturing, namely because they free oil emulsion of impurities (i.e., "refine") and create from that emulsion marketable products (i.e., "manufacture"). Respondents' protestations to the contrary are mistaken and post-decisional. *See, supra,* Part II.B.1 (on post-hoc rationalizations).

**C.      Sable's Other Jurisdictional Theories Are Neither Invoked by PHMSA nor Tethered to the PSA.**

Mired by the fact that the LFC Facilities cannot, on any record, be considered a "pipeline facility," Sable offers two additional theories in support of federal jurisdiction: the Onshore Pipelines are part of an integrated, *inter*state facility because (1) Sable intends to operate them as such in interstate commerce, and (2) all of the infrastructure here, which spans from the OCS to Pentland Station, is now under Sable's unified ownership.

As an initial matter, neither of these theories were invoked by PHMSA in its jurisdictional determination. *See* 1-ER-25–27. Thus, "the court is powerless to affirm the administrative action[s]" on these bases. *Burlington*, 371 U.S. at 169.

16

In any event, both theories are untethered to the PSA and lose sight of the pertinent inquiry here.

First, Sable posits that the determining factor in whether a pipeline facility is *inter*state or *intra*state is the intent of the operator, and specifically, whether the operator intends to use it to facilitate interstate commerce. Sable Br. at 28. But the PSA is unambiguous: whether a pipeline facility is interstate turns purely on its physical location. 49 U.S.C. § 60101(a)(7), (a)(8)(B); *see also* 49 C.F.R. pt. 195, app. A (The PSA "defines interstate liquid pipeline facilities by the more commonly used means of specifying the end points of the transportation involved."). If a pipeline facility begins and ends within state boundaries (like the Onshore Pipelines), it is by definition *not* interstate, 49 U.S.C. § 60101(a)(7), (a)(8)(B), and an operator cannot click its heels and make it so by invoking some subjective intent.

Nor does Sable's intent have any bearing on whether the Onshore and Offshore Pipelines form a single, continuous pipeline, as Sable appears to suggest. *See* Sable Br. at 30–31 (relying on inapposite authorities considering FERC's jurisdiction under the Interstate Commerce Act). The only pertinent inquiry under the PSA is, again, whether the intervening LFC Facilities constitute a "pipeline facility"—which is a question of physical function, not operator intent. 49 U.S.C. § 60101(a)(5), (a)(22)(A). In other words, Sable cannot will the LFC Facilities into

17

being a "pipeline facility," and it thus cannot will into existence its single integrated pipeline.

Second, Sable's unified ownership theory fails for the same reasons: what constitutes a "pipeline facility," and whether that facility is interstate, are determined by the facility's physical location and functioning. 49 U.S.C. § 60101(a)(5), (a)(7), (a)(22)(A). Who owns the facility is irrelevant.[5] *See* 49 U.S.C. § 60101(a)(5), (a)(7), (a)(22)(A)..

Lastly, both of Sable's theories were already rejected by, or are at least inconsistent with, existing case law that Sable fails to address. *See S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986) (lateral pipelines delivering oil from *inter*state pipeline were properly considered *intra*state, even though all lines were owned by single operator and were an "integral part of an interstate system").

### D. PHMSA's Characterization of the Facilities as a Single Pipeline Is Unprecedented.

In their Opening Brief, Petitioners point out that the Onshore and Offshore Pipelines have always been considered separate facilities. They also point out that PHMSA has never regulated the LFC Facilities, belying its newfound claim that they are a "pipeline facility" under its jurisdiction.

---

[5] Notably, these assets came under Exxon's common ownership in 2022, which did not then compel PHMSA to make an *inter*state determination. *See* 2-ER-70.

Although an agency has a duty to explain a departure from precedent, *see Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion), PHMSA does not address or rebut Petitioners' first point. As to the latter, PHMSA contrives four examples where it purportedly regulated the LFC Facilities. PHMSA Br. at 37–38. None, however, are demonstrative of the regulatory authority PHMSA now claims. While they suggest that PHMSA may have considered certain aspects of the LFC Facilities in ancillary contexts—e.g., assessing operator capability and investigating the 2015 spill—they do not show that PHMSA has ever regulated the *processing* functions of the facilities that render them non-transportation related.

Beyond PHMSA's historical treatment of *these* facilities, Sable suggests PHMSA's characterization finds precedent in a prior agency decision involving THUMS Long Beach Company. Sable Br. at 32 (citing *PHMSA Letter of Interpretation*, PI-20-0008 (June 15, 2020) ("THUMS Letter")). But Sable's reliance on the THUMS Letter is misplaced.

THUMS owns "nine subsea pipelines that transport a multi-phase crude oil, natural gas, and water mix from four man-made oil production islands," where it undergoes initial separation, to THUMS' onshore processing facilities (the "Pier J Facilities"), where it "undergoes final separation, processing, and dehydration … to yield sales-quality crude oil." THUMS Letter at 1.

19

At issue in the THUMS Letter was whether the nine subsea pipelines were exempt from Part 195 Regulations under 49 C.F.R. section 195.1(b)(5). *Id.* Because the subsea pipelines follow the point of first separation, PHMSA concluded that they were not exempt and thus fell under PHMSA's jurisdiction. *Id.* at 2.

Translated here, all the THUMS Letter suggests is that the Offshore Pipeline, which follows the point of first separation, 1-SableSER-18–20, is subject to the Part 195 Regulations—which Petitioners do not dispute. It has no bearing on the jurisdictional character of the *Onshore Pipelines*, or whether the LFC Facilities link the two into a single "pipeline facility."

What *does* bear on that issue, however, is how PHMSA treats the onshore pipelines that transport oil onward from the Pier J Facilities—the equivalent, in this analogy, of the Onshore Pipelines. While PHMSA regulates THUMS' offshore pipelines, *these onshore pipelines are intrastate pipelines under OSFM's exclusive jurisdiction*, which Sable fails to mention. *See* Letter from Alan Mayberry, PHSMA, to Ben Ho, OSFM (Apr. 19, 2018) (showing that the onshore pipelines are under OSFM's jurisdiction).[6]

---

[6] This agency document is judicially noticeable, *see* Fed. R. Evid. 201(b), and available at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/standards-rulemaking/pipeline/special-permits-state-waivers/58346/2018-0017-lod-grant-state-ca-thums-crc.pdf.

In other words, the THUMS project confirms that facilities conducting "separation, processing, and dehydration … to yield sales-quality crude oil"—like the LFC Facilities—mark a delineation point between pipeline facilities.

## III. Petitioners Are Entitled to Relief on Their ESP Claims.

### A. Petitioners' ESP Claims Present Ripe and Justiciable Issues.

The expiration of the ESP under which Sable continues to operate does not moot Petitioners' claims, as Respondents contend. PHMSA Br. at 42–45; Sable Br. at 55–56.

"The burden of demonstrating mootness is a heavy one." *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citations omitted). A claim "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id*. (citation omitted).

This case bears no resemblance to the "typical" cases Respondents cite, like *Northwest Resource Information Center v. National Marine Fisheries Service*, where the action "began and ended." 56 F.3d 1060, 1069 (9th Cir. 1995). Because the ESP continues to govern Respondents' conduct and is subject to renewal, the Court can grant effectual relief. Even if moot, the ESP claims are capable of repetition yet evading review.

21

1.  The ESP Claims Are Not Moot Because Effectual Relief
    Remains Available.

The ESP and its conditions remain at the center of an active controversy. After allowing the ESP to lapse, Sable committed to "abid[ing] by the [ESP] conditions" while it awaits a decision on a non-emergency special permit containing those same conditions. Sable Br. at 56; *see also* 1-PSE-50. In other words, during this interim period, Sable is effectively operating under the expired ESP—which Respondents suggest is a permitted, alternative form of compliance with the PSA. *See* 1-PSE-50; *see also* PHMSA, Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency (Jan. 12, 2026) ("Notice of Limited Enforcement").[7] This Court has found that effectual relief remains available and a case is not moot if a permit has expired, but "the same condition[s] [are] still in effect and continue[ ] to govern … operations." *Kescoli v. Babbitt*, 101 F. 3d 1304, 1309 (9th Cir. 1996).

Moreover, Sable retains the option to renew the ESP. *See* 49 U.S.C. § 60118(c)(2)(B). Thus, should PHMSA deny Sable's application for a non-

---

[7] Available at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2026-01/Notice%20of%20Limited%20Enforcement%20Discretion%20and%20Statement%20of%20Policy%20for%20Issuing%20Special%20Permits%20in%20Response%20to%20National%20Energy%20Emergency.pdf.

22

emergency special permit, or if the later permit is challenged and stayed, Sable can revert to the ESP by availing itself of the PSA's renewal procedures.

In short, Respondents cannot moot this controversy by engineering a gap in permitting while continuing to operate under the ESP's conditions. By holding the ESP unlawful, the Court would effectively enjoin Sable from relying on or renewing it, thereby affording Petitioners effective relief. *See, e.g., California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) ("[T]here is little practical difference between injunctive and declaratory relief."). Thus, Petitioners' challenge to the ESP is not moot. *See Chafin*, 568 U.S. at 172.

2.    <u>Even If Moot, the ESP Claims Are Capable of Repetition but Evading Review.</u>

PHMSA contends Petitioners' claims here will not recur while conceding its 60-day duration "make[s] it difficult to challenge … prior to its expiration." PHMSA Br. at 43 (citation omitted). To the contrary, "there is a reasonable expectation that the plaintiffs will be subjected to it again." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329 (9th Cir. 1992) (citation omitted). Sable could apply for renewal of the ESP—or even a new ESP—to plug its permitting gap or if its non-emergency special permit is delayed, denied, or challenged. *See* 49 U.S.C. § 60118(c)(2)(B).

That PHMSA has rarely issued ESPs is not determinative here. PHMSA has made clear it will wield emergency authorities aggressively to advance this

23

administration's energy agenda. 1-ER-4; 1-ER-21; *see also* Notice of Limited Enforcement.

PHMSA also asserts "review through the subsequent permit generally defeats the mootness exception." PHMSA Br. at 45 (citing *Northwest Resource*, 56 F.3d at 1070). But no subsequent permit has been issued, as PHMSA acknowledges. *See* PHMSA Br. at 45.

In sum, the ESP remains in effect, and these claims are not moot. Even if they were, the issues raised by the ESP are capable of repetition and thus require judicial review.

### B. PHMSA Could Not and Did Not Properly Make the Required PSA Findings for the ESP.

Respondents fail to demonstrate PHMSA properly made the three required ESP findings under 49 U.S.C. section 60118(c)(2)(A).

#### 1. There Is No Actual Emergency Justifying the ESP.

In their Opening Brief, Petitioners argue, *inter alia*, that PHMSA's "emergency" is not, as a matter of law, an "emergency" for purposes of the PSA. Respondents do not respond to this argument, which Petitioners maintain is dispositive.

Petitioners briefed two alternative arguments: even if cognizable under the PSA, PHMSA's "emergency" here is fabricated and, in any case, would not be ameliorated by the ESP. Opening Br. at 41–50, Dkt. No. 53.1. In this regard,

24

Respondents assert PHMSA reasonably relied on Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025), and an expert report submitted by Sable "identifying how the permit is necessary to implement the Executive Order." PHMSA Br. at 54; *see also* Sable Br. at 64. However, PHMSA's blanket invocation of the Executive Order did not satisfy its *independent* obligation to "examine the relevant data and articulate a satisfactory explanation" as to why an emergency exists and why the ESP is necessary to address it. *Waterkeeper All. v. EPA*, 140 F.4th 1193, 1214 (9th Cir. 2025) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43); *see also Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("carr[ying] out a presidential directive" does not insulate agency actions from APA review); *New York v. Trump*, 811 F. Supp. 3d 215, 235 (D. Mass. 2025) (an agency cannot claim to have fulfilled its statutory duties "whenever it acts pursuant to a presidential command").

> 2. The ESP's Purported "Narrow Scope" and Conditions Do Not Render It Consistent with Pipeline Safety.

First, Respondents attempt to characterize the ESP as "narrow in scope," limited to one PSA requirement that "poses little risk," and thus consistent with pipeline safety. PHMSA Br. at 47; Sable Br. at 62. This mischaracterization underplays the Onshore Pipelines' pervasive design flaws that caused the 2015 spill, continue to pose a significant risk, and are the reason the PSA and Consent Decree mandate Sable to seek waivers to restart. *See* Opening Br. at 50–56.

Elsewhere Respondents admit Sable sought the ESP for "the limited effectiveness of cathodic protection" and because "OSFM had approved similar waivers before PHMSA assumed jurisdiction." PHMSA Br. at 13–14; *see also* Sable Br. at 18–19. In fact, Sable's application for the ESP expressly states that it seeks a waiver due to the limited effectiveness of cathodic protection. 2-ER-42; *see also* 2-ER-29.

Respondents' attempt to narrow the focus of the waiver is inconsistent with the application. Nor is it consistent with the Consent Decree or PSA, which require a waiver to address the limited effectiveness of cathodic protection on the Onshore Pipelines. *See* 49 U.S.C. § 60118; 49 C.F.R. §§ 195.551–195.563; 2-ER-294.

Second, Respondents claim the ESP is consistent with pipeline safety because its conditions are stricter than the PSA requires. PHMSA Br. at 47; Sable Br. at 62. This again obscures that the Onshore Pipelines require a waiver precisely because their design flaws render them susceptible to pervasive corrosion and thus at odds with the PSA. The pipelines' defects remain unaddressed. Opening Br. at 50–55. Additionally, the ESP is less safe than OSFM's Waivers, as PHMSA essentially concedes but does not explain. PHMSA Br. at 50–51 (arguing instead it must be afforded the discretion of relying on its own experts). As emphasized in *Burlington*, "courts may not accept appellate counsel's *post hoc* rationalizations for

agency action"; the action must "be upheld, if at all, on the same basis articulated in the order by the agency itself." 371 U.S. at 168–69.

Finally, the bulk of PHMSA's argument is spent pleading for deference. PHMSA Br. at 49–51. Its brief frames the ESP's cursory "analysis and findings" (1-ER-19–22) as scientific determinations warranting deference rather than simple findings of fact. PHMSA Br. at 51. PHMSA's "scientific analysis" on pipeline safety constitutes one paragraph stating it "reviewed the conditions proposed by Sable and determined that compliance with those conditions … provide an equivalent level of safety." 1-ER-20. Such blanket conclusions do not constitute reasoned analysis under the APA, let alone scientific and technical analyses warranting heightened deference.

As this Court has held:

> The deference accorded an agency's scientific or technical expertise is not unlimited …. The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned.

*Brower v. Evans,* 257 F.3d 1058, 1067 (9th Cir. 2001) (citing *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997); *see also Burlington,* 371 U.S. at 167 ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence.").

27

PHMSA has not met these burdens, and operating these pipelines as envisioned by the ESP is inconsistent with pipeline safety. Opening Br. at 50–56; 1-PSE-125, 225–226; 2-PSE-277; Bodell Decl. ¶¶ 69–88, 94, 95.

### 3. PHMSA's Sable-Friendly Public Interest Analysis Ignored Public Safety and Environmental Risks.

Respondents argue the ESP was in the public interest because it ensured "uniform and continuous regulatory oversight" over the Onshore Pipelines. PHMSA Br. at 51; Sable Br. at 20. This argument is circular and self-serving. PHMSA seized the pipelines and created the threat to uniformity it now claims to be curing.

PHMSA further contends that restarting the Pipelines has the "potential" to strengthen "energy and economic security." PHMSA Br. at 53. Contrary to PHMSA's conclusory statements, the Pipelines will not markedly benefit statewide or national energy markets. Opening Br. at 44. Moreover, PHMSA admittedly did not even consider numerous public interest considerations that outweigh these speculative benefits. For instance, it did not consider the likelihood of another spill, which could cause vast environmental degradation and economic losses; the sensitive habitat and recreational risks from the extensive excavations the ESP requires; or the pollution from restarting the Onshore Pipelines. PHMSA Br. at 51–53; 1-ER-20. PHMSA's narrow and arbitrary consideration of the public interest ignores the PSA's primary purpose of protecting the public and environment, 49

28

U.S.C. § 60102, and inappropriately elevates Sable's interests above the public's. *See N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (in interpreting a statutory "public interest" criterion, courts look to "[t]he purpose of the Act, the requirements it imposes, and the context of the provision in question"); *Laycock v. Kenney*, 270 F.2d 580, 592–93 (9th Cir. 1959) (similar).

PHMSA's slanted public interest analysis only considers oil and Sable, not public safety and the environment, and is thus arbitrary and capricious.

**C.      Respondents Violated NEPA by Approving the ESP Without Conducting Environmental Review.**

1.      The Asserted Emergency Does Not Absolve Respondents of Their NEPA Obligations.

As explained in Petitioners' Opening Brief, there were no "*immediate emergency* actions necessary to protect the lives and safety of the public or protect valuable resources." 2-ER-99 (DOT Order 5610.1D § 23) (emphasis added)). PHMSA's assertion that its determination deserves blanket deference is unsupported. *Seven County* is distinguishable because there the agency *did* conduct NEPA review prior to its decision and, in fact, prepared an Environmental Impact Statement (EIS). *Seven Cnty. Infrastructure Coal. v. Eagle Cnty*., 605 U.S. 168, 194–95 (2025). Sable's reliance on *Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776 (1976), is also misplaced. There, the Court held that a 30-day deadline in the Disclosure Act resulted in an "irreconcilable and

29

fundamental conflict" that precluded the government from preparing an EIS. *Id*. at 788–89. Here, there is no such statutory conflict, and the Court should reject PHMSA's arguments for skipping NEPA in its rush to issue the Approvals.

2. PHMSA's Scope of Review Is Improperly Narrow.

As noted above, Respondents' assertion that the permit "only waived the regulation requiring Sable to remediate corrosion along longitudinal pipeline seams" is false and misleading. PHMSA Br. at 56. Indeed, Sable admitted that the cathodic protection system "across the entire CA-324 and CA-325A/B pipeline segments" is not effective and that "the pipeline remains at risk of corrosion under insulation." 2-ER-36. Environmental review is thus required to evaluate the impacts of operating without effective cathodic protection.

3. Sable's Reliance on Prior Environmental Review Is Misplaced.

Sable's reliance on the 1985 EIS fails to acknowledge that the EIS was predicated on installation of an effective cathodic protection system that would minimize the risk of an oil spill. 3-CalER-000379. Because the project has now been changed to allow the Onshore Pipelines to operate without such system, PHMSA was required to conduct new or supplemental environmental review. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557–58 (9th Cir. 2000) (agencies must prepare a supplemental EIS if new information shows that the action will affect the quality of the human environment "in a significant manner or

to a significant extent not already considered" (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)).

> 4. Respondents Cannot Rely on Subsequent Environmental Review to Cure Their NEPA Violation.

Sable cites an out-of-circuit district court case for the proposition that post-hoc environmental review is permissible under NEPA in emergencies. *Valley Citizens for a Safe Env't v. Vest*, No. 91-30077, 1991 WL 330963, at *5 (D. Mass. May 6, 1991). There the court upheld the Air Force's determination that the crisis in the Middle East required the military to conduct twenty-four-hour operations to provide critical supplies to American troops. *Id*. No similar military emergency exists here. Moreover, the Central District Court for California has rejected a similar attempt to invoke emergency procedures under NEPA and prepare an after-the-fact EIS. *Nat. Res. Def. Council v. Winter*, 527 F.Supp.2d 1216, 1228–32 (C.D. Cal. 2008). For these reasons, PHMSA was required to conduct environmental review before approving the ESP.

## IV. The Restart Plan Is Reviewable and Unlawful.

### A. This Court Has Jurisdiction to Address the Restart Plan Approval.

Respondents wrongly claim that the Restart Plan is not subject to review under 49 U.S.C. section 60119(a), which provides for jurisdiction in this Court over, *inter alia*, "order[s] issued under" Chapter 601 of the PSA.

31

First, Respondents incorrectly argue that the Restart Plan is not an order issued under Chapter 601 because it is a creature of the Consent Decree. PHMSA Br. at 57; Sable Br. at 57–58. However, the requirement for a Restart Plan actually originates from a Corrective Action Order that PHMSA issued to Sable's predecessor, 2-PHMSA-SER-7, which was subsequently amended, 1-FER-4–28, and eventually "merged into th[e] Consent Decree," 2-ER-310. That order, as amended, was explicitly issued under the PSA, invoking 49 U.S.C. section 60112, and mandated the Restart Plan as a corrective action. 2-PHMSA-SER-2. Accordingly, the Restart Plan was required by, and approved pursuant to, PHMSA's authority under 49 U.S.C. section 60112.

The Restart Plan also qualifies as an "order." *See* 49 U.S.C. § 60119(a)(1). While the PSA does not define this term, the APA's definition is instructive: "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). The Restart Plan readily meets this definition as a final disposition granting Sable authorization to operate the Onshore Pipelines. *See ONEOK Hydrocarbon, L.P. v. U.S. Dep't of Transp.*, No. 12-cv-660-JHP-FHM, 2013 WL 1412823, at *3–5 (N.D. Okla. Apr. 8, 2013) (using the APA to inform interpretation of the term "order" under 49 U.S.C. § 60119(a)).

32

Moreover, 49 U.S.C. section 60119(a) envisions judicial review of "final agency actions"—a broad category within which the Restart Plan certainly falls. Indeed, the provision is titled "[r]eview of regulations, orders, and *other final agency actions*," *id.* (emphasis added), and provides that "judicial review of *agency action* under this section shall apply the standards of review established in section 706 of title 5." *Id.* § 60119(a)(3) (emphasis added).

"Agency action" is likewise not defined in the PSA. But the APA defines it as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). "This definition is expansive and is meant to cover comprehensively every manner in which an agency may exercise its power." *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 49 (D.D.C. 2025) (citation modified). Accordingly, even if not an "order," the Restart Plan is nonetheless an "agency action" subject to review under 49 U.S.C. section 60119(a). *See ONEOK Hydrocarbon*, 2013 WL 1412823, at *4 (rejecting argument that appellate court lacked jurisdiction because PHMSA's decision was an "agency action," not a formal order or rule).

Even if the requirement to prepare a Restart Plan were triggered purely by the Consent Decree (which it was not), it would not be subject to review exclusively under its dispute resolution process, as Sable suggests. Instead, the subsequent approval of the Restart Plan is an independent agency action subject to

33

judicial review outside the confines of the Consent Decree. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 866, 867–69 (9th Cir. 2022) (finding agency's NEPA review on offshore well stimulation was a "final agency action" subject to judicial review even though the NEPA review stemmed from a settlement agreement). The cases Sable cites do not compel a different conclusion. Petitioners are not challenging the Consent Decree itself, as was at issue in *Turtle Island Restoration Network v. U.S. Department of Commerce*, 834 F. Supp. 2d 1004, 1010–14 (D. Haw. 2011), *aff'd,* 672 F.3d 1160 (9th Cir. 2012). Nor are Petitioners seeking review of an agency decision to settle an enforcement action, as was at issue in *New York State Department of Law v. FCC*, 984 F.2d 1209, 1214 (D.C. Cir. 1993).

Finally, the approvals of the Restart Plan and ESP hinge on the same or similar legal and factual issues, and thus review of the Restart Plan alongside the ESP helps avoid "inconsistency and conflicts between the district and appellate courts while ensuring the timely and efficient resolution of administrative cases." *Ruud v. U.S. Dep't of Lab.*, 347 F.3d 1086, 1090 (9th Cir. 2003) (where an agency decision is subject to review under two or more statutes, with one providing review in the court of appeals and the other providing review in the district court, an appellate court may rule on a petition seeking review of the entire decision if the claims are "inextricably intertwined").

34

### B. Approval of the Restart Plan Was a Discretionary Action Subject to NEPA.

Respondents argue that PHMSA's approval of the Restart Plan was not a major federal action because the Consent Decree provided specific criteria and thus the action was non-discretionary. To the contrary, PHMSA exercised "substantial Federal control and responsibility" over whether to approve, modify, or deny Sable's Restart Plan and was thus obligated to comply with NEPA. 42 U.S.C. § 4336e(10)(A).

The Consent Decree required PHMSA to exercise substantial discretion to determine whether the Restart Plan sufficiently addressed "the inadequate corrosion prevention" system on the Pipelines. 2-ER-312. Discretion was also required to determine the adequacy of patrolling, surveillance, control room enhancements, actions to prevent inappropriate valve changes, installation of additional safety valves and pressure sensors, and an appropriate in-line inspection schedule. 2-ER-310-312. Each of these determinations required the agency's independent analysis.

Notably, PHMSA admits the Consent Decree "does not mandate that PHMSA 'shall approve' any restart plan containing the required elements." PHMSA Br. at 59. Additionally, Sable cites *Turtle Island*, which recognized that a consent decree must not "unduly constrain the agency's discretion." 834 F.Supp.2d at 1020 (citation omitted). There, the court held that a consent decree requiring an

35

agency to prepare a new biological opinion necessarily provided it with discretion to impose additional terms to protect loggerhead sea turtles. *Id*.

The remaining cases cited by Respondents are irrelevant here because they addressed situations where agencies lacked discretion due to *mandatory language in underlying statutes*. *See, e.g. Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1224–25 (9th Cir. 2015) (NEPA review was not required for oil spill response plans because they were subject to non-discretionary requirements under the Clean Water Act); *Nat'l Wildlife Fed'n v. U.S. Dep't of Transp*., 960 F.3d 872, 879–80 (6th Cir. 2020) (same); *Jamul Action Comm. v. Chaudhuri,* 837 F.3d 958, 964 (9th Cir. 2016); *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1251 (10th Cir. 2021).

Here there are no congressionally mandated limitations on PHMSA's review of a Restart Plan. Notably, the Ninth Circuit has consistently held that courts should resist assertions of statutory conflict to uphold the Congressional mandate to apply NEPA "broadly" and "to the fullest extent possible." *Jamul Action*, 837 F.3d at 961, 964 (citing *Forelaws on Bd. v. Johnson*, 743 F.2d 677, 683 (9th Cir. 1985) (additional citation omitted); *Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986) (holding that it was possible (and thus required) for NMFS to comply with *both* the Marine Mammal Protection Act and NEPA).

36

In sum, approval of the Restart Plan was an inherently discretionary function, and there was no statutory impediment to PHMSA exercising that discretion. Thus, it was a "major federal action" for which PHMSA failed to conduct NEPA review.

## V.    **The Court Should Vacate PHMSA's Approvals.**

Should the Court find one or more of Petitioners' claims meritorious, the appropriate remedy is to vacate the Approvals. The only real question for the Court is whether to do so with or without remand.

If PHMSA lacks jurisdiction over the Onshore Pipelines—e.g., because they are *intra*state facilities—the appropriate remedy is vacatur *without* remand, as PHMSA lacks authority to take any further action regarding the pipelines. *See, e.g., United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (where agency action was *ultra vires*, vacating without remand). If, however, the Court determines that the Approvals were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," the appropriate remedy is vacatur *with* remand—not, as Respondents suggest, leaving the Approvals in place.

Where a court finds a violation of the APA, it "*shall ... set aside agency action.*" 5 U.S.C. § 706(2) (emphasis added). Accordingly, vacatur is the "presumptive remedy under the APA." *350 Montana v. Haaland*, 50 F.4th 1254,

37

1273 (9th Cir. 2022) (citation omitted). Remand without vacatur is allowed only in "limited circumstances," where (1) the violation is not serious (thus the agency's decision on remand is unlikely to change); and (2) vacating the agency action would result in disruptive consequences. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citing *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992, 994 (9th Cir. 2012)).

The errors underlying the Approvals—PHMSA's flawed jurisdictional analysis, improper invocation of emergency procedures, arbitrary findings under the PSA, and violations of NEPA—were serious and had a material effect on PHMSA's decisions. *See, e.g., Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and … public comment … is a fundamental flaw that 'normally' requires vacatur …." (citation omitted)); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (vacatur is necessary to address NEPA procedural violations because to do otherwise would "vitiate" the statute (citation omitted)).[8]

Vacatur is also necessary to prevent harm that may occur if Sable is allowed to operate the defective pipelines without further review. *See Pollinator*, 806 F.3d

---

[8] In *Seven County*, 605 U.S. at 185, the court remanded without vacatur because the agency prepared an EIS would not change its decision even "if it added more to the EIS." Here, in contrast, PHMSA failed to conduct *any* environmental review before issuing the Approvals.

38

at 532–33 (vacating EPA's registration of pesticide because leaving it in place "risk[ed] more potential environmental harm than vacating it"); *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022) (similar).

## CONCLUSION

Accordingly, Petitioners request that the Court (1) grant the Petition for Review; (2) determine that PHMSA exceeded the limits of its jurisdiction and authority, violated the PSA, and violated NEPA; and (3) vacate the Approvals.

Dated: June 11, 2026

Respectfully submitted,

s/ *Jeremy Frankel*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

39

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 25-8059, 26-508

I am the attorney or self-represented party.

**This brief contains 8,366 words,** including 25 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [X] it is a joint brief submitted by separately represented parties.
    [X] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ *Jeremy M. Frankel*        **Date:** June 11, 2026

40