No. 25-8059, 26-508
Argument Held: July 7, 2026

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,

*Petitioner*,

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, ET AL.,

*Respondents*

## PETITIONER'S SUPPLEMENTAL BRIEF

ROB BONTA
 *Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
 *Senior Assistant Attorneys*
 *General*
MYUNG J. PARK
VANESSA C. MORRISON
 *Supervising Deputy Attorneys*
 *General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
 *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
 *Attorneys for Petitioner*

July 20, 2026

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................... 1

Argument ........................................................................................... 2

    I.    *Flowers Foods* is Irrelevant to the Question of Whether Lines CA-324/325 Are Interstate or Intrastate Hazardous Liquid Pipeline Facilities ......................................................... 2

        A.    The Federal Arbitration Act Differs in Crucial Ways from the Pipeline Safety Act ........................................... 2

        B.    The Historical Understandings that Informed the Supreme Court's Interpretation of the FAA in *Flowers Foods* Have no Equivalent for the Pipeline Safety Act ........................................................................ 6

        C.    Processing at the LFC Facilities Interrupts "Continuous Carriage" and Breaks the Flow of Transport in Interstate Commerce. ................................ 8

        D.    The Text and Structure of the Pipeline Safety Act Indicate That the Pipeline Safety Act Does Not Reach the Outer Extent of the Commerce Clause ........ 13

        E.    PHMSA's Own Regulations Demonstrate the Key Difference Between the Pipeline Safety Act and FAA, Making *Flowers Foods* a Poor Analogy ............. 17

    II.    California Has Filed a Petition Challenging PHMSA'S New Jurisdictional Determination; Regardless, This Court Can Rule Now and Hold that PHMSA Illegally Asserted Exclusive Federal Jurisdiction over Lines CA-324/325 ......... 19

        A.    The Federalization Order and the Jurisdictional Determination Share the Same Factual Premise and Conclusion ................................................................... 20

        B.    The Jurisdictional Determination Does Not Negate the Case or Controversy Between California and PHMSA ................................................................... 22

**TABLE OF CONTENTS**
**(continued)**

                                                                **Page**

    C.    California Has Filed a Petition Challenging the
               Special Permit and this Court May Wait to Issue a
               Decision ........................................................................ 24

Conclusion .......................................................................... 24

# TABLE OF AUTHORITIES

**Page**

CASES

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*
249 U.S. 134 (1919).................................................................10

*Armster v. U.S. Dist. Ct. for Cent. Dist. of Cal.*
806 F.2d. 1347 (9th Cir. 1986) ................................................23

*Arrington v. Daniels*
516 F.3d 1106 (9th Cir. 2008) ..................................................16

*Burlaka v. Contract Transport Services LLC*
971 F.3d 718 (7th Cir. 2020) ....................................................12

*Clark v. Sweeney*
607 U.S. 7 (2025)......................................................................16

*Crescent Cotton Oil Co. v. Mississippi*
42 S. Ct. 42 (1921)................................................................9, 10

*Flowers Foods, Inc. v. Brock*
146 S. Ct. 1358 (2026)......................................................*passim*

*Goldberg v. Faber Industries*
291 F.2d 232 (7th Cir. 1961) ....................................................11

*Indep. Mining Co. v. Babbitt*
105 F.3d 502 (9th Cir. 1997) ....................................................16

*Kescoli v. Babbit*
101 F.3d 1304 (9th Cir. 1996) ..................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)....................................................................19

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*
595 F.Supp. 1255 ......................................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*.
545 U.S. 967 (2005).................................................................19

*Olympic Pipe Line Co. v. City of Seattle*
437 F.3d 872 ...........................................................................4

*Pulsifer v. United States.*
601 U.S. 124 (2024)................................................................14

*Rittmann v. Amazon.com, Inc.*
971 F.3d 904 (9th Cir. 2020) ..................................................16

*Roberts v. Levine*
921 F.2d 804 (8th Cir. 1990) ........................................9, 10, 11

*Robinson v. Shell Oil Co.*
519 U.S. 337 (1997).................................................................3

*Shew v. Southland Corp*.
370 F.2d 376 (5th Cir. 1966) ..................................................12

*Southern Pacific Pipe Lines Inc. v. U.S. Department of
Transportation*
796 F.2d 539 (D.C. Cir. 1986)............................................15, 16

*Sw. Airlines Co. v. Saxon*
596 U.S. 450 (2022)..................................................................4

*United States v. Chavez-Vernaza*
844 F.2d 1368 (9th Cir. 1987) ................................................16

**STATUTES**

9 U.S.C. § 1 ........................................................................2, 3, 4

## TABLE OF AUTHORITIES
### (continued)

Page

49 U.S.C.

  § 60101.................................................................................... 13

  § 60101(a)(7) ......................................................................3, 4, 14

  § 60101(a)(8) ....................................................................................3

  § 60101(a)(8)(A).........................................................................3, 4

  § 60101(a)(8)(B) ...............................................................1, 3, 4, 14

  § 60101(a)(22) .............................................................................5, 12

  § 60104(c) .............................................................................14, 15, 16

  § 60105.................................................................................14, 15, 16

### REGULATIONS

49 C.F.R. pt. 195 ...........................................................................17, 19

### FEDERAL REGISTER

50 Fed. Reg. 39,008 (Sept. 26, 1985) .....................................13, 17, 18

### OTHER AUTHORITIES

Black's Law Dictionary (6th ed. 1990) ...........................................5

Cyclopedic Law Dictionary (2d ed. 1922).......................................8

v

**INTRODUCTION**

*Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026), a recent decision interpreting the meaning of "interstate commerce" under the Federal Arbitration Act ("FAA"), has little relevance to the meaning of "interstate or foreign commerce" under the Pipeline Safety Act, 49 U.S.C. § 60101(a)(8)(B), because the two statutes have no overlap in subject matter, purpose, or regulatory scope, and have materially different definitions. The FAA governs the enforceability of private arbitration agreements whereas the Pipeline Safety Act regulates the transportation of natural gas and hazardous liquids through pipelines. In short, PHMSA's broad new interpretation of the scope of the Pipeline Safety Act's definitions based on *Flowers Foods* is not supported by the text of the statute, renders nonsensical the regulations interpreting "interstate pipeline facility," and if left to stand would erode Congress's intent for a "major role" for the states in pipeline safety.

The December 17, 2025, Federalization Order is not mooted by PHMSA's non-emergency special permit issued June 25, 2026 ("Special Permit"), that includes, as Exhibit 2, a "Jurisdictional Determination in Support of [the] Special Permit" ("Jurisdictional Determination"). Although PHMSA claims that the Jurisdictional Determination supersedes the Federalization Order, this Court is not bound to accept that assertion at face value and should independently assess that

1

claim because the Federalization Order has not been withdrawn, and because the Jurisdictional Determination merely built upon PHMSA's existing reasoning. Notwithstanding, there is no need to decide this issue because California has filed a new Petition for Review challenging the Special Permit.

## ARGUMENT

**I.**     ***FLOWERS FOODS* IS IRRELEVANT TO THE QUESTION OF WHETHER LINES CA-324/325 ARE INTERSTATE OR INTRASTATE HAZARDOUS LIQUID PIPELINE FACILITIES**

     **A.**     **The Federal Arbitration Act Differs in Crucial Ways from the Pipeline Safety Act**

*Flowers Foods* considered the scope of the Federal Arbitration Act's exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; *see* 146 S. Ct. at 1363. The question that the Court resolved was whether a worker who picks up and delivers a company's products within a single state qualified under that exemption. *Id.* The Supreme Court recounted a series of three prior cases that had rejected attempts at a narrow interpretation of that provision. *Id.* And the Court rejected a narrow definition in *Flowers Foods*, too, holding that "[a]t least sometimes, a worker who transports goods on an intrastate leg of an interstate journey can qualify for § 1's exemption" even though he neither "cros[s]es state lines" nor "interacts with a vehicle that does (say by loading or unloading the goods that it carries)." *Id.*

That decision about the FAA has little relevance to the Pipeline Safety Act provision at issue here. The two statutes contain one similar phrase: "foreign or interstate commerce" under the FAA, 9 U.S.C. § 1, and "interstate or foreign commerce" under the Pipeline Safety Act, 49 U.S.C. § 60101(a)(7) & (8). But the different statutes contain different definitions of interstate commerce, and those definitions differ from the meaning of interstate commerce under the Commerce Clause. *See Flowers Foods,* 146 U.S. at 1365 ("We do not mean to suggest that the scope of § 1 is coterminous with the scope of the Commerce Clause . . . ."). The meaning of statutory language must be "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Unlike the FAA, the Pipeline Safety Act specifically defines the term "interstate and foreign commerce."[1] Indeed, the Pipeline Safety Act sets out two *different* definitions of "interstate or foreign commerce," neither of which appears in the FAA. 49 U.S.C. § 60101(a)(8)(A) and (B). *See* Part I.C, *infra*. The definition that applies to gas pipelines is broader in that it encompasses not only commerce that is "between a place in a State and a place outside that State," but also commerce that "*affects*" commerce between a place in a State and a place outside

---

[1] The FAA defines "commerce" in 9 U.S.C. § 1. But it does not define "foreign or interstate commerce" as used in the exception construed in *Flowers Foods*.

3

of it. 49 U.S.C. § 60101(a)(8)(A). In contrast, the definition related to hazardous liquid is narrower, because it does not include the "affects" clause. 49 U.S.C. § 60101(a)(8)(B). Instead, it applies only to commerce "between a place in a State and a place outside that State" or commerce "between places in the same state through a place outside that state." *Id.*; *see also Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 n.15. This indicates an intent, with respect to hazardous liquids, to focus federal jurisdiction on questions of geography with no parallel in the FAA. *Cf. Flowers Foods*, 146 S. Ct. at 1363 (noting that *Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022), had already held that "an airline cargo worker who loaded and unloaded cargo fit within [the FAA's] exemption even though she did not fly planes or otherwise cross state lines").

Moreover, because the Pipeline Safety Act's term "in interstate or foreign commerce" modifies the term "used to transport," § 60101(a)(7), the focus is on where the pipeline is doing its "transport[ing]." That question is quite different from (under the FAA) asking where a "class of workers" is "engaged." 9 U.S.C. § 1. The Court in *Flowers Foods* recounted contemporaneous dictionary definitions, making clear that a person is "engaged" in an activity if she only "take[s] a part," *id.* (quoting Webster's New International Dictionary 725 (1913), or is in any way "involved," *Flowers Foods*, 146 S. Ct. at 1363 (quoting Black's Law Dictionary 661 (3d ed. 1933)). In contrast, dictionaries contemporaneous to

4

the Pipeline Safety Act show that to "transport" something meant "[t]o carry or convey [it] from one place to another." Black's Law Dictionary (6th ed. 1990). A person has not transported something "from one place to another" if he drops it halfway leaving another to complete the task. If the modification of the word "transport" was ignored and the *Flowers Foods* interpretation of the FAA were applied in this context, that would mean that a pipeline that runs exclusively from a storage tank in California to another storage tank in California a mile away, and where the hazardous liquid is transported in and out via truck on either end, would be deemed an "interstate" pipeline because the hazardous liquid exists in "interstate commerce." This cannot be the correct interpretation of the Pipeline Safety Act given that the word "transport" *is* a part of the statute and is the word that is being modified by the term "interstate commerce." It would also be contrary to Congressional intent, as discussed in Section I.D.

The context and structure of the Pipeline Safety Act provides yet another limiting concept not present in the FAA. The term "transporting hazardous liquid" is expressly defined to exclude moving hazardous liquid through certain types of facilities such as onshore production, refining, or manufacturing facilities. 49 U.S.C. § 60101(a)(22). This distinction is discussed in Section I.C.

5

**B.** **The Historical Understandings that Informed the Supreme Court's Interpretation of the FAA in *Flowers Foods* Have no Equivalent for the Pipeline Safety Act**

In interpreting the FAA in *Flowers Foods*, the Supreme Court viewed applications of the Article I, § 8, Commerce Clause in cases preceding that statute's adoption as "probative evidence of what an ordinary person at the time of the FAA's enactment would have understood [engaged in interstate commerce] to mean." 146 S. Ct. at 1365. For instance, in 1871 the Court had stated that a steamer that operated entirely within one state but "'was employed in transporting goods destined for other States'" and therefore "'was engaged in commerce between the States.'" *Flowers Foods*, 146 S. Ct. at 1364 (quoting *The Daniel Ball*, 10 Wall. 557, 565 (1871)). And the Supreme Court in 1906 held that a salesman who never left Pennsylvania but "picked up goods shipped from out of state and delivered them to their final destination [in-state]" was similarly "'engaged in interstate commerce.'" *Id.* (quoting *Rearick v. Pennsylvania*, 203 U.S. 507, 510-513). Those statements preceding the FAA's enactment had relevance to the FAA's interpretation because the FAA used that same term, "engaged in interstate commerce." But the Pipeline Safety Act does not—and the conclusions *Flowers*

6

*Foods* drew about the FAA do not translate to the quite different statute at issue here.[2]

Instead, the historical understanding relevant to the Pipeline Safety Act's provisions is best evidenced by PHMSA's historical definition of Lines CA-324/325. Prior to the 2015 Refugio oil spill, PHMSA regulated Lines CA-324/325 as interstate pipelines *only* because they began at the Las Flores Canyon facilities ("LFC Facilities") and were slated to cross into Arizona and subject to a FERC tariff. *See* 3-CalER-376 (citing Celeron-All American EIR/EIS). Following the 2015 Refugio oil spill and the cancellation of the FERC tariff, Lines CA-324/325 were regulated as intrastate pipelines subject to OSFM's regulatory jurisdiction. 5-CalER-000899. At no time prior to 2015 were Lines CA-324/325 regulated as interstate on the ground that PHMSA now asserts—that they connect to the outer-continental shelf via the LFC Facilities. The Court should refuse to do so now, which would exclude state regulation of a wholly intrastate pipeline contrary to Congressional intent.

---

[2] *Flowers Foods* also quoted other cases preceding the FAA's enactment where it described various entirely in-state activities as "'part of . . . interstate commerce transportation'" or "'connected with interstate commerce.'" 146 S. Ct. at 1365. Those also bore on the question of who is "engaged" in interstate commerce, given the broad meaning of "engage." *See supra* p. 3. But the Pipeline Safety Act uses no similar term.

### C. Processing at the LFC Facilities Interrupts "Continuous Carriage" and Breaks the Flow of Transport in Interstate Commerce.

Even as to the FAA, the *Flowers Foods* opinion contains a significant limitation: a "continuous carriage" standard for whether intrastate activity is part of larger transportation of goods in interstate commerce. 146 S. Ct. at 1364 (though "a continuous carriage" may begin in one state and end in another, "much of the journey" can take place "within the limits of a single state"); *id.* ("[a] shipment from one state to another under a contract for continuous carriage is interstate commerce, even as to so much of the journey as is within the limits of a single state") (citing Black's Law Dictionary 1001 (3d ed. 1933)); Cyclopedic Law Dictionary 548 (2d ed. 1922)).

The LFC Facilities are a terminus of transportation. They provide a sufficient interruption to break up the "continuous carriage" of the emulsion that originated from the offshore platforms on the outer-continental shelf because the hazardous liquid being transported is not only taken out of a pipeline transportation system at the LFC Facilities, but processed into entirely different hazardous liquids at those facilities before those newly constituted liquids are then transported, *intra*state to Pentland Station. *See* California Opening Br. 8-9 and 27-30.

PHMSA has argued that the LFC Facilities do not break the chain of "continuous carriage" from federal waters offshore to Pentland, California, because

8

"[j]ust like the warehouse in *Flowers Foods*, the Las Flores Canyon facility is a way-station that facilitates interstate transportation," and "act[s] as a transportation hub." PHMSA 28(j) Letter 2, 3. But PHMSA mischaracterizes what occurs at the LFC Facilities.

Courts have recognized the difference between transporting a product in its rawest form and processes that occur to transform one product into others which break up the continuity of the transportation.

In *Roberts v. Levine*, 921 F.2d 804 (8th Cir. 1990), the Eighth Circuit considered whether intrastate transportation of soybeans to a processing plant was part of an interstate journey governed by the motor carrier provisions of the Interstate Commerce Act. The court held that the carrier's intrastate transportation of soybeans from elevator to processing plants, where they were processed into soybean meal and oil, did not involve interstate commerce for purposes of the Interstate Commerce Act because the entity overseeing shipment from the cooperative elevator to the processing plant did not intend to ship raw soybeans in interstate commerce. 921 F.2d at 816. The *Roberts* court cited *Crescent Cotton Oil Co. v. Mississippi*, 42 S. Ct. 42, 43-44 (1921), which held that separation of the seed from the fiber of cotton by means of a cotton gin constituted "manufacturing," and interstate commerce began only after the ginning process, when the seed was committed to a carrier for interstate transport. *See id.* at 815. The *Roberts* court

9

found the import of *Crescent Cotton* was "that manufacture of an item interrupts the stream of commerce so that after manufacture there is a new commercial journey, either inter- or intrastate." *Id.* Processing, as well as manufacturing, interrupts continuous carriage in interstate commerce. The *Roberts* court rejected the carrier's attempt to distinguish *processing* and *manufacturing*, instead concluding that processing made the in-state leg of the journey intrastate. *Id.* at 816. Further, change that occurs to a product need not be substantial, but material. *See Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 151 (1919) (shipment of rough lumber from forest to mill within a state was not interstate commerce, even though the milling was followed by shipment of nearly all of the final product to points outside the state, because "when the rough material left the woods it was not intended that it should be transported out of the state. . . . until it had been subjected to a manufacturing process that *materially* changed its character, utility, and value.") (emphasis added).

The raw crude extracted at the outer-continental shelf is not the product that is distributed, nor does Sable intend it to be. There is a material difference between the oil that originates from the outer-continental shelf and the processed product that arrives in Pentland. This alteration happens at the LFC Facilities. The processes that occur at those facilities have already been briefed in detail. *See* California's Opening Br. at 8-9. And even if the only product transformation at the

10

LFC Facilities was simply thinning the crude oil for transportation to Pentland—and in fact it does much more, *see* PHMSA Br. 23-24, 28, Sable Br. 9-10—the result would still be a different product. Transportation is not continuous because (1) the "thing" being transported is different in each journey, *and* (2) the break between them is not just a junction between pipelines; it is the machinery that transforms the original, heavy crude emulsion after it leaves the Offshore Emulsion Pipeline and before the new, sweetened crude product is put into Lines CA-324/325. Transportation through Lines CA-324/325 to Pentland is thus intrastate.

Like the soybeans in *Roberts*, the raw product extracted from the outer-continental shelf is not sold until its "character, utility, and value" are changed at the LFC Facilities; the plant thus interrupt transportation in interstate commerce. *See Roberts*, 921 F.2d at 816 (citation omitted); *Goldberg v. Faber Industries*, 291 F.2d 232, 234 (7th Cir. 1961) (the processing of meat scraps into grease and feed ended interstate commerce; the "*processing [wa]s sufficient to break the continuity of the transportation.*") (emphasis added).

Further, the LFC Facilities are neither a warehouse nor a way-station. Their function is distinct from the warehouses in sister circuits' FAA precedents. *Roberts*, 921 F.2d at 816 (citing Interstate Commerce Commission decisions finding interstate commerce because no activity at a warehouse "change[d] the character" of the goods and "*no further processing or manufacturing*" of the goods

11

occurred at a warehouse.) (citations omitted); *cf. Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966) (dairy products that came from out of state and stopped temporarily in Dallas—where no processing took place—were held to be part of a continuous movement in interstate commerce, such that truck drivers delivering the products from the Dallas plant to other points in Texas were engaged in interstate commerce); *Burlaka v. Contract Transport Services LLC*, 971 F.3d 718, 721 (7th Cir. 2020) (intermediary steps such as stops at warehouses, involving potentially unloading and reloading, did not sever the connection between drivers' services and the ultimate interstate movement of goods). Notably, unlike the FAA, the Pipeline Safety Act contains an express exception for mid-trip handling. *See* 49 U.S.C. § 60101(a)(22) ("transporting hazardous liquid" is defined to exclude moving hazardous liquid through certain types of facilities such as onshore production, refining, or manufacturing facilities). Under the Pipeline Safety Act, a mid-trip stop interrupts transportation. If such an exception existed in the FAA, *Shew* and *Burlaka* likely would have different outcomes.

Nor does it matter whether the sweetened oil, or products later refined from that oil (like gasoline and diesel) eventually wind up in the stream of interstate commerce. Again, the inquiry under the Pipeline Safety Act is whether the pipeline transports the particular hazardous liquid within a state or across a state line. Transportation in interstate commerce ends at the LFC Facilities; thus, Lines CA-

324/325, which are downstream of the LFC Facilities, serve a purely intrastate transport function.

**D.    The Text and Structure of the Pipeline Safety Act Indicate That the Pipeline Safety Act Does Not Reach the Outer Extent of the Commerce Clause**

PHMSA's maximalist interpretation of federal jurisdiction is contrary to the plain language of the Pipeline Safety Act, contrary to Congressional intent, and contrary to the case law.

As affirmed by PHMSA's predecessor, the Materials Transportation Bureau, Research and Special Programs Administration ("RSPA"), in interpreting the Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 1003, (originally codified at 49 U.S.C. § 2002 with current version at 49 U.S.C. § 60101, et seq.) ("HLPSA"): "Congress . . . has always recognized a major role for the states in pipeline safety." Transp. of Hazardous Liquids by Pipeline; Regul. of Intrastate Pipelines, 50 Fed. Reg. 39,008, 39,011 (Sept. 26, 1985). Moreover, Congress has "encouraged extensive state involvement" in the regulation of pipeline safety, and it would be "contrary to the spirit of the HLPSA to attempt to expand the area of exclusive Federal jurisdiction beyond that *clearly intended by Congress*." *Id.* (emphasis added). Indeed, Congress intended for the maximum role of the states in pipeline safety, confined only to prevent "conflicting state rules [that] could impede the flow of interstate commerce." *Id.*

13

The Pipeline Safety Act contemplates state involvement. 49 U.S.C. § 60104(c) explicitly authorizes states to "adopt additional or more stringent safety standards for intrastate pipeline facilities" as long as the state "standards are compatible with the minimum standards prescribed" by PHMSA. And 49 U.S.C. § 60105 prescribes how states will obtain certifications for their programs. PHMSA's broad reading of interstate commerce would also render these provisions of the Pipeline Safety Act meaningless.

At argument, the Court touched on the question whether 49 U.S.C. § 60101(a)(7) and (a)(8)(B) could be read to mean that an intrastate pipeline is either (A) a pipeline that itself moves oil across a state line, or (B) a pipeline that ships oil that, at some point in its journey, crosses a state line. Analysis of this type of phrase can be indeterminate. But the answer to this type of interpretive puzzle need not come from that sentence itself. Rather, the meaning of a phrase which can be interpreted in two ways can be informed by the context in a statute. *See Pulsifer v. United States.*, 601 U.S. 124, 133-134 (2024) (discussing E. CARLE, THE VERY HUNGRY CATERPILLAR 15–16 (2018)). Here, there seems to be no dispute that if the Court adopts PHMSA's view, it will all but eliminate intrastate pipelines— because virtually *all* petroleum products exist in an interstate stream of commerce, given the mobility of vehicles powered by liquid fuels and the ubiquity of

14

hydrocarbon-based products in consumer goods. That, in turn, would render 49 U.S.C. §§ 60104(c) and 60105 meaningless.

The D.C. Circuit addressed a version of this problem in *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539 (D.C. Cir. 1986). There, Southern Pacific alleged that their pipelines were interconnected systems (which, as a practical matter, transported oil from California to Arizona and Nevada) and that, according to Southern Pacific, RSPA wrongly concluded that Southern Pacific's lateral lines were intrastate pipelines. *Id.* at 542. Lines CA-324/325 are, in the ways material to the analysis in *Southern Pacific*, similar to the lateral lines in Southern Pacific. While Lines CA-324/325 may be indirectly "connected to" the Offshore Emulsion Pipeline via the LFC Facilities, and the Offshore Emulsion Pipeline reaches the outer-continental shelf, Lines CA-324/325 themselves are not used for transportation in interstate commerce, as they both start and end in California, as described more fully in Petitioner's opening and reply briefs. *See* California Opening Br. at 4-7, 20, 29; California Reply Br. at 2-4, 8-9.

Adopting PHMSA's position today—which is difficult to distinguish from Southern Pacific's position at the time— "could result in the virtual exclusion of the states from the area of hazardous liquid pipeline regulation." *Southern Pacific*, 796 F.2d at 542 (quoting 50 Fed. Reg. 39,008, 39,011). The D.C. Circuit found that to be contrary to Congress's purpose. This Court can reach the same conclusion

15

based either on a broader view of Congress's purpose or based on the need to not effectively write sections 60104(c) and 60105 out of the Pipeline Safety Act.

Neither PHMSA nor Sable has explained how to distinguish *Southern Pacific*. The Court should not do that work for them. *Cf. Clark v. Sweeney*, 607 U.S. 7, 9-10 (2025) (discussing party presentation principle). Nor has PHMSA or Sable argued that *Southern Pacific* is wrongly decided and that this Court should create a circuit split. It should not. *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987) ("absent a strong reason to do so, we will not create a direct conflict with other circuits.").[3]

---

[3] Relatedly, the rationale of *Flowers Foods* is not the basis upon which PHMSA issued the December 2025 orders. Rather, PHMSA justified those Orders on the theory that the Offshore Emulsion Pipeline, the LFC Facilities, and onshore Lines CA-324/325 operate as a single pipeline facility originating in federal waters. *See* 1-CalER-26 (citing 49 C.F.R. Appendix A, Example 7). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Arrington v. Daniels*, 516 F.3d 1106, 1112-13 (9th Cir. 2008) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). As such, PHMSA's reliance on *Flowers Foods* is a *post hoc* rationalization. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) (the rule barring consideration of *post hoc* rationalizations operates where an agency has provided a particular justification at the time of the determination but provides a different justification later). To the extent that these positions might be reconciled, PHMSA did not do so in its December 2025 orders or in any supporting documents in the record.

Of course, PHMSA could not have relied on *Flowers Foods* when issuing the December 2025 orders because *Flowers Foods* had not yet been decided. If PHMSA intended to rely on the similar (and pre-existing) Ninth Circuit precedent in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020), there is no indication of this in the decision documents.

**E.      PHMSA's Own Regulations Demonstrate the Key Difference Between the Pipeline Safety Act and FAA, Making *Flowers Foods* a Poor Analogy**

Unlike the FAA, the Pipeline Safety Act considers the physical location of the transportation mechanism (the pipeline) itself to delineate whether it is intra- or interstate, not the ultimate source or destination of the liquid that is moving through it. This was PHMSA's own considered and long-held understanding stretching back decades and continuing through and beyond the issuance of the challenged orders, including within the regulations they are now attempting to reinterpret.

PHMSA's predecessor RSPA rejected the view that connection to an interstate pipeline makes an otherwise intrastate line into an interstate line. 50 Fed. Reg. 39,008, 39,010. Instead, RSPA stated that "[i]nterstate or foreign commerce is defined by the end points of the commerce." To the extent that this Court finds this phrase ambiguous as to whether "commerce" means the transit in one line or the transit in multiple lines, PHMSA addressed that in Appendix A to 49 C.F.R. Part 195. While PHMSA has focused on Example 7, the more useful example on this point is 4B. Example 7 depicts a pipeline that originates in the outer-continental shelf. *See* 1-CalPSE-181 (Liquid Pipeline Interstate/Intrastate Delineation Map). From this, PHMSA concludes that Example 7 depicts the entirety of the Offshore Emulsion Pipeline, the LFC Facilities, and Lines CA-324/325. *See* Federalization

17

Order (citing 49 C.F.R. Part 195, Example 7). But Example 7 can best be viewed as depicting the Offshore Emulsion Pipeline only, with the LFC Facilities at "Point B" and Lines CA-324/325 not depicted by Example 7 at all. Instead, Lines CA-324/325 are best depicted by Example 4B, which depicts an intrastate line that connects to an interstate line. *See* 1-CalPSE-179. The fact that the interstate line travels to another state rather than the outer-continental shelf is of no moment, and neither is the fact that the interstate line is owned by another company, since "[t]he critical term 'interstate pipeline facilities' is without hint of ownership or physical connection." 50 Fed. Reg. 39,008, 39,010.

RSPA also made a useful observation about the drafting history. As explained in the Senate Report, an earlier draft of the Hazardous Liquid Pipeline Safety Act read: "'(I)nterstate pipeline facilities' include pipeline facilities that, either on their own or by connection with other pipeline facilities, are used to move hazardous liquids in interstate or foreign commerce." 50 Fed. Reg. at 39,008, 39,010 (citing S. Rep. No. 182, 96th Cong. 1st Sess., at p. 19). The bill that ultimately passed removed the reference to "by connection with other pipeline facilities." Context illustrates that this change had a purpose: to prevent the adoption of a definition that would largely eliminate intrastate pipelines.[4]

---

[4] RSPA thus noted that "[t]he critical term 'interstate pipeline facilities' is without hint of ownership *or physical connection*." *Id.* at 39,010 (emphasis added).

Thus, the examples in 49 C.F.R. Part 195 primarily rely on the physical location of the pipeline itself, specifically whether it crosses state lines, and secondarily whether there is a FERC tariff. 49 C.F.R. Part 195, Examples 1-9. They do not rely on, identify, or discuss the source or destination of the liquid being transported. *Id*.; *see* Example 4B (pipeline ultimately sending oil out of state is intrastate pipeline if pipeline starts and ends in same state). If *Flowers Foods* spoke to the relevant considerations for hazardous liquid pipelines, then the regulation, extant for decades and relied on by PHMSA when issuing the challenged orders, would be utterly meaningless and irrelevant. An administrative agency must respect its own precedent, and cannot change it arbitrarily and without explanation, from case to case, much less within the same case. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981 (2005); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). PHMSA has provided no reasoned basis for this sudden renunciation of the very regulations it relied on to issue the challenged orders. It is not the Court's job to provide one for PHMSA.

## II. CALIFORNIA HAS FILED A PETITION CHALLENGING PHMSA'S NEW JURISDICTIONAL DETERMINATION; REGARDLESS, THIS COURT CAN RULE NOW AND HOLD THAT PHMSA ILLEGALLY ASSERTED EXCLUSIVE FEDERAL JURISDICTION OVER LINES CA-324/325

California acknowledges that a new petition for review of PHMSA's June 25, 2026, issuance of a non-emergency special permit ("Special Permit"), designated

Docket Number PHMSA-2026-0464, to Sable Offshore Corp. is warranted and has filed that petition in this Circuit. California also acknowledges that the new Special Permit is the active permit and replaces the expired Emergency Special Permit. Nevertheless, as discussed in California's Opposition to Defendants' Motion to Dismiss, the December 17, 2025, Federalization Order and Restart Approval remain operative and have not been mooted. Therefore, this Court can rule now on whether PHMSA improperly asserted federal jurisdiction over Lines CA-324/325.

**A.    The Federalization Order and the Jurisdictional Determination Share the Same Factual Premise and Conclusion**

On June 25, 2026, PHMSA issued a Jurisdictional Determination in Support of the Special Permit. *See* Federal Respondents' Motion to Dismiss as Moot, Exhibit 2. The Jurisdictional Determination offers a more robust legal analysis of PHMSA's determination that Lines CA-324/325 are segments of an interstate hazardous liquid pipeline facility, but the factual basis for its determination remains the same. When the same conditions are carried through from one action to another, the challenge to the first action does not become moot. *Kescoli v. Babbit,* 101 F.3d 1304, 1309 (9th Cir. 1996). In *Kescoli*, the appeal of a mining permit did not become moot where an offensive permit condition was included in a subsequent permit without material modification. *Id.* Similarly, here, just like the Federalization Order issued in December 2025, the Jurisdictional Determination contends that:

20

> The [Santa Ynez Pipeline System] transports crude oil from offshore production platforms on the Outer Continental Shelf (OCS) through state waters to an onshore processing facility in Santa Barbara County, California, and onto a terminal in Kern County, California [. . .] Accordingly, the [Santa Ynez Pipeline System] is an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act.

Jurisdictional Determination at 2; *compare* 1-CalER-26 ("PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California."). In both, PHMSA's determination is premised on the theory that Lines CA-324/325 are "segments" of the fictional Santa Ynez/Las Flores pipeline system. The "system" is a fabrication by Sable that was accepted by PHMSA in December 2025 and again in the Jurisdictional Determination. In reality, the oil platforms, Offshore Emulsion Pipeline, LFC Facilities, and Lines CA-324/325, remain the same as before Sable owned any of these facilities and when PHMSA recognized Lines CA-324/325 as intrastate hazardous liquid pipeline facilities.

In its Reply in Support of Federal Respondents' Motion to Dismiss as Moot ("PHMSA Reply"), PHMSA argues that the Jurisdictional Determination "relies on new record evidence" such as "a purchase agreement for selling product at the Pentland terminal, new diagrams of the Las Flores Canyon facility and Pentland terminal, and manuals discussing the processes at the Las Flores Canyon facility

21

and Pentland terminal" PHMSA Reply at 7. Yet, neither in the PHMSA Reply nor in the Jurisdictional Determination itself does PHMSA explain what additional or novel facts these purported new documents offer. PHMSA also fails to state whether these documents were in existence and available in December 2025 (this is especially relevant given PHMSA's repeated failures to compile a complete administrative record, as explained in detail in California's Reply Brief). In any event, the "new" documents do not change PHMSA's contention that Lines CA-324/325 are not standalone facilities but rather "segments" of a larger system. Nor does PHMSA offer any new facts to validate its determination that Lines CA-324/325 are now interstate hazardous liquid pipeline facilities. Ultimately, in both the Jurisdictional Determination and Federalization Order, PHMSA's conclusion and the facts and arguments upon which it relies are the same, and the Court may decide now whether PHMSA's determination is illegal.

### B. The Jurisdictional Determination Does Not Negate the Case or Controversy Between California and PHMSA

PHMSA unilaterally asserted that the Jurisdictional Determination "supersedes the jurisdictional determination issued on December 17, 2025." Jurisdictional Determination at 2. As argued in California's Opposition to PHMSA's Motion to Dismiss, at pages 10-13, the Court does not have to, and should not, accept that contention. While PHMSA contends that the Jurisdictional

22

Determination "supersedes" the Federalization Order, the case or controversy between California and PHMSA remains live.

As this Court noted in *Armster v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 806 F.2d. 1347, 1357 (9th Cir. 1986), when an agency ceases to conduct an unlawful activity it does not deprive the court of jurisdiction when a "case or controversy" remains to be disposed of. *See also Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 595 F.Supp. 1255, 1263 ("Moreover, when an administrative agency withdraws an order while still maintaining that the legal position is justified, repetition is likely and the claim should not be considered moot.") Notably, PHMSA has *not* ceased conducting its illegal activity and the same case or controversy that was created by the Federalization Order exists today. Or, at the very least, the illegal activity is clearly being repeated. The Jurisdictional Determination does not change the fact that PHMSA continues to illegally assert that Lines CA-324/325 are interstate hazardous liquid pipelines, that it does so based on the false premise that the lines are mere "segments" of a larger system rather than standalone facilities, that it has usurped regulatory authority over Lines CA-324/325 from the California Office of State Fire Marshal, and that it did so in contravention of a federal district court Consent Decree. Because the same issues remain to be decided, the case or controversy between California and PHMSA remains the same and awaits a decision by this Court.

23

### C. California Has Filed a Petition Challenging the Special Permit and this Court May Wait to Issue a Decision

The Jurisdictional Determination made under the new Special Permit is the same jurisdictional determination made in the Federalization Order: PHMSA determined that Lines CA-324/325 are interstate pipelines under the exact same applicable provisions of the Pipeline Safety Act and regulations. Should the Court disagree and determine that the new Jurisdictional Determination under the new Special Permit supplants the Federalization Order, California has submitted a protective petition for review challenging that new Special Permit. Accordingly, this Court need not decide the mootness issue.

## CONCLUSION

The Court should grant the petition and vacate the Federalization Order and Restart Approval.

24

Dated: July 20, 2026

Respectfully submitted,

*/s/ Michael S. Dorsi*

MICHAEL S. DORSI
  *Deputy Attorney General*
ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
  *Senior Assistant Attorney General*
DEBORAH M. SMITH
  *Acting Senior Assistant Attorney General*
MYUNG J. PARK
VANESSA C. MORRISON
  *Supervising Deputy Attorneys General*
MATTHEW BULLOCK
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
  *Deputy Attorneys General*

25

# CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) and Circuit Rule 27-1(1)(d) because, excluding the parts of the document exempted by Rules 27(a)(2)(B) and 32(f), this document contains 5,669 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

**Signature**   */s/ Michael S. Dorsi*            **Date**   July 20, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**   25-8059, 26-508

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[x] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

PETITIONER'S SUPPLEMENTAL BRIEF

**Signature**   */s/ Michael S. Dorsi*          **Date**   July 20, 2026