Nos. 25-8059, 26-508

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*,

and

SABLE OFFSHORE CORP., et al.,
*Intervenors*.

On Petition for Review of Decisions Issued by the
Pipeline & Hazardous Materials Safety Administration

## PETITIONERS' SUPPLEMENTAL BRIEF

Linda Krop
Jeremy M. Frankel
Margaret M. Hall

Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
lkrop@environmentaldefensecenter.org
jfrankel@environmentaldefensecenter.org
mhall@environmentaldefensecenter.org

*Attorneys for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

Julie Teel Simmonds
David Pettit
Talia Nimmer

Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
tnimmer@biologicaldiversity.org

*Attorneys for Petitioners
Center for Biological Diversity
and Wishtoyo Foundation*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

QUESTIONS PRESENTED AND BRIEF ANSWERS ..........................................2

ARGUMENT ...............................................................................................5

    I.     Question 1: *Flowers Foods* is Irrelevant to the Scope of
         Federal Jurisdiction under the PSA, but if Found Instructive,
         would Lead to the Same Result: the Onshore Pipelines are
         *Intra*state Facilities. ...............................................................................5

         A.     Material Differences in the Language and Purpose of
                the PSA Render the Interpretive Analysis in *Flowers
                Foods* Irrelevant; the PSA Requires that the
                Jurisdictional Character of a Facility be Determined by
                its Start and End Points. ..............................................................6

                1.     Differences in Text Compel a Distinct Interpretation......7

                2.     The Statutory Scheme of the PSA Supports This
                       Interpretation and Counsels Against a "Continuous
                       Carriage" Test..............................................................13

         B.     Even if the Court Were to Read the "Continuous
                Carriage" test of *Flowers Foods* into the PSA, the
                Onshore Pipelines would Still be *Intra*state Facilities..............15

                1.     *Flowers Foods* Does Not Support Federal Respondents'
                       New Theory that Federal Reach under the PSA is
                       Coterminous with the Commerce Clause.......................15

                2.     Application of a "Continuous Carriage" Test Must be
                       Informed by the PSA and Would Result in an *Intra*state
                       Determination. ..............................................................17

3. A "Continuous Carriage" Test without Necessary PSA Context Would Still Result in an *Intra*state Determination. ...............................................................23

II. Question 2: The Court Can Rule on Whether PHMSA Properly Asserted Jurisdiction Over the Onshore Pipelines in the Present Posture. ...............................................................27

CONCLUSION ...............................................................31

CERTIFICATE OF COMPLIANCE ...............................................................32

# TABLE OF AUTHORITIES

**Cases**

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*,
  249 U.S. 134 (1919) ....................................................................................25

*Crescent Cotton Oil Co. v. Mississippi*,
  257 U.S. 129 (1921) ....................................................................................26

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*,
  283 U.S. 465 (1931) ............................................................................ 23, 24

*Fed. Power Comm'n v. Moss*,
  424 U.S. 494 (1976) ....................................................................................27

*Flowers Foods, Inc. v. Brock*,
  146 S.Ct. 1358 (2026) ............................................................................ passim

*Goldberg v. Faver Indus., Inc.*,
  291 F.2d 232 (7th Cir. 1961) .......................................................................26

*Kline v. Wirtz*,
  373 F.2d 281 (5th Cir. 1967) .......................................................................26

*Roberts v. Levine*,
  921 F.2d 804 (8th Cir. 1990) .......................................................................26

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) ......................................................................................17

*S. Nat. Gas Corp. v. Alabama*,
  301 U.S. 148 (1939) ....................................................................................26

*S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*,
  796 F.2d 539 (D.C. Cir. 1986) ........................................................ 11, 13, 14, 15

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022) ..................................................................................2, 16

*United States v. Lopez*,
   515 U.S. 549 (1995) ...................................................................................16

*W. Union Tel. Co. v. Fed. Commc'ns Comm'n*,
   541 F.2d 346 (3rd Cir. 1976)......................................................................28


**Statutes**

5 U.S.C. § 706(2)(A)......................................................................................27

5 U.S.C. § 706(2)(C) ........................................................................... 4, 27, 30

9 U.S.C. § 1 ..................................................................................................6, 7

49 U.S.C. § 60101(a)(4).................................................................................22

49 U.S.C. § 60101(a)(5).................................................................................18

49 U.S.C. § 60101(a)(7)........................................................................... passim

49 U.S.C. § 60101(a)(8)(B)(i)................................................................. 8, 9, 10

49 U.S.C. § 60101(a)(22)...............................................................................8, 9

49 U.S.C. § 60101(a)(22)(A) ............................................................................6

49 U.S.C. § 60101(a)(22)(A)(i) ....................................................... 18, 19, 20, 21

49 U.S.C. § 60101(a)(22)(B)(ii) ............................................................... 18, 21

49 U.S.C. § 60104(c) .....................................................................................13

49 U.S.C. § 60105 ..........................................................................................13

49 U.S.C. § 60106 ..........................................................................................13

49 U.S.C. § 60112(d) .....................................................................................30

iv

**Regulations**

49 C.F.R. § 195.0 .............................................................................20

49 C.F.R. § 195.2 .............................................................................20

49 C.F.R. pt. 195, Appendix A ................................................... 11, 15

**Other Authorities**

50 Fed. Reg. 39008-02 (Sept. 26 1985)................................. 13, 19, 20, 21

Black's Law Dictionary (5th ed. 1979) .......................................... 8, 9, 10

Black's Law Dictionary (12th ed. 2024) .............................................8

*The Safety of Hazardous Liquid Pipelines: Regulated vs. Unregulated Pipelines, Hearing Before the Subcomm. on Railroad, Pipelines, and Hazardous Materials of the Comm. on Transp. and Infrastructure*, 111th Cong. (2010)................ 12, 15

**INTRODUCTION**

After filing their principal brief, Federal Respondents filed a Rule 28(j) letter citing the Supreme Court's recent decision in *Flowers Foods, Inc. v. Brock*, 146 S.Ct. 1358 (2026). Dkt. No. 114. Therein, Federal Respondents advanced an interpretation of the Hazardous Liquid Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101–60143, that was neither raised in their Answering Brief nor the administrative proceedings at issue.

From December 17, 2025, when PHMSA seized the Onshore Pipelines,[1] to June 5, 2026, when it filed its Rule 28(j) letter, Federal Respondents' jurisdictional theory was as follows: the LFC Facilities bridge together the Onshore and Offshore Pipelines, thereby rendering the Onshore Pipelines segments of a larger pipeline facility that spans across a state border. *See* PHMSA Br. at 16 (summary of argument). Now, however, they suggest that the Onshore Pipelines are *inter*state not because they cross a state border, but because they engage in commerce that does—a departure from how the PSA has been understood for its entire forty-year history. The pivot continued at oral argument, where counsel for Federal Respondents appeared to suggest that *Flowers Foods* compels a reading of 49 U.S.C. § 60101(a)(7), the relevant provision here, that is essentially coterminous with the Commerce Clause.

---

[1] Defined terms have the same meaning as in Petitioners' Opening Brief.

*Flowers Foods* did not interpret the PSA. It interpreted the scope of Section 1 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-402, and it did so in largely the same manner the Supreme Court had done just four years ago. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 456–57 (2022). In other words, there is nothing new in *Flowers Foods* that Federal Respondents could not have raised in their Answering Brief, and, as explained below, nothing that informs how to interpret the provision of the PSA on which PHMSA asserted jurisdiction. *Flowers Foods* was just used as a means to get the foot of their new interpretive theory into this Court's door.

The Court has asked for additional briefing on (1) whether *Flowers Foods* has any relevance to this case, and (2) whether the Court can resolve the jurisdictional dispute here absent a new petition. Petitioners answer those questions (1) "no" and (2) "yes."

## QUESTIONS PRESENTED AND BRIEF ANSWERS

### I. Question 1

#### Question

"What is the relevance, if any, of *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026) to this case? While giving effect to the whole statute, the parties are invited to explain the relevance of that decision to the scopes of the phrases "interstate pipeline facilities" and "interstate pipeline transportation," 49 U.S.C. § 60104(c), as defined in 49 U.S.C. § 60101, and to explain whether those provisions

apply to pipelines or pipeline facilities that do not cross state borders." Dkt. No. 132.

## Brief Answer

*Flowers Foods'* interpretation of the FAA does not bear on how the Court should interpret the reach of federal jurisdiction under the PSA. The Court should interpret 49 U.S.C. § 60101(a)(7) according to its distinct language and context, and in the same way it has been interpreted for the last four decades: the jurisdictional character of a facility is determined by looking to its physical start and end points, not by whether it is "engaged" or "involved" in some broader interstate journey like the FAA. Thus, a hazardous liquid pipeline facility that does not itself cross state borders, like the Onshore Pipelines, is an *intra*state facility.

To read into the statute a "continuous carriage" test from *Flowers Foods* would fail to give effect to the plain meaning and intent of Section 60101(a)(7), open a circuit split, and eviscerate the PSA's cooperative federalism scheme. But should the Court nonetheless find *Flowers Foods* instructive, the result here would not vary. Because the LFC Facilities take hazardous liquid out of transportation for treatment and processing, the subsequent carriage in the Onshore Pipelines is not continuous with the carriage from the Offshore Pipeline, rendering the Onshore Pipelines *intra*state. In other words, for the same reason the Onshore Pipelines do

3

not form with the Offshore Pipeline a single facility, they transport hazardous liquid in a distinct *intra*state journey.

Accordingly, the Onshore Pipelines, which begin and end in the State of California, are *intra*state facilities subject to exclusive state jurisdiction. *Flowers Foods* is inapposite and, even if instructive, would not compel a different result.

## II.     Question 2

### Question

"Absent a petition that specifically challenges PHMSA's new jurisdictional determination, can this court rule on whether PHMSA properly asserted exclusive federal jurisdiction over Lines CA-324 and CA-325." Dkt. No. 132.

### Brief Answer

Yes. Petitioners' challenges brought under 5 U.S.C. § 706(2)(C) are not tethered to any specific "jurisdictional determination"—either the Federalization Order or PHMSA's new jurisdictional determination. Instead, they ask the Court to generally consider whether PHMSA acted "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). That inquiry is a question of law to be resolved purely by looking, independently, at the language of the PSA.

The PSA has not changed, the relevant facts here have not changed, and the Court can rule on the propriety of PHMSA's assertion of jurisdiction based on the record and briefs currently before the Court.

**ARGUMENT**

I.  **Question 1: *Flowers Foods* is Irrelevant to the Scope of Federal Jurisdiction under the PSA, but if Found Instructive, would Lead to the Same Result: the Onshore Pipelines are *Intra*state Facilities.**

Petitioners first address the material differences between the FAA language interpreted in *Flowers Foods*, and the relevant language here in 49 U.S.C. § 60101(a)(7). Where the FAA employs the term "engaged in . . . interstate commerce," the concern of Section 60101(a)(7) of the PSA is whether a facility is "used to transport hazardous liquid in interstate commerce." The term "used to" denotes a particular purpose, and when the whole provision is considered in context, drives an interpretation that the jurisdictional character of a facility is determined not by whether it is "engaged" or "involved" in some broader interstate journey, like the FAA, but the points between which *that facility* is used to transport hazardous liquid.

This is not, to be clear, a new interpretation. It has been enshrined in case law for forty years, confirmed by Federal Respondents, and found critical to preserving the PSA's cooperative federalism scheme.

Petitioners then address how a "continuous carriage" test akin to that in *Flowers Foods* would apply in the context of the PSA, and to the uncontroverted facts of this case. As contextualized by the PSA, hazardous liquid would be in "continuous carriage" so long as it is in "transport," as defined in 49 U.S.C. §

60101(a)(22)(A). Because the LFC Facilities take hazardous liquid out of "transportation" for treatment and processing, the subsequent carriage in the Onshore Pipelines is not continuous with the carriage from the Offshore Pipeline, rendering the Onshore Pipelines *intra*state.

Lastly, if the Court were to apply the "continuous carriage" test out of context—i.e., without regard to the relevant definitions of transportation in the PSA—Petitioners address why the result would be the same. A century of case law addressing interruptions in interstate commerce confirms that treatment at the LFC Facilities—where oil emulsion is processed into sales-quality crude and natural gases—interrupts the flow of commerce.

Accordingly, the Onshore Pipelines are *intra*state facilities.

### A. Material Differences in the Language and Purpose of the PSA Render the Interpretive Analysis in *Flowers Foods* Irrelevant; the PSA Requires that the Jurisdictional Character of a Facility be Determined by its Start and End Points.

The distinctions between Section 1 of the FAA and Section 60101(a)(7) of the PSA compel a different interpretative framework altogether than that applied in *Flowers Foods*. Under the text of Section 60101(a)(7), whether a pipeline facility is *inter*state requires looking at the start and end points of *that specific facility*. To read into the PSA a "continuous carriage" test would eviscerate the cooperative federalism scheme intended by Congress.

6

1.  <u>Differences in Text Compel a Distinct Interpretation.</u>

Start with the language of the FAA interpreted in *Flowers Foods* and the relevant language here in the PSA:

"workers engaged in foreign or interstate commerce," 9 U.S.C. § 1,

v.

"a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce," 49 U.S.C. § 60101(a)(7).

In *Flowers Foods*, the Court parsed out this language in the FAA as follows. "Engaged in," for purposes of the FAA, means "'to take part in' something or to be 'employ[ed]' or 'involve[d]' in that thing." *Flowers Foods*, 146 S.Ct. at 1363–64 (citing Black's Law Dictionary 661 (3d ed. 1933)). And "interstate commerce" means "the transportation of . . . property"—in "continuous carriage"—"between points in one state and points in another state." *Id.* at 1364 (citing Black's Law Dictionary 1001 (3d ed. 1933) and Cyclopedic Law Dictionary 548 (2d ed. 1922)). Thus, it held, to be "engaged in . . . interstate commerce," a worker need not necessarily "cross state lines or interact with a vehicle that does"; the individual need only be "involve[d]" in the "continuous journey" of a product that began out of state. *Id.*

But whether a worker is "engaged in . . . interstate commerce" is not the same inquiry as whether a facility is "used to transport hazardous liquid in interstate . . . commerce," as those terms are defined in the PSA. *See* 49 U.S.C. §

7

60101(a)(8)(B)(i), (a)(22). Material differences in the language of the PSA render *Flowers Foods* largely irrelevant, and they compel a different conclusion: a pipeline facility is interstate not if it is "involved" in a continuous interstate journey, but if its physical start and end points cross a state boundary.

To begin, unlike the FAA, Section 60101(a)(7) does not include the term "*engaged in*." Instead, it employs the term "*used to*." *Id.* While "*engaged in*" is broad enough to encompass anything "involved" in a given activity, *see Flowers Foods*, 146 S.Ct. at 1363–64, "*used*" denotes a particular purpose. *Use*, Black's Law Dictionary 1710 (5th ed. 1979) ("[t]o make use of," where "use" means "[t]he purpose served, a purpose, object or end for useful or advantageous nature"); *Use*, Black's Law Dictionary (12th ed. 2024) ("To employ for the accomplishment of a purpose."). Here, the provision clarifies, that purpose is "to transport hazardous liquid in interstate commerce." 49 U.S.C. § 60101(a)(7). Thus, whether a pipeline facility is interstate turns not on whether it is "involved in" interstate commerce, like the FAA, but whether the specific purpose of that facility is "to transport hazardous liquid in interstate commerce."

Understanding the import of this distinction requires wading through a couple more definitions. Unlike the FAA, the PSA further defines "interstate commerce." In the context of hazardous liquids, it means "commerce between a place in a State and a place outside that State." 49 U.S.C. § 60101(a)(8)(B)(i). The

8

PSA does not further define the term "commerce." However, at the time the PSA was enacted, "commerce" referred simply to an "exchange of goods" or "the transportation of persons and property." *Commerce*, Black's Law Dictionary 244 (5th ed. 1979). In its totality, then, "interstate commerce" here means an exchange of goods or the transportation of property "between a place in a State and a place outside that State." 49 U.S.C. § 60101(a)(8)(B)(i).

Reassembling the above terms into their statutory context, Section 60101(a)(7), when read as a whole, requires an entirely different inquiry than Section 1 of the FAA. An interstate hazardous liquid pipeline facility is a facility whose purpose is (1) to "transport hazardous liquid," as that term is defined in Section 60101(a)(22), *and* (2) to exchange or transport that hazardous liquid between a place in a State and a place outside of that State. In other words, whether a pipeline facility is interstate turns on whether *that specific facility* is used to exchange or transport hazardous liquid across a state boundary. The inquiry is thus conterminous with the facility's physical scope: a facility is *inter*state if it operates between a point in one state and a point in another, such that the facility itself, in its own independent capacity, is exchanging or transporting hazardous liquid across state lines.

Put yet another way, the jurisdictional character of a facility is determined not by whether it is "involved" in some broader interstate journey of a *product*, like

9

the FAA, but the points between which *that facility* is used to transport hazardous liquid—i.e., the specific purpose of that facility. Indeed, the overarching structure of Section 60101(a)(7) confirms this understanding. By asking what the purpose is of the *specific facility* at issue, the provision cabins the inquiry to the scope of that facility.

There is, yet, another plausible reading of Section 60101(a)(7) that reaches the same result. When read together with the definition of "interstate commerce" in Section 60101(a)(8)(B)(i), as required, a hazardous liquid pipeline facility is *inter*state if it is "used to transport hazardous liquid in commerce between a place in a State and a place outside that State." This can be read as two clauses, with two separate requirements. The first clause—"used to transport hazardous liquid in commerce"—sets forth the requisite purpose of the facility: it must transport hazardous liquid in an exchange of goods or transportation of product. *See Use*, Black's Law Dictionary (5th ed. 1979); *Commerce*, Black's Law Dictionary 244 (5th ed. 1979). The second clause—"between a place in a State and a place outside of that State"—provides that facility must do so across a state boundary. This interpretation, thus, is functionally the same as above: whether a pipeline facility is *inter*state ultimately turns on whether it straddles a state boundary.

To be clear, this is not a novel interpretation of the PSA, but one that has been enshrined in case law for forty years. In *Southern Pacific Pipe Lines Inc. v.*

10

*U.S. Department of Transportation*, the D.C. Circuit, *agreeing with the Secretary of Transportation's interpretation*, concluded that lateral lines which branch off an interstate pipeline facility, but themselves begin and end entirely within state boundaries, are *intra*state facilities. 796 F.2d 539, 542, 543 (D.C. Cir. 1986) (concluding that the PSA supports the Secretary's interpretation that "a wholly intrastate lateral connected to an interstate pipeline is nevertheless intrastate for purposes of the statute"). In so holding, the court necessarily looked to the start and end points of those specific lines to determine their jurisdictional character. *Id.* And, the court specifically rejected an interpretation of the statute akin to the "continuous carriage" test in *Flowers Foods*. *Id.* at 542 (rejecting the theory that "a state may not regulate intrastate pipelines connected to interstate pipelines, or, any part of a pipeline system that has interstate portions").

This interpretation is also Federal Respondents' *own* understanding of the statute. It is codified in PHMSA's regulations. 49 C.F.R. pt. 195, app. A (The PSA "defines interstate liquid pipeline facilities by the more commonly used means of specifying the end points of the transportation involved."). It was the position that the United States took in *Southern Pacific*. 796 F.2d at 542. And it was reaffirmed by the Administrator of PHMSA, in testimony to Congress, as recently as 2010: "a State is allowed to regulate exclusively a pipeline if located wholly within its borders." *The Safety of Hazardous Liquid Pipelines: Regulated vs. Unregulated*

11

*Pipelines, Hearing Before the Subcomm. on Railroad, Pipelines, and Hazardous Materials of the Comm. on Transp. and Infrastructure*, 111th Cong. 68 (2010) (statement of Cynthia Quarterman, Adm'r, PHMSA) (hereinafter "PHMSA Adm'r Statement"), https://www.congress.gov/111/chrg/CHRG-111hhrg57251/CHRG-111hhrg57251.pdf.

And indeed, this was the framework by which PHMSA determined the jurisdictional character of the Onshore Pipelines at issue for their entire forty-year lifespan. The Onshore Pipelines have always transported hazardous liquid that originated from the OCS. But PHMSA looked to the start and end points of the facility to determine whether the pipelines are *inter*state or *intra*state. When the Onshore Pipelines were viewed as part of a larger pipeline facility that spanned from the LFC Facilities to Midland, Texas, PHMSA saw them as *inter*state. But when, after the 2015 spill, it was recognized that they merely delivered hazardous liquid to Pentland Station in Kern County, PHMSA reclassified them as *intra*state.

In sum, it is, and always has been, the physical location of a hazardous liquid pipeline facility—its start and end points—that dictate its jurisdictional character under the PSA, not whether it is more broadly "engaged in . . . interstate commerce."

12

2. <u>The Statutory Scheme of the PSA Supports This Interpretation and Counsels Against a "Continuous Carriage" Test.</u>

In enacting the PSA, Congress mandated a sweeping regime of cooperative federalism that is codified, namely, in 49 U.S.C. §§ 60105 and 60106. In particular, Section 60105 allows states, at their option, to assume exclusive jurisdiction of *intra*state pipelines, rendering federal oversight over such pipelines merely provisional. Once a state does so, it may impose stricter requirements than those mandated in 49 C.F.R. Part 195 (the "Part 195 Regulations") to meet the specific safety needs of that state. 49 U.S.C. § 60104(c).

The PSA's particular flavor of cooperative federalism evinces "a *major role* for the states in pipeline safety." *Southern Pacific*, 796 F.2d at 542 (emphasis added) (quoting Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 39,008-02, 39,011 (Sept. 26 1985)). Indeed, as a practical matter, state participation is critical to ensuring adequate oversight of the thousands of miles of pipelines that operate within the United States—both because of federal resource constraints, but also because "States are in the best position to assess the needs of their communities with respect to pipeline safety." 50 Fed. Reg. at 39,011. Hence, it is the federal policy "to allow states to assume as much responsibility for pipeline safety within their states as possible, subject only to the limitations of the [PSA]." *Id.*

The longstanding interpretation of the PSA outlined above is the only way to

give effect to the extensive state participation that Congress envisioned. Indeed, it was by defining the jurisdictional character of a pipeline facility in terms of its start and end points that Congress ensured that states would have the major role in pipeline safety regulation that it intended.

To adopt the "continuous carriage" test of *Flowers' Foods* would, first and foremost, be an unjustified departure from the decades-long textual understanding of the PSA outlined above. But it would also eviscerate the cooperative federalism scheme of the PSA so carefully structured by Congress.

Indeed, it is hard to conceive of a pipeline that would *not* be *inter*state, particularly those located in the many states that have little or no internal oil production. In one fell swoop, these states' oversight over pipelines that begin and end entirely within their own boundaries—and may have been approved and sited based on an understanding they would be subject to state oversight—would be read out of existence. As the court in *Southern Pacific* observed forty years ago, such "approach could result in the virtual exclusion of the states from the area of hazardous liquid pipeline regulation." 796 F.2d at 542 (quoting 50 Fed. Reg. at 39,011). "This result was not intended by Congress . . . ." *Id.* (quoting 50 Fed. Reg. at 39,011).

So, as posed by the Court's Order for Supplemental Briefing, can a hazardous liquid pipeline facility that does not cross state borders be considered

14

*inter*state? The text, statutory scheme, and overarching purpose of the PSA answer that question "no." And *Flowers Foods* is irrelevant to that inquiry.

The jurisdictional character of a hazardous liquid pipeline facility is determined by the start and end points of that facility. That is what the PSA says. 49 U.S.C. § 60101(a)(7), (a)(8)(B). That is what *Southern Pacific* said. 796 F.2d at 542-43. That is what Federal Respondents have said. 49 C.F.R. pt. 195, app. A; PHMSA Adm'r Statement. And that is what this Court should conclude.

**B.      Even if the Court Were to Read the "Continuous Carriage" test of *Flowers Foods* into the PSA, the Onshore Pipelines would Still be *Intra*state Facilities.**

      1.  *Flowers Foods* Does Not Support Federal Respondents' New Theory that Federal Reach under the PSA is Coterminous with the Commerce Clause.

As an initial matter, the most recent iteration of Federal Respondents' argument, as presented at oral argument, employs an extraordinarily broad interpretation of Section 60101(a)(7). According, it appears, to Federal Respondents, for a hazardous liquid pipeline facility to be *inter*state, it need only carry hazardous liquid that is in some way traceable to an out of state source, even if the character of the liquid has changed, and even if it is commingled with liquids whose journey is purely *intra*state. In other words, Federal Respondents urge an interpretation that is essentially coterminous with the Commerce Clause. *See, e.g.,*

15

*United States v. Lopez*, 515 U.S. 549, 558–59 (1995) (explaining the reach of the Commerce Clause).

Neither the text nor the purpose of the PSA supports that interpretation, as explained in Part I.A, *supra*. But neither does *Flowers Foods*, insofar as this Court finds it instructive.

In interpreting the phrase "engaged in . . . interstate commerce," as used in the FAA, the Court in *Flowers Foods* expressly disavowed that its "scope . . . is coterminous with the scope of the Commerce Clause." 146 S.Ct. at 1365. As the Court acknowledged, Congress uses more-open ended formulations like "affecting" or "involving" commerce to signal congressional intent to regulate to the outer limits of authority under the Commerce Clause. *Id.* "By contrast, Congress used a 'narrower' phrase—'engaged in commerce'—when it wanted to regulate short of those limits." *Southwest Airlines*, 596 U.S. at 458 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)) (likewise interpreting Section 1 of the FAA).

Federal Respondents' interpretation, in short, extends far beyond what *Flowers Foods* understood "engaged in . . . interstate commerce" to mean.

16

2. Application of a "Continuous Carriage" Test Must be Informed by the PSA and Would Result in an *Intra*state Determination.

Instead, what *Flowers Foods* suggests is that implicit in this language of the FAA—"engaged in . . . interstate commerce"—is a "continuous carriage" test. 146 S.Ct. at 1364.

As the Court observed, "[t]hough 'a continuous carriage' may begin in one State and end in another, 'much of the journey' can take place 'within the limits of a single state.'" *Id.* (quoting Cyclopedic Law Dictionary 548 (2d ed. 1922)). "At least sometimes," the Court found, "a worker who transports goods on an intrastate leg of an interstate journey can qualify for § 1's exemption." *Id.* at 1363. But those times, it is clear, are when that journey is a *continuous* one. *Id.* at 1363.

Should the Court read into Section 60101(a)(7) a version of this "continuous carriage" test—despite the many compelling reasons not to, *see, supra,* Part I.A—such test would need to be informed by the language and context of the PSA. *See, e.g., Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("Statutory language, however, 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context with a view to their place in the overall statutory scheme.'" (citation omitted)).

In particular, when it comes to hazardous liquids, Congress has already given voice to what constitutes a continuous journey, and at what point that journey is interrupted. Hazardous liquid is in "transport" when it is being "move[d]

17

. . . by pipeline" or in "storage . . . incidental to the movement of hazardous liquid by pipeline." 49 U.S.C. § 60101(a)(22)(A)(i). In any other circumstance, it is not in "transport." *See id*. Nor, the PSA specifically provides, is it in "transport" when it is "move[d] . . . through . . . onshore production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B)(ii).

So, even under a "continuous carriage" test, we would return to the same paradigm in which Petitioners and Federal Respondents initially briefed this matter. Whether the Onshore Pipelines are *inter*state ultimately turns on whether the processing that occurs at the LFC Facilities interrupts transportation, as defined in Section 60101(a)(22):

> *New "Continuous Carriage" Theory*. If hazardous liquid is not in "transport" at the LFC Facilities, it is not in continuous carriage from the OCS—a place out of California—to Pentland station—a place in California.

v.

> *Original Single Pipeline Facility Theory*. If hazardous liquid is not in "transport" at the LFC Facilities, they cannot form together with the Onshore and Offshore Pipelines a single, "hazardous liquid pipeline facility" that spans from the OCS to Pentland Station. *See* 49 U.S.C. § 60101(a)(5) ("hazardous liquid pipeline facility" is defined as something "used or intended to be used in transporting hazardous liquid").

Thus, the resolution of the jurisdictional question in *this* case—i.e., whether the Onshore Pipelines are *inter*state or *intra*state—requires the same inquiry either under the existing interpretation of the PSA outlined *supra* Part I.A or a new

18

interpretation employing a formulation of the "continuous carriage" test: whether the LFC Facilities take hazardous liquid out of "transportation."[2]

Petitioners have already explained at length why hazardous liquid is not in "transport" at the LFC Facilities, *see* Op. Br. at 27-40; Reply Br. at 9-16, but summarize those reasons again here.

*First*, the LFC Facilities are not "transporting hazardous liquid," as that term is affirmatively defined, because they are not used in the "movement of hazardous liquid by pipeline." 49 U.S.C. § 60101(a)(22)(A)(i).

When oil emulsion produced offshore is delivered to the LFC Facilities, they treat and refine that emulsion into sales-quality crude oil via a process of separation, dehydration, chemical addition, and stabilization. *E.g.,* 2-PSE-372–76. What enters the Onshore Pipelines afterwards is an entirely different product: "treated and stabilized"—i.e., sales-quality—crude oil. *E.g.,* 2-PSE-376.

The legislative history here is instructive when it comes to treatment facilities like LFC. As initially drafted, the definition of "transporting hazardous liquid" included the words "or the treatment of hazardous liquids during the course of transportation." 50 Fed. Reg. at 39,010. But Congress specifically removed that phrase, apparently at the behest of industry, to narrow its scope. *Id.* at 39,010,

---

[2] In other instances, however, that is not likely to be true. Again, adopting a formulation of the "continuous carriage" test would conceivably render a significant portion of *intra*state pipeline facilities *inter*state.

39,011. Congress, thus, did not intend "transporting hazardous liquid" to encompass treatment facilities.

And indeed, under the narrower definition now codified, treatment equipment of the type used at the LFC Facilities does not "transport hazardous liquid" because it does not itself propel or cause movement of hazardous liquid through a pipeline. 49 U.S.C. § 60101(a)(22)(A)(i). Hence, there are no Part 195 Regulations that purport to regulate such equipment or processes. *See* 49 C.F.R. § 195.0 (the Part 195 Regulations regulate "pipeline facilities used in the transportation of hazardous liquids"). The type of equipment that *does* "transport hazardous liquid" is exemplified in 49 C.F.R. § 195.2, under the definition of "pipeline or pipeline system," which omits infrastructure used for treatment.

Nor are the LFC Facilities *intended* to engage in, or even facilitate, "the movement of hazardous liquid by pipeline." 49 U.S.C. § 60101(a)(22)(A)(i). The LFC Facilities were designed and proposed without any regard for pipeline transportation, which did not yet exist. The LFC project predated the Onshore Pipelines, and the project proposal stated that, after treatment at the LFC Facilities, "[c]rude oil transportation will be via marine vessels." 2-PSE-366. The LFC Facilities' only purpose, thus, is to perform the same function as the Offshore Storage and Treatment facility that preceded it: to process oil emulsion into sales-quality crude oil, *not* to facilitate pipeline transportation.

20

That components of the treatment process may have an incidental effect on "the movement of hazardous liquid by pipeline" is irrelevant. 49 U.S.C. § 60101(a)(22)(A)(i). The term "incidental" is used only once in the relevant definition here—only the "*storage* of hazardous liquid incidental to the movement of hazardous liquid" falls under the ambit of "transportation." *Id.* Incidental treatment of hazardous liquid is not transportation. And indeed, as already noted, the legislative history reflects an intent that treatment be excluded from the definition of "transporting hazardous liquids." 50 Fed. Reg. at 39,010.

Also a red herring is that the LFC Facilities may include "breakout tanks." *See* 49 C.F.R. § 195.2 (definition of "pipeline"). Even assuming it does,[3] hazardous liquid is only directed here *after* being taken out of transportation for processing and the carriage becomes discontinuous. The journey of oil emulsion stops during the treatment process, and the resulting sales-quality crude then begins a new *intra*state journey.

*Second*, the LFC Facilities are specifically excluded from the definition of "transporting hazardous liquid" because they are "onshore production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B)(ii). The LFC Facilities engage in production, refining, and manufacturing namely because they free oil

---

[3] Before December 2025, the two LFC tanks were never considered "breakout tanks." *See* Sable Br. at 10, n. 3 ("Sable did not label the two LFC tanks as 'breakout tanks.'"); 1-FER-3 ("[T]he facility does not include breakout tanks.").

emulsion of impurities (i.e., "refine") and create from that emulsion marketable products (i.e., "manufacture"), including natural gases and sales-quality crude oil. *E.g.,* 2-PSE-372–76. While Federal Respondents have suggested looking to oil industry colloquialisms of those terms, the PSA is not limited to petroleum products—"hazardous liquids" also includes "nonpetroleum fuel" and certain other "substance[s] the Secretary of Transportation decides may pose an unreasonable risk to life or property." 49 U.S.C. § 60101(a)(4). Thus, to understand Congress' intent here, the Court must look to the ordinary definitions of "manufacturing" and "refining" that Petitioners have offered, *see* Op. Br. at 33-34, which would be common to all hazardous liquids, and not just oil.

Accordingly, the LFC Facilities do not "transport hazardous liquid." Hence, PHMSA has never regulated the LFC Facilities, and it has not purported to do so even after it began claiming, in December 2025, that they engage in "transportation."[4] Thus, whatever carriage that follows from the LFC Facilities in the Onshore Pipelines is not continuous with the carriage from the OCS.

---

[4] Since their inception, the LFC Facilities have been exclusively regulated by state and local entities—namely, CalGEM and Santa Barbara County.

### 3. A "Continuous Carriage" Test without Necessary PSA Context Would Still Result in an *Intra*state Determination.

Even if the Court were to apply the "continuous carriage" test out of context—i.e., without regard to the relevant definitions of transportation in the PSA—the result would be the same. Because the LFC Facilities change the character of the product—from oil emulsion to natural gases and sales-quality crude—they interrupt the flow of commerce.

Particularly instructive is *East Ohio Gas Company v. Tax Commission of Ohio*, 283 U.S. 465 (1931). There, a public utility company challenged a state law that imposed an excise tax on companies that supply natural gas to in-state consumers. As applied, it said, the law operated directly to regulate or burden interstate commerce, as the gas it delivered was sourced from out of state. Thus, the company claimed, it was not carrying on *intra*state commerce within the reach of the state's tax authority. The Court was unpersuaded. *Id.* at 501.

The Court began by recounting the journey of the gas: producers delivered pressurized gas from wells out of state via transmission lines; at Ohio's state boundary, those lines connected to the appellant's high-pressure transmission lines, which delivered the gas to in-state pressure reducing stations; from those stations, distribution lines brought the gas to various municipalities; and, finally, the gas entered local supply mains, where pressure was further reduced, to consumers. *Id.* at 500.

The Court found that the first two parts of the journey, from out of state to in-state pressure reducing stations, may well be interstate in nature. *Id.* at 500. "But when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon [from] the producing companies, its volume thereby is expanded to many times what it was while in the high-pressure transmission lines, and it is divided into the many thousand relatively tiny streams that enter the small service lines connecting [to consumers]." *Id.* at 501. "The *treatment* and division of the large compressed volume of gas," the Court held, "is like the breaking of an original package, after shipment in interstate commerce, in order that is contents may be treated, prepared for sale, and sold at retail." *Id.* (emphasis added).

With that in mind, the Court concluded the following: "[T]he furnishing of gas to consumers in Ohio municipalities by means of distribution plants to supply the gas suitably for the service for which it is intended is not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the state." *Id.*

Here, too, treatment at the LFC Facilities "is like the breaking of an original package." *Id.* In fact, it is an even easier call than in *East Ohio Gas*. The LFC Facilities do not merely facilitate a change in pressure—though that is one of its functions. *See* PHMSA Br. at 23 ("The facility also processes crude oil through a

24

stabilizer, which reduces vapor pressure . . . .”). Through separation, dehydration, chemical addition, and stabilization, it “prepare[s] for sale” entirely new products, manufacturing from the oil emulsion it receives marketable natural gases and sales-quality crude oil. *See* Sable Br. at 9 (treatment at the LFC Facilities is done, *inter alia*, to “meet product specifications”). And it is this hazardous liquid that emerges—“treated” and “prepared for sale”—that is delivered via the Onshore Pipelines to market.[5]

In short, if reducing the pressure of gas changes the character of the product enough to interrupt interstate commerce, so too do the separation, dehydration, chemical addition, and stabilization processes that occur at the LFC Facilities.

While instructive, Petitioners do not hang their hat only on *East Ohio Gas*. Nearly a hundred years of case law addressing analogous circumstances confirms that the type of treatment that occurs at the LFC Facilities interrupts the flow of commerce. *See Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 151 (1919) (movement of rough lumber from the forest to a mill, where it underwent “a manufacturing process that materially changed its character, utility, and value,” interrupted commerce); *Crescent Cotton Oil Co. v. Mississippi*, 257

---

[5] Presumably, any purchase contracts that Sable fulfills are not for oil emulsion, but for a product meeting the specifications of the treated hazardous liquid that emerges from the LFC Facilities. There is, however, nothing in the record to confirm this, as Sable was not selling any product prior to March 13, 2026.

U.S. 129, 136 (1921) (separation of cotton seed from fiber, like gas from oil, interrupted the stream of commerce so that that the subsequent commercial journey was new and distinct); *S. Nat. Gas Corp. v. Alabama*, 301 U.S. 148, 155 (1939) (following *East Ohio Gas* and holding that treatment by means of pressure reduction breaks the flow of interstate commerce); *Goldberg v. Faver Indus., Inc.*, 291 F.2d 232, 234 (7th Cir. 1961) (meat delivered to rendering plants for processing into livestock food interrupts interstate commerce); *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967) (boning, trimming, and cutting meat at storage and processing area interrupted commerce); *Roberts v. Levine*, 921 F.2d 804, 815–16 (8th Cir. 1990) (processing of soybeans into oil and meal interrupted commerce).

In sum, *Flowers Foods*' interpretation of the FAA does not bear on how the Court should interpret the reach of federal jurisdiction under the PSA. The Court should interpret the PSA according to its distinct language and context, and in the same way it has been interpreted for the last four decades: the jurisdictional character of a facility is determined by looking to its physical start and end points. However, even if the Court finds *Flowers Foods* instructive, under any iteration of a "continuous carriage" test, the Onshore Pipelines would still be considered *intra*state facilities.

26

**II.** **Question 2: The Court Can Rule on Whether PHMSA Properly Asserted Jurisdiction Over the Onshore Pipelines in the Present Posture.**

Whether PHMSA properly asserted jurisdiction over the Onshore Pipelines has been presented to the Court in two distinct ways. First, by the State alone, as a direct challenge to the December Federalization Order invoking 5 U.S.C. § 706(2)(A) and (C). Second, by all petitioners, as a challenge to the Restart Approval and the ESP (the "Approvals") under 5 U.S.C. § 706(2)(A) and (C). Because the NGO Petitioners have not directly challenged the Federalization Order, we address only this second category of challenges, and why they require that the Court determine the scope of PHMSA's jurisdiction and authority without regard for PHMSA's new jurisdictional determination.[6]

Petitioners' challenges under Section 706(2)(C) claim the Approvals were issued "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). That claim presents a question of law to be resolved purely by looking, independently, at the scope of PHMSA's jurisdiction under the PSA. *See, e.g., Fed. Power Comm'n v. Moss*, 424 U.S. 494, 496 (1976) (a jurisdictional challenge is a matter of comparing the claimed excessive action with the pertinent statutory authority); *W. Union Tel. Co. v. Fed. Commc'ns Comm'n*, 541 F.2d 346, 354 (3rd

---

[6] Petitioners previously addressed this question in their opposition to Federal Respondents' motion to dismiss, as well as why their challenges to the Approvals are not moot. Dkt. No. 129. Petitioners hereby incorporate that brief by reference.

Cir. 1976) (applying this principle to a challenge under 5 U.S.C. § 706(2)(C)); *see also Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").

The PSA has not changed. Nor has PHMSA's basis under the PSA to assert jurisdiction. In both the December 2025 and the June 2026 determinations, PHMSA relies on the same provisions of the PSA, namely 49 U.S.C. § 60101(a)(7), to claim that the Onshore Pipelines are *inter*state. 1-ER-25–27; Dkt. No. 127.3 at 9. Thus, a new challenge to the Special Permit, or jurisdictional determination in support thereof, will present the same fundamental legal question that is already before the Court: whether the Onshore Pipelines are an "interstate hazardous liquid pipeline facility," as that term is defined in Section 60101(a)(7). That PHMSA may have modified or expanded its interpretation of the PSA in its new jurisdictional determination does not preclude the Court from reaching that question or resolving Petitioners' existing Section 706(2)(C) claims. Federal Respondents had every opportunity to address the scope of the PSA in their Answering Brief.

Nor have the facts changed: (1) the Onshore Pipelines were originally designated as *inter*state pipelines because they were expected to transport oil from the LFC Facilities to Texas and because the operator filed for a FERC tariff; (2)

28

after the 2015 oil spill, it was recognized that the Onshore Pipelines transported oil solely within California, between the LFC Facilities and Pentland Station, and the FERC tariff was cancelled; (3) PHMSA therefore transferred jurisdiction to the State in a 2016 memorandum of understanding that it authored; (4) PHMSA agreed to be bound by the 2020 Consent Decree which confirmed the exclusive authority of the State; and (5) the design and function of the relevant infrastructure here, which lies at the core of this dispute, has remained the same from their conception to the present day. At oral argument, Federal Respondents' counsel conceded that the "facts on the ground" have not changed from December 2025 to present.

While Federal Respondents claim their new jurisdictional determination provides "additional factual analysis," Mtn. to Dismiss at 15, it simply reiterates the same description of the relevant facilities that is already before the Court, Mtn. to Dismiss, Ex. 5, at 6-7. *They do not allege anything new*. Between Federal Respondents' supplementations to the record and the documents this Court has judicially noticed, *see* Dkt. Nos. 96 and 109, the Court already has before it a comprehensive and uncontroverted overview of the facilities at issue sufficient to resolve the jurisdictional question presented here.

Accordingly, neither the law nor the facts have changed, and the Court need not defer its ruling on Petitioners' Section 706(2)(C) claims. And consider the implications of doing so.

29

Say Petitioners filed a new petition challenging the Special Permit and jurisdictional determination in support thereof. Then, as the case is pending, PHMSA issues a new order to Sable under the PSA—say, a Corrective Action Order, *see* 49 U.S.C. § 60112(d)—and with it yet another jurisdictional determination further expanding on their arguments. How long does the shell game continue? In perpetuity? Or just until Federal Respondents are satisfied the issue is presented in the light most favorable to them? The Court should not indulge Federal Respondents' attempt to, essentially, insulate the *ultra vires* nature of their past actions from review.

Turning, lastly, to Petitioners' challenges to the Approvals under Section 706(2)(A), as it relates to the jurisdictional dispute, Petitioners claim that the Approvals are "contrary to law" because they are inconsistent with the Consent Decree. The Consent Decree remains in full force and effect and—as a judicial order—unequivocally vests exclusive regulatory authority over the Onshore Pipelines to the State. Nothing prevents the Court from reviewing that claim.

In sum, while PHMSA has elected to re-justify its assertion of jurisdiction in an ancillary agency action, the relevant law has not changed, the relevant facts have not changed, and the Court can rule on the propriety of PHMSA's assertion of jurisdiction based on the record and briefs currently before the Court.

30

## CONCLUSION

For the foregoing reasons, the Court can resolve the jurisdictional dispute presented here, and it should resolve that dispute in favor of Petitioners by looking to the physical scope of the Onshore Pipelines, which begin and end in California.

Dated: July 20, 2026

Respectfully submitted,

s/ *Jeremy Frankel*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Talia Nimmer*
Talia Nimmer
Julie Teel Simmonds
David Pettit
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

31

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 25-8059, 26-508

I am the attorney or self-represented party.

**This brief contains 6,982 words,** including **0 words** manually counted in any visual images, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[**X**] complies with the length limit designated by court order dated <u>July 13, 2026</u>.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>s/ *Jeremy M. Frankel*</u>        **Date:** <u>July 20, 2026</u>