No. 25-8059, consolidated with No. 26-508

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION, et al.,
*Respondents*.

On Petition for Review of Actions by the Pipeline & Hazardous Materials Safety
Administration

## SUPPLEMENTAL BRIEF FOR FEDERAL RESPONDENTS

Of Counsel:

GREGORY ZERZAN
*General Counsel*
U.S. Dept. of Transportation

KEITH COYLE
*Chief Counsel*
BENJAMIN FRED
*Assistant Chief Counsel*
TIMOTHY O'SHEA
KATHLEEN MAITLAND
*Attorneys*
Pipeline and Hazardous Materials Safety
Administration

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
REBECCA JAFFE
MATTHEW R. OAKES
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
matthew.oakes@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ........................................................................................1

I.      The onshore pipeline segments are used to transport crude oil in interstate commerce under *Flowers Foods*........................................3

      A.      The rule from *Flowers Foods* is dispositive here. ...............3

      B.      As in *Flowers Foods*, the processing at the Las Flores facility does not break the flow of interstate commerce. .....................8

      C.      Petitioners are wrong to focus on the pipelines divorced from the crude oil traveling through them. .........................................18

      D.      Applying the *Flowers Foods* rule still allows for state regulation of intrastate pipelines. .......................................................24

      E.      In the alternative, the Las Flores Canyon Facility is itself regulated by PHMSA as an interstate pipeline facility .....................25

II.      This Court cannot rule on whether PHMSA properly asserted jurisdiction without considering PHMSA's new jurisdictional determination. .................................................................................25

CONCLUSION .........................................................................................28

CERTIFICATE OF COMPLIANCE .......................................................30

# TABLE OF AUTHORITIES

## Cases

*Aircraft Serv. Int'l, Inc. v. FERC*,
   985 F.3d 1013 (D.C. Cir. 2021) ............................................................ 5, 8, 22, 25

*Allenberg Cotton Co. v. Pittman*,
   419 U.S. 20 (1974) ................................................................................. 10, 12

*Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co.*,
   249 U.S. 134 (1919) ............................................................................... 12, 15

*Bacon v. Texaco, Inc.*,
   503 F.2d 946 (5th Cir. 1974) ....................................................................... 11

*Baltimore & O.R. Co. v. United States*,
   15 F. Supp. 674, 676 (N.D.N.Y. 1936) ...................................................... 8, 10

*Central Ice Cream Co. v. Golden Rod Ice Cream Co.*,
   287 F.2d 265 (7th Cir. 1961) ....................................................................... 11

*Crescent Cotton Oil Co. v. Mississippi*,
   257 U.S. 129 (1921) ............................................................................... 15-17

*Dean Milk Co. v. F.T.C.*,
   395 F.2d 696 (7th Cir. 1968) ................................................................... 10-11

*East Ohio Gas Company v. Tax Commission*,
   283 U.S. 465 (1931) ..................................................................................... 24

*Escobedo v. Ace Gathering, Inc.*,
   109 F.4th 831 (5th Cir. 2024) ...................................................................... 21

ii

*Eureka Pipe Line Co. v. Hallanan*,
  257 U.S. 265 (1921)......................................................................................18

*Flowers Foods v. Brock*,
  No. 24-935, 2025 WL 3555100 (2025) .................................................4

*Flowers Foods, Inc. v. Brock*,
  146 S. Ct. 1358 (2026)...........................................1-9, 11, 14, 18-21, 24, 25, 27

*Foremost Dairies, Inc. v. F.T.C.*,
  348 F.2d 674 (5th Cir. 1965) ...................................................... 2, 5, 10

*Goldberg v. Faber Indus., Inc.*,
  291 F.2d 232 (7th Cir. 1961) ....................................................................16

*Gulf Refining Co. of Louisiana v. Phillips*,
  11 F.2d 967 (5th Cir. 1926) ......................................................................18

*In the Matter of ONEOK NGL Pipeline, L.P. et al.*,
  2016 WL 8315623 (PHMSA Oct. 12, 2016)......................................................13

*Interstate Energy Co.*,
  32 FERC ¶ 61,294 (Aug. 23, 1985) ........................................................24

*Klitzke v. Steiner Corp.*,
  110 F.3d 1465 (9th Cir. 1997) ..................................................................21

*Maryland v. Louisiana*,
  451 U.S. 725 (1981)........................................................................ 2, 9, 18

*Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*,
  874 F.3d 604 (9th Cir. 2017) ...............................................................26

*Northville Dock Pipe Line Corp. & Consol. Petrol. Terminal, Inc.*,
  14 FERC ¶ 61,111 (Feb. 6, 1981) .........................................................25

*Roberts v. Levine*,
  921 F.2d 804 (8th Cir. 1990) ...............................................................15

*S. Nat. Gas Corp v. Alabama*,
  301 U.S. 148 (1937).............................................................................17

*Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*,
  796 F.2d 539 (D.C. Cir. 1986)...................................................... 13, 14

*Texaco Ref. & Mktg., Inc.*,
80 FERC ¶ 61,200, 61,804 (1997) ...................................... 7, 8, 20, 21

*The Daniel Ball*,
  77 U.S. 557 (1870)......................................................................... 5, 21

*Theodore Roosevelt Conserv. P'shp v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011)...............................................................26

*U.S. v. Ohio Oil Co.*,
  234 U.S. 548 (1914)............................................................................21

*United States v. Champlin Refining Co.*,
  341 U.S. 290 (1951)............................................................................24

## Statutes

49 U.S.C. § 60101(a)(7)........................................... 1, 3, 4, 5, 19, 20, 22

iv

49 U.S.C. § 60101(a)(8)............................................................... 4, 6, 7

49 U.S.C. § 60101(a)(22)........................................................ 6, 19, 20, 25

49 U.S.C. § 60101(a)(22)(A)(i) .....................................................6

49 U.S.C. § 60104 .................................................................. 1, 3, 6

## Regulations

49 C.F.R. Part 195.....................................................................23

50 Fed. Reg. 39,008 (Sept. 26, 1985) .......................................22

## INTRODUCTION

The key merits issue in this case is whether Sable's onshore pipeline segments within the Santa Ynez Pipeline System are used to transport crude oil "in interstate commerce" under the Pipeline Safety Act. 49 U.S.C. § 60101(a)(7). If so, then the onshore segments perform "interstate pipeline transportation" and are "interstate pipeline facilities" under the exclusive regulatory authority of the U.S. Pipeline and Materials Hazardous Safety Administration (PHMSA). *Id.* § 60104(c).

After oral argument, this Court ordered supplemental briefing on the relevance of *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026), to the meaning of "interstate pipeline facilities" and "interstate pipeline transportation" as defined in 49 U.S.C. § 60101. The Court also ordered briefing on a mootness question: whether this Court can rule on the interstate commerce issue "[a]bsent a petition that specifically challenges PHMSA's new jurisdictional determination." Dkt.132.1. The United States submits this brief answering the Court's questions.

As explained in Part II below, the Court need not decide the merits at this time because California has filed a new petition that "specifically challenges PHMSA's new jurisdictional determination." Dkt. 132.1. California's supplemental brief concedes that "this Court need not decide the mootness issue" because it can resolve the merits in the context of California's newly filed petition.

1

Cal.Supp.Br. 24. (Dkt.105.1). Thus, the best course is to hold these petitions in abeyance pending resolution of California's new petition.

For the sake of completeness, Part I below addresses the merits. On the meaning of "interstate commerce," *Flowers Foods* is directly applicable to the text of the Pipeline Safety Act and controls this case. The Supreme Court relied on 150 years of precedent interpreting the meaning of "interstate commerce" and held that once goods cross state lines, they remain in interstate commerce all the way to their final destination, regardless of a temporary stop at a warehouse or processing facility.

The delivery driver in *Flowers Foods* picked up Butterscotch Krimpets from a warehouse in Colorado and delivered them to stores in Colorado. The Court held that he was engaged in interstate commerce because he performed an intrastate leg of an interstate journey. Even though he never crossed state lines, what mattered was that the goods crossed state lines. And it made no difference that the goods were sorted in the warehouse after they crossed state lines, just as processing gas did not break the flow of commerce in *Maryland v. Louisiana*, 451 U.S. 725, 728-29 (1981), and just pasteurizing milk did not do so in *Foremost Dairies, Inc. v. FTC*, 348 F.2d 674, 678 (5th Cir. 1965). Treatment of a product does not break the flow of commerce when the goods are not fundamentally transformed into a new

2

product and when the shipper intends to ship the goods all the way to a final destination.

Here, the purpose of the Santa Ynez pipeline is to transport crude oil from production facilities on the outer continental shelf to a terminal in Pentland, California. Along the way, the Las Flores Canyon facility removes excess water and gas, and treats the crude oil for the purpose of facilitating transportation. That does not break the flow of commerce because it does not fundamentally transform the crude oil into a new product. Crude oil flows into Las Flores, and crude oil flows out. The onshore pipeline segments then continue the transportation of the crude oil all the way to Pentland.

Just as the driver in *Flowers Foods* was "engaged in interstate commerce," the onshore segments are "used to transport" crude oil "in interstate commerce," § 60101(a)(7), because they perform an intrastate leg of an interstate journey. None of Petitioners' arguments undermine this conclusion.

## I.     The onshore pipeline segments are used to transport crude oil in interstate commerce under *Flowers Foods.*

### A.     The rule from *Flowers Foods* is dispositive here.

The Pipeline Safety Act vests the federal government with exclusive regulatory jurisdiction over "interstate pipeline facilities" and "interstate pipeline transportation." 49 U.S.C. § 60104. For hazardous liquids, such as crude oil, Congress defined an "interstate hazardous liquid pipeline facility" as "a hazardous

3

liquid pipeline facility used to transport hazardous liquid *in interstate or foreign commerce*[.]" *Id.* § 60101(a)(7) (emphasis added). And, in relevant part, the statute defines "interstate or foreign commerce" as "commerce between … a place in a State and a place outside that State." *Id.* § 60101(a)(8)(B)(i).

California concedes that Sable's onshore pipeline segments are a hazardous liquid pipeline facility because they transport crude oil. The only question is whether the crude oil is "in interstate commerce" when it flows through the onshore pipeline segments, such that the segments "are used to transport crude oil in interstate commerce."

*Flowers Foods* provides the governing rule. The Supreme Court unanimously held that a delivery driver who picked up baked goods from a Colorado warehouse and delivered them to Colorado stores was "engaged in interstate commerce" under the Federal Arbitration Act because he performed "an intrastate leg of an interstate journey." 146 S. Ct. at 1363-66. The Court rejected an argument that the driver was not engaged in interstate commerce because he never physically crossed state lines and never interacted with vehicles that crossed state lines. *Id.* at 1364 ("that cannot be right"). Nor did it matter that the baked goods stopped at a warehouse, nor that they were unloaded, sorted, and arranged for subsequent retail sales. *Id.* at 1362, 1365; *see also* Pet'rs Br. in *Flowers Foods*,

4

2025 WL 3555100 at *2, *9. What mattered is that the goods crossed state lines as part of their overall journey.

The Supreme Court drew that rule from 150 years of Supreme Court precedent about the meaning of "interstate commerce." 146 S. Ct. at 1364 (discussing *The Daniel Ball*, 77 U.S. 557 (1870)). The Court explained that when Congress uses "interstate commerce" in a statute, the Court's Commerce Clause precedents "offer probative evidence of what an ordinary person at the time of the [statute's] enactment would have understood its terms to mean." *Id.* at 1365. Courts have followed this same framework for interpreting the meaning of "interstate commerce" under many other analogous statutes. *E.g.*, *Aircraft Serv. Int'l, Inc. v. Federal Energy Regulatory Commission*, 985 F.3d 1013, 1016-17 (D.C. Cir. 2021) (analyzing Supreme Court's Commerce Clause cases to apply FERC's "interstate commerce" test for oil pipelines under the Interstate Commerce Act); *Foremost Dairies, Inc. v. FTC*, 348 F.2d at 676 (Robinson Patman Act).

*Flowers Foods*'s analysis of the text "engaged" "in interstate commerce" is on all fours with the language "used to transport" "in interstate or foreign commerce" under definition 7 of the Pipeline Safety Act. 49 U.S.C. § 60101(a)(7).

First, "engaged" under the Federal Arbitration Act is equivalent to "used" under the Pipeline Safety Act. *Flowers Foods* contrasted "engaged in" interstate commerce with the broader term "affecting" interstate commerce, which reaches to

5

the "outer bounds of [Congress's] authority under the Commerce Clause." 146 S. Ct. at 1365. The Court held that "engaged" is a *narrow* term that requires a "direct," "necessary," and "active" role in "moving goods across borders." *Id.* Under this holding, "engaged in interstate commerce" is no broader than "used to transport" "in interstate commerce" under the Pipeline Safety Act. There is no basis to distinguish *Flowers Foods* on the ground that "engaged" under the Federal Arbitration Act is somehow broader than "used" under the Pipeline Safety Act.[1]

Second, the Court's definition of "interstate commerce" in *Flowers Foods* is materially identical to the Pipeline Safety Act. § 60101(a)(8). From *Flowers Foods*: "interstate commerce" means "the transportation of persons or property … between points in one state and points in another state." 146 S. Ct. at 1364. From

---

[1] Contrary to California's repeated inaccurate assertions (*e.g.*, Supp.Br. 3-4), the Hazardous Liquid Pipeline Safety Act expressly applies to all transportation "in or affecting interstate or foreign commerce," § 60101(a)(22)(A)(i), which extends to the full "outer bounds" of Congress's Commerce Clause power, *Flowers Foods*, 146 S. Ct. at 1365. The "affecting" commerce provision in definition 22 authorizes PHMSA to prescribe safety standards for *intrastate* pipeline facilities and to enforce those standards in states that do not have an annual certification under § 60105(a); *see also* § 60102(a)(2) (authorizing PHMSA to regulate all "pipeline transportation" and "pipeline facilities"); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878-879 (9th Cir. 2006) (discussing differences in the regulation of interstate and intrastate facilities under the Pipeline Safety Act). Because CA-324/325 are part of an interstate hazardous liquid pipeline facility, PHMSA does not need to rely on the "affecting" commerce provision to prevail in this case. However, if a state authority did not have an annual certification, even intrastate pipelines in California would be subject to PHMSA's exclusive jurisdiction. § 60104(c) (requiring "current certification"); *Olympic Pipe Line Co.*, 437 F.3d at 880 (explaining that only certified states can assert Pipeline Safety Act jurisdiction).

6

the Pipeline Safety Act: "interstate … commerce" means "commerce between … a place in a State and a place outside that State." 49 U.S.C. § 60101(a)(8).

Third, it makes no difference that "used" modifies "transport" in the Pipeline Safety Act, whereas the Arbitration Act does not use the word "transport." The word "transportation" in *Flowers Foods* is supplied in the definition of "interstate commerce," which the Court stated as "the transportation…of property" between states. 146 S. Ct. at 1364. That is why the Court held that "engaged in interstate commerce" requires a direct role in "*moving* goods across borders." *Id.* (emphasis added). In other words, to be engaged in interstate "commerce" is to be engaged in interstate "transportation."

For these reasons, Petitioners' arguments that there are meaningful differences in the statutory language in the Arbitration Act and the Pipeline Safety Act are wholly unavailing. Envtl.Supp.Br. 7-12 (Dkt. 134.1); Cal.Supp.Br. 2-5. There is no meaningful difference in the statutory language interpreted in *Flowers Foods* and the relevant language of the Pipeline Safety Act.

Nor is there any meaningful difference in the language of the Interstate Commerce Act, which governs FERC's regulation of oil pipelines, and applies to "common carriers engaged in ... the transportation of oil … by pipeline ... from one State to another." *Texaco Ref. & Mktg., Inc.*, 80 FERC ¶ 61,200, 61,804 (1997). There is a significant body of precedent addressing "interstate commerce" under

that statute. *E.g.*, *Aircraft Servs.*, 985 F.3d at 1016-17 (D.C. Cir.). Like *Flowers Foods*, those cases rely on the Supreme Court's Commerce Clause cases. *Id.*; *Texaco*, 80 FERC at ¶ 61,804-05. And, like *Flowers Foods*, those cases hold that "[w]henever fuel crosses state lines and subsequently moves within a state by pipeline," "the presumption [is] that the fuel's entire journey is interstate commerce." *Aircraft Servs.*, 985 F.3d at 1017.

**B.     As in *Flowers Foods*, the processing at the Las Flores facility does not break the flow of interstate commerce.**

California contends that interstate transportation of the crude oil terminates at Las Flores Canyon on the theory that the crude oil is manufactured into a new product, and then that new product begins a wholly new, intrastate journey when it is pumped through the onshore pipeline segments. Cal.Supp.Br. 11. That is incorrect.

As shown in the cases discussed below, processing during a temporary stop does not break the flow of commerce unless an ingredient is fundamentally transformed into a new product. So long as the product retains its essential identity, it remains in interstate commerce. This "standard is elastic" and lacks "hard outlines," but looks to all relevant circumstances to assess whether "raw material was made into a new article at the stop." *Baltimore & O.R. Co. v. United States*, 15 F. Supp. 674, 676 (N.D.N.Y. 1936) (Hand, J.) (synthesizing the Supreme Court precedent).

8

Under this line of precedent, this is an easy case. There is no dispute that Sable intends to ship crude oil from federal waters through the pipeline system all the way to Pentland. 2-ER-69. Crude oil goes into Las Flores, and crude oil comes out. U.S. Response Br. 16. And the treatment at Las Flores is undertaken for the purpose of facilitating transportation. *Id.* at 19-30. This no more breaks the flow of commerce than sorting the baked goods at the warehouse in *Flowers Foods.*

**1.** To begin, the Supreme Court has held that processing of natural gas does not break the flow of commerce. In *Maryland v. Louisiana*, 451 U.S. 725, 728-29 (1981), the Supreme Court concluded that natural gas transported from federal waters in the Gulf of America to "processing plants" in Louisiana and then to Maryland was continuously transported in interstate commerce all the way to Maryland. *Id.* at 754. The Louisiana processing facility "dried" the gas by removing specific types of hydrocarbons before distribution to customers in over 30 states. *Id.* at 729. The Court held that the flow "through processing plants in Louisiana" did not break the flow of interstate commerce under the Commerce Clause. *Id.* at 754; *see id.* at 746 (identifying the issue as whether Louisiana's tax interferes with "transportation and sale of natural gas in interstate commerce").

The Fifth and Seventh Circuits have concluded that pasteurizing milk does not break the flow of interstate commerce under the Robinson Patman Act, which applies only in the "restrictive context" of goods purchased "in interstate

9

commerce." *Foremost Dairies, Inc. v. FTC*, 348 F.2d 674, 676 (5th Cir. 1965). In *Foremost Dairies*, the Fifth Circuit held that milk produced in Colorado was transported in interstate commerce to retail establishments in Albuquerque, New Mexico, and the flow of interstate commerce was not broken by midstream processing in a Santa Fe, New Mexico plant. *Id.* at 677-78. At the processing facility, the milk was "unloaded from the trucks, tested, standardized to a uniform butterfat content by the addition of other milk of a predetermined butterfat ratio, pasteurized, in some cases homogenized, and bottled." *Id.* at 676. Because the milk "passed in a steady flow from the farms in Colorado through the Santa Fe processing plant" where it underwent processing that "did not change its character appreciably," that processing did not interrupt the flow of interstate commerce from Colorado to retail stores in Albuquerque. *Id.* at 677-78.

Like *Foremost Dairies*, the Seventh Circuit has held that pasteurized milk retained its "essential identity" and thus the stream of interstate commerce was not broken during processing of raw milk. *Dean Milk Co. v. F.T.C.*, 395 F.2d 696, 715 n.37 (7th Cir. 1968); *see also Baltimore & O.R. Co.*, 15 F. Supp. at 677 (processing by "packing, bailing and the like" does not break the flow of commerce).

Next, the Supreme Court has explained that processing which results in separating goods into separate streams of commerce does not break the flow of commerce. In *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 34 (1974), the Court

10

held that a Mississippi court's refusal to honor and enforce an interstate contract was "repugnant to the Commerce Clause." The contract involved a farmer in Mississippi delivering cotton to a company in Mississippi for ginning and then delivering the ginned cotton to a local warehouse. *Id.* at 24. It was an interstate contract, even though it only involved transactions within Mississippi, because the cotton was graded and sold to mills in other states after delivery at the local warehouse. *Id.* at 23-26. The Court recognized that this local cotton "enter[ed] a long interstate pipeline" that terminated at mills across the country "after a complex sorting and matching process" at the local warehouse that was "designed to provide each mill with the particular grade of cotton" it could process. *Id.* at 25. Thus, breaking a single stream of commerce into multiple streams leaves goods in interstate commerce.

On the other side of the ledger, a manufacturing process that materially transforms an ingredient into a new product may break the flow of interstate commerce. In *Dean Milk*, for example, the Seventh Circuit distinguished pasteurizing milk from turning butterfat into ice cream. *Dean* Milk, 395 F.2d at 715 n.37 (discussing *Central Ice Cream Co. v. Golden Rod Ice Cream Co.*, 287 F.2d 265 (7th Cir. 1961)); *see also Bacon v. Texaco, Inc.*, 503 F.2d 946, 948 (5th Cir. 1974) (holding that the "extensive process involved in refining crude oil into

11

gasoline results in the alteration of the nature of the product" and breaks the flow of interstate commerce).

Likewise, in *Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co.*, 249 U.S. 134 (1919), a wood mill broke the flow of commerce when it manufactured "rough lumber" "into finished staves, headings and hoops," a process that "occupied several months." *Id.* at 150. Even before the manufacturing, the rough lumber was stored at the mill for an indefinite period for the purpose of finding a market—"[w]here it would eventually be sold no one knew." *Id.* The flow of interstate commerce may thus be broken when a facility transforms ingredients into a fundamentally different product or when goods are stored indefinitely and the customer is not yet determined. *Id.*; *see also Aircraft Serv.*, 985 F.3d at 1017 (shipper's intent to stop the transportation indefinitely can break the flow of interstate commerce).

**2.** Applying this precedent here, the processing at Las Flores Canyon does not break the flow of commerce because crude oil goes in, and crude oil comes out. The crude oil is processed to facilitate immediate transportation to a final destination in Pentland, and the crude oil retains its essential identity as crude oil. U.S. Response Br. 19-30.

The Las Flores facility removes water and gas from the crude oil, separating it into three streams of commerce: one stream of crude oil, one stream of water,

12

and one stream of gas. *Id.* This does not change the essential nature of the crude oil, which continues on to Pentland. *Id.* At most, separation of gas is like separation of different grades of cotton in *Allenberg Cotton*. And, as *Allenberg Cotton* shows, separating a product into multiple commercial streams does not break the flow of commerce for the product that continues beyond the processing facility—here, the crude oil. 419 U.S. at 30. Just as separating one truckload of cakes, pies, and bread into three smaller trucks in *Flowers Foods* would not have broken the stream of commerce, separating water, gas, and oil does not break the flow here. *Cf. In re ONEOK NGL Pipeline, L.P., et al.,* 2016 WL 8315623 at *8 (PHMSA Oct. 12, 2016) ("separation of a mixture" of crude oil is incidental to transportation and is not "refining," which "is a term commonly used in the industry to refer to the conversion of crude petroleum into new products, not the separation of a mixture.").

Further, during this process, the Las Flores facility stabilizes the crude oil with heat and an anticorrosion agent, all for the purpose of facilitating continued interstate transportation. Like milk pasteurization, the crude oil retains its essential identity as crude oil, and Las Flores Canyon does not break the flow of commerce.

**3.** Petitioners cases are inapposite. To begin, California's lead case in its reply brief was *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539, 541 (D.C. Cir. 1986). Indeed, California claimed at

13

oral argument that the jurisdictional question at issue is not a question of first impression because *Southern Pacific* had already resolved it. Oral Arg. At 1:03:12; *see also* Cal Reply Br. 1, 10, 11, 13. Petitioners continue to rely on it here. Cal.Supp.Br. 15-16; Envtl.Supp.Br. 10-15.

But *Southern Pacific* is irrelevant. For one thing, it does not involve processing or any stop at any facility of any kind. For another, it addressed a pipeline with a "point of origin in California." 796 F.2d at 541. Unlike here, where the oil begins in federal waters out of state, the pipeline trunk in *Southern Pacific* had no upstream flow from out of state. The question of interstate flow into California, which is the entire question here, was not at issue. Instead, the court held that "lateral" delivery lines "located entirely within the state of California" were intrastate pipelines because the oil had an undisputed "point of origin in California" and terminated in California. *Id.* The D.C. Circuit rejected the pipeline owner's argument that downstream flow in Nevada rendered the lateral delivery lines in California interstate, even though the flow of oil originated in the trunk in California and terminated in the lateral lines in California. *Id.* at 542. That case is inapposite here because the crude oil begins in federal waters out of state. All of the oil that flows through Sable's onshore pipeline segments had a "point of origin" in federal waters out of state. Accordingly, the governing rule for this case comes from *Flowers Foods*, and under that case, once the crude oil crossed state

lines, it remains in interstate commerce all the way to its final destination in Pentland.

Next, when Petitioners do turn to cases addressing warehouse stops or processing, their cases do not support their arguments. They first rely on soybean processing in *Roberts v. Levine*, 921 F.2d 804 (8th Cir. 1990). Envtl.Supp.Br. 26; Cal.Supp.Br. 9-11. There, a plant bought soybeans and converted them to meal and oils by heating, drying, cracking the hulls of the soybeans, rolling beans into flakes, soaking the flakes in a solvent to recover oil, and toasting, drying, and grinding. 921 F.2d at 808. Though soybeans entered the plant, no soybeans left it. *Id.* This is a stark contrast to the Las Flores Canyon processing facility, where there is no refining and no change to the essential nature of the crude oil.

Petitioners' reliance on *Arkadelphia Milling*, 249 U.S. 149, is misplaced. Cal.Supp.Br. 10; Envtl.Supp.Br. 25. Manufacturing rough lumber into staves and barrels turns the rough wood into a fundamentally different product. By contrast, processing at the Las Flores Canyon facility does not change the essential character of crude oil.

Petitioners next rely on *Crescent Cotton Oil Co. v. Mississippi*, 257 U.S. 129, 136 (1921), which is also inapposite. Envtl.Supp.Br. 26; Cal. Br. 9-10. In *Crescent Cotton*, a cotton gin separated cotton from cotton seeds and the gin operator then had an option to either purchase the seeds or not to purchase them.

15

*Id.* The initial sale was local and did not cross state lines, so no interstate commerce had ever begun. *Id.* If seeds were purchased, the operator could store them indefinitely, sell or use them in state, or ship them interstate. *Id.* The Supreme Court held that interstate commerce did not begin until after the seeds left the ginning facility, not just because of the processing, but because of the potential for long-term storage at the gin and the undefined and uncertain market, which could be in state or out of state, for the seeds. *Id.*

Here, by contrast, Sable has contracted for crude oil to be shipped in commerce from the outer continental shelf across the California state line to the Pentland terminal, so the goods have already been shipped in interstate commerce, the market is certain, the destination has been determined, and there is no indication that crude oil is stored long term at Las Flores Canyon. Further, unlike in *Crescent Cotton*, the processing at Las Flores is undertaken for the purpose of facilitating transportation, and it separates three products (crude oil, gas, water) that are already in interstate commerce, such that the three interstate products are arranged in three separate streams instead of one. Just like pasteurizing milk, this does not break the flow of commerce.

Petitioners cite other cases for the proposition that processing breaks the chain of commerce—all are inapposite. Cal.Supp.Br. 9-12; Envtl.Supp.Br. 25-26. In *Goldberg v. Faber Indus., Inc.,* 291 F.2d 232, 234 (7th Cir. 1961), a plant

16

converted meat scraps into livestock food, a fundamentally different product. Two of the cases involve processing natural gas. Natural gas is distributed across state lines at high pressure, and when it comes to rest the pressure is reduced so that the gas expands. *East Ohio Gas Company v. Tax Commission*, 283 U.S. 465, 470 (1931); *S. Nat. Gas Corp v. Alabama*, 301 U.S. 148, 155 (1937). This expansion is a necessary aspect of retail distribution, and following expansion the gas is no longer suitable for anything but local sale. *East Ohio*, 283 U.S. at 470-471. There is no parallel change to the character of crude oil at the Las Flores Canyon facility. Instead, the effect of that processing is the opposite—rather than expanding the volume of the crude oil emulsion to allow for retail sale, the volume of the emulsion is reduced by removing water and other contaminants, allowing for more efficient transport. *See* U.S. Br. 19-30. Environmental Petitioners also rely on *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967), which summarily affirmed a district court's factual finding that meat delivered and processed interrupted continuity of transit, but did not discuss the duration or nature of the interruption other than to say it involved boning and cutting meat. This case is irrelevant.

Finally, Petitioners rely on cases concluding that the flow of interstate commerce is broken because the goods come to rest. *Arkdelphia Milling*, 249 U.S. 149; *Crescent Cotton*, 257 U.S. 129.  But that is not the case here. Interstate and intrastate commerce have been distinguished in the crude oil context based on

17

whether the oil's movement is continuous or whether it has been deliberately halted for an indefinite period with no concrete plan to continue its journey. *See Eureka Pipe Line Co. v. Hallanan*, 257 U.S. 265, 271-272 (1921); *Gulf Refining Co. of Louisiana v. Phillips*, 11 F.2d 967, 969 (5th Cir. 1926). For example, where storage tanks are used to detain oil until it is sold to an unspecified buyer, those tanks might break the flow of interstate commerce. *Gulf Refining Co.*, 11 F.2d at 969. That is not the situation here where the Las Flores Canyon facility does not hold the crude oil until it is sold. Sable has already contracted to sell the oil at Pentland; the Las Flores Canyon facility simply processes the oil to facilitate further transportation to the oil's final destination. *See* Sable Merits Br. 28-31.

To sum up, the onshore pipeline segments are used in interstate commerce because they perform an intrastate leg of the oil's interstate journey. The crude oil begins in federal waters offshore and is transported through the onshore pipeline segments all the way to Pentland. Just like the warehouse in *Flowers Foods*, just like the Louisiana processing facility at issue in *Maryland*, and just like pasteurizing milk, the Las Flores Canyon facility's processing activity does not stop the flow of interstate commerce.

### C. Petitioners are wrong to focus on the pipelines divorced from the crude oil traveling through them.

While Petitioners contend that *Flowers Foods* is irrelevant, their alternative theory of how the Pipeline Safety Act's jurisdictional provisions work is

fundamentally misguided. They argue that whether a pipeline facility is interstate "is determined by looking to its physical start and end points." Envtl.Supp.Br. 3; *accord* Cal.Supp.Br. 17 ("the Pipeline Safety Act considers the physical location of the transport mechanism…to delineate whether it is intra- or interstate"). According to Petitioners, if a pipeline "begins and ends within state boundaries, it is by definition intrastate." Envtl. Reply 17. Relatedly, Petitioners argue that if a facility does any activity that is outside the scope of the definition of "transporting hazardous liquid" in 49 U.S.C. § 60101(a)(22), then the facility automatically terminates the flow of interstate commerce and under 49 U.S.C. § 60101(a)(7). Cal.Supp.Br. 8-11; Envtl.Supp.Br. 24-25. Both arguments are incorrect.

First, the disputed issue here is not about jurisdiction over the Las Flores Canyon Facility itself. The disputed issue is about jurisdiction over the *onshore pipeline segments*. Thus, the question is not whether Las Flores is an interstate pipeline facility, but is instead whether the onshore pipeline segments are an interstate pipeline facility. And to answer that question, the issue is whether those pipeline segments are "used to transport hazardous liquid in interstate … commerce," 49 U.S.C. § 60101(a)(7). Under that provision, it is the hazardous liquid, the crude oil, that must be transported "in interstate commerce."

And under *Flowers Foods*, goods remain "in interstate commerce" when they cross state lines, even if multiple different carriers transport them on an

19

intrastate leg of that interstate journey. Just as it did not matter that the delivery driver in *Flowers Foods* did not cross state lines, it makes no difference whether a pipeline physically crosses state lines. *See Flowers Foods*, 146 S.Ct. at 1362, 1364. That is why FERC regulates oil pipelines that are physically located "wholly within California," so long as the oil itself is "intended to, and do[es], travel interstate." *Texaco Ref. & Mktg., Inc.*, 80 FERC ¶ at 61,803, 61,805; *id.* at ¶ 61,806 ("The Commission has found that interstate movements along a line only 1,400 feet long are jurisdictional.") So, what matters here is not whether the pipeline crosses state lines, but whether the crude oil crosses state lines. And it does, starting on the outer continental shelf and moving to Pentland.

Second, even if an activity, like midstream processing, were outside the scope of "transporting hazardous liquid" under § 60101(a)(22), all that would mean is that PHMSA does not regulate that activity; it would not mean the activity breaks the flow of interstate commerce. Whether PHMSA regulates an activity as transporting hazardous liquid under § 60101(a)(22) is a different question than whether that activity breaks the flow of commerce under § 60101(a)(7). Those are different questions. Sometimes overlapping, but different.

To see why this must be true, consider a system that uses both pipelines and tanker trucks to transport crude oil. Truck transportation is outside the scope of "transporting hazardous liquid," which is limited to pipelines, § 60101(a)(22), and

20

it is therefore not regulated under the Pipeline Safety Act. Suppose an oil pipeline starts in Nevada and crosses into California, where it terminates just across the border. A tanker truck then picks up the oil and transports it 50 miles down the road and loads it on to another pipeline that transports the oil within California to Pentland. That second pipeline would be used to transport crude oil in interstate commerce because the oil crossed state lines, just like the driver in *Flowers Foods*, who never crossed state lines but performed an intrastate leg of an interstate journey. *See The Daniel Ball*, 77 U.S. at 565 (steam ship operating entirely within the boundaries of Michigan was operating in interstate commerce); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469-70 (9th Cir. 1997) (interstate jurisdiction "necessarily extends to transportation within a state that 'is a practical continuity of movement from the manufacturers or suppliers without the state.'") (cleaned up); *Escobedo v. Ace Gathering, Inc.*, 109 F.4th 831, 835-36 (5th Cir. 2024) (holding that truckers who haul crude oil entirely within Texas are engaged in interstate commerce because the crude oil eventually travels to other states or countries).

And that is true even though the second pipeline is physically located entirely within California, and even though PHMSA does not regulate trucks under the PSA. Indeed, that would be true even if no pipeline ever crossed state lines, and the oil was transported by truck from Nevada to California and then loaded into a pipeline in California. *The Daniel Ball*, 77 U.S. at 565; *Texaco Ref. & Mktg., Inc.*,

21

80 FERC ¶ at 61,807 (pipeline physically located intrastate was engaged in interstate transportation because operators "use these lines for part of their interstate oil shipments").

California resists this, claiming that the Pipeline Safety Act cannot be interpreted to extend jurisdiction over a pipeline running between two in-state storage tanks where the hazardous liquid is transported in and out via truck on either end. Cal.Supp.Br. 5. But California's argument would mean that transporting by truck would break the flow of interstate commerce, which is plainly incorrect.

California mistakenly points to a statement from PHMSA's predecessor agency that "[i]nterstate or foreign commerce is defined by the end points of the commerce." 50 Fed. Reg. 39,008, 39,010 (Sept. 26, 1985). Contrary to California's argument, Cal.Supp.Br. 17, this is consistent with the United States' interpretation here. The flow of commerce is determined by the flow of the goods being bought and sold, not by the pipeline's physical location. *See supra*, § I(A).

Petitioners' theory also has pernicious consequences. Under their theory, any company could evade PHMSA jurisdiction simply by breaking a pipeline and trucking oil over state lines. That is inconsistent with Congressional intent in establishing federal jurisdiction over interstate commerce. 49 U.S.C. § 60101(a)(7).

Environmental Petitioners also claim that PHMSA has always looked to the start and end points of a pipeline to distinguish between an interstate or an intrastate pipeline, but their example is a red herring. Envtl.Supp.Br. 12. Petitioners argue that, before the pipelines were shut down in 2015, PHMSA jurisdiction extended to onshore pipeline segments only because the lines were connected to a network that extended into Arizona. Cal.Supp.Br. 7. But this argument assumes that onshore pipeline segments were regulated only based on outbound movement from the pipeline, rather than inbound flow from the outer continental shelf. This is belied by the facts. From 2000 to 2016, CA-324/325 ended in Pentland, California, and did not extend to Arizona. *All Am. Pipeline, L.P., FERC Tariff Nos. 4 & 5*, No. IS00-148-000 (FERC filed Feb. 18, 2000) (No. 20000224-0094). PHMSA still asserted jurisdiction over those segments during that 16-year period.

California also misreads PHMSA regulations, claiming that Appendix A to 49 C.F.R. Part 195 contains an example, 4B, that resolves the status of onshore pipeline segments. Cal.Supp.Br. 18; 1-CalPSE-179. It does not. Example 4A shows that a pipeline covered by a tariff is considered interstate, and example 4B shows that the same pipeline, with no tariff, is intrastate. 1-CalPSE-178-179. The examples provide no additional detail about whether, and how, the hypothetical pipelines are connected or how oil flows through those pipelines. While FERC tariffs may be relevant for determining whether a pipeline is interstate, they are not

23

dispositive, particularly when, as here, the pipelines are transporting oil in interstate commerce from the Outer Continental Shelf.

> **D.     Applying the *Flowers Foods* rule still allows for state regulation of intrastate pipelines.**

Applying the *Flowers Foods* rule to recognize PHMSA's jurisdiction over the Santa Ynez pipeline would not render intrastate pipelines a null set, as Petitioners assert. Envtl.Supp.Br. 13-15; Cal.Supp.Br. 13-14. There is still a broad role for state regulation where states obtain certification from PHMSA.

For example, where a pipeline begins in California waters and ends in California at a refinery, California would have regulatory jurisdiction. *E.g.*, *PHMSA Letter of Interpretation to THUMS Long Beach Company*, PI-20-0008 (June 15, 2020). State regulation is also appropriate when a company transports oil from its own oil storage facility to its own generating plant without crossing state lines. *See U.S. v. Ohio Oil Co.*, 234 U.S. 548, 561 (1914); *Interstate Energy Co.*, 32 FERC ¶ 61,294, at *61,693 (Aug. 23, 1985). And when a pipeline carries refined petroleum products from its own refinery to another destination in the same state and no other refinery has connections with the line or ships products through it, that pipeline is not operating in interstate commerce. *See United States v. Champlin Refining Co.*, 341 U.S. 290 (1951). When petroleum is delivered by pipeline within a state from a storage facility, and sales from that storage facility are separate from the transportation contract that brought the petroleum to the

24

storage facility, the delivery pipeline would be regulated by the state. *See Aircraft Serv.*, 985 F.3d 1013; *Northville Dock Pipe Line Corp. & Consol. Petrol. Terminal, Inc.*, 14 FERC ¶ 61,111, 61,207 (Feb. 6, 1981). Thus, applying the rule in *Flowers Foods* still leaves a significant role for intrastate pipeline regulation.

> ### E. In the alternative, the Las Flores Canyon Facility is itself regulated by PHMSA as an interstate pipeline facility

This case can be resolved through application of the rule set out in *Flowers Foods*, as discussed above. But the United States also prevails through the separate argument, discussed in its response brief, that processing at the Las Flores Canyon facility is included within the meaning of "transporting hazardous liquid." 49 U.S.C. § 60101(a)(22)(A). U.S. Resp. Br. 19-35. The processing at the Las Flores Canyon facility is incidental to transportation, and the functions at that facility are either part of "movement" or "storage incidental to movement" as those terms are used in the Pipeline Safety Act. *Id.* PHMSA's assertion of jurisdiction is correct both under the rule in *Flowers Foods* and because the Las Flores Canyon facility is transporting a hazardous liquid.

## II. This Court cannot rule on whether PHMSA properly asserted jurisdiction without considering PHMSA's new jurisdictional determination.

As the United States argues in its Motion to Dismiss, Petitioners' challenges to PHMSA's assertion of jurisdiction are moot because the agency has taken a superseding action. U.S. MTD 9-11. PHMSA asserts jurisdiction in a new

decision, which is based on amended and updated reasoning and supported by a new administrative record. This new action, not the superseded action, causes any potential injury to petitioners. *See, e.g., Theodore Roosevelt Conserv. P'shp v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011). And because the old jurisdictional determination has no continuing effect, vacating the old determination would be meaningless. It is already gone. *See* U.S. MTD 9-11.

California has now filed a petition challenging the superseding PHMSA action. California thus concedes that "this Court need not decide the mootness issue" because the Court can simply hold this case in abeyance and decide the jurisdictional question in the context of the new action. Cal.Supp.Br. 24. And if the Court "need no decide the mootness issue," it should not decide it. *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 617 n.13 (9th Cir. 2017) ("if it is not necessary to decide more, it is necessary not to decide more").

There are strong reasons for holding this case in abeyance and deciding the jurisdictional questions based on PHMSA's new determination. As discussed above, *supra* § I, this Court's review turns on the nature of the goods being transported in commerce and on the shipper's intent. The record supporting PHMSA's June 26, 2026, superseding jurisdictional determination includes contracts that are not in the current record and that demonstrate Sable's intent to

26

use the Santa Ynez pipeline to transport crude oil, not gas or water, to the Pentland terminal. These same contracts demonstrate that crude oil is being transported to Pentland, not to Las Flores Canyon.

In addition, a relevant legal issue is whether processing at the Las Flores Canyon facility changes the "nature" or "character" of crude oil. The new administrative record contains documents that are not in the current record and that provide additional and relevant factual information about the processes undertaken at Las Flores, allowing this Court to better assess whether the nature or character of crude oil changes at that facility. (It does not change, but the Court should have a complete factual record before it in adjudicating this question.)

At bottom, PHMSA's new jurisdictional determination is supported by a new administrative record that contains additional facts about Sable's intent in operating the pipeline, and additional facts about the nature of processing at the Las Flores Canyon facility. The Court should adjudicate whether PHMSA appropriately asserted interstate jurisdiction onshore pipeline segments based on the new, superseding determination and supporting administrative record.

Aside from the fact that the original jurisdictional determination is moot, the jurisdictional issue is important, with consequences far beyond the Sable pipeline, and is an issue of first impression under the Pipeline Safety Act and *Flowers Foods*. Even if the original determination were not moot (it is), the Court should

27

not consider this important question without having PHMSA's updated reasoning and the new factual record before it.

## CONCLUSION

For the foregoing reasons, when the Court resolves the jurisdictional issue, the rule in *Flowers Foods* is dispositive. In the meantime, the Court should dismiss these petitions as moot or should consider PHMSA's assertion of jurisdiction in the context of California's petition for review challenging the non-emergency special permit.

Respectfully submitted,

/s/ *Matthew R. Oakes*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
REBECCA JAFFE
MATTHEW R. OAKES
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
matthew.oakes@usdoj.gov

Of Counsel:

GREGORY ZERZAN
*General Counsel*
U.S. Dept. of Transportation

KEITH COYLE
*Chief Counsel*
BENJAMIN FRED
*Assistant Chief Counsel*
TIMOTHY O'SHEA
KATHLEEN MAITLAND
*Attorneys*
Pipeline and Hazardous Materials Safety Administration

July 27, 2026

28

DJ# 90-13-1-18706

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume limitations of imposed by this Court because this document contains 6,685 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

s/ *Matthew R. Oakes*
MATTHEW R. OAKES

Counsel for Appellants