**Nos. 25-8059, 26-508**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**ENVIRONMENTAL DEFENSE CENTER, et al.,**

*Petitioners,*

v.

**U.S. DEPARTMENT OF TRANSPORTATION, et al.,**

*Respondents,*

and

**SABLE OFFSHORE CORP., et al.,**

*Respondent-Intervenors.*

On Petition for Review of Actions Taken by the
Pipeline and Hazardous Materials Safety Administration

## RESPONDENT-INTERVENORS' SUPPLEMENTAL BRIEF

Nicholas McDaniel
Lucille E. Wiesner
BABST CALLAND CLEMENTS
AND ZOMNIR, P.C.
505 9th St., NW, Suite 602
Washington, DC 20004
(202) 853-3455

Jessica Stebbins Bina
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(424) 653-5525
jessica.stebbinsbina@lw.com

James W. Noe
Rafe Petersen
Ashley Akers
HOLLAND & KNIGHT LLP
800 17th St., NW, Suite 1100
Washington, DC 20006
(202) 469-5525

*Attorneys for Respondent-Intervenors
Sable Offshore Corp. and Pacific Pipeline Company*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES...................................................................iii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................2

I.    *Flowers Foods* Supports the Conclusion that the Onshore Segments Transport Hazardous Liquid in Commerce Between a Place Outside California and a Place in California. ...........................................................3

    A. The Onshore Segments are the Final Leg of a Single Interstate Journey to Pentland Station.............................................5

        1. The Santa Ynez Pipeline Transports Crude Oil from the OCS to Pentland Station in One Continuous Interstate Journey. ....5

        2. The Onshore Segments Remain in Interstate Commerce. ......6

        3. Petitioners' Proposed Interpretation Would Read "Commerce" Out of the Statute. ...................................................................9

        4. The Reasoning in *Flowers Foods* and its Cited Cases is Consistent with PHMSA's Determination. ..........................10

    B. The Court Does Not Need to Resolve the Status of the LFC to Find that PHMSA Has Jurisdiction Over the Onshore Segments........................................................................12

        1. The Statutory Exclusion for Production, Refining, and Manufacturing Facilities Does Not Determine the Jurisdictional Character of the Onshore Segments..............12

        2. In Any Event, the Dehydration and Stabilization Functions at Las Flores Canyon Do Not Break the Flow of Interstate Commerce. ........................................................................14

    C. Petitioners Misrepresent *Southern Pacific*....................................18

    D. Recognizing PHMSA Jurisdiction Comports with the Statutory Scheme and Congressional Intent. ...............................22

II.   The Petitions Should Be Dismissed as Moot or Otherwise Unreviewable...................................................................................26

    A. The Challenges to the Interstate Letter, Special Permit, and Restart Plan Letter are Moot. ................................................26

i

B. The Restart Plan Letter is Not Reviewable Here. ..........................26

C. If Inclined, the Court May Decide the Jurisdictional Question. ...............................................................................28

CONCLUSION...............................................................................30

ii

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Ameren Servs. Co. v. FERC*,
330 F.3d 494 (D.C. Cir. 2003) ................................................................11

*Carmona Mendoza v. Domino's Pizza, LLC*,
73 F.4th 1135 (9th Cir. 2023)................................................................15

*Champlain Realty Co. v. Town of Brattleboro*,
260 U.S. 366 (1922).................................................................................15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984).................................................................................18

*Crescent Cotton Oil Co. v. Mississippi*,
257 U.S. 129 (1921)......................................................................... 16, 17

*The Daniel Ball*,
77 U.S. 557 (1870)..................................................................................3, 6

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*,
283 U.S. 465 (1931)..................................................................................18

*EP Operating Co. v. FERC*,
876 F.2d 46 (5th Cir. 1989) ....................................................................13

*Escobedo v. Ace Gathering, Inc.,*
109 F.4th 831 (5th Cir. 2024)…………...................................... ……………..8

*Eureka Pipe Line Co. v. Hallanan,*
257 U.S. 265 (1921).....................................................................................8

*Fed. Power Comm'n v. E. Ohio Gas Co.*,
338 U.S. 464 (1950).....................................................................................7

*Flowers Foods, Inc. v. Brock*,
146 S. Ct. 1358 (2026)............................................... 1, 2, 3, 4, 6, 9, 10, 11, 20, 22

*Foremost Dairies, Inc. v. F.T.C.*,
  348 F.2d 674 (5th Cir. 1965)..............................................................................17

*Int'l Bhd. of Teamsters v. ICC,*
  921 F.2d 904 (9th Cir. 1990)........................................................................8, 13

*Klitzke v. Steiner Corp.*,
  110 F.3d 1465 (9th Cir. 1997) ...........................................................................9

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)...................................................................11, 19, 28, 29

*Maryland v. Louisiana*,
  451 U.S. 725 (1981)................................................... 7, 14, 15, 16, 17

*McElroy v. United States*,
  455 U.S. 642 (1982)...........................................................................................6

*Olympic Pipe Line Co. v. City of Seattle*,
  437 F.3d 872 (9th Cir. 2006)............................................................................22

*Rittmann v. Amazon.com, Inc.*,
  971 F.3d 904 (9th Cir. 2020).............................................................................9

*Roberts v. Levine*,
  921 F.2d 804 (8th Cir. 1990)..................................................................... 16, 17

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).................................................................................10, 11

*Shell Oil Co. v. City of Santa Monica*,
  830 F.2d 1052 (9th Cir. 1987).........................................................................29

*S. Pac. Pipe Lines, Inc. v. U.S. Dep't of Transp.*,
  796 F.2d 539 (D.C. Cir. 1986)...................................... 18, 19, 20, 21, 23, 24, 25

*State Tax Comm'n of Miss. v. Interstate Nat. Gas Co.*,
  284 U.S. 41 (1931).........................................................................................15

*United States v. Erie R. Co.*,
  280 U.S. 98, (1929)................................................................................6

*United States v. Gallenardo*,
  579 F.3d 1076 (9th Cir. 2009) ...............................................................10

*United States v. Lopez,*
  514 U.S. 549 (1995) ..................................... ......................... 4

*Walling v. Jacksonville Paper Co.*,
  317 U.S. 564 (1943)...............................................................................15

*Williams Pipe Line Co. v. City of Mounds View*,
  651 F. Supp. 551 (D. Minn. 1987) ................................................. 22, 26

**Statutes**

5 U.S.C. § 706..........................................................................................28

15 U.S.C. § 717a(7) ..................................................................................7

49 U.S.C. § 60101(a)(7)................................................................. 3, 7, 9, 25

49 U.S.C. § 60101 (a)(8)(B) ....................................................................3

49 U.S.C. § 60101(a)(22)..........................................................................24

49 U.S.C. § 60101(a)(22)(A)(i) ......................................................... 13, 25

49 U.S.C. § 60101(a)(22)(B)(ii) .............................................................12

49 U.S.C. § 60104(c) ...........................................................................4, 22

**Regulations**

49 C.F.R. pt. 195, app. A .......................................................................22

50 Fed. Reg. 39,008 (Sept. 26, 1985) ............................................. 23, 24

v

## <u>INTRODUCTION</u>

Segments 324 and 325 transport Sable's oil, extracted offshore under federal leases, to its contractual delivery point in Pentland, California. The parties agree that these segments are a "hazardous liquid pipeline facility" and that they are "used to transport hazardous liquid." The only disputed question is whether Sable's oil is being transported in "commerce between a place in a State and a place outside that State." *Flowers Foods* and decades of Supreme Court caselaw confirm that it is.

Nothing in the Pipeline Safety Act supports Petitioners' strained interpretation that the interstate character of a pipeline segment should be determined by its physical start and end points. Instead, the statute defines an interstate pipeline based on where the *commerce* begins and ends, not where the *equipment* begins and ends. Here, Sable's oil begins its interstate commerce journey when it is produced at offshore wells in federal waters under federal leases and then is transported to its intended delivery and sale point at Pentland. As it moves through Segments 324 and 325, the oil is moving in interstate commerce. This is true regardless of the midstream processing that takes place at the Las Flores Canyon facility. Commodities like oil remain in interstate commerce until they reach the intended destination—for Sable and its buyers, that destination is Pentland Station, not Las Flores Canyon.

1

Although the existing record amply supports PHMSA's jurisdiction, the Court need not decide the jurisdictional question on these petitions. On July 20, California filed a new petition challenging the non-emergency special permit issued by PHMSA. The Court should decide jurisdiction in that new petition, and dismiss the current petitions as moot or otherwise unreviewable. Petitioners' arguments against mootness hinge on their challenge to a letter from PHMSA approving Sable's "Restart Plan," prepared in conjunction with a 2020 Consent Decree. But the Restart Plan is not what the Petitioners make it out to be. The Restart Plan is merely a Consent Decree-created submission covering safety measures related to the process for resuming oil flow through the line—not some broader federal "order" allowing restart—and is not reviewable here. Because the District Court is the proper forum to hear disputes about this Restart Plan submission and other Consent Decree issues, this Court should dismiss those challenges.

## ARGUMENT

Section I below addresses the Court's first question, explaining that *Flowers Foods* supports PHMSA's conclusion that the Onshore Segments of Sable's Santa Ynez Pipeline are interstate because they are transporting oil in interstate commerce. Section II addresses the Court's second question and explains that the current petitions should properly be considered moot or otherwise unreviewable; but, if the

2

Court is so inclined, it could affirm PHMSA's assertion of jurisdiction as a matter of law.

**I.** ***Flowers Foods* Supports the Conclusion that the Onshore Segments Transport Hazardous Liquid in Commerce Between a Place Outside California and a Place in California.**

Petitioners do not dispute that Sable's Pipeline transports hazardous liquid nor that the crude oil it carries begins in interstate commerce as it moves from federal waters to the onshore Las Flores Canyon facility. The dispute over PHMSA's jurisdiction thus hinges on a single question: Does the crude oil remain in interstate commerce when it travels from Las Flores Canyon to Pentland?

*Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026), answers that question. Applying longstanding precedent dating to *The Daniel Ball*, 77 U.S. 557 (1870), the Court held that goods moving in interstate commerce remain in interstate commerce until they reach their destination, and that a worker moving them is engaged in interstate commerce even though he never crosses a state line. That principle controls here.

The key statutory definitions for pipelines are at 49 U.S.C. § 60101(a)(7) and (a)(8)(B):

> (7) "interstate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce;

> (8) "interstate or foreign commerce"—

\*\*\*

(B) related to hazardous liquid, means commerce between—

(i) a place in a State and a place outside that State; or
(ii) places in the same State through a place outside the State;[1]

Giving effect to the whole statute, an interstate pipeline is thus a pipeline "used to transport hazardous liquid in commerce between a place in a State and a place outside that State." *Id.* (cleaned up). So long as Sable's Outer Continental Shelf ("OCS") crude is in interstate commerce on its journey to Pentland, the Onshore Segments are "used to transport hazardous liquid in interstate or foreign commerce," and PHMSA has exclusive jurisdiction over them under 49 U.S.C. § 60104(c).

*Flowers Foods* is relevant to this Court's interpretation of the Pipeline Safety Act for at least two separate reasons. First, it analyzes interstate-commerce concepts in an analogous context: the similarly worded Federal Arbitration Act. Second, *Flowers Foods* explicitly holds that "cases using the same language as [the statute at issue] or formulations very close to it[] offer probative evidence" of the statute's meaning. 146 S. Ct. at 1365. Following the Supreme Court's instructions, this brief addresses the robust body of caselaw analyzing interstate commerce concepts under

---

[1] The fact that "interstate commerce" for natural gas extends to transportation "affect[ing] . . . commerce" is irrelevant. "[A]ffecting commerce" has always been analyzed differently than "in commerce," *see, e.g.*, *United States v. Lopez*, 514 U.S. 549, 561–62 (1995). Sable's cited cases analyze what it means to be "in commerce."

similarly worded federal statutes. All cases support Sable's and PHMSA's straightforward, plain-language understanding of what it means for oil to be transported "in commerce between a place in a State and a place outside a State."

### A. The Onshore Segments are the Final Leg of a Single Interstate Journey to Pentland Station.

#### 1. The Santa Ynez Pipeline Transports Crude Oil from the OCS to Pentland Station in One Continuous Interstate Journey.

As already explained, crude oil flows from the OCS, through the Las Flores Canyon facility and Onshore Segments, to Pentland Station with only minimal processing—to remove excess water and gas unsuitable for onshore transport—that does not change its essential character. *See* ECF 80.1 at 20–22 and citations therein.

There is no dispute that Sable intends to and does transport *all* OCS-origin crude for delivery to buyers at Pentland. There are no other contractual sale or delivery points. And in fact, the oil physically can go nowhere else—there are no connecting pipelines, delivery laterals, or alternative configurations that could transport it elsewhere, and Las Flores Canyon has no facilities to manufacture the oil into new saleable products, like gasoline or plastic. The Pipeline thus carries crude in commerce from the OCS platforms (a place outside California) to Pentland (a place in California), placing the entire Santa Ynez Pipeline within PHMSA's exclusive pipeline-safety authority.

### 2. The Onshore Segments Remain in Interstate Commerce.

Sable maintains that the Santa Ynez Pipeline is a single integrated system from the OCS platforms to Pentland and rejects Petitioners' premise that the Las Flores Canyon facility severs the Pipeline into disconnected pieces. But even accepting *arguendo* that the Onshore Segments should be analyzed separately from the rest of the Pipeline, Segments 324 and 325 remain in interstate commerce.

"Interstate commerce includes transporting products 'between points in one state and points in another state.'" *Flowers Foods*, 146 S. Ct. at 1364. Petitioners concede that the *offshore* segment of the Pipeline is an interstate pipeline transporting hazardous liquid in interstate commerce—in other words, the crude has begun its interstate commerce journey in this offshore segment. *See* ECF 51 at 49. And once a shipment acquires its "interstate character," that character "continues at least until the load reaches the point where the parties originally intended that the movement should finally end." *McElroy v. United States*, 455 U.S. 642, 653 n.17 (1982). Thus, "[t]hough 'a continuous carriage' may begin in one State and end in another, 'much of the journey' can take place 'within the limits of a single state'" and still remain in interstate commerce. *Flowers Foods*, 146 S. Ct. at 1364.

That interstate character is "determined by the essential character of the commerce," not by the boundaries of any single leg. *United States v. Erie R. Co.*, 280 U.S. 98, 101–02 (1929). As the Court explained in *The Daniel Ball*, "[t]he fact

that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction." 77 U.S. at 565. The "interstate character" of the Santa Ynez Pipeline is even more straightforward: there are no other operators and no interrupting commercial transactions between the OCS and Pentland. On these facts, the Onshore Segments are plainly "used to transport hazardous liquid in interstate or foreign commerce." 49 U.S.C. § 60101(a)(7).

These basic interstate commerce principles have been applied directly to pipelines by the Supreme Court. For interstate natural gas, which is subject to a nearly identical statutory definition of interstate commerce,[2] "[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." *Maryland v. Louisiana,* 451 U.S. 725, 755 (1981) (citing cases). It "does not cease its interstate journey the instant it crosses the [state] boundary or enters [the] pipes, even though th[e] [c]ompany operates completely within the state where the gas is finally consumed." *Fed. Power Comm'n v. E. Ohio Gas Co.*, 338 U.S. 464, 467 (1950). Likewise, crude oil that originates on the OCS and travels to Pentland does not lose its interstate character merely because the

---

[2] "[C]ommerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof[.]" 15 U.S.C. § 717a(7).

7

Onshore Segments operate within California. In *Eureka Pipe Line Co. v. Hallanan*, the Court observed that oil gathered within West Virginia entered the operator's pipes and moved in "a continuous stream to the State line and beyond." 257 U.S. 265, 269 (1921). The Court held that "the transmission of this stream of oil was interstate commerce from the beginning of the flow," and that its interstate character was fixed by the pipeline company's intent and control of the destination, even if some of the oil might be diverted for delivery to an intrastate buyer. *Id.* at 272.

The Fifth Circuit's opinion in *Escobedo v. Ace Gathering, Inc.*, is also helpful in the crude oil context. Ace gathered crude oil from oil fields in Texas and transported it to pipelines using tanker trucks. 109 F.4th 831, 832–33 (5th Cir. 2024). While Ace operates entirely within Texas, the crude oil it carries was shipped to out-of-state refineries or export markets. *Id.* at 833. Applying the Motor Carrier Act exemption to the FLSA's overtime requirements—which turns on whether employees transport property "in interstate or foreign commerce"—the court held that the drivers' haul "is but one segment of the crude oil's larger interstate journey and, by all indications, part of the crude oil's 'practical continuity of movement' out of the state." *Id.* at 835. That the haul never left Texas did not change the result.

Ninth Circuit precedent supports the same conclusion. In *International Brotherhood of Teamsters v. ICC*, this Court held that goods shipped interstate to a California warehouse and then on to in-state points "continued to be in interstate

commerce despite the fact that the final leg . . . took place entirely within California," because of the shipper's "fixed and persisting intent." 921 F.2d 904, 906 (9th Cir. 1990); *see also Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir. 1997). More recently, in *Rittmann v. Amazon.com, Inc.*, this Court held that because last-leg delivery workers carry "goods that remain in the stream of interstate commerce until they are delivered," the final leg of that delivery, although made entirely within the state of California, is still part of the interstate movement. 971 F.3d 904, 915 (9th Cir. 2020). The Supreme Court directly relied on this "intended destination" focus in *Flowers Foods*. 146 S. Ct. at 1366.

Petitioners, for their part, entirely ignore the dispositive factor of intent: Sable has a fixed, persisting, and undisputed intent to transport and deliver its OCS-produced oil to Pentland. *Flowers Foods* and Ninth Circuit precedent confirm that Sable's oil remains in interstate commerce because it is intended for delivery at Pentland.

### 3. Petitioners' Proposed Interpretation Would Read "Commerce" Out of the Statute.

In Petitioners' view, the Pipeline Safety Act's "used to transport hazardous liquid in interstate or foreign commerce," § 60101(a)(7), is narrower than the FAA's "engaged in . . . interstate commerce" because "used to" allegedly signifies the physical endpoints of the particular pipe. The statute does not support that strained

9

reading. Section 60101(a)(7) is not fixed on a pipeline that itself crosses a state line, or one whose endpoints lie in two States. The statute does not address the physical location of the pipe at all. Instead, the definition covers a facility being *used in interstate commerce*; the key is the interstate character of the *commerce* in which the facility is used, not the physical location of the pipeline itself. Indeed, here Plains disconnected these segments from its broader system in states outside of California in 2000, *yet they continued to be regulated as interstate until 2016*, when oil ceased flowing. *See* ECF 80.1 at 50.

Petitioners' contrary reading writes "commerce" out of the statute. Yet, reading "used to transport . . . in interstate commerce" to require the segment itself to cross a border would impose a physical geographic limitation Congress did not create, and would render the defined phrase "interstate or foreign commerce" surplusage. *See, e.g.*, *United States v. Gallenardo*, 579 F.3d 1076, 1086 (9th Cir. 2009) ("[W]e attempt to give effect, if possible, to every clause and word of a statute."). The plain language of the Pipeline Safety Act reaches the transportation of oil *in commerce* between a place in a State and a place outside the State. And that is exactly what the Onshore Segments do.

### 4. The Reasoning in *Flowers Foods* and its Cited Cases is Consistent with PHMSA's Determination.

California contends that PHMSA's December 2025 actions rested on a "single-facility" theory rather than a consideration of interstate commerce, and that

10

any reliance on *Flowers Foods* is an impermissible post-hoc rationalization barred by *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). The objection fails on two grounds.

First, *Chenery* is limited to determinations or judgments an administrative agency alone is authorized to make. *See Chenery*, 332 U.S. at 196. After *Loper Bright*, statutory interpretation is not such a determination—the reviewing court decides "all relevant questions of law," reserving deference only for agency policymaking and factfinding. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Even before *Loper Bright*, where a court reviews the operative statutory language *de novo*, it may do so even on grounds the agency did not invoke *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 500 n.10 (D.C. Cir. 2003). The Court must independently apply the statute's correct construction. *Flowers Foods* and its cited cases are persuasive authority bearing on that construction.

Second, even if *Chenery* did have some relevance, there has been no post-hoc substitution. PHMSA's jurisdictional determination has consistently rested on the fact that the crude originates on the OCS and is transported in continuous interstate movement to Pentland. *Flowers Foods* confirms that longstanding stream-of-commerce principle. *Chenery*'s requirement that an order be judged on the grounds the record discloses is satisfied where an intervening decision reinforces the agency's stated position.

11

**B.** **The Court Does Not Need to Resolve the Status of the LFC to Find that PHMSA Has Jurisdiction Over the Onshore Segments.**

Whether PHMSA has jurisdiction over every part of the Las Flores Canyon facility is irrelevant. Regardless of whether PHMSA has jurisdiction over the facility, it has jurisdiction over the Onshore Segments transporting oil in interstate commerce, and the statutory exclusion for production, refining, and manufacturing facilities does not strip PHMSA of its jurisdiction over downstream pipeline segments. No matter the status of the LFC, Segments 324 and 325 remain within PHMSA's exclusive pipeline-safety jurisdiction.

**1. The Statutory Exclusion for Production, Refining, and Manufacturing Facilities Does Not Determine the Jurisdictional Character of the Onshore Segments.**

Petitioners argue that (a) the Las Flores Canyon facility is an "onshore production, refining, or manufacturing facilit[y]" whose operations fall outside the definition of "transporting hazardous liquid," 49 U.S.C. § 60101(a)(22)(B)(ii), so (b) that the crude entering Segments 324 and 325 begins a new, intrastate journey. That argument misreads both the exclusion and its role in the statute: (a) is not true, and (b) does not follow (a) in any event.

With respect to (a), Sable has explained that Las Flores Canyon is not an excluded facility: nothing is produced refined, or manufactured there, and PHMSA has jurisdiction over the "movement" of oil through LFC's piping and processing

12

equipment. *See* 49 U.S.C. § 60101(a)(22)(A)(i); *see* ECF 80.1 at 44–47.  But the Court need not resolve that question to sustain PHMSA's jurisdiction over the Onshore Segments because even if LFC were excluded, that would not make the Onshore Segments a new intrastate pipeline. Section 60101(a)(22)(B)'s carve-out says nothing about the jurisdictional character of the pipeline segments downstream of an excluded facility. The facility exclusion and the jurisdictional inquiry are distinct questions. Even if an excluded facility separates the Offshore and Onshore Segments, that does not convert the Onshore Segments into intrastate lines.

This Court's analysis in *International Brotherhood of Teamsters*, 921 F.2d 904, is illustrative. There, paper goods shipped by a manufacturer from out of state to a California warehouse, and then to in-state points, remained in interstate commerce throughout their journey. Because certain upstream shipments were statutorily exempt from federal regulation, the Teamsters union argued—like Petitioners here—that the goods leaving the warehouse were new, intrastate movements originating at the warehouse, regardless of the shipper's intent to move its goods in continuous interstate commerce. This Court rejected that argument, holding that "goods shipped from a point in one state to a point in the same state may remain in interstate commerce even where an exempt movement of the goods precedes the single-state movement," based on the shipper's "fixed and persisting intent" to move the goods in continuous interstate commerce. *Id.* at 910; *see also EP*

13

*Operating Co. v. FERC*, 876 F.2d 46, 50 (5th Cir. 1989) (explaining that despite FERC's inability to regulate the price of gas moving through a line "[t]he movement of [that] gas in interstate commerce is still clearly within the Commission's jurisdiction.").

The same principle applies here. Even if some aspect of Las Flores Canyon were exempt (*i.e.* treating the LFC as the warehouse in *International Brotherhood of Teamsters*), the carve-out would not strip PHMSA of jurisdiction over the Pipeline, which carries oil in interstate commerce from the OCS all the way to delivery at Pentland.

### 2. In Any Event, the Dehydration and Stabilization Functions at Las Flores Canyon Do Not Break the Flow of Interstate Commerce.

The Las Flores Canyon facility functions as a midstream processing point within the integrated Santa Ynez Pipeline, with crude oil entering the facility and crude oil exiting. As explained in Sable's answering brief, the dehydration and stabilization performed at Las Flores Canyon prepare the crude for continued pipeline movement. That processing—and the limited, temporary storage that accompanies it—does not take the crude out of its intended interstate journey.

The Supreme Court has addressed precisely this midstream-processing question, confirming Sable's position that commodities like crude oil remain in interstate commerce after processing. *Maryland v. Louisiana* held that hydrocarbons

14

produced on the OCS and piped "through processing plants" on their way to market remain "a continual flow of gas in interstate commerce," even when "'interrupted' by certain events," because "[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." 451 U.S. at 755. The same is true of OCS crude moving through processing at LFC to Pentland.

An overwhelming body of authority confirms that temporary stops and interruptions, including processing, do not break the flow of interstate commerce where the interruption is incidental to and supportive of the continued movement. *See* ECF 80.1 at 41–42.

Continuity turns on the shipper's intent, and interruptions made "only to promote the safe or convenient transit" do not break "the continuity of the interstate trip." *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376 (1922). Work done "upon the flowing gas to help the delivery" is likewise "incident to the interstate commerce." *State Tax Comm'n of Miss. v. Interstate Nat. Gas Co.*, 284 U.S. 41, 44 (1931). And where goods are temporarily halted "in the process of getting them to their final destinations," they remain in commerce "until they reach those points," for "[a]ny other test would allow formalities to conceal the continuous nature of the interstate transit." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943). So too where goods are "inevitably destined from the outset of the interstate

15

journey" for the buyer: "it matters not that they briefly paused that journey." *Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135, 1138 (9th Cir. 2023).

The processing at Las Flores Canyon is precisely such an "interruption." It is incidental to, and supportive of, the oil's continued interstate movement to Pentland. It does not break the flow of interstate commerce or strip the Onshore Segments of their interstate character.

Petitioners' authorities do not compel a different result. California and the Environmental Petitioners rely on *Roberts v. Levine*, 921 F.2d 804 (8th Cir. 1990), for the proposition that processing interrupts interstate commerce, and on *Crescent Cotton Oil Co. v. Mississippi*, 257 U.S. 129 (1921), for the proposition that manufacturing begins a new commercial journey. *See* ECF 133.1 at 15–16; ECF 134.1 at 31–32. Neither speak to the situation here.

Unlike here, the plant in *Roberts* transformed raw soybeans into distinct, useful products: meal and soybean oil. 921 F.2d at 816 ("ICC regulation . . . lists soybean oil and meal as manufactured commodities."). Similarly, the plant in *Crescent Cotton* converted raw cotton into seed and fiber. Important to the Supreme Court's analysis, seed was only salable after ginning, and the downstream commercial path for the seed was uncertain prior to the ginning process—ginning created a new product (seed) that could then be kept, sold interstate *or* intrastate, or

16

made into seed oil, or not. 257 U.S. at 136. The Court held that while the cotton-ginning process preceded interstate commerce, once "the seed ha[d] been committed to a carrier for interstate transport," it "pass[ed] . . . into interstate commerce and under the national power." *Id.*[3]

Las Flores Canyon does not "convert" oil into anything else. Its dehydration and stabilization functions remove components (water and gas) from the crude and prepare it for continued pipeline transportation, but they do not change the fundamental character of the hazardous liquid. Crude oil enters the facility, and crude oil with less water goes out. *Roberts* and *Crescent Cotton* are thus wholly inapposite. *See Maryland v. Louisiana*, 451 U.S. at 732 fn.8 & 754–55 (concluding that "processing for the extraction of . . . waste materials" does not "break" the "continual flow of gas in interstate commerce"); *Foremost Dairies, Inc. v. F.T.C.*, 348 F.2d 674, 677–78 (5th Cir. 1965) (concluding that "rather negligible processing" in the form of "standardization[] and pasteurization . . . no more interrupts the flow of [interstate] commerce than . . . temporary storage."). *Roberts* is further

---

[3] *Crescent Cotton* also does not address the circumstances under which interstate commerce is *interrupted* by a process like ginning; it instead examines at what point interstate commerce *begins*. Here, Petitioners concede that Sable's crude oil is already being transported in interstate commerce prior to the LFC, and an overwhelming body of caselaw establishes that the interstate commerce is not *interrupted* by the midstream processing and incidental storage that takes place there. *See, e.g., Maryland v. Louisiana*, 451 U.S. at 732 fn.8 & 754–55.

17

distinguishable because, unlike here, its shippers lacked the requisite intent to move their product in interstate commerce. *See* 921 F.2d at 816.

The Environmental Petitioners separately invoke *East Ohio Gas Co. v. Tax Commission of Ohio*, 283 U.S. 465 (1931), for the proposition that treatment interrupts interstate commerce. *See* ECF 134.1 at 29–31. That case is again distinguishable: the Court evaluated the status of supply lines that divided de-pressured gas into many local streams for retail delivery, an operation the Court compared to breaking a bulk package into individual units for retail sale. That analogy does not fit the facts here: the Onshore Segments are not supply lines, and Las Flores Canyon does not divide the crude for local retail delivery. Instead, the crude remains in Sable's single Pipeline, moving in a single direction, to its only delivery point at Pentland.

## C.    Petitioners Misrepresent *Southern Pacific*.

Petitioners' reliance on *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539 (D.C. Cir. 1986), is misplaced for multiple reasons.

*First*, *Southern Pacific* was decided under *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), so the court did not independently determine the meaning of the statute, only whether "the Secretary's definition of interstate and intrastate pipelines" in the regulations constituted a "reasonable interpretation of the statute." 796 F.2d at 540–42. In fact, the petitioner in that case

18

did not raise any arguments about "the statutory provision that directly defines interstate pipelines," instead relying on other provisions and other arguments. *Id*. at 542. But regardless, after *Loper Bright*, this Court must "exercise independent judgment in determining the meaning of statutory provisions." 603 U.S. at 394. Whether the D.C. Circuit found the Secretary of Transportation's 1984 regulations reasonable says nothing about what the Pipeline Safety Act requires.

*Second*, the facts of *Southern Pacific* support the conclusion that the Santa Ynez Pipeline is interstate. The *Southern Pacific* pipeline system originated in California and crossed the border into Nevada and Arizona. *See* 796 F.2d at 541. No party disputed that the main trunk line shipped oil from California to Nevada and Arizona and was interstate for its entire length. At issue were "delivery laterals" located entirely within California and which branched off from the trunk line to deliver oil to specific customers in California. *See id*. Accordingly, while some of the oil in the trunk line was transported in interstate commerce with a delivery point out of state, *none* of the oil traveling through the California lateral lines ever entered interstate commerce, as it originated at the trunk line's origin point in California and was always intended for, and actually delivered to, customers within California. That is not the fact pattern here. Segments 324 and 325 are not delivery laterals that branch off from a trunk line going elsewhere; they are themselves the trunk line, moving oil from the OCS to Pentland. *See* ECF 80 at 22–23. Petitioners obfuscate

19

this, asserting "Lines CA-324/325 *may* be *indirectly* 'connected to' the Offshore Emulsion Pipeline," ECF 133.1 at 21 (emphasis added)—but the record is crystal clear as to that "connection" and its directness: *every drop of crude oil* Sable produces offshore flows through both the "Offshore Emulsion Pipeline" and Segments 324 and 325 under a contract for continuous carriage from the OCS to Pentland.

Petitioners incorrectly suggest *Southern Pacific* held that whether a pipeline segment is interstate or intrastate is determined solely by a geographic examination of its start- and endpoints. *See* ECF 134.1 at 17; ECF 133.1 at 21. Yet no such rule—or even analysis—appears within *Southern Pacific*. While it is clear a state can never regulate a pipeline segment that starts or ends beyond its borders, it does not follow, nor does *Southern Pacific* hold or the statute allow, that a state *automatically* has jurisdiction over *all* pipeline segments within its borders.

*Third*, to the extent the court in *Southern Pacific* analyzed the Pipeline Safety Act, the core of its analysis was that "the character of a given pipeline as either interstate or intrastate depends on whether *it is actually used to transport liquid moving in interstate commerce*." 796 F.2d at 543 (emphasis added). Likewise, as the Supreme Court stated in *Flowers Foods*, "[a] shipment from one state to another under a contract for continuous carriage is interstate commerce, even as to so much of the journey as is within the limits of a single state." 146 S. Ct. at 1364 (citation

20

omitted). *Southern Pacific* did not, as Petitioners claim, "specifically reject[]" the interstate commerce definition from *Flowers Foods*, ECF 134.1 at 17, but in fact accords with it. If a pipeline is "actually used to transport hazardous liquid in interstate commerce," it is interstate, *Southern Pacific*, 796 F.2d at 543, "even as to so much of the journey as is within the limits of a single state." *Flowers Foods*, 146 S. Ct. at 1364. *Southern Pacific* does not contradict *Flowers Foods*, or any of Respondents' previously cited precedent, and supports Respondents' position that courts look beyond the physical location of a pipeline segment in determining jurisdiction. That is why California is correct that neither "PHMSA [n]or Sable argued that *Southern Pacific* is wrongly decided [or] that this Court should create a circuit split." ECF 133.1 at 22. A ruling in Sable's and PHMSA's favor is in accord with *Southern Pacific* and would not create a circuit split.

Petitioners misleadingly fault Sable for failing to "explain[] how to distinguish *Southern Pacific*" in its prior briefing. ECF 133.1 at 22. But Environmental Petitioners did not raise *Southern Pacific* at all in their opening brief, and California only cited *Southern Pacific* for an unrelated, generic policy point about states retaining a regulatory role for pipelines. Neither Petitioner even attempted to argue that Southern Pacific was factually similar. And for good reason, because fundamentally, *Southern Pacific* addressed an entirely different factual scenario. The Santa Ynez Pipeline is a single trunk line moving oil in interstate

21

commerce, not a lateral branch line. *Southern Pacific* recognized—as does *Flowers Foods*—that a shipment across state lines remains interstate commerce even as to those parts of the journey within a single state.

**D.** **Recognizing PHMSA Jurisdiction Comports with the Statutory Scheme and Congressional Intent.**

PHMSA's assertion of jurisdiction over the entire Santa Ynez Pipeline is entirely consistent with how the Pipeline Safety Act has been understood for decades, and it would not lead—as Petitioners erroneously claim—to the exclusion of states from pipeline regulation.

Congress enacted the Pipeline Safety Act with a "policy of providing national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 883 (9th Cir. 2006); *see also Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 571 (D. Minn. 1987). To that end, the Pipeline Safety Act provides for "nationally uniform" safety standards, 49 C.F.R. pt. 195, app. A, and by default prohibits state regulation even over *intrastate* pipelines absent federal approval, *see* 49 U.S.C. § 60104(c).

The legislative and regulatory history confirms this understanding. Shortly after enactment, the Department of Transportation—in the 1985 regulatory document on which California relies (at 24) and which was upheld in *Southern*

22

*Pacific*—expressed its concern that "conflicting state rules could impede the flow of interstate commerce." 50 Fed. Reg. 39,008, 39,011 (Sept. 26, 1985). To resolve that concern, the Department made clear that "[i]nterstate or foreign commerce is defined by the end points *of the commerce*." *Id.* at 39,010 (emphasis added). In that rulemaking proceeding, just as now, California objected, claiming that the federal government's "approach could result in the virtual exclusion of the states from the area of hazardous liquid pipeline regulation." *Id.* at 39,011. But the Department specifically rejected California's view that a pipeline running from Los Angeles to Nevada should be chopped up into segments such that "only that part of the line after the point of last delivery within the state would be interstate." *Id.* This view, it concluded, would be "contrary to both a plain and a contextual reading of the HLPSA," and it would also contravene "usual conceptions of Federal regulation of interstate and foreign commerce." *Id.* Instead, to preserve the free flow of interstate commerce, the agency asserted jurisdiction over the entire pipeline, even if it "deliver[ed] a large percentage of its product to points within California," because a pipeline with "any, if only a small amount of, interstate or foreign commerce" is still a federally regulated interstate pipeline. *Id.* at 39,011–12.

Petitioners also invoke two deletions from the Act's drafting history: removal of "by connection with other pipeline facilities" from the definition of "interstate pipeline facilities," and removal of "treatment of hazardous liquids during the course

23

of transportation" from the definition of "transporting hazardous liquid." Neither deletion helps Petitioners.

Removing language related to "connection with other pipeline facilities" confirms only that the test is not whether a pipeline is connected to an interstate system. The legislative history demonstrates as much: Congress removed that language to clarify that PHMSA jurisdiction turns on "the degree of use of particular facilities in interstate or foreign commerce" rather than extending to "*any* pipeline facilities that are physically connected to" an interstate pipeline facility. *Id.* at 39,009 (emphasis added). Consistent with Respondents' position, the focus is on the interstate character of the commerce the pipeline is moving in, not merely connection.

Petitioners are thus wrong to assert that "PHMSA's position today [] is difficult to distinguish from Southern Pacific's position at the time." ECF 133.1 at 21. Before both the D.C. Circuit and the Department of Transportation, Southern Pacific argued that "a pipeline is interstate if it is physically part of an interstate pipeline system—*regardless of how that part of the system is actually used*." 796 F.2d at 543 (emphasis added). The entire Santa Ynez Pipeline is an interstate pipeline from the OCS to Pentland by nature of its use in interstate commerce.

Removing the express "treatment" language from § 60101(a)(22) likewise does not exclude the pipeline segments downstream of a treatment step from federal

24

jurisdiction. The operative text still defines "transporting hazardous liquid" to include the movement of hazardous liquid by pipeline "in or affecting interstate or foreign commerce," § 60101(a)(22)(A)(i), and separately defines an interstate facility by reference to the commerce it serves, § 60101(a)(7).[4]

California is also wrong that Respondents' position would eliminate any role for states. The Pipeline Safety Act, both today and when it was enacted, creates exclusive federal jurisdiction for pipelines "actually used to transport liquid moving in interstate commerce." *Southern Pacific*, 796 F.2d at 543. Then, as now, states may regulate where transportation is not taking place in interstate commerce. As explained by counsel for Sable at the July 7 argument, there are ready examples of these intrastate pipelines—including pipelines that transport oil produced from onshore California wells and deliver that oil for sale at other points within California.

In fact, while Petitioners warn that PHMSA's position would exclude states from all pipeline regulation, their theory produces the opposite result: any pipeline could be subdivided to guarantee state regulation except as to the specific stretch of pipe crossing state lines—nullifying the Pipeline Safety Act and achieving the exact result the Department of Transportation rejected in 1985. Permitting every state "to

---

[4] Separately, Sable's Answering Brief explains why the removal of the word "treatment" does not exclude the LFC facility itself from PHMSA's jurisdiction. The oil is *moving* through the LFC while it is being treated, which creates federal jurisdiction under § 60101(a)(22)(A)(i).

25

demand compliance with their own safety standards" would thwart "the clear Congressional goal of a national standard for hazardous liquid pipeline safety" and "in effect deprive [HLPSA] of its efficacy." *Williams*, 651 F. Supp. at 569–70 (alteration in original).

## II.    The Petitions Should Be Dismissed as Moot or Otherwise Unreviewable.

### A.    The Challenges to the Interstate Letter, Special Permit, and Restart Plan Letter are Moot.

The petitions should be dismissed as moot for the reasons explained in the United States' Motion to Dismiss. California agrees that "there is no need to decide [the mootness] issue" because of its new Petition. ECF 133.1 at 8. The most prudent course of action is for this Court to consolidate the new petition here, dismiss the earlier petitions as moot, and evaluate PHMSA's jurisdiction in the context of the nonemergency special permit and new jurisdictional memo.[5]

### B.    The Restart Plan Letter is Not Reviewable Here.

Petitioners make the Restart Plan out to be something more than it is. "Restart Plan Approval" is not "Restart Approval." There is no requirement in the Pipeline Safety Act or any federal or state law for an operator to obtain advance approval prior to flowing oil through a pipeline. Instead, as part of a global settlement to

---

[5] Assuming the Court consolidates California's new petition here, Sable would not need to separately move to intervene as it is already a party to the existing petitions.

26

resolve alleged violations by Plains (the pipeline's previous owner), Plains agreed to submit a "Restart Plan" that would document safety measures and cover the logistics and procedures for resuming oil flow. For example, the Restart Plan includes provisions on patrolling and surveillance of the pipeline as oil flow resumes.

If Petitioners believe PHMSA erred in approving Sable's Restart Plan, those claims must be brought in the District Court. *See* ECF 80.1 at 66–69 (explaining that the Restart Plan Letter is not an "order" under the Pipeline Safety Act and that Consent Decrees and Consent Decree-created plans and submissions are not subject to standard APA review). It is of no consequence that the Restart Plan provisions of the Consent Decree adopted language from a 2015 PHMSA Corrective Action Order; that 2015 Order was reviewable at the time. And importantly, the Consent Decree itself provides for dispute resolution procedures that "shall be the exclusive mechanism to resolve disputes" relating to the Restart Plan, and the District Court retains jurisdiction to hear those disputes. ECF 6-1 at 41, *United States of America, et. al. v. Plains All American Pipeline, L.P. et al.*, No. 2:20-cv-02415-SVV-SCCx (Mar. 13, 2020).[6]

---

[6] In the District Court, Sable and the United States contend that the Restart Plan and other Consent Decree requirements are not binding on Sable at all, because Plains—not Sable—is the only party to the Consent Decree. *See, e.g.*, *Plains*, ECF 61. This and other arguments are not briefed in this court, and they demonstrate why disputes about the Restart Plan are properly addressed in the District Court.

27

Contrary to California's unsupported assertion, Sable and the United States are not playing a shell game on the reviewability of the Restart Plan Letter across cases. Sable's and the United States' position is consistent and simple: Challenges to PHMSA's jurisdictional determination are properly brought in this Court; challenges to PHMSA's Restart Plan Letter must be brought in the District Court.

## C. If Inclined, the Court May Decide the Jurisdictional Question.

The Court can and should dispose of the petitions on threshold grounds of mootness and reviewability without reaching the merits of PHMSA's jurisdiction. However, should the Court conclude that PHMSA's original assertion of jurisdiction has not been superseded, the jurisdictional question could be resolved now, as a matter of law.

California's objection to the Interstate Letter challenges PHMSA's legal authority to regulate the Onshore Segments. Under the Administrative Procedure Act, the reviewing court must "decide all relevant questions of law" and must hold unlawful any agency action found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. Whether PHMSA correctly interpreted the Pipeline Safety Act to include the Onshore Segments is such a question of law. After *Loper Bright*, a court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. at 412. That principle applies with special force to "the scope of an agency's own power." *Id.* at 401.

28

Although an agency's interpretation "cannot bind a court," it may inform the court's decision "to the extent it rests on factual premises within [the agency's] expertise." *Id.* at 402.

The interstate-versus-intrastate character of a pipeline is a mixed question of fact and law that requires a fact-intensive inquiry. *See Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1064 (9th Cir. 1987). While the agency's factual findings with respect to the operational structure and function of the Santa Ynez Pipeline are still entitled to deference, *Loper Bright*, 603 U.S. at 392 (§ 706 preserves deferential review of "agency policymaking and factfinding"), the *legal* question of whether the Pipeline, as constituted, falls within PHMSA's exclusive pipeline-safety jurisdiction is for the court to decide *de novo*.

The Interstate Letter rests on PHMSA's factual determination that the Santa Ynez Pipeline is intended to and does transport crude oil originating on the OCS to a delivery point in Pentland. As explained above, under these undisputed facts, the Onshore Segments are used to transport hazardous liquid in interstate commerce. Applying the statute to the facts, the Pipeline is interstate. The Court could reach this conclusion as a matter of law without consideration of the new June 25, 2026 Jurisdictional Determination.

If the Court instead believes the factual record underlying the Interstate Letter is insufficient to rule as a matter of law, or concludes that the Letter has been

29

superseded, it need not resolve the jurisdictional question on this record. The identical legal question is squarely before it in California's new petition (No. 26-508) challenging the operative non-emergency Special Permit. The Court may resolve the jurisdictional question in the context of that action, with the benefit of PHMSA's new jurisdictional memo and a new administrative record.

## CONCLUSION

The Court need not rule, but if it does, it should deny the petition.

Dated: July 27, 2026

Respectfully submitted,

By: */s/ Jessica Stebbins Bina*
Jessica Stebbins Bina
jessica.stebbinsbina@lw.com
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5525

James W. Noe
jim.noe@hklaw.com
Rafe Petersen
rafe.petersen@hklaw.com
Ashley Akers
ashley.akers@hklaw.com
**HOLLAND & KNIGHT LLP**
800 17th Street N.W., Suite 1100
Washington, DC 20006
Tel: (202) 469-5525

Nicholas McDaniel

30

nmcdaniel@babstcalland.com
Lucille E. Wiesner
lwiesner@babstcalland.com
**BABST CALLAND CLEMENTS
AND ZOMNIR, P.C.**
505 9th Street NW, Suite 602
Washington, DC 20004
Tel: (202) 853-3455

*Attorneys for Respondent-Intervenors
Sable Offshore Corp. and Pacific
Pipeline Company*

31

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations imposed by this Court's order dated July 13, 2026 because this document contains **6,996** words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jessica Stebbins Bina*
Jessica Stebbins Bina

*Attorney for Respondent-Intervenors*
*Sable Offshore Corp. and Pacific*
*Pipeline Company*