Nos. 25-8059, 26-508

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*,

and

SABLE OFFSHORE CORP., et al.,
*Intervenors*.

On Petition for Review of Actions Taken by the
Pipeline & Hazardous Materials Safety Administration

**PETITIONERS' REPLY IN SUPPORT OF SUPPLEMENTAL BRIEF**

Linda Krop
Jeremy M. Frankel
Margaret M. Hall

Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
lkrop@environmentaldefensecenter.org
jfrankel@environmentaldefensecenter.org
mhall@environmentaldefensecenter.org

*Attorneys for Petitioners Environmental
Defense Center, Get Oil Out!, Santa
Barbara County Action Network, Sierra
Club, and Santa Barbara Channelkeeper*

Julie Teel Simmonds
David Pettit
Talia Nimmer

Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
tnimmer@biologicaldiversity.org

*Attorneys for Petitioners
Center for Biological Diversity
and Wishtoyo Foundation*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ......................................................................... ii

ARGUMENT ............................................................................................... 2

    I.    Question 1: *Flowers Foods* is Irrelevant, Respondents' Interpretation is Misguided, and the Onshore Pipelines are an *Intra*state Facility under Any Conceivable Interpretation of the PSA. ........................................................................................... 2

        A.    Respondents' Interpretation of the PSA Deviates from its Language, its Purpose, and *Southern Pacific* ......................... 2

            1.    The Text Does Not Support Respondents' Interpretation. ................................................................ 2

            2.    *Southern Pacific* is Dispositive ........................ 4

            3.    Respondents' Interpretation Would Deprive States of the Major Role that Congress Reserved for Them in Pipeline Safety. ........................................................................ 6

        B.    Should the Court Apply a "Continuous Carriage" Test, the PSA Tells Us When the Carriage of Hazardous Liquid is Interrupted. .................................................................... 7

        C.    The LFC Facilities Break the Flow of Interstate Commerce. ..................................................................... 9

    II.    Question 2: The Court Can, and Should, Resolve the Jurisdictional Dispute Now. ............................................... 14

CONCLUSION .......................................................................................... 15

CERTIFICATE OF COMPLIANCE ......................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Able Sales Co., Inc. v. Compania de Azucar de Puerto Rico*,
   406 F.3d 56 (1st Cir. 2005) ..................................................................12

*Allenberg Cotton Co. v. Pittman*,
   419 U.S. 20 (1974) ..............................................................................13

*Arkadelphia Milling Co. v. St Louis Sw. Ry. Co.*,
   249 U.S. 134 (1919) ..........................................................................9, 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...............................................................................5

*Crescent Cotton Oil Co. v. Mississippi*,
   257 U.S. 129 (1921) ...............................................................................11

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*,
   283 U.S. 465, 501 (1931) ............................................................. passim

*Escobedo v. Ace Gathering, Inc.*,
   109 F.4th 831 (5th Cir. 2024)...............................................................13

*Eureka Pipe Line Co. v. Hallanan*,
   257 U.S. 265 (1921) ..............................................................................13

*Flowers Foods, Inc. v. Brock*,
   146 S.Ct. 1358 (2026) ................................................................. 1, 3, 13

*Foremost Dairies, Inc. v. F.T.C.*,
   348 F.2d 674 (5th Cir. 1965)................................................................12

*Int'l Bhd. of Teamsters v. ICC*,
   921 F.2d 904 (9th Cir. 1990)................................................................13

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 335 (1986) ..............................................................................14

ii

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ........................................................................5

*Maryland v. Louisiana*,
  451 U.S. 725 (1981) .................................................................. 12, 13

*Rittman v. Amazon.com, Inc.*,
  971 F.3d 904 (9th Cir. 2020).............................................................13

*Roberts v. Levine*,
  921 F.2d 804 (8th Cir. 1990).........................................................9, 10

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) ..........................................................................7

*S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*,
  796 F.2d 539 (D.C. Cir. 1986) ................................................. 1, 4, 5, 7

**Statutes**

5 U.S.C. § 706(2)(C)........................................................................14

9 U.S.C. § 1 ...................................................................................2, 4

49 U.S.C. § 60101(a)(6)..................................................................3, 12

49 U.S.C. § 60101(a)(7).................................................................. 2, 3, 4

49 U.S.C. § 60101(a)(8)(A) .............................................................3, 12

49 U.S.C. § 60101(a)(8)(B) ...................................................................3

49 U.S.C. § 60101(a)(21)................................................................3, 13

49 U.S.C. § 60101(a)(22)..................................................................1, 8

49 U.S.C. § 60101(a)(22)(A)(i) ..............................................................8

49 U.S.C. § 60101(a)(22)(B)(ii) ..............................................................8

iii

49 U.S.C. §60105 ..................................................................................6

49 U.S.C. § 60106 ................................................................................6

49 U.S.C. § 60112 ...............................................................................14

49 U.S.C. § 60119 ...............................................................................14

## Other Authorities

*Commerce*, Black's Law Dictionary 244 (5th ed. 1979) ...........................4

*Use*, Black's Law Dictionary 1710 (5th ed. 1979) ...............................2, 3

U.S. Energy Info. Admin., *Capacity of Operable Petroleum Refineries by State*
   (Jan. 1 2026) ...................................................................................7

## INTRODUCTION

The Hazardous Liquid Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101–60143, defines the jurisdictional character of a hazardous liquid pipeline facility by its start and end points. That is how it has been understood for its entire forty-year history, including by Federal Respondents, up until their June 5, 2026, Rule 28(j) letter. Federal Respondents' new interpretation of 49 U.S.C. § 60101(a)(7), in which Sable joins, departs from the plain language of the provision, fails to give meaning to the provision as a whole, and suppresses the right Congress granted to states to regulate their own pipelines. Hence why it was rejected in *S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539 (D.C. Cir. 1986).

But should the Court nonetheless read into the PSA a "continuous carriage" test akin to that from *Flowers Foods, Inc. v. Brock*, 146 S.Ct. 1358 (2026), it need not strain to analogize to the morass of case law considering interruptions in commerce to resolve this dispute. Congress has provided in 49 U.S.C. § 60101(a)(22) a ready framework to determine whether the journey of hazardous liquid is continuous, and when it is interrupted. And under that framework, the Onshore Pipelines are *intra*state, as the LFC Facilities take hazardous liquid out of "transportation" to prepare oil, propane, butane, and sulfur products for sale.

The Court can resolve the jurisdictional dispute absent a new petition, as Sable acknowledges, and should resolve it in Petitioners' favor.

1

## ARGUMENT

**I.** **Question 1: *Flowers Foods* is Irrelevant, Respondents' Interpretation is Misguided, and the Onshore Pipelines are an *Intra*state Facility under Any Conceivable Interpretation of the PSA.**

    **A.** **Respondents' Interpretation of the PSA Deviates from its Language, its Purpose, and *Southern Pacific.***

        1.    The Text Does Not Support Respondents' Interpretation.

In their Supplemental Brief, Petitioners explained that the language of 49 U.S.C. § 60101(a)(7) is distinct from that in Section 1 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-402, and it defines the jurisdictional character of a facility by its start and end points. As also explained, this plain-language interpretation is how the PSA has been understood for forty years, including by the D.C. Circuit and by Federal Respondents, and is necessary to preserve the statute's cooperative federalism scheme.

Federal Respondents' only real response to this is to equivocate the phrases "engaged in . . . interstate commerce" and "used to transport hazardous liquid in interstate commerce." PHMSA Supp. Br. at 5–6. But Federal Respondents do so in conclusory fashion—they do not even attempt to reconcile the distinctions between these phrases. "Engaged in," Federal Respondents agree, is a "*narrow* term." *Id.* at 6. But "used to," as explained, is even narrower. *See Use*, Black's Law Dictionary 1710 (5th ed. 1979). And "used to transport hazardous liquid in interstate commerce," as those terms are further defined by the PSA, is narrower still.

2

Sable, for its part, does not address the material distinctions between the language of the PSA and FAA that render *Flower Foods* irrelevant. Instead, Sable posits that the phrase "used to transport . . . in interstate commerce" suggests "the key is the interstate character of the *commerce* in which the facility is used," as opposed to the end points between which the specific facility is transporting goods. Sable Supp. Br. at 10. In shifting the focus from the facility itself to the product within, Sable urges an interpretation that is not only at odds with the language and structure of the provision, but one that embraces the full reach of the Commerce Clause, despite every indication that was not Congress' intent in drafting Section 60101(a)(7). *See, Flowers Foods*, 146 S.Ct. at 1365 (Congress uses more open-ended formulations like "affecting interstate commerce" to signal such intent); 49 U.S.C. § 60101(a)(6), (a)(8)(A), (a)(21) (unlike hazardous liquid, a gas pipeline facility is interstate if it "affects" interstate commerce).

Sable only gets to this interpretation, however, by picking a select phrase from the provision, failing to give effect to its plain language, and reading it out of context. Specifically, Sable fails to read Section 60101(a)(7) in conjunction with Section 60101(a)(8)(B), as required. It fails to ascribe a meaning to the term "commerce." And it ignores the meaning of the term "used" and its import, which focuses the inquiry of the provision on the specific purpose of the facility at issue, and not the product within. *See Use*, Black's Law Dictionary 1710 (5th ed. 1979).

3

As previously explained, when taking those necessary interpretive steps, Section 60101(a)(7) reads as follows: a hazardous liquid pipeline facility is *inter*state if its specific purpose is to exchange or transport hazardous liquid—i.e., it is "used . . . in commerce"—across a state boundary. Petitioners' Supp. Br. at 8–10. In other words, to determine the jurisdictional character of a pipeline facility, the relevant points of origin and terminus are not dictated by the broader journey of a product in which the facility may be "engaged" or "involved in," like the FAA, but the points between which that facility physically conveys the hazardous liquid.

Sable suggests that this reading "writes 'commerce' out of the statute." Sable Supp. Br. at 10. It does not. The provision simply asks what are the two points between which *that facility* is used "in commerce"—i.e., to "exchange" or "transport" goods. *Commerce*, Black's Law Dictionary 244 (5th ed. 1979).

### 2.     *Southern Pacific* is Dispositive.

Despite their assertions otherwise, Sable and Federal Respondents' contrary interpretation cannot be reconciled with *Southern Pacific*. The D.C. Circuit held that lateral lines which continue, without interruption, the transportation of hazardous liquid delivered from out of state are *intra*state facilities. Those same lines, under Respondents' new interpretation, would be considered *inter*state.

So, while Respondents assure the Court they are not asking it to open a circuit split, they do, indeed, urge it to depart from *Southern Pacific*. One reason to

do so, they suggest, is that *Southern Pacific* was decided under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which was recently overruled by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). That is irrelevant for two reasons. First, in substance, the court independently looked at the statutory language of the PSA and found that "[it] supports the Secretary's interpretation" that lateral lines are *intra*state. *Southern Pacific*, 796 F.2d at 543. Second, the Court in *Loper Bright* "d[id] not call into question prior cases that relied on the *Chevron* framework," which are "subject to statutory *stare decisis* despite [the] change in interpretive methodology." 603 U.S. at 412.

Failing that, Respondents attempt to portray the scope of the court's holding in *Southern Pacific* as exceedingly narrow. First, they say, the court held that only the laterals in California were *intra*state, and not those in Arizona or Nevada. At issue, however, was the jurisdictional character of the lateral lines in *all three states*. *Southern Pacific*, 796 F.2d at 541 ("SPPL notes that its objection applies in principle to delivery laterals located wholly in Nevada and Arizona as well."). And, the interpretation it upheld applied to lateral lines writ large. *Id.* at 542 ("[A] wholly intrastate lateral connected to an interstate pipeline is nevertheless intrastate for purposes of the statute."). Second, Sable suggests that the court did not look to the start and end points of the lateral lines to make its determination. But that is the *only* way it could have reached its result.

5

Respondents then try to distinguish *Southern Pacific* on the facts—to no avail. That the lines in *Southern Pacific* were lateral lines is a distinction without a difference. Like the lateral lines, the Onshore Pipelines form a distinct pipeline facility—for reasons already explained, *see, e.g.,* Petitioners' Op. Br. at 27–40—that begin and end in state boundaries. The only material difference is that the lateral lines in *Southern Pacific* moved hazardous liquid in continuous transportation from a point out of state, and the Onshore Pipelines do not, as transportation is interrupted at the LFC Facilities. Thus, if those lateral lines were *intra*state, the Onshore Pipelines are likewise *intra*state under *Southern Pacific*.

### 3. Respondents' Interpretation Would Deprive States of the Major Role that Congress Reserved for Them in Pipeline Safety.

Federal Respondents downplay to what extent their newfound interpretation would upend the PSA's cooperative federalism scheme, codified in 49 U.S.C. §§ 60105 and 60106. In reality, what they suggest is that the many states with negligible in-state oil production would retain a limited role to regulate three types of pipelines: lines that extend (1) from "a state's own storage facility to its own generating plant," (2) from a storage facility to a sale point, or (3) from "its own refinery to another destination in the same state." PHMSA Supp. Br. at 24–25. But a storage facility, Respondents emphatically assert, does not interrupt interstate commerce; thus, line types (1) and (2), which carry hazardous liquid subsequent to storage, would be considered *inter*state under Respondents' interpretation. That

6

leaves only line type (3). But such lines do not exist in nearly half of all states. A full twenty states do not have any refineries. U.S. Energy Info. Admin., *Capacity of Operable Petroleum Refineries by State* (Jan. 1 2026), https://www.eia.gov/petroleum/refinerycapacity/table3.pdf. And the majority of refining occurs in only three: California, Texas, and Louisiana. *Id.* Thus, Respondents' claim that their interpretation still leaves ample room for state oversight is incorrect.

In sum, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context with a view to their place in the overall statutory scheme.'" (citation omitted)). *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Respondents lose sight of this mandate, both by failing to give effect to Section 60101(a)(7) as a whole and by brushing aside the cooperative federalism scheme envisioned by Congress. To the extent there is any ambiguity in Section 60101(a)(7), the Court should opt for the interpretation—i.e., Petitioners'—that most closely comports with Congressional intent that states retain a "major role" in pipeline safety. *Southern Pacific*, 796 F.2d at 542 (quoting 50 Fed. Reg. 39,008-02, 39,011 (Sept. 26 1985)).

**B.      Should the Court Apply a "Continuous Carriage" Test, the PSA Tells Us When the Carriage of Hazardous Liquid is Interrupted.**

Between them, the parties have offered well over a dozen cases addressing interruptions in commerce, or non-interruptions, in various settings. But perhaps

the only thing that is clear from this morass of cases—addressed further below—is that whether the journey of a product is continuous is an inquiry unique to the specific product at issue. The commercial journey and processing of hazardous liquid is different from gas, which is different from soybeans, which is different from milk, and it is difficult to analogize between them.

If the Court reads into the PSA a "continuous carriage" test—despite all the compelling reasons not to—the Court should, and must, look to guidance in the PSA itself, which, as explained, provides a ready framework to determine whether the journey of hazardous liquid is continuous. *See* Petitioners' Supp. Br. at 17–22.

Indeed, for purposes of the PSA, Congress has already told us when hazardous liquid is in continuous transportation, and when its journey is interrupted. It did so in Section 60101(a)(22), when it defined "transporting hazardous liquid." Hazardous liquid is in "transport" when it is being "move[d] . . by pipeline," or in "storage incidental" thereto. 49 U.S.C. § 60101(a)(22)(A)(i). And it is not in transport when, *inter alia*, it is being "move[d] . . . through . . . onshore production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B)(ii). Section 60101(a)(22) provides a workable standard that is true to Congressional intent and offers some measure of predictability.

As previously explained, under this framework, the Onshore Pipelines are *intra*state facilities. *See* Petitioners' Supp. Br. at 17–22. Because the LFC Facilities

do not propel or cause movement of hazardous liquid through a pipeline, and instead "manufacture" and "refine" the liquid into new products, the facilities interrupt "transportation," and further transport in the Onshore Pipelines constitutes a new, *intra*state commercial journey.

**C.      The LFC Facilities Break the Flow of Interstate Commerce.**

Commerce Clause jurisprudence has formulated two principle tests to determine whether a product's journey in commerce is continuous. The first, from *Arkadelphia Milling Co. v. St Louis Sw. Ry. Co.*, is that the flow of commerce is interrupted where a product undergoes a process "that materially change[s] its character, utility, and value." 249 U.S. 134, 151 (1919). The second, from the later-decided *East Ohio Gas Co. v. Tax Comm'n of Ohio*, is that commerce is interrupted where a product is "treated, prepared for sale, and sold at retail." 283 U.S. 465, 471 (1931).

Sable faults Petitioners for, in applying these tests, ignoring the *intent* of the shipper, and more specifically, whether the shipper holds a fixed and persisting intent to deliver a product out of state. Sable Supp. Br. at 9. Petitioners have not. Such intent is already baked into these tests, as explained in *Roberts v. Levine*, 921 F.2d 804, 816 (8th Cir. 1990). Where a commodity is materially changed in "character, utility, and value," *Arkadelphia*, 249 U.S. at 151, or otherwise "treated [and] prepared for sale," *East Ohio Gas*, 283 U.S. at 471, the shipper only intends

9

to deliver that commodity to the processing point. The only commodity that the shipper intends to deliver onward from there is the *processed product*—a new and different commodity. *Roberts*, 921 F.2d at 816 (citing *Arkadelphia*, 249 U.S. 134). In other words, because such processing breaks the flow of commerce, transportation pre- and post-processing are distinct commercial journeys, and the shipper's intent is different for each. *Arkadelphia*, 249 U.S. at 151; *East Ohio Gas*, 283 U.S. at 471; *Roberts*, 921 F.2d at 816.

Substantively, Respondents' argument boils down to the following: the LFC Facilities are akin to a warehouse; crude oil comes into the LFC Facilities, they say, and crude oil goes out. *See* PHMSA Supp. Br. at 9; Sable Supp. Br. at 17. As Petitioners have already explained—*see* Petitioners' Op. Br. at 27–35; Reply Br. at 7–16; Supp. Br. at 19–22—this is contrary to the facts in the record, contrary to the facts judicially noticed, and fundamentally mischaracterizes the processing that occurs at LFC.

The LFC Facilities take a raw material, oil emulsion, and extensively treat, process, and refine it to create and "prepare for sale" products that differ in "character, utility, and value." *East Ohio Gas*, 283 U.S. at 471; *Arkadelphia*, 249 U.S. at 151. They remove brine from the emulsion, dehydrate the emulsion, and break it "by a combination of elevated temperature, chemical addition, and [an] electrostatic field." 2-PSE-373–374; *see Roberts*, 921 F.2d at 808 (the first step in

10

a process that interrupts the commerce of soybeans is "heat[ing] and "dr[ying]"). They strip out natural gases, fractionate them, and sweeten oil in a "crude stripping tower" via "counter-current[] contact[] with sweet natural gas." 2-PSE-375; *see Crescent Cotton Oil Co. v. Mississippi*, 257 U.S. 129, 136 (1921) (separation of cotton seed from fiber, like gas from oil, interrupted commerce). They reduce the pressure of the product through stabilization. 2-PSE-270; *see East Ohio Gas*, 283 U.S. at 471 (reducing pressure interrupts commerce). And, at the end of this process, what emerges are materially distinct products from the oil emulsion that LFC receives: "treated and stabilized crude" and "propane, butane, and sulfur products." 2-PSE-269; 2-PSE-376.

Respondents can point to nothing in the record that states that the purpose of the LFC Facilities is merely to facilitate transportation, or that it acts merely as a warehouse. The purpose of the LFC Facilities is singular: they prepare "oil, propane, butane, and sulfur products for sale," 2-PSE-269, and process them to "meet product specifications," 2-PSE-270; *accord* 2-PSE-373; Sable Op. Br. at 9.

And even if it was true that one oil product comes into LFC, and the same oil product goes out, that would not be dispositive. In *East Ohio Gas*, natural gas came into a pressure-reducing station, and natural gas came out. 283 U.S. at 471. The only change to the character of the product was that its pressure was reduced,

11

and that was sufficient to break the flow of commerce. *Id.* The LFC Facilities likewise reduce pressure—and much more.

The LFC Facilities thus interrupt the flow of commerce, and the cases cited by Respondents do not compel a different conclusion:

In *Foremost Dairies, Inc. v. F.T.C.*, 348 F.2d 674 (5th Cir. 1965), the court found that the standardization and pasteurization of milk involved a "negligible processing operation, which did not change its character appreciably." *Id.* at 677. For reasons explained, the processing at the LFC Facilities is hardly "negligible": it changes the character, value, and utility of the oil emulsion received. Notably, a more recent decision, *Able Sales Co., Inc. v. Compania de Azucar de Puerto Rico*, distinguished *Foremost Dairies* in considering the refinement of sugar. 406 F.3d 56, 63 (1st Cir. 2005). The First Circuit held that the "extract[ion] [of] molasses and other non-sugar minerals," like the LFC Facilities extract water, gas, and oil from emulsion, was not "negligible" and interrupted commerce. *Id.* at 63.

In *Maryland v. Louisiana*, 451 U.S. 725 (1981), the Court was satisfied that "the flow of gas from the OCS wells, through processing plants in Louisiana, and through interstate pipelines to the ultimate consumers . . . constitutes interstate commerce." *Id.* at 755. But the Court was considering the full reach of the Commerce Clause, and not any particular statute that has limiting language akin to the Section 60101(a)(7). *Id.* at 753–54; *see also* 49 U.S.C. § 60101(a)(6), (a)(8)(A),

12

(a)(21) (unlike Section 60101(a)(7), a gas pipeline facility is interstate if it "affects" interstate commerce). Moreover, the extent of processing that occurred at these plants was only vaguely alluded to in the opinion. All the Court noted was that the gas is "dried." *Id.* at 729. It did not opine as to whether other forms of treatment, like pressure reduction, might interrupt commerce. And indeed, the Court's ruling in *East Ohio Gas*, that pressure reduction *does* interrupt commerce, has not been abrogated or overruled. 283 U.S. at 471.

The remaining cases cited by Respondents all involved temporary storage and/or sorting at warehouses where the product and its character were untouched. Each is thus plainly inapposite in the context of the LFC Facilities. *See Flowers Foods*, 146 S.Ct. 1358; *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20 (1974); *Eureka Pipe Line Co. v. Hallanan*, 257 U.S. 265 (1921); *Rittman v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020); *Int'l Bhd. of Teamsters v. ICC*, 921 F.2d 904 (9th Cir. 1990); *Escobedo v. Ace Gathering, Inc.*, 109 F.4th 831 (5th Cir. 2024).

In sum, Sable does not sell oil emulsion, and it does not deliver oil emulsion to Pentland Station. It sells sales-quality crude oil and various natural gases, which are the products that exit the LFC Facilities for transportation to their intended in-state destinations. The process at the LFC Facilities that prepares those products for sale breaks the flow of commerce, and thus the onward transportation of sales-quality crude in the Onshore Pipelines constitutes a distinct intrastate journey.

13

## II.  **Question 2: The Court Can, and Should, Resolve the Jurisdictional Dispute Now.**

This petition is not moot. *See* Petitioners' Opp. to Mtn. to Dismiss. And the Restart Approval—the ultimate entitlement necessary from OSFM to resume operations—is reviewable under 49 U.S.C. § 60119. Petitioners' Reply Br. at 31–34. Indeed, the Restart Approval, which originates from a 49 U.S.C. § 60112 Corrective Action Order, was a function of PSA authority. It *had* to be. Like any agency action, it had to have a basis in statutory authority. *See, e.g., La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 335, 374 (1986).

Sable agrees that the Court can rule on the jurisdictional question presented here under Petitioners' existing 5 U.S.C. § 706(2)(C) claims. Sable Supp. Br. at 28. And that is the course that is most efficient for the Court, most efficient for the parties, and least prejudicial to Petitioners.

Federal Respondents have asserted two theories of jurisdiction: a "single pipeline facility" theory, advanced in their Answering Brief, and an "interstate commerce" theory, advanced in their Supplemental Brief. Both have now been briefed and can be adjudicated on the record currently before the Court, as Sable acknowledges. There is no need for yet another round of briefing—these issues have been exhausted, and nothing new will come of it. An abeyance is thus

14

unnecessary. And the delay to Petitioners, who sought an emergency stay, and who were granted expedited briefing, would be materially prejudicial.[1]

<b>CONCLUSION</b>

The Court should rule on, and grant, the petition.

Dated: July 30, 2026

Respectfully submitted,

*s/ Jeremy Frankel*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*s/ Talia Nimmer*
Talia Nimmer
Julie Teel Simmonds
David Pettit
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

---

[1] On July 23, 2026, Petitioners served on PHMSA a 60-Day Notice of Intent to sue for violations of the Endangered Species Act in issuing the Special Permit. Thus, the soonest Petitioners can file a new petition is September 21, 2026.

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 25-8059, 26-508

I am the attorney or self-represented party.

**This brief contains 3,499 words,** including **0 words** manually counted in any visual images, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[**X**] complies with the length limit designated by court order dated July 13, 2026.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ *Jeremy Frankel*          **Date:** July 30, 2026

16