Nos. 25-8059, 26-508, 26-4629, 26-6190

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*,

and

SABLE OFFSHORE CORP., et al.,
*Intervenors*.

On Petition for Review of Actions Taken by the
Pipeline & Hazardous Materials Safety Administration

# NGO PETITIONERS' JOINT OPENING BRIEF (UNDER SEAL)

Linda Krop
Jeremy M. Frankel
Margaret M. Hall

Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
lkrop@environmentaldefensecenter.org
jfrankel@environmentaldefensecenter.org
mhall@environmentaldefensecenter.org

*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

Julie Teel Simmonds
Talia Nimmer

Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
jteelsimmonds@biologicaldiversity.org
tnimmer@biologicaldiversity.org

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1-1, Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation state as follows:

Petitioners are non-profit organizations. They do not have any parent corporations, and no publicly held corporations own ten percent or more of their stock.

Dated: November 9, 2026

Respectfully submitted,

s/ *Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Julie Teel Simmonds*
Julie Teel Simmonds
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................v

TABLE OF ACRONYMS AND TERMS ........................................................x

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

STATUTORY AND REGULATORY AUTHORITIES ..................................3

INCORPORATION BY REFERENCE OF PRIOR BRIEFS ...........................3

STATEMENT OF THE ISSUES ...................................................................3

STATEMENT OF THE CASE ......................................................................4

I. Overview of Relevant Facilities ......................................................4

II. The Refugio Oil Spill and Transfer of Jurisdiction to OSFM .............6

III. PHMSA's Unlawful Federalization of the Onshore Pipelines and Shifting Litigation Positions ........................................................8

IV. The Special Permit and Proceedings Subsequent ...............................10

SUMMARY OF THE ARGUMENT ...........................................................11

STANDARD OF REVIEW .........................................................................14

ARGUMENT ..............................................................................................17

I. The PSA Defines the Jurisdictional Character of a Pipeline Facility by the *Facility's* Start and End Points, Not Those of the Product Within.................................................................18

II. PHMSA's Single Pipeline Facility Theory Fails Because the LFC Facilities Are Not a "Pipeline Facility." ....................................24

A. The LFC Facilities Are Not a "Pipeline Facility" Because They Do Not "Move[] Hazardous Liquid by Pipeline," and PHMSA's Contrary Conclusion is Arbitrary, Capricious, and Unlawful. ......................................25

1. PHMSA's Finding That the Sole Purpose of the LFC Facilities Is to Facilitate Pipeline Transportation Is Unsupported by, and Contradicts, the Record. ...............................................26

2. That the LFC Facilities May Have an Incidental Effect on Pipeline Transportation Does Not, as a Matter of Law, Render Them a "Pipeline Facility." ...........................................................32

B. The LFC Facilities Are Production, Refining, and/or Manufacturing Facilities That Are Expressly Excluded from the Definition of "Pipeline Facility." ..............................34

C. PHMSA's Newfound Position That the LFC Facilities Are a "Pipeline Facility" Fails to Satisfy *Fox Television*. ..........................................................................35

III. PHMSA's Continuous Carriage Theory Misinterprets the PSA, but the Onshore Pipelines Would Nonetheless Be Considered *Intra*state under Any Iteration of a Continuous Carriage Test. ..........................................................................38

A. The LFC Facilities Interrupt the Carriage of Hazardous Liquid by Taking It Out of "Transportation," as Defined in the PSA. ...............................................................39

B. Even Under General Commerce Clause Jurisprudence, the LFC Facilities Break the Flow of Commerce. ....................40

C. PHMSA's Application of its New Continuous Carriage Test Violates *Fox Television*. ..................................................42

IV. Writ Large, PHMSA's Jurisdictional Determination Represents an Unjustified Change in Position that Fails to Satisfy *Fox Television*. ....................43

CONCLUSION ....................47

STATEMENT OF RELATED CASES ....................49

CERTIFICATE OF COMPLIANCE ....................50

CERTIFICATE OF SERVICE ....................51

# TABLE OF AUTHORITIES

## Cases

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) .......... 47

*Arkadelphia Milling Co. v. St Louis Sw. Ry. Co.*,
249 U.S. 134 (1919) .......... 40, 41, 42

*Crescent Cotton Oil Co. v. Mississippi*,
257 U.S. 129 (1921) .......... 42

*Dehoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) .......... 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 46

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*,
283 U.S. 465 (1931) .......... 40, 41, 42

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 45, 46

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 13, 14, 17, 36, 37, 44, 45, 46

*FCC v. Prometheus Radio Proj.*,
592 U.S. 414 (2021) .......... 16

*Fed. Power Comm'n v. Moss*,
424 U.S. 494 (1976) .......... 15

*Flowers Foods, Inc. v. Brock*,
608 U.S. 380 (2026) .......... 9, 38

*GPA Midstream Ass'n v. U.S. Dep't of Transp.*,
67 F.4th 1188 (D.C. Cir. 2023) .......... 47

*Kelly v. Rhoads*,
188 U.S. 1 (1903) ....................................................................................38

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................15

*Marchese v. Shearson Hayden Stone, Inc.*,
822 F.2d 876 (9th Cir. 1987)....................................................................23

*Maryland v. Louisiana*,
451 U.S. 725 (1981) ................................................................................38

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025)................................................................ 17, 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................ 16, 17

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .............................................................................. 17, 37

*North Haven Bd. of Educ. v. Bell,*
456 U.S. 512 (1982) ................................................................................23

*Ohio v. EPA*,
603 U.S. 279 (2024) ................................................................................16

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) (en banc)............................................ 17, 37, 45

*Price v. Stevedoring Servs. of Am., Inc.*,
697 F.3d 820 (9th Cir. 2012) (en banc)....................................................30

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006)....................................................................18

*Roberts v. Levine*,
921 F.2d 804 (8th Cir. 1990)....................................................................41

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) .......................................................................................39

*S. Pac. Pipe Lines Inc. v. U.S. Dep't of Transp.*,
796 F.2d 539 (D.C. Cir. 1986) ........................................................ 20, 22, 23, 38

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
878 F.3d 725 (9th Cir. 2017)...........................................................................17

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .....................................................................47

**Statutes**

5 U.S.C. § 706 ............................................................................................ 14, 15

5 U.S.C. § 706(2)(A).................................................................... 14, 15, 16, 17

5 U.S.C. § 706(2)(C)........................................................................... 14, 15, 17

49 U.S.C. § 60101(a)(4)..................................................................................35

49 U.S.C. § 60101(a)(5).......................................................... 9, 12, 24, 36, 37

49 U.S.C. § 60101(a)(7).......................................................... 19, 20, 23, 38, 39

49 U.S.C. § 60101(a)(8)(B)(i)........................................................................ 19, 20

49 U.S.C. § 60101(a)(10)................................................................................19

49 U.S.C. § 60101(a)(22)...................................................................... 12, 21, 39, 41

49 U.S.C. § 60101(a)(22)(A) ........................................................................ 32, 36

49 U.S.C. § 60101(a)(22)(A)(i) ............................................ 13, 25, 32, 33, 34, 37

49 U.S.C. § 60101(a)(22)(B)(ii) ............................................................... 13, 34, 35

49 U.S.C. § 60104(c) .........................................................................................7

49 U.S.C. § 60105 ........................................................................................37

49 U.S.C. § 60105(a) ...................................................................................7

49 U.S.C. § 60119 ........................................................................................47

49 U.S.C. § 60119(a) ...................................................................................2, 3

49 U.S.C. § 60119(a)(3) ...............................................................................14

**Rules**

9th Cir. R. 28-2.7 ..........................................................................................3

Fed. R. App. P. 28(f) .......................................................................................3

**Regulations**

40 C.F.R. § 112.1(b) ......................................................................................36

40 C.F.R. pt. 112, app. A ...............................................................................36

49 C.F.R. § 195.0 ............................................................................................33

49 C.F.R. § 195.2 ............................................................................................34

49 C.F.R. pt. 195, app. A ........................................................................ 22, 45

**Federal Register Notices**

50 Fed. Reg. 39,008 (Sept. 26, 1985) ..................................................... 20, 23, 33

**Legislative History**

*The Safety of Hazardous Liquid Pipelines: Regulated vs. Unregulated Pipelines: Hearing Before the Subcomm. on Railroad, Pipelines, and Hazardous Materials of the Comm. on Transp. and Infrastructure*, 111th Cong. 68 (2010) (statement of Cynthia Quarterman, Adm'r, PHMSA), https://www.congress.gov/111/chrg/CHRG-111hhrg57251/CHRG-111hhrg57251.pdf ........................................................22

**Other Authorities**

PHMSA Glossary, https://primis.phmsa.dot.gov/stakeholder-comms/glossary (last visited Nov. 9, 2026) ...................................... 12, 18, 21, 22

*Use*, Black's Law Dictionary (12th ed. 2024) .......................................................20

*Use*, Black's Law Dictionary (5th ed. 1979) .........................................................20

## TABLE OF ACRONYMS AND TERMS

| | |
|---|---|
| Consent Decree | Consent Decree entered in *United States v. Plains All American Pipeline*, U.S. District Court for the Central District of California, No. 2:20-cv-02415 |
| Continuous Carriage Theory | PHMSA's theory that the Onshore Pipelines are *inter*state not because they cross a state border, but because they engage in commerce that does |
| ESP | Emergency Special Permit |
| FERC | Federal Energy Regulatory Commission |
| LFC Facilities | Las Flores Canyon Oil and Gas Facilities |
| MOU | Memorandum of Understanding |
| Offshore Pipeline | Subsea produced emulsion pipeline that extends from federal waters to the LFC Facilities |
| Onshore Pipelines | Pipelines CA-324 and CA-325, f/k/a Lines 901 and 903 |
| OS&T | Offshore Storage and Treatment Vessel |
| OSFM | California Office of the State Fire Marshal |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| *PHMSA I* | Consolidated Case Nos. 25-8059 and 26-508 |
| PSA | Hazardous Liquid Pipeline Safety Act, 49 U.S.C. §§ 60101–60143 |

| | |
|---|---|
| Single Pipeline Facility Theory | PHMSA's theory that the Offshore Pipeline, LFC Facilities, and Onshore Pipelines form a single, contiguous "pipeline" that extends from federal waters to Pentland Station |
| SYU | Santa Ynez Unit |

## INTRODUCTION

In December 2025, the federal executive, at the behest of Sable Offshore Corp. ("Sable"), launched a two-pronged assault on California's state sovereignty to force open defective pipelines CA-324 and CA-325 (the "Onshore Pipelines").

First, the Pipeline and Hazardous Materials Safety Administration (PHMSA) purported to seize jurisdiction of the pipelines from California's Office of the State Fire Marshal (OSFM) and issued a series of controversial approvals facilitating their restart. Shortly thereafter, the Secretary of Energy, under a novel interpretation of the Defense Production Act, issued an order purportedly *compelling* Sable to operate the lines. Emboldened by these actions, Sable restarted the Onshore Pipelines in open defiance of multiple court orders, state laws critical to protecting public health and the environment, and the property rights of public and private landowners.

This Petition for Review (Case No. 26-6190, Dkt. No. 1) challenges PHMSA's latest action: its issuance of a non-emergency Special Permit under the Hazardous Liquid Pipeline Safety Act (PSA), supported by a new Jurisdictional Determination. As directed by this Court's October 6, 2026, Bifurcation Order (Dkt. No. 175), Petitioners herein address only their claims bearing on PHMSA's lack of jurisdiction.

When PHMSA unilaterally reclassified the Onshore Pipelines as *inter*state, it had no basis to do so—indeed, nothing had changed since 2016, when PHMSA acknowledged their *intra*state nature. Yet, at Sable's behest, PHMSA did so anyway. And it has scrambled to justify its decision ever since, contriving an array of spurious theories, and continuously shifting its legal and factual positions for the convenience of litigation.

Continuing their arguments raised in Case No. 25-8059, Petitioners contend that any attempt by PHMSA to regulate the Onshore Pipelines—including by issuing the Special Permit—exceeds the agency's jurisdiction and authority, as the Onshore Pipelines are *intra*state facilities. Nothing in this new administrative record compels a different conclusion. Thus, Petitioners respectfully request that the Court set aside PHMSA's new Jurisdictional Determination, vacate the Special Permit, and restore regulatory authority of the Onshore Pipelines to the State.

## JURISDICTIONAL STATEMENT

"Regulations, orders, and other final agency actions" of PHMSA must be challenged by filing, within eighty-nine days, a Petition for Review in the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which the petitioner resides. 49 U.S.C. § 60119(a).

Petitioners are non-profit organizations that are headquartered or operate in California and whose members would be directly harmed by PHMSA's issuance of

the Special Permit and assertion of jurisdiction over the Onshore Pipelines. *See* Declarations of Petitioners (filed concurrently herewith). Petitioners timely filed their Petition for Review on September 22, 2026. Thus, jurisdiction in this Court is proper. *See* 49 U.S.C. § 60119(a).

## STATUTORY AND REGULATORY AUTHORITIES

In accordance with Federal Rule of Appellate Procedure 28(f) and Ninth Circuit Rule 28-2.7, all relevant statutory and regulatory authorities are provided in the Addendum to this brief.

## INCORPORATION BY REFERENCE OF PRIOR BRIEFS

Petitioners hereby incorporate by reference all briefs they have filed to date in consolidated Case No. 25-8059.

## STATEMENT OF THE ISSUES

Consistent with the Court's October 6, 2026, Bifurcation Order (Dkt. No. 175), this brief addresses only the two following, interrelated issues:

1. Did PHMSA exceed its jurisdiction in issuing the Special Permit because, contrary to PHMSA's new Jurisdictional Determination, the Onshore Pipelines are *intra*state facilities under the PSA?
2. Was PHMSA's new Jurisdictional Determination arbitrary, capricious, or otherwise not in accordance with law?

## STATEMENT OF THE CASE

Petitioners' prior briefs in Case No. 25-8059 set forth the factual and procedural background of this matter up to June 11, 2026, and Petitioners respectfully refer the Court to their Opening Brief (Dkt. No. 53) at 3–17 and Reply Brief (Dkt. No. 122) at 2–5. Petitioners here summarize the most salient facts previously stated, and then address new factual and procedural developments bearing on the Special Permit at issue in Case No. 26-6190.

### I. Overview of Relevant Facilities

Development of the Santa Ynez Unit (SYU) began in 1981 via a single platform, Hondo. 3-NGO_ER2-330. Oil emulsion produced at the platform—consisting of oil, water, brine, gases, and other impurities—was processed in a nearby Offshore Storage and Treatment Vessel ("OS&T") into "treated and stabilized" crude oil for sale to downstream refiners. 3-NGO_ER2-363–64; 3-NGO_ER2-332. The treated and stabilized crude was then transported to market directly from the OS&T by marine vessel. 3-NGO_ER2-364–65.

In 1982, ExxonMobil, the longtime owner of the SYU, proposed moving that processing function onshore as part of a planned expansion of SYU operations to its modern configuration. 3-NGO_ER2-333. The envisioned expansion included the addition of two new platforms (Harmony and Heritage) and, as relevant here, consolidated oil and gas treatment facilities located in Las Flores Canyon, just west

of Goleta, California (the "LFC Facilities"). 3-NGO_ER2-333. All oil emulsion produced at the offshore platforms would be transported via a 20-inch "produced emulsion pipeline" from Platform Harmony to the LFC Facilities (the "Offshore Pipeline"). 3-NGO_ER2-339. Once processed, treated and stabilized crude would then be transported "*via marine vessels* from a modernized nearshore marine terminal in approximately 140 feet of water." 3-NGO_ER2-333 (emphasis added).

Separately, in 1984, an unaffiliated company proposed building two buried pipelines—i.e., the Onshore Pipelines—that would service oil projects in the Gaviota Coast area, including the SYU. 3-NGO_ER2-311–12. The proposal was a subset of a larger project, known as the Celeron/All American Pipeline Project, which envisioned a pipeline route that would extend all the way to refineries in Midland, Texas. 3-NGO_ER2-313.

The Offshore Pipeline, LFC Facilities, and Onshore Pipelines were all operational by the early 1990s, and they have functioned in the same way since their inception. Oil emulsion produced offshore is transported to the LFC Facilities via the Offshore Pipeline. 3-NGO_ER2-333. The LFC Facilities, like the OS&T that preceded it, then extensively treat and refine that emulsion to create and prepare for sale certain oil and gas commodities. 2-NGO_ER2-111. The emulsion is "dehydrate[d], stabilize[d], and sweeten[ed] . . . to meet product specifications," and natural gases are stripped and separated, including propane, butane, and sulfur

products, and fuel quality gas. 2-NGO_ER2-111-12; *see also, e.g.,* 3-NGO_ER2-339–43. Ultimately, several new products are created from the raw emulsion, including "treated and stabilized crude" and marketable natural gases. 2-NGO_ER2-111-12; 3-NGO_ER2-339–43. The treated and stabilized crude is then transported via the Onshore Pipelines to Pentland Station for sale to downstream refiners. 2-NGO_ER2-95.

## II. The Refugio Oil Spill and Transfer of Jurisdiction to OSFM

In 2015, the Onshore Pipelines ruptured catastrophically at Refugio Beach State Park, spilling more than 120,000 gallons of heavy crude oil into the surrounding environment. 2-NGO_ER2-125–26. The spill was one of the largest oil disasters in California history, affecting approximately 150 miles of the California coast. 2-NGO_ER2-125–26.

Upon investigation, PHMSA determined that the rupture was the result of "progressive external corrosion," and that the Onshore Pipelines' cathodic protection system—intended to prevent such corrosion—is ineffective due to a design defect. 3-NGO_ER2-248. The same defect persists today, and progressive corrosion of the Onshore Pipelines remains pervasive.

Recall that, when initially permitted in the 1980s, the Onshore Pipelines were intended to be part of a larger pipeline system that would extend from Las Flores Canyon to Texas. Thus, the Onshore Pipelines were initially classified as

*inter*state facilities, which, pursuant to the PSA, placed them under PHMSA's jurisdiction. *See* 49 U.S.C. § 60104(c).

However, while the Onshore Pipelines were installed in the early 1990s, it is unclear if the broader project connecting them to Texas ever came to fruition, and, after the 2015 spill, it was acknowledged that the pipelines were not actually being used to transport crude oil out of state. 3-NGO_ER2-239–40. Thus, after the spill, the operator at the time cancelled its Federal Energy Regulatory Commission (FERC) certificates for the pipelines, and PHMSA formally reclassified them as *intra*state facilities that would be subject, per the PSA, to the exclusive regulatory authority of OSFM. 3-NGO_ER2-256–58; *see* 49 U.S.C. § 60105(a).

The reclassification of the Onshore Pipelines as *intra*state, and the corollary transfer of jurisdiction to OSFM, was memorialized in a 2016 Memorandum of Understanding (MOU) between PHMSA and OSFM. 3-NGO_ER2-256–58. And, in 2020, PHMSA agreed to be bound by a Consent Decree that confirmed the exclusive authority of the State. 2-NGO_ER2-132–233.

OSFM relied on the MOU and Consent Decree to require that Sable apply for State Waivers (the State equivalent of a Special Permit) to address the lack of effective cathodic protection on the lines. Sable so applied, and OSFM approved the Waivers in December 2024. 2-NGO_ER2-53–67; 2-NGO_ER2-68–82. OSFM then provided PHMSA with the opportunity to review the Waivers, and PHMSA

notified OSFM of its concurrence in February 2025, again confirming OSFM's regulatory authority. 2-NGO_ER2-49–50; 2-NGO_ER2-51–52. At no time during this process did either PHMSA or Sable object to OSFM's jurisdiction and regulatory oversight.

## III. PHMSA's Unlawful Federalization of the Onshore Pipelines and Shifting Litigation Positions

In December 2025, PHMSA suddenly reversed course. At the behest of Sable—whose application to restart the Onshore Pipelines was denied by OSFM pending further remediation—PHMSA unilaterally reclassified the Onshore Pipelines as *inter*state. 2-NGO_ER2-43–45. It then swiftly issued to Sable the Emergency Special Permit (ESP) and Restart Approval challenged in consolidated cases 25-8059 and 26-508 ("*PHMSA I*").

However, in its haste to force open the defective pipelines for Sable, PHMSA failed to offer any credible justification for its change in position. Nothing had changed in how the relevant facilities operate or function. But PHMSA suddenly reimagined them as a single *inter*state pipeline, claiming, in conclusory fashion, that the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines form a single, contiguous "pipeline" that extends from federal waters to Pentland Station (the "Single Pipeline Facility Theory"). 2-NGO_ER2-44–45. *Never before had PHSMA, or any other agency, construed these facilities as a single "pipeline."*

In their Opening Brief in *PHMSA I*, Petitioners pointed out the speciousness of PHMSA's position. To form a single "pipeline," the LFC Facilities would have to constitute a "hazardous liquid pipeline facility" under 49 U.S.C. § 60101(a)(5). But there was nothing in the record that even addressed how the LFC Facilities function. And all available evidence confirmed that the LFC Facilities are an oil treatment plant, not a "pipeline facility."

After reviewing Petitioners' Opening Brief, PHMSA unilaterally supplemented the record with documents pertaining to the LFC Facilities. *See* Dkt. No. 77 (Revised Certification). In its Answering Brief, it then claimed, post-hoc, that the LFC Facilities are a "pipeline facility." *Never before had PHSMA, or any other agency, considered the LFC Facilities to be a "pipeline facility" within PHMSA's jurisdiction.* Since their inception, the LFC Facilities have been exclusively regulated by state and local entities—primarily, Santa Barbara County and the California Geologic Energy Management Division.

Then, after filing its Answering Brief, PHMSA changed tack. When it became clear that the facts did not support PHMSA's *inter*state determination, it set out to change the law. Seizing on the Supreme Court's recent decision in *Flowers Foods, Inc. v. Brock*, 608 U.S. 380 (2026), it filed a Rule 28(j) letter advancing an interpretation of the PSA that would redefine the scope of the agency's jurisdiction. Dkt. No. 114. Therein, it suggested, for the first time, that

the Onshore Pipelines are *inter*state not because they cross a state border, but because they engage in commerce that does (the "Continuous Carriage Theory")—a departure from how the PSA has been understood for its entire forty-year history. Indeed, *never before had PHMSA interpreted the PSA in this way.*

## IV. The Special Permit and Proceedings Subsequent

On June 25, 2026, PHMSA issued a new Special Permit, 1-NGO_ER2-2–16, supported by a new Jurisdictional Determination, 1-NGO_ER2-17–36. The new Jurisdictional Determination appears to be an amalgamation of both PHMSA's Single Pipeline Facility and Continuous Carriage Theories. It maintains that the facilities form a single pipeline, but it ultimately suggests the Onshore Pipelines are *inter*state because they engage in interstate commerce.

During administrative review of the Special Permit, PHMSA received 25,408 public comments, including from Petitioners. The overwhelming majority of comments opposed the permit. Only twenty-four comments, or .001%, supported granting it.

After issuance of the Special Permit, Federal Respondents filed a Motion to Dismiss in *PHMSA I*, claiming that Petitioners' entire Petition was moot. Dkt. No. 127. The Court found that Petitioners' challenge to the ESP was moot, but reserved ruling on their challenge to the Restart Approval. Dkt. No. 145.

The Court held oral argument in *PHMSA I* on July 7, 2026. Thereafter, it ordered supplemental briefing on PHMSA's new Continuous Carriage Theory, Dkt. No. 132, which concluded on July 30, 2026. The Petitions for Review in *PHMSA I* now stand submitted.

On July 20, 2026, the State filed a new Petition for Review challenging the new Special Permit and associated Jurisdictional Determination (Case No. 26-4629, Dkt. No. 1). The NGO Petitioners followed suit on September 22, 2026 (Case No. 26-6190, Dkt. No. 1). Both cases have been consolidated with Case No. 25-8059. Dkt. No. 175.

Following an October 5, 2026, status conference, the Court bifurcated challenges raised in the new petitions that bear on the jurisdictional issue. Dkt. No. 175. This brief follows.

## SUMMARY OF THE ARGUMENT

The Onshore Pipelines are *intra*state, PHMSA's contrary finding in its Jurisdictional Determination was arbitrary and capricious, and the Special Permit is *ultra vires*, for the following reasons:

The PSA defines the jurisdictional character of a "hazardous liquid pipeline facility" by its physical footprint: "[a]n interstate pipeline is a pipeline that extends beyond the boundaries of one state," and "[a]n intrastate pipeline is a pipeline or that part of a pipeline that is entirely contained within one state's borders."

PHMSA Glossary, https://primis.phmsa.dot.gov/stakeholder-comms/glossary (last visited Nov. 9, 2026). This is not, to be clear, a new interpretation. It has been enshrined in case law for forty years, confirmed by Federal Respondents, and found critical to preserving the PSA's cooperative federalism scheme.

Accordingly, PHMSA's only viable theory of jurisdiction is its Single Pipeline Facility Theory—i.e., that the LFC Facilities bridge together the Onshore and Offshore Pipelines, forming a single "hazardous liquid pipeline facility" that spans from the Outer Continental Shelf (OCS) to Pentland Station. Thus, the jurisdictional inquiry here turns on a relatively narrow question: are the LFC Facilities a "hazardous liquid pipeline facility" under 49 U.S.C. § 60101(a)(5)?

As explained at length in prior briefing, they are not, as they are not used, or intended to be used, in "transporting hazardous liquid," as that term is defined in 49 U.S.C. § 60101(a)(22). And no materials in this new administrative record compel a different conclusion.

The basic functions of the LFC Facilities have not changed since their inception. But PHMSA's interpretation of them suddenly has. The agency now suggests, for the first time, that the LFC Facilities' sole function is "to facilitate further movement by pipeline," 1-NGO_ER2-32, and that they engage only in "transportation-related processing," 1-NGO_ER2-34. Yet the record shows that the LFC Facilities were designed and proposed without any regard for onshore

pipeline transportation, which did not yet exist. Instead, the record confirms that their intended function, like the OS&T that preceded it, is to process oil emulsion into sales-quality crude and natural gases—*not* to facilitate pipeline transportation.

To the extent the LFC Facilities have an *incidental* effect on pipeline transportation, that would not, as a matter of law, render them a "pipeline facility." Treatment incidental to transportation does not fall under the ambit of "transporting hazardous liquid." *See* 49 U.S.C. § 60101(a)(22)(A)(i). Plus, the LFC Facilities are expressly excluded from the definition of "pipeline facility" by virtue of being "onshore production, refining, or manufacturing facilities." 49 U.S.C. § 60101(a)(22)(B)(ii).

Thus, PHMSA's reimagining of the infrastructure here as a single "pipeline facility" is arbitrary and capricious, contravenes the PSA, and represents a sudden departure, without any justification, from over forty years of its own regulatory precedent, defying *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). The Onshore Pipelines are a distinct, *intra*state pipeline facility that begins and ends in state boundaries.

While that should be the end of the Court's inquiry, if the Court entertains PHMSA's new Continuous Carriage Theory, the result here would not vary. Because the LFC Facilities take hazardous liquid out of transportation for treatment and processing into new commodities, any subsequent carriage in the

Onshore Pipelines is not continuous with the carriage from the Offshore Pipeline, rendering the Onshore Pipelines *intra*state.

Lastly, PHMSA's reclassification of the Onshore Pipelines as *inter*state represents a wholesale deviation from its 2016 *intra*state determination that fails to comply with *Fox Television*. The only changed circumstances that PHMSA invokes to revisit its prior position are that (1) Sable has restarted the Onshore Pipelines and (2) all relevant infrastructure is now under Sable's unified ownership. Neither have any bearing on whether the Onshore Pipelines are *inter*state or *intra*state under the PSA.

In sum, no matter how the Court construes the PSA, the Onshore Pipelines are *intra*state facilities within the exclusive jurisdiction of the State, and PHMSA's Jurisdictional Determination to the contrary is arbitrary, capricious, and unlawful. Accordingly, in issuing the Special Permit, PHMSA exceeded the bounds of its jurisdiction and authority, requiring vacatur of the permit and the return to the State of regulatory oversight. *See* 5 U.S.C. § 706(2)(A), (C).

## STANDARD OF REVIEW

Pursuant to the PSA, final agency actions taken by PHMSA—e.g., the Special Permit—are reviewable under the standards set forth in the Administrative Procedure Act (APA). 49 U.S.C. § 60119(a)(3) (expressly incorporating 5 U.S.C. § 706). Under the APA, courts "shall hold unlawful and set aside agency action,

findings, and conclusions" found to meet any of the standards enumerated in 5 U.S.C. § 706. As it relates to PHMSA's jurisdiction, Petitioners' challenge invokes the standards in 5 U.S.C. § 706(2)(A) and (C).

Because the Onshore Pipelines are *intra*state, Petitioners claim PHMSA issued the Special Permit "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and "not in accordance with law," 5 U.S.C. § 706(2)(A). The scope of PHMSA's jurisdiction under the PSA—including how the statute delineates between *inter*state and *intra*state facilities—is a question of law that this Court reviews de novo, without deference to PHMSA, and according to standard means of statutory construction. *See Fed. Power Comm'n v. Moss*, 424 U.S. 494, 496 (1976) (a jurisdictional challenge is a matter of comparing the claimed excessive action with the pertinent statutory authority); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").

As to PHMSA's underlying findings and conclusions that bear on the jurisdictional character of the Onshore Pipelines—i.e., those in the Jurisdictional Determination—Petitioners challenge such findings under 5 U.S.C. § 706(2)(A).[1]

[1] To the extent the Jurisdictional Determination constitutes a discrete, independent agency action, Petitioners challenge it as a whole under 5 U.S.C. § 706(2)(A).

Section 706(2)(A) requires reviewing courts to hold unlawful and set aside agency findings and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021)). Under the arbitrary and capricious standard, reviewing courts "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Reviewing courts

> will strike down agency action as "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732–33 (9th Cir. 2017) (quoting *Motor Vehicle*, 463 U.S. at 43).

Further, "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 36 (9th Cir. 2025) (quoting *Nat'l Cable &*

*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). And, when an agency reverses or changes a prior position, such change only complies with the APA if the agency

> (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox Television*, 556 U.S. at 515–16).

## ARGUMENT

PHMSA's Jurisdictional Determination contradicted the agency's own, decades-long understanding of both the PSA and how the relevant facilities here function. And it reversed its own 2016 *intra*state determination without any new legal or factual basis or legitimate explanation. For the reasons that follow, the Onshore Pipelines are *intra*state; PHMSA's contrary finding in its Jurisdictional Determination was arbitrary, capricious, and unlawful; and the Special Permit was issued in excess of PHMSA's jurisdiction and authority, requiring that it be set aside. 5 U.S.C. § 706(2)(A), (C).

## I. The PSA Defines the Jurisdictional Character of a Pipeline Facility by the *Facility's* Start and End Points, Not Those of the Product Within.

For its entire forty-year history, the PSA has been understood to mark the contours of state and federal jurisdiction by the physical scope of hazardous liquid pipeline facilities: if a pipeline crosses a state border, it is *inter*state; if not, it is *intra*state. And indeed, that is the interpretation that PHMSA espouses on its own website even today: "[a]n interstate pipeline is a pipeline that extends beyond the boundaries of one state," and "[a]n intrastate pipeline is a pipeline or that part of a pipeline that is entirely contained within one's state's borders." PHMSA Glossary, https://primis.phmsa.dot.gov/stakeholder-comms/glossary (last visited Nov. 9, 2026).[2]

In its Jurisdictional Determination, PHMSA brusquely casts aside the interpretation that it has endorsed for decades. In its place, PHMSA advances an untenable interpretation of the PSA that would redefine the scope of the agency's jurisdiction—seemingly for the convenience of this litigation.

Petitioners' principal and supplemental briefs in Case No. 25-8059 addressed at length PHMSA's new interpretation and explained how the PSA

---

[2] This Court may take judicial notice of "matters of public record," *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006), which include "government documents," *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n. 5 (9th Cir. 2018).

delineates between *inter*state and *intra*state hazardous liquid pipeline facilities. Petitioners respectfully refer the Court to their Opening Brief (Dkt. No. 53) at 24–26, Supplemental Brief (Dkt. No. 134) at 5–15, and Supplemental Reply (Dkt. No. 141) at 2–7. However, for the Court's convenience, Petitioners summarize their position again here.

The PSA, at 49 U.S.C. § 60101(a)(7), provides that a hazardous liquid pipeline facility is "*inter*state" if it is "used to transport hazardous liquid in interstate or foreign commerce"—i.e., "commerce between a place in a State and a place outside that State," 49 U.S.C. § 60101(a)(8)(B)(i). *Intra*state facilities are defined by exclusion: any hazardous liquid pipeline facility that is not *inter*state is *intra*state. 49 U.S.C. § 60101(a)(10).

Relying on cases that do not address the PSA, including *Flowers Foods*, PHMSA seizes on the phrase "interstate commerce" in Section 60101(a)(7) to suggest that a pipeline facility is *inter*state if it is involved in transporting hazardous liquid in a continuous, interstate journey. *See* 1-NGO_ER2-25–26. In other words, instead of looking to the physical footprint of the facility at issue, and whether it crosses a state boundary, PHMSA posits that the jurisdictional character of a facility is instead defined by the product it carries.

PHMSA's interpretation—which departs, without explanation, from its own prior positions—is textually specious. PHMSA only reaches this interpretation by

reading the phrase "interstate commerce" in isolation, failing to give effect to Section 60101(a)(7) as a whole, and ignoring necessary statutory context. And, if adopted, it would lead to a stunning expansion of federal jurisdiction that deprives states of the "major role" that Congress reserved for them in pipeline safety. *Southern Pacific Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986) (quoting 50 Fed. Reg. 39,008, 39,011 (Sept. 26, 1985)). It is no wonder, then, that the D.C. Circuit rejected such an expansive reading of the statute in *Southern Pacific*—a forty-year-old decision that PHMSA's Jurisdictional Determination conspicuously fails to reconcile.

Start with the text. Reading the definition of "interstate hazardous liquid pipeline facility" in Section 60101(a)(7) together with the definition of "interstate or foreign commerce" in Section 60101(a)(8)(B)(i), as required, a hazardous liquid pipeline facility is *inter*state if it is "used to transport hazardous liquid in commerce between a place in a State and a place outside that State."

Properly construed, the inquiry under Section 60101(a)(7) has two components, each tied to the specific purpose (or "use") of the facility. *See Use*, Black's Law Dictionary (5th ed. 1979) ("[t]o make use of," where "use" means "[t]he purpose served, a purpose, object or end for useful or advantageous nature"); *see also Use*, Black's Law Dictionary (12th ed. 2024) ("To employ for the accomplishment of a purpose."). An *inter*state hazardous liquid pipeline facility is

a facility whose purpose is (1) to "transport hazardous liquid," as the term is defined in Section 60101(a)(22), *and* (2) to exchange or transport that hazardous liquid between a place in a State and a place outside of that State.

In other words, whether a pipeline facility is *inter*state turns on whether that specific facility is used to transport hazardous liquid across a state boundary. The inquiry is thus conterminous with the facility's physical scope: a pipeline is *inter*state if it operates between a point in one state and a point in another, such that the pipeline itself, in its own independent capacity, is transporting hazardous liquid across state lines. Put yet another way, the jurisdictional character of a facility is determined not by whether it is "involved" in some broader interstate journey of a *product*, but the points between which *that facility* is used to transport hazardous liquid.

Thus, as perhaps best articulated by PHMSA itself, "[a]n interstate pipeline is a pipeline that extends beyond the boundaries of one state," and "[a]n intrastate pipeline is a pipeline or that part of a pipeline that is entirely contained within one's state's borders." PHMSA Glossary, https://primis.phmsa.dot.gov/stakeholder-comms/glossary (last visited Nov. 9, 2026).

And this is the way the PSA has been understood to delineate jurisdiction for its entire forty-year history. It has been reflected in the statement of policy

appended to the Part 195 Regulations since 1985. 49 C.F.R. pt. 195, app. A (The PSA "defines interstate liquid pipeline facilities by the more commonly used means of specifying the end points of the transportation involved."). It was the position espoused and successfully defended by the United States in *Southern Pacific*. 796 F.2d at 542 (upholding the Secretary of Transportation's interpretation that "a wholly intrastate lateral" that transports hazardous liquid originating from another state "is nevertheless intrastate for purposes of the statute"). It was reaffirmed by the Administrator of PHMSA, in testimony to Congress, as recently as 2010. *See The Safety of Hazardous Liquid Pipelines: Regulated vs. Unregulated Pipelines: Hearing Before the Subcomm. on Railroad, Pipelines, and Hazardous Materials of the Comm. on Transp. and Infrastructure*, 111th Cong. 68 (2010) (statement of Cynthia Quarterman, Adm'r, PHMSA) ("[A] State is allowed to regulate exclusively a pipeline if located wholly within its borders."), https://www.congress.gov/111/chrg/CHRG-111hhrg57251/CHRG-111hhrg57251.pdf. It is the current position taken by PHMSA on its own website *today*. PHMSA Glossary, https://primis.phmsa.dot.gov/stakeholder-comms/glossary (last visited Nov. 9, 2026). And it was the framework by which PHMSA determined the jurisdictional character of the Onshore Pipelines at issue for their entire forty-year lifespan: when they were viewed as part of a larger pipeline facility that spanned from the LFC Facilities to Texas, PHMSA saw them

as *inter*state; but when, after the 2015 spill, it was recognized that they merely delivered hazardous liquid in-state, PHMSA reclassified them as *intra*state.

Against this backdrop, Congress has reauthorized, amended, or otherwise addressed the PSA on at least eight occasions, and it has never amended the statutory definition of "interstate hazardous liquid pipeline facility." *See* 1-NGO_ER2-17 (outlining the PSA's post-enactment legislative history). "[I]t is proper for this court to presume that Congress was aware of the existing administrative regulations and interpretations each time it reauthorized the Act," and that the legislative intent had been correctly discerned. *Marchese v. Shearson Hayden Stone, Inc.*, 822 F.2d 876, 878 (9th Cir. 1987) (citing *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535 (1982)).

In sum, this Court should interpret Section 60101(a)(7) in the same way it has been interpreted for the last four decades: the jurisdictional character of a facility is determined by looking to the *facility's* start and end points, not those of the product within. To the extent there is any ambiguity in Section 60101(a)(7), the Court should opt for the interpretation—i.e., Petitioners'—that most closely comports with Congressional intent that states retain a "major role" in pipeline safety. *Southern Pacific*, 796 F.2d at 542 (quoting 50 Fed. Reg. at 39,011).

## II. PHMSA's Single Pipeline Facility Theory Fails Because the LFC Facilities Are Not a "Pipeline Facility."

The upshot of the above is that PHMSA's only viable theory of jurisdiction is its Single Pipeline Facility Theory. That is, the *only* way the Onshore Pipelines can be considered *inter*state is if they form, together with the LFC Facilities and Offshore Pipeline, a single "hazardous liquid pipeline facility" that stretches from federal waters to Pentland Station.

A "hazardous liquid pipeline facility" includes "a pipeline, a right of way, a facility, a building, or equipment used or intended to be used in *transporting hazardous liquid.*" 49 U.S.C. § 60101(a)(5) (emphasis added). Thus, the jurisdictional inquiry here—i.e., whether the Onshore Pipelines are *inter*state or *intra*state—turns on a relatively narrow question: are the LFC Facilities used or intended to be used in "transporting hazardous liquid," such that they constitute a "hazardous liquid pipeline facility"?

As explained at length in prior briefing, they are not. Thus, all the infrastructure here cannot, by definition, be considered a single "pipeline facility"; the Onshore Pipelines are instead a distinct, *intra*state pipeline facility that begins and ends in state boundaries.

### A. The LFC Facilities Are Not a "Pipeline Facility" Because They Do Not "Move[] Hazardous Liquid by Pipeline," and PHMSA's Contrary Conclusion is Arbitrary, Capricious, and Unlawful.

The PSA affirmatively defines "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce." 49 U.S.C. § 60101(a)(22)(A)(i).

The parties do not appear to disagree about the basic processes that occur at the LFC Facilities—e.g., heating, separation, sweetening, and stabilization. These are uncontroverted facts that have remained the same from the inception of the facilities to today. Where the parties disagree, and where PHMSA has changed its position, is the import of these processes.

Echoing its Supplemental Brief, PHMSA's Jurisdictional Determination suggests that the LFC Facilities' sole function is "to facilitate further movement by pipeline," 1-NGO_ER2-32, and that they engage only in "transportation-related processing," 1-NGO_ER2-34. Petitioners' principal and supplemental briefs in Case No. 25-8059 addressed at length the folly of PHMSA's new position. As explained, the LFC Facilities were designed and proposed without any regard for onshore pipeline transportation, *which did not yet exist*. Like the OS&T that preceded it, their sole intended function is to process oil emulsion into sales-quality crude and natural gases—*not* to facilitate pipeline transportation. Hence, PHMSA

has never before considered them a "pipeline facility," and it has never purported to regulate them, even after claiming jurisdiction in December 2025.

To avoid repetition, Petitioners respectfully refer the Court to their Opening Brief (Dkt. No. 53) at 27–40, Reply Brief (Dkt. No. 122) at 9–16, and Supplemental Brief (Dkt. No. 134) at 19–21. The analysis that follows is limited to materials in the new record that were previously unaddressed—none of which change the invariable conclusion that PHMSA's construal of the LFC Facilities is arbitrary, capricious, and indefensible.

#### 1. PHMSA's Finding That the Sole Purpose of the LFC Facilities Is to Facilitate Pipeline Transportation Is Unsupported by, and Contradicts, the Record.

Recall that the administrative record in *PHMSA I* contained no information about the processing that occurs at the LFC Facilities—at least initially. After Petitioners filed their Opening Brief pointing out the speciousness of PHMSA's position, Federal Respondents unilaterally supplemented the record with documents addressing the LFC Facilities, which they claimed supported a finding that the LFC Facilities are merely transportation-related. *See* Dkt. No. 77 (Revised Certification). They did not. *See* NGO Reply Br. (Dkt. No. 122) at 10–15.

The administrative record for the Special Permit contains new, additional documents that describe the processing at the LFC Facilities.[3] Upon request, counsel for Federal Respondents identified four such documents they would rely on to support their jurisdictional argument, addressed in turn below:

*First* is the introduction section of a document dated September 15, 1991. 4-NGO_ER2-371–75. This is a four-page excerpt that includes a general overview of the LFC Facilities. *Id.* There is no new information in this document that is not already before the Court. It reiterates the same information contained, for example, in the SYU's 1982 Development and Production Plan and 2024 Air Pollution Control District Permit, submitted previously as 2-PSE-361–81 and 2-PSE-268–72, and now part of the new administrative record, *see* 3-NGO_ER2-328–48 and 2-NGO_ER2-110–14.

As with all prior evidence submitted, nothing in this document suggests that the LFC Facilities facilitate, or are intended to facilitate, pipeline transportation. Instead, it expressly states that the purpose of the facilities is to "receive produced oil/water emulsion and gas from the [SYU] offshore platforms and treat the oil,

[3] When Petitioners filed their Opening Brief in *PHMSA I*, they moved the Court to supplement the record with, and/or take judicial notice of, a number of documents outlining how the LFC Facilities function and their intended purpose. All documents subject to that motion were attached to comments submitted in opposition to the Special Permit and are thus part of the new administrative record.

gas, water and other by-products *to acceptable product quality specifications* prior to shipment by pipeline *or* truck to their destinations." 4-NGO_ER2-372 (emphasis added). In other words, the document confirms *Petitioners'* position—the status quo for forty years—that the intended function of the LFC Facilities is to process raw oil emulsion into saleable products like treated and stabilized crude and marketable natural gases.

*Second* is an excerpt from the same 1991 document that details the facilities' crude heat exchange and dehydration process—the first of multiple steps in the treatment process. 4-NGO_ER2-376–422. The document contains a more in-depth explanation of this process than was previously provided to the Court, but the additional details do not suggest that the process facilitates, or is intended to facilitate, pipeline transportation. Indeed, it does not include any statements regarding how, if at all, the process would affect pipeline transportation. In fact, the document does not even mention subsequent transportation by pipeline.

Instead, the document merely suggests that this process is intended "to produce a treated crude oil product with less than a 1% water cut." 4-NGO_ER2-384. Again, this supports *Petitioners'* position that the function of the facilities is to process oil emulsion into sales-quality crude—not to facilitate pipeline transportation.

*Third* is a contract between Sable and Chevron, a downstream refiner, that reflects an agreement to purchase the treated and stabilized crude produced at the LFC Facilities. 4-NGO_ER2-367–70. Addressing product quality, the agreement provides that quality will be measured by "[s]amples taken from the Sable Las Flores tankage"—i.e., the tanks where treated and stabilized crude is stored after treatment and prior to transportation—"in accordance with the latest ASTM measurement standards for the agreed to specifications." 4-NGO_ER2-367. The purchase agreement thus further confirms that the LFC Facilities are intended to, and do, produce from raw emulsion a crude oil product that meets the specifications of downstream purchasers of treated and stabilized crude.

So, none of these three documents suggest that the LFC Facilities facilitate, or are intended to facilitate, pipeline transportation. As with all other available evidence, they merely confirm the purpose of the facilities is to manufacture from raw emulsion sales-quality crude oil and marketable natural gases.

Which brings us to the *fourth* document cited by Federal Respondents: a June 25, 2026, memorandum filed by Dustin Hubbard, a regional director within PHMSA's Office of Pipeline Safety. 2-NGO_ER2-38–39. Citing, in part, the same documents just described, Mr. Hubbard found that the LFC Facilities "are necessary to facilitate the safe transportation of crude oil through [the Onshore Pipelines]," reframing each of the facilities' treatment processes as functions that

support pipeline transportation, as opposed to processes that convert oil emulsion into sales-quality products. 2-NGO_ER2-38–39. This memorandum appears to be the principal document that PHMSA relies on in its Jurisdictional Determination to conclude that the LFC Facilities merely "facilitate further movement by pipeline." 1-NGO_ER2-32.

Mr. Hubbard's findings are seemingly drawn from thin air. None of the documents he cites, described above, suggest that the LFC Facilities facilitate, or are intended to facilitate, pipeline transportation. And elsewhere in the record, Mr. Hubbard appears to embrace Petitioners' view of the LFC Facilities: hazardous liquid "comes in as an emulsion and leaves as a high-quality crude." 2-NGO_ER2-46. The Court should see the memorandum for what it is: a self-serving opinion prepared by PHMSA that strains to rationalize, post-hoc, the agency's seizure of the Onshore Pipelines six months after it asserted jurisdiction. *See Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 829–30 n.4 (9th Cir. 2012) (en banc) (courts are skeptical of agency interpretations where there are "signs that the agency's interpretation amounts to no more than a convenient litigating position[,] or an appearance that the agency's interpretation is no more than a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack" (citation modified)).

These findings, which PHMSA espouses in its Jurisdictional Determination,

are not only unsupported—and in some cases, contradicted—by the documents Mr. Hubbard cites, but inexplicably conflict with all available evidence about the LFC Facilities. The administrative record is replete with documents describing the LFC Facilities as an "oil treatment plant" whose function is to manufacture and refine oil emulsion into sales-quality products. *See, e.g.,* 2-NGO_ER2-110–14 (Air Pollution Control District Permit); 3-NGO_ER2-328–48 (1982 Development and Production Plan); 3-NGO_ER2-259–309 (1985 Development and Production Plan Update); 4-NGO_ER3-371–75; 4-NGO_ER2-376–422. Neither Mr. Hubbard's memorandum nor the Jurisdictional Determination purports to address these contrary descriptions of the facilities.

As important, nor do they address the *history* of the LFC Facilities, which is dispositive of their purpose. Again, the LFC Facilities were designed and proposed without any regard for pipeline transportation, which did not yet exist. The LFC project predated the Onshore Pipelines, and the project proposal stated that, after treatment at the LFC Facilities, "[c]rude oil transportation will be via marine vessels." 3-NGO_ER2-333. The LFC Facilities' only purpose, thus, is to perform the same function as the OS&T that it replaced: to process oil emulsion into sales-quality crude oil, not to facilitate pipeline transportation.

Lastly, *the Hubbard Memorandum does not actually support PHMSA's conclusion* that the sole, intended function of the LFC Facilities is "to facilitate

further movement by pipeline." 1-NGO_ER2-32. It finds that certain "functions performed at the [LFC Facilities] are necessary to facilitate the safe transportation of crude oil through the [Onshore Pipelines]," but it does not opine that is the *only* function of the facilities, or even their *intended* function. 2-NGO_ER2-38.

2. <u>That the LFC Facilities May Have an Incidental Effect on Pipeline Transportation Does Not, as a Matter of Law, Render Them a "Pipeline Facility."</u>

At best, the Hubbard Memorandum supports a finding that the LFC Facilities have an *incidental* effect on pipeline transportation—particularly in light of the record evidence that makes clear the purpose of the facilities is to yield sales-quality products. *See, e.g.,* 2-NGO_ER2-110–14; 3-NGO_ER2-328–48; 3-NGO_ER2-259–309; 4-NGO_ER3-371–75; 4-NGO_ER2-376–422. And that is the position PHMSA took in prior briefing to this Court: "the [LFC Facilities are] . . . '*incidental* to the movement' of the crude oil from the Pacific Ocean to Pentland." PHMSA Ans. Br. at 2 (quoting 49 U.S.C. § 60101(a)(22)(A)) (emphasis added).

But the treatment of hazardous liquid "incidental" to transportation is not, as a matter of law, itself transportation for purposes of 49 U.S.C. § 60101(a)(22)(A)(i). The term "incidental" is used only once in the relevant definition here—only the "*storage* of hazardous liquid incidental to the movement

of hazardous liquid by pipeline" falls under the ambit of "transportation."[4] *Id.* (emphasis added). *Treatment* incidental to such movement does not.

The legislative history here is instructive. As initially drafted, the definition of "transporting hazardous liquid" included the words "or the treatment of hazardous liquids during the course of transportation." 50 Fed. Reg. at 39,010. But Congress specifically removed that phrase, apparently at the behest of industry, to narrow its scope. *Id.* at 39,011. Congress, thus, did not intend "transporting hazardous liquid" to encompass treatment facilities like LFC.

And indeed, under the narrower definition now codified, treatment equipment of the type used at the LFC Facilities does not "transport hazardous liquid" because it does not itself propel or cause movement of hazardous liquid through a pipeline—even if, as the Hubbard Memorandum suggests, they may have an incidental effect on such movement. 49 U.S.C. § 60101(a)(22)(A)(i). Hence, there are no Part 195 regulations that purport to regulate such equipment or processes. *See* 49 C.F.R. § 195.0 (Part 195 regulates "pipeline facilities used in the

[4] The Jurisdictional Determination's reference to "breakout tanks" at the LFC Facilities is a red herring. Before December 2025, the two LFC tanks were never considered "breakout tanks" incidental to pipeline transportation. *See* Sable Ans. Br. at 10, n. 3 ("Sable did not label the two LFC tanks as 'breakout tanks.'"); 2-NGO_ER2-48 ("[T]he facility does not include breakout tanks."). But even if they are, hazardous liquid is only directed here *after* being taken out of transportation for processing, and the Onshore and Offshore Pipelines become noncontiguous.

transportation of hazardous liquids”). The type of equipment that does “transport hazardous liquid” is exemplified in 49 C.F.R. § 195.2, under the definition of “pipeline or pipeline system,” which omits infrastructure used for treatment.

In sum, even on this new record, PHMSA’s finding that the LFC Facilities “transport[] hazardous liquid,” as the term is defined in 49 U.S.C. § 60101(a)(22)(A)(i), is arbitrary, capricious, and otherwise not in accordance with law.

### B. The LFC Facilities Are Production, Refining, and/or Manufacturing Facilities That Are Expressly Excluded from the Definition of “Pipeline Facility.”

PHMSA’s Single Pipeline Facility Theory fails for yet another reason. The PSA provides that facilities “moving hazardous liquid through . . . onshore production, refining, and manufacturing facilities” are not “transporting hazardous liquid,” and thus expressly excludes them from the definition of “pipeline facility.” 49 U.S.C. § 60101(a)(22)(B)(ii). And the LFC Facilities are facilities used for “production,” “refining,” and/or “manufacturing.”

Petitioners previously outlined their position on this issue in Case No. 25-8059, and they respectfully refer the Court to their Opening Brief (Dkt. No. 53) at 33–35 and Supplemental Brief (Dkt. No. 134) at 21–22. However, for the Court’s convenience, Petitioners summarize their position again here.

The LFC Facilities engage in production, refining, and manufacturing namely because they free oil emulsion of impurities (i.e., "refine") and create from that emulsion marketable products (i.e., "manufacture"), including natural gases and sales-quality crude oil. *E.g.,* 3-NGO_ER2-339–43. PHMSA's new Jurisdictional Determination reiterates its prior position that the Court ought to look to oil industry colloquialisms of those terms to ascertain their meaning. 1-NGO_ER2-30–31. But the PSA is not limited to petroleum products—"hazardous liquids" also includes "nonpetroleum fuel" and certain other "substance[s] the Secretary of Transportation decides may pose an unreasonable risk to life or property." 49 U.S.C. § 60101(a)(4). Thus, to understand Congress' intent here, the Court must look to the ordinary definitions of "manufacturing" and "refining" that Petitioners have offered, which would be common to all hazardous liquids, and not just oil.

When given such effect, the LFC Facilities constitute, as a matter of law, "onshore production, refining, and manufacturing facilities," 49 U.S.C. § 60101(a)(22)(B)(ii), and PHMSA's contrary finding is arbitrary and capricious.

### C. PHMSA's Newfound Position That the LFC Facilities Are a "Pipeline Facility" Fails to Satisfy *Fox Television*.

Lastly, PHMSA's determination here—that the LFC Facilities are a "pipeline facility" that "transport[s] hazardous liquid"—represents a change in position as to how it construes facilities. Thus, PHMSA's determination must be

scrutinized under the standard outlined in *Fox Television*, 556 U.S. at 515–16, which it fails to meet.

Again, PHMSA has never before construed the LFC Facilities as a "pipeline facility." Hence, it has never regulated the LFC Facilities—even before 2016, when both the Offshore and Onshore Pipelines were deemed *inter*state. In fact, at the time of its first jurisdictional analysis in December 2025, PHMSA *still* concluded the "Sable Offshore pipeline system consists of [the Offshore Pipeline] and [the Onshore Pipelines]"—i.e., not the LFC Facilities. 2-NGO_ER2-40. In other words, despite the contrary position now espoused by PHMSA, the agency presumed that the LFC Facilities do *not* constitute, and are *not* part of, a "pipeline facility."[5]

Whether a facility constitutes a "pipeline facility" is determined by the facility's function. 49 U.S.C. § 60101(a)(5), (a)(22)(A). And the LFC Facilities have performed the same treatment processes since their inception. There are thus no new circumstances to warrant any change in how PHMSA construes them. *Mont. Wildlife Fed'n*, 127 F.4th at 36 ("Unexplained inconsistency' between

[5] Nor has it ever disavowed that the facilities are subject to the federal Spill Prevention, Control, and Countermeasure rule, which, as expressly recognized by PHMSA, applies only to facilities that are non-transportation related. 40 C.F.R. § 112.1(b); 40 C.F.R. pt. 112, app. A.

agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" (quoting *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981)).

As important, PHMSA displays no "awareness that it is changing position" in its Jurisdictional Determination. *Fox Television*, 556 U.S. at 515. Indeed, it does not address, or even mention, how the LFC Facilities have historically been viewed and regulated—yet alone provide a "reasoned explanation" for disregarding its prior classification of the LFC Facilities. *Id.* at 516.

For this reason, too, PHMSA's finding that the LFC Facilities "transport[] hazardous liquid," such that they constitute a "pipeline facility," is arbitrary and capricious. *See id*. at 515–16; *accord Kake*, 795 F.3d at 966.

In conclusion, the LFC Facilities are not used in "transporting hazardous liquid," as the term is defined, and thus cannot be considered a "pipeline facility." 49 U.S.C. § 60101(a)(5), (a)(22)(A)(i). Consequently, the totality of the infrastructure here—the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines—cannot properly be cast as a single "pipeline facility." Thus, the Onshore Pipelines are a distinct, *intra*state "pipeline facility" that lies beyond the reach of PHMSA's jurisdiction. 49 U.S.C. § 60105.

## III. PHMSA's Continuous Carriage Theory Misinterprets the PSA, but the Onshore Pipelines Would Nonetheless Be Considered *Intra*state under Any Iteration of a Continuous Carriage Test.

In advancing its new theory of jurisdiction, PHMSA improperly superimposes onto the PSA jurisprudence interpreting the Commerce Clause and various inapposite statutes, suggesting that hidden in the PSA is a "continuous carriage" test. *See* 1-NGO_ER2-26 (citing *Kelly v. Rhoads*, 188 U.S. 1 (1903), which addressed the constitutionality of a state tax under the Commerce Clause; *Maryland v. Louisiana*, 451 U.S. 725 (1981), which did the same; and *Flowers Foods*, 608 U.S. 380, which interpreted the scope of Section 1 of the Federal Arbitration Act).

To read into the statute a "continuous carriage" test would fail to give effect to the plain meaning and intent of 49 U.S.C. § 60101(a)(7); open a circuit split, *see Southern Pacific*, 796 F.2d at 542; and eviscerate the PSA's cooperative federalism scheme. But should the Court nonetheless do so, the result here would not vary. As explained at length in Petitioners' supplemental briefs in Case No. 25-8059, because the LFC Facilities take hazardous liquid out of transportation for treatment and processing, the subsequent carriage in the Onshore Pipelines is not continuous with the carriage from the Offshore Pipeline, rendering the Onshore Pipelines *intra*state. Petitioners respectfully refer the Court to their Supplemental Brief (Dkt.

No. 134) at 15–26 and Supplemental Reply (Dkt. No. 141) at 7–13. However, for the Court's convenience, Petitioners summarize their position again here.

### A. The LFC Facilities Interrupt the Carriage of Hazardous Liquid by Taking It Out of "Transportation," as Defined in the PSA.

Should the Court read into 49 U.S.C. § 60101(a)(7) some sort of "continuous carriage" test, as PHMSA urges, such test would need to be informed by the specific language and context of the PSA. *See, e.g., Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context with a view to their place in the overall statutory scheme.'" (citation omitted)). This is particularly salient given how widely commercial journeys—and interruptions in such journeys—vary between products.

When it comes to *hazardous liquids*, Congress has already given voice to what constitutes a continuous journey, and at what point that journey is interrupted. It did so in 49 U.S.C. § 60101(a)(22), which defines when hazardous liquid is in "transport."

Thus, even under a "continuous carriage" test, we would return to the same paradigm as the Single Pipeline Facility Theory. Whether the Onshore Pipelines are *inter*state ultimately turns on whether the processing that occurs at the LFC Facilities interrupts "transportation," as defined in 49 U.S.C. § 60101(a)(22).

As explained *supra* Part II, hazardous liquid is taken out of "transportation" at the LFC Facilities, where oil emulsion is processed into new marketable products, including treated and stabilized crude and natural gases. Thus, the carriage that follows from the LFC Facilities in the Onshore Pipelines (of sales-quality crude) is not continuous with the preceding carriage in the Offshore Pipeline (of oil emulsion). It is, instead, a distinct *intra*state journey.

### B. Even Under General Commerce Clause Jurisprudence, the LFC Facilities Break the Flow of Commerce.

Commerce Clause jurisprudence has formulated two principal tests to determine whether a product's journey in commerce is continuous. The first, from *Arkadelphia Milling Co. v. St Louis Sw. Ry. Co.*, is that the flow of commerce is interrupted where a product undergoes a process "that materially change[s] its character, utility, and value." 249 U.S. 134, 151 (1919). The second, from the later-decided *East Ohio Gas Co. v. Tax Comm'n of Ohio*, is that commerce is interrupted where a product is "treated, prepared for sale, and sold at retail." 283 U.S. 465, 471 (1931).

In supplemental briefing, the parties offered well over a dozen cases addressing interruptions in commerce, or non-interruptions, in various settings that apply these tests. Again, however, the Court need not—and should not—strain to analogize to this morass of case law, as the PSA already provides a ready framework to determine whether the journey of hazardous liquid is continuous in

49 U.S.C. § 60101(a)(22). But should the Court do so, the Onshore Pipelines would still be considered *intra*state.

PHMSA's argument boils down to the following: the LFC Facilities' *sole* function is "to facilitate further movement by pipeline," 1-NGO_ER2-32, and they engage *only* in "transportation-related processing," 1-NGO_ER2-34. Thus, it says, the LFC Facilities are akin to a warehouse; crude oil comes into the LFC Facilities, and crude oil goes out. PHMSA's new construal of the LFC Facilities strains credulity. As explained *supra* Part II, it is unsupported by, and contrary to, the facts in the record; fails to satisfy *Fox Television*; and fundamentally mischaracterizes the processing that occurs at LFC.

Indeed, the LFC Facilities take a raw material, oil emulsion, and extensively treat, process, and refine it to create and "prepare for sale" products that differ in "character, utility, and value." *E. Ohio Gas*, 283 U.S. at 471; *Arkadelphia*, 249 U.S. at 151. They remove brine from the emulsion, dehydrate the emulsion, and break it "by a combination of elevated temperature, chemical addition, and [an] electrostatic field." 3-NGO_ER2-340–41; *see Roberts v. Levine*, 921 F.2d 804, 808 (8th Cir. 1990) (the first step in a process that interrupts the commerce of soybeans is "heat[ing] and "dr[ying]"). They strip out natural gases, fractionate them, and sweeten oil in a "crude stripping tower" via "counter-current[] contact[] with sweet natural gas." 3-NGO_ER2-342; *see Crescent Cotton Oil Co. v. Mississippi*, 257

U.S. 129, 136 (1921) (separation of cotton seed from fiber, like gas from oil, interrupted commerce). They reduce the pressure of the product through stabilization. 2-NGO_ER2-112; *see E. Ohio Gas*, 283 U.S. at 471 (reducing pressure interrupts commerce). And, at the end of this process, what emerges are materially distinct products from the oil emulsion that LFC receives: "treated and stabilized crude," "propane, butane, and sulfur products," and "fuel quality gas." 2-NGO_ER2-111; 3-NGO_ER2-343.

Accordingly, the LFC Facilities interrupt the flow of commerce. *See Arkadelphia*, 249 U.S. at 151; *E. Ohio Gas*, 283 U.S. at 471.

### C. PHMSA's Application of its New Continuous Carriage Test Violates *Fox Television.*

Lastly, the Onshore Pipelines have always transported hazardous liquid that is traceable to offshore production in federal waters. But PHMSA nonetheless classified them as *intra*state in 2016, acknowledging that that they "provide transportation service *from Santa Barbara County to Pentland Station, Kern County*." 3-NGO_ER2-256 (emphasis added). PHMSA has not offered any reasonable explanation for its change in position—either as to how it construes the function of the relevant facilities, *see supra* Part II.C., or as to its reclassification of the Onshore Pipelines writ large from *intra*state to *inter*state, discussed next. Thus, PHMSA's Continuous Carriage Theory fails for the additional reason that it defies *Fox Television*.

In sum, Sable does not sell oil emulsion, and it does not deliver oil emulsion to Pentland Station. It sells sales-quality crude oil and various natural gases, which are the products that exit the LFC Facilities for transportation to their intended in-state destinations. The process at the LFC Facilities that prepares those products for sale takes hazardous liquid out of "transportation" and breaks the flow of commerce. Thus, under any iteration of a continuous carriage test, the onward transportation of sales-quality crude in the Onshore Pipelines constitutes a distinct *intra*state journey, rendering the pipelines *intra*state.

## IV. **Writ Large, PHMSA's Jurisdictional Determination Represents an Unjustified Change in Position that Fails to Satisfy *Fox Television*.**

In 2016, PHMSA determined that the Onshore Pipelines were *intra*state because they do not transport oil out of state, and it instead acknowledged that they "provide transportation service *from Santa Barbara County to Pentland Station, Kern County*." 3-NGO_ER2-256 (emphasis added). Then, in 2020, PHMSA agreed to be bound by a Consent Decree that confirmed the *intra*state nature of the pipelines. *See* 2-NGO_ER2-227. And as recently as 2025, PHMSA concurred with OSFM's State Waivers, once again confirming OSFM's authority over the *intra*state lines. 2-NGO_ER2-49–52. It was only when OSFM subsequently denied Sable's application to restart the Onshore Pipelines—citing unremediated areas of severe corrosion—that PHMSA reversed its position, acquiescing to Sable's plea for federal intervention to circumvent state pipeline safety standards.

In doing so, however, PHMSA failed to provide "good reasons" for the change or a "reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox Television*, 556 U.S. at 515, as explained in prior briefing. And PHMSA's new Jurisdictional Determination suffers the same flaw.

As discussed, both PHMSA's Single Pipeline Facility Theory and Continuous Carriage Theory turn on how the relevant infrastructure here functions—i.e., the Offshore Pipeline, the LFC Facilities, and the Onshore Pipelines. And all of these facilities perform the same exact function they always have. The Offshore Pipeline carries oil emulsion to the LFC Facilities; the LFC Facilities process that emulsion into, *inter alia*, treated and stabilized crude; and the Onshore Pipelines carry that treated and stabilized crude to Pentland Station.

The only changed circumstances that PHMSA cites in its Jurisdictional Determination are that (1) the Onshore Pipelines have restarted and (2) all the infrastructure here is now under unified ownership. 1-NGO_ER2-35–36. Neither justifies deviating from its 2016 determination.

First, the operational status of a pipeline facility—active, idled, or abandoned—has no bearing on whether it is *inter*state or *intra*state. If it did, *all* dormant pipelines would be *intra*state, regardless of their geographic bounds, because they do not transport oil. This is contrary to PHMSA's own guidance. *See,*

*e.g.*, 49 C.F.R. pt. 195, app. A, Example 8 (pipeline under construction that will cross state lines is interstate).

In any event, when PHMSA classified the pipelines as *intra*state, it did so while expressly contemplating their "potential restart." 3-NGO_ER2-257. The determining factor underlying the decision was how, when active, the pipelines operate. And post-restart, they function in the same exact way as they always have.

Second, that Sable is the current owner of the Offshore Pipeline, LFC Facilities, *and* the Onshore Pipelines is irrelevant. Under any interpretation of the PSA offered by the parties, the jurisdictional character of a pipeline facility is determined purely by how it functions—not by who owns it. Notably, these assets came under ExxonMobil's common ownership in 2022, and PHMSA did not then make an *inter*state determination. 2-NGO_ER2-115–17.

Accordingly, PHMSA has neither provided "good reasons" nor a "reasoned explanation" for its sudden change in position—including a "detailed justification" for its departure from its 2016 finding that the Onshore Pipelines merely "provide transportation service from Santa Barbara County"—a place within California—"to Pentland Station"—another place in California. 3-NGO_ER2-256; *Fox Television*, 556 U.S. at 515; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (rejecting regulation that represented a change in agency's position without a "reasoned explanation"); *Kake*, 795 F.3d at 968 (rejecting an

agency's change in position that was not based on new circumstances and finding that it improperly discarded its previous factual findings without proper justification).

Equally fatal, PHMSA did not address the "significant reliance interests involved" here. *Encino Motorcars*, 579 U.S. at 222; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Since 2016, OSFM, the regulated industry, and the public have substantially relied on PHMSA's determination that the Onshore Pipelines are *intra*state and subject to OSFM regulation. Based on the MOU and Consent Decree, OSFM required Sable to apply for State Waivers that adopted stricter state pipeline safety standards; sought and obtained PHMSA's concurrence; and, once final, defended the Waivers in litigation. And the public relied on the State's authority to impose and enforce its own safety standards, which culminated in OSFM denying Sable's restart application when it found Sable had not complied with the Waivers. PHMSA completely ignored these significant reliance interests when it issued its Jurisdictional Determination.

Accordingly, the Jurisdictional Determination must be set aside as arbitrary and capricious. *Fox Television*, 556 U.S. at 515–16.

## CONCLUSION

For the reasons above, Petitioners respectfully request that the Court grant their Petition for Review, set aside PHMSA's new Jurisdictional Determination, and vacate the Special Permit without remand. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022) (vacatur is the "presumptive remedy under the APA"); *GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1202 (D.C. Cir. 2023) (in successful challenge to a PHMSA action under 49 U.S.C. § 60119, remedy was to grant petition for review and vacate PHMSA's action); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (where agency action was *ultra vires*, vacating without remand).

Dated: November 9, 2026

Respectfully submitted,

s/ *Jeremy Frankel*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

s/ *Julie Teel Simmonds*
Julie Teel Simmonds
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY

*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## STATEMENT OF RELATED CASES

This action is consolidated with the following related cases: *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.,* Case No. 25-8059; *State of California v. Pipeline and Hazardous Materials Safety Administration, et al.*, Case No. 26-508; and *State of California v. Pipeline and Hazardous Materials Safety Administration, et al.,* Case No. 26-4629.

**Signature:** s/ *Jeremy Frankel* **Date:** November 9, 2026

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** No. 25-8059, 26-508, 26-4629, 26-6190

I am the attorney or self-represented party.

**This brief contains 10,136 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[**X**] complies with the length limit designated by court order dated October 6, 2026.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ *Jeremy Frankel* **Date:** November 9, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Opening Brief on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

I certify that I served the foregoing Opening Brief via email to all registered case participants on this date because it is a sealed filing and therefore cannot be served via the Appellate Electronic Filing system.

**Signature:** s/ *Jeremy Frankel* **Date:** November 9, 2026